## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

**MARY PHILLIPA SLEDGE, MARY JANE PIDGEON SLEDGE TRUST, and PIDGEON SLEDGE FAMILY LIMITED PARTNERSHIP**

**Plaintiffs,**

**v.**

**INDICO SYSTEM RESOURCES, INC. and CLEAL WATTS, III**

**Defendants.**

Civ. 2:13-cv-2578

## COMPLAINT

Plaintiffs, for their causes of action against the Defendants named above, respectfully state to this Honorable Court as follows:

### NATURE OF THE CASE

1.     This case arises from the fraudulent investment scheme perpetrated by the Defendants consisting of the solicitation of approximately $5 million from Plaintiffs to purchase alleged gold dust mined in the Republic of Ghana, as further detailed herein.  Defendants made material misrepresentations that misled Plaintiffs into believing that they were actually purchasing unrefined gold dust and that they would realize a sizeable return on their investment in a relatively short period of time.  Upon information and belief, no gold was ever purchased and Defendant Cleal Watts, III, intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.  As a direct result, Plaintiffs have suffered considerable damages.

## PARTIES

2.      Plaintiff Mary Phillipa Sledge ("Sledge") is an adult resident citizen of Shelby County, Tennessee.

3.      Plaintiff Mary Jane Pidgeon Sledge Trust ("MJPS Trust") was established by trust agreement, dated February 9, 2005.  The situs of the MJPS Trust is located in Shelby County, Tennessee, and the Trustees of the MJPS Trust are Mary Jane Pidgeon Sledge and Phillipa Sledge.

4.      Plaintiff Pidgeon Sledge Family Limited Partnership ("PSFLP") is a Tennessee limited partnership with its domicile and principal office located in Shelby County, Tennessee.  Phillipa Sledge is a Manager and duly authorized representative of PSFLP.

5.      Defendant Cleal Watts, III ("Watts"), is a resident of Dallas, Texas.   Upon information and belief his home address is 8926 Forest Hills Blvd., Dallas, Texas 75218.

6.      Defendant Indico System Resources, Inc. ("Indico") is a Texas corporation.  The registered agent for Indico is Cleal Watts, III, and the address of the registered agent is 5280 Trail Lake Drive, Suite 14, Fort Worth, Texas 76133 and/or 8926 Forest Hills Blvd., Dallas, Texas 75218.

7.       Each Defendant is liable for his/its own conduct, as well as the acts and omissions of his/its servants, employees, agents, and contractors, including each other Defendant, by virtue of the doctrines of agency, apparent agency, implied agency, employer/employee relations, master/servant relations, loaned servant relations, joint venture, joint and several liability, *respondeat superior*, vicarious liability, and contract.  At all times

pertinent, Watts was an employee, agent, or servant of Indico and was acting both in his individual capacity as well as in his capacity as an employee and/or agent of Indico.

## JURISDICTION AND VENUE

8.    This Court has diversity jurisdiction over Defendant Indico, a Texas corporation, pursuant to 28 USC § 1332(a) and (c), because it is both incorporated and has its principal place of business in Texas, and because the amount in controversy for all claims exceeds $75,000.

9.    This Court has diversity jurisdiction over Defendant Watts, a Texas resident, pursuant to 28 USC § 1332(a) and because the amount in controversy for all claims exceeds $75,000.

10.    In addition, this Court has federal question jurisdiction under 28 USC § 1331, because several of the causes of action arise under the Securities Act of 1933, *codified* at 15 U.S.C. § 77a, and the Securities and Exchange Act of 1934, *codified* at 15 U.S.C. § 78a.

11.    This Court has personal jurisdiction over both Defendants because Defendants together solicited Plaintiffs at their home and principal offices in Tennessee and consummated the fraudulent transactions in the state of Tennessee.  Defendants also sent and received millions of dollars in funds to and from Plaintiffs' banks located in Memphis Tennessee.  Both Defendants purposefully directed their activities toward the Plaintiffs in Tennessee, and purposefully availed themselves of the privilege of transacting business in Tennessee.

12.    Venue is proper in the United States District Court for the Western District of Tennessee pursuant to 28 USC § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in the Western District of Tennessee.

## FACTUAL ALLEGATIONS

## Summary of Facts

13.     Defendants have and are continuing to perpetrate a fraudulent scheme upon Plaintiffs.  The fraudulent scheme involves the Defendants' solicitation of approximately $5 million to purchase alleged gold dust mined in Ghana, as further detailed herein.

14.     Defendants have entered into transactions in the State of Tennessee by soliciting millions of dollars in investments from the Plaintiffs who are Tennessee residents.  Furthermore, the transactions complained of herein were consummated in the State of Tennessee.  At all times relevant to the allegations, Defendants knew that Plaintiffs were residents of Memphis, Tennessee.  Defendants purposefully directed their activities toward the Plaintiffs in Tennessee, and purposefully availed themselves of the privilege of transacting business in Tennessee.

15.     The details of the fraudulent scheme are summarized as follows:

        (a)     Defendant Watts solicited Plaintiffs by representing that he and Defendant Indico owned and/or had relationships with entities that owned gold mines in the Republic of Ghana.  Watts proposed an investment opportunity whereby Plaintiffs would purchase unrefined gold dust.

        (b)     Watts represented that the gold dust would be purchased by Plaintiffs in its unrefined form and then shipped from Ghana by charter plane to Texas to be refined at a refinery owned by Defendants or one of their affiliates.  Watts enticed Plaintiffs with the representation that the unrefined gold dust to be purchased was of the highest quality and was assessed to be more than 91% pure.   Watts further stated that upon completion of the refining process the gold purchased would be worth up to thirty percent (30%) more than the original investment and that the Plaintiffs would realize considerable profits upon the completion of the refining process in a

4

relatively short period of time.  Watts stated that this rate of return was based upon actual historical results of similar investments that he had handled for other investors.

(c)     Watts represented to Plaintiffs that based upon previous deals he had executed prior to the date of purchasing, the shipment of the gold dust from Ghana to the Texas refinery and the completion of the refining process would be just a few months.  Watts represented that upon the completion of the refining process, Plaintiffs would be able to realize cash in the amount of the investment plus the forecasted profits.

(d)     In reliance on Watts' representations, Plaintiffs advanced $5,293,500 to the Defendants during the period of November 2011 through October 2012.

(e)     Beginning a few months after the initial investments and continuing until the time of the filing of this Complaint, Watts has been representing that various unavoidable events have arisen which have caused delays in the shipment of the gold dust from Africa to the Indico refinery in Texas.  According to Watts, on at least four separate occasions there were planes chartered specifically for the purpose of transporting the shipments of Plaintiffs' gold from the Republic of Ghana to the United States.  However, Watts stated that the shipments were not made due to various reasons.  To date, no shipments have been made.

(f)     Upon information and belief, all of the statements made by Watts to solicit Plaintiffs' investments described herein were false representations of material facts and Watts knew that such statements were false at the time he made them.  Upon information and belief, the statements made by Watts concerning the events allegedly causing the delay in the gold shipments were false representations of material facts, and Watts knew that such representations were false at the time he made them.  These misrepresentations misled Plaintiffs into believing that they were actually purchasing gold and that they would realize a sizeable return on their

investment in a relatively short period of time.  Upon information and belief, no gold was ever purchased and Watts intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.  Plaintiffs have suffered considerable damages which were the direct, foreseeable, and proximate result of Watts' materially misleading statements, acts and omissions.

## Specific Facts

16.      In or around November 2011, Plaintiff Phillipa Sledge was referred to Watts by a friend from Dallas, William (Bill) Hamilton, who told her that Watts was someone to contact about investing in the gold market.  Plaintiff Phillipa Sledge desired to diversify the Plaintiffs' investment portfolios in light of the volatility in the stock market.

17.       Phillipa Sledge and Watts began corresponding in or around November 2011. During those conversations Watts told Sledge that he and Defendant Indico were in the business of selling and refining gold, providing investment advice and opportunities for people interested in investing in the gold market, and providing money management services.

18.      Watts told Sledge that he was a medical doctor but had ceased to practice medicine and instead concentrated on various business endeavors including the gold investment business.   He said that he and his family had been involved the African gold market for many years and had achieved great success.

19.      Watts told Sledge that he and Indico owned and/or had relationships with entities that owned gold mines in the Republic of Ghana, and that he had been assisting investors achieve success in the gold market for years.  During these conferences Watts made the representations to Phillipa Sledge described in paragraphs 15(a) through 15(c) above, including the representations that his investors historically had realized on average a return on their investment of up to 30% over a period of just a few months and that he or his affiliate owned a precious

metals refinery in Texas.   These representations were false and Watts knew that these representations were false at the time he made them.

20.     Watts also told Sledge that Indico had another division which was in the business of money management and discretionary investing for investors.   Watts told Sledge that this money management division had historically achieved very high investment returns for investors.   These representations were false and Watts knew that these representations were false at the time he made them.

21.     On or about of November 23, 2011, Watts solicited an investment from Phillipa Sledge in the amount of $250,000.   On or about of November 22, 2011, Watts solicited an investment from PSFLP in the amount of $250,000.   On or about of December 1, 2011, Watts solicited an investment from MJPS Trust in the amount of $500,000.

22.     At the time of soliciting each of these investments, Watts represented to Sledge that the funds would be used to purchase unrefined gold from Ghana which would be shipped to the refinery owned by Defendants or their affiliate within just a few months.   Watts represented that the specific gold to be purchased had at least a 91% purity rate and that the anticipated return on the investment would be 30% once the gold was refined based upon the historical rate of return realized by others who invested with Watts.   Watts also represented that the shipment of the gold and refining of the gold should all be completed within a few months after the investment.   Upon information and belief, these representations were false and Watts knew that such representations were false at the time of making them.   Further, Watts and Indico were without the present intention to perform the commitments that were being made because there was in fact no gold to be purchased nor did the Defendants own or control a refinery as represented to the Plaintiffs.

23.     In reliance upon the representations of Watts, Plaintiffs invested and wired the following amounts from their bank accounts in Memphis to bank accounts identified and controlled by Watts.

|  | Date of Wire | Amount |
|---|---|---|
| Phillipa Sledge | 11/23/2011 | $250,000 |
| MJPS Trust | 12/01/2011 | $500,000 |
| PSFLP | 12/05/2011 | $250,000 |

24.     At the time of soliciting these investments, upon information and belief, Watts knew but did not disclose (i) that no gold was going to be purchased or refined, (ii) that there had not been a historic rate of return of 30%, and (iii) neither Defendants nor their affiliate owned a precious metal refinery.  Upon information and belief, no gold was in fact purchased and Watts intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.

25.     At various times over the months following the initial investments, Watts contacted Sledge and informed her that the shipments containing the gold purchased by the Plaintiffs were to be shipped soon and that the circumstances were very favorable for the Plaintiffs' investments.

26.     On or about the following dates, Watts solicited additional investments from the Plaintiffs:

**Phillipa Sledge**

| Date of Solicitation | Amount |
|---|---|
| December 1, 2011 | $250,000 |
| December 21/22, 2011 | $330,000 |
| February 2/3, 2011 | $50,000 |

October 10, 2012        $100,000

October 17, 2012        $85,000

**MJPS Trust**

| Date of Solicitation | Amount |
| --- | --- |
| December 5, 2011 | $750,000 |
| December 21/23, 2011 | $670,000 |
| January 13, 2012 | $500,000 |
| February 2/6, 2012 | $620,000 |
| April 17, 2012 | $1,250,000 |
| May 25, 2012 | $150,000 |
| June 22, 2012 | $300,000[1] |
| June 25, 2012 | $175,000[2] |
| July 26/27, 2012 | $350,000 |

**PSFLP**

| Date of Solicitation | Amount |
| --- | --- |
| January 12, 2012 | $1,300,000 |
| February 1/2, 2012 | $800,000 |
| June 22, 2012 | $700,000[3] |

27.    At the time of soliciting each of these additional investments, Watts represented to Sledge that the funds would be used to purchase unrefined gold from Ghana which would be shipped to the refinery owned by Defendants or their affiliate within a few months.  Watts

---

[1] This investment was originally made by another trust for the benefit of the Sledge family, but such investment and all rights related thereto have been assigned and transferred to MJPS Trust.

[2] This investment was originally made by another trust for the benefit of the Sledge family, but such investment and all rights related thereto have been assigned and transferred to MJPS Trust.

[3] This investment was originally made by another trust for the benefit of the Sledge family, but such investment and all rights related thereto have been assigned and transferred to PSFLP Trust.

represented that the specific gold to be purchased had a 91% or higher purity rate and that the anticipated return on the investment would be 30% once the gold was refined based upon the historical rate of return realized by others who invested with Watts.  Watts also represented that the shipment of the gold and refining of the gold should all be completed within a few months after the investment.  Upon information and belief, these representations were false and Watts knew that such representations were false at the time of making them.

28.     In reliance upon the representations of Watts, Plaintiffs invested and wired the amounts set forth above from their bank accounts in Memphis to bank accounts identified and controlled by Watts.

29.     At the time of soliciting these investments, upon information and belief, Watts knew but did not disclose (i) that no gold was going to be purchased or refined, (ii) that there had not been a historic rate of return of 30%, and (iii) neither Defendants nor their affiliate owned a precious metal refinery.  Upon information and belief, no gold was in fact purchased and Watts intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.

30.     Most of the above investments were evidenced by a document entitled "Soft Corporate Offer" signed by Watts and Indico and containing the misrepresentations set forth above.  One example of such document is attached hereto as Exhibit A.

31.     Despite Watts' statements that the gold would be shipped shortly after the time of the investments, Watts told Sledge that certain unavoidable events had occurred that caused delays in shipment.  According to Watts, on at least four separate occasions there were planes chartered specifically for the purpose of transporting the shipments of Plaintiffs' gold from the Republic of Ghana to the United States.  However, Watts stated that the due to various reasons,

including alleged concerns about a possible coup in the Republic of Ghana, a fire on one of the planes as it was taking off, an attempted theft of the gold and the premature landing of a plane that did not have sufficient fuel to make the complete trip, the gold shipments were delayed. Watts continued making representations as to various events causing delays in shipment right up until the time of the filing of this Complaint.  To date, no shipments have been made.

32.     Upon information and belief, the statements made by Watts concerning the events allegedly causing the delay in the gold shipments were false representations of material facts, and Watts knew that such representations were false at the time he made them.  Upon information and belief, no gold was ever purchased and Watts intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.

33.     At the time of soliciting each of the above described investments, Watts knew that Plaintiffs Phillipa Sledge and Mary Jane Pidgeon Sledge (Trustee of the MJPS Trust) resided in Memphis, Tennessee and that Plaintiff PSFLP had its principal office in Memphis.

34.     Each of the "Soft Corporate Offers" signed by Watts and Indico identified each of the Plaintiffs with Memphis addresses and provided for delivery of the purchased and refined gold to the Plaintiffs at their Memphis addresses.  All of the "Soft Corporate Offers" were signed by Plaintiffs in Memphis, Tennessee.

35.     Beginning in November 2011 and continuing through the time period of this Complaint, Watts made numerous telephone calls, sent numerous emails and sent at least one item by delivery service to the Plaintiffs in Memphis, Tennessee.  Additionally, Watts received and accepted money wires for millions of dollars from Plaintiffs' bank accounts located in Memphis, Tennessee.  Watts also sent to and received correspondence from Plaintiffs' CPA in Memphis.

36.     At all times pertinent to this Complaint, Watts utilized Indico in order to perpetrate the fraudulent scheme.   Indico's separate identity was a sham and should be disregarded in order to accomplish justice in this case.

37.     During the time period pertinent to this Complaint, Watts diverted assets away from Indico for his personal benefit without consideration and to the detriment of creditors, including the Plaintiffs. At the time of such diversion, Indico was (or became) insolvent and was not able to pay its obligations when and as they became due.  Watts used the corporation as a mere subterfuge in illegal transactions in order to make it appear as if the purported investments in gold were legitimate, when in fact they were not.

38.     Indico was the mere alter ego of Watts.  Upon information and belief, during the time period pertinent to this Complaint (a) Watts was the sole stockholder of Indico and its sole Director and only employee; (b) Indico was grossly undercapitalized; (c) Watts and Indico used the same office or business location and Indico's principal office was Watt's personal residence; (d) Watts used Indico as mere instrumentality or conduit for his fraudulent scheme; (e) Indico failed to observe corporate formalities and (f) Indico's funds were co-mingled with Watts' funds.

39.     To date, Plaintiffs have been able to recoup $4,086,500 of their investments[4], but the remaining $5,293,500 has not been repaid and has upon information and belief been misappropriated by Watts.

## COUNT I
## FRAUD CLAIM AGAINST WATTS

40.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

---

[4] Plaintiffs Sledge, MJPS Trust and PSFLP have recouped respectively, $50,000, $1,971,500 and $2,065,000.

41.     Defendant Watts is guilty of common law fraud by at least the following acts: The misrepresentations of material present and past facts made by Watts in connection with the solicitations of investments from Phillipa Sledge, MJPS Trust and PSFLP as described hereinabove, including but not limited to paragraphs 15, 18, 19, 20 and 25, and specifically

(a)     Watts represented to Sledge that the funds would be used to purchase unrefined gold from Ghana which would be shipped to the refinery owned by Defendants or their affiliate within just a few months.

(b)     Watts represented that the specific gold to be purchased had at least a 91% purity rate and that the anticipated return on the investment would be 30% once the gold was refined based upon the historical rate of return realized by others who invested with Watts.

(c)     Watts represented that he and Indico and/or one of their affiliates owned a refinery in Texas where the purchased gold was to be refined.

(d)     Watts also represented that the shipment of the gold and refining of the gold should all be completed within a few months after the investment based on his experience with previous investments.

42.     These representations were made at or about the time that each of the above described investments was made.

43.     These representations were false when made.

44.     Watts either knew that each representation was false or did not believe it to be true or Watts made each representation recklessly without knowing whether it was true or false. At the time of soliciting these investments, upon information and belief, Watts knew but did not disclose (i) that no gold was going to be purchased or refined, (ii) that there had not been a historic rate of return of 30%, and (iii) neither Defendants nor their affiliate owned a precious

metal refinery.  Upon information and belief, no gold was in fact purchased and Watts intended and did in fact unlawfully convert and misappropriate the invested funds to his personal use.

45.     To the extent a representation made by Watts involved a promise of future action, each such representation was made without the present intention to perform.

46.     Phillipa Sledge, MJPS Trust and PSFLP did not know that the representations were false when made and were justified in relying on the truth of the representations.

47.     Phillipa Sledge, MJPS Trust and PSFLP have sustained damages as a direct and proximate result of the representations in an amount of not less than $5,293,500 plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT II
### CONVERSION, TROVER AND MISAPPROPRIATION CLAIMS AGAINST WATTS

48.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

49.     Plaintiffs wired specific sums as described above to bank accounts controlled by Watts which were to be used to purchase gold.

50.     Watts unlawfully and without Plaintiffs' express or implied assent converted and misappropriated said sums to his personal use and did not use such sums for the intended purpose of purchasing gold.

51.     Plaintiffs have sustained damages as a direct and proximate result of the conversion and misappropriation in an amount of not less than $5,293,500 plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT III
### NEGLIGENT MISREPRESENTATION

52.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

53.     Watts is guilty of negligent misrepresentation by at least the following acts:  At that time of soliciting each of these investments described above, Watts represented to Phillipa Sledge that the funds would be used to purchase unrefined gold from Ghana which would be shipped to the refinery owned by Watts or his affiliate within a few months.  Watts represented that the specific gold to be purchased had at least a 91% purity rate and that the anticipated return on the investment would be 30% once the gold was refined based upon the historical rate of return realized by others who invested with Watts.  Upon information and belief, these representations were false at the time of making them, and Watts knew or should have known these representations were false at the time of making them and he failed to exercise reasonable care or competence in obtaining or communicating this information.

54.     To the extent a representation made by Watts involved a promise of future action, each such representation was made without the present intention to perform.

55.     Phillipa Sledge, MJPS Trust and PSFLP did not know that the representations were false when made and were justified in relying on the truth of the representations.

56.     Phillipa Sledge, MJPS Trust and PSFLP have sustained damages as a direct and proximate result of the representations in an amount of not less than $5,293,500 plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT IV
## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT BY WATTS

57.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

58.     Watts violated Section 47-18-101, *et seq.*, of the Tennessee Consumer Protection Act of 1977, by and in connection with the sale of the investments to the Plaintiffs, by directly or indirectly, engaging in an act or practice that was deceptive to Plaintiffs.

59.     Watts willfully and knowingly employed unfair and/or deceptive actions or practices towards Plaintiffs in the purchase of the investments.

60.     As a direct and proximate result of the misrepresentations, concealment, fraud, unfair and/or deceptive actions of Watts, Plaintiffs suffered loss and damage of not less than $5,293,500 plus additional damages to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.   Further, since such deception was practiced knowingly and willfully by Watts, Plaintiffs are entitled to an award of three times the actual damages sustained, along with such other relief as the Court considers necessary and proper.

## COUNT V
## VIOLATION OF §10(b) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND RULE 10b-5 BY WATTS AND INDICO

61.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

62.     During the time period described above, Watts and Indico disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934 (the "1934 Act") in that they

        (a)     intentionally employed devices, schemes and artifices to defraud;

16

(b)       made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)       engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Plaintiffs in connection with their investments.

64.       Phillipa Sledge, MJPS Trust and PSFLP have sustained damages as a direct and proximate result of the actions of Defendants in an amount of not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

**COUNT VI**
**VIOLATION OF §20(a) OF THE SECURITIES**
**AND EXCHANGE ACT OF 1934 BY WATTS**

65.       Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

66.       Watts acted as the controlling person of Indico within the meaning of §20(a) of the 1934 Act.  By virtue of his position with Indico and ownership of Indico stock, Watts had the power and authority to cause Indico to engage in the wrongful conduct complained of herein.  By reason of such conduct, Watts is liable to Plaintiffs pursuant to §20(a) of the 1934 Act.

**COUNT VII**
**CLAIM UNDER §12(1) OF THE SECURITIES**
**ACT OF 1933 AGAINST INDICO AND WATTS**

67.       Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

68.       This Count is brought pursuant to Section 12(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77l(1), against Indico and Watts.

69.     Each of the Plaintiffs' investments as described above was a "security" within the statutory definition contained in the Securities Act.

70.     Indico and Watts were each a "seller" of these investments for purposes of the Securities Act.

71.     Indico and Watts offered or sold such investments to the Plaintiffs in violation of the registration requirement of the Securities Act.

72.      At all times Watts was acting as Indico's agent who solicited these investments and both Watts and Indico were thought by the Plaintiffs to be among those from whom the Plaintiffs were purchasing the investments.  Watts played a significant role in the marketing of these investments and was the only marketer and solicitor of these investments.

73.     The Plaintiffs' investments as described above were not registered by Defendants as required by § 5 of the Securities Act.

74.     As a result Watts and Indico are jointly and severally liable to Plaintiffs for an amount of not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT VIII
## CLAIM UNDER §12(1) OF THE SECURITIES
## ACT OF 1933 AGAINST INDICO AND WATTS

75.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

76.     This Count is brought pursuant to Section 12(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77l(1), against Indico and Watts.

77.     Each of the Plaintiffs' investments as described above was a "security" within the statutory definition contained in the Securities Act.

78.     Indico and Watts were each a "seller" of these investments for purposes of the Securities Act.

79.     Indico and Watts each offered or sold these investments to Plaintiffs by use of means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which included untrue statements of a material facts or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

80.     Both Watts and Indico knew, or in the exercise of reasonable care could have known, of such untruths or omissions.

81.     The Plaintiffs did not know of such untruths or omissions and justifiably relied upon the statements and omissions of Defendants.

82.     As a direct and proximate result of the untruths or omissions, Plaintiffs suffered loss and damage of not less than $5,293,500 plus additional damages to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT IX
## BREACH OF CONTRACT BY WATTS AND INDICO

83.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

84.     Watts and Indico contracted with the Plaintiffs to provide Plaintiffs with the following:

(a)     an investment opportunity whereby Plaintiffs would purchase unrefined gold dust being mined in the Republic of Ghana;

(b)     a supply of gold to be purchased by Plaintiffs in its unrefined form and then shipped from Ghana by charter plane to Texas to be refined at a refinery owned by Watts or one of his affiliates;

(c)     said gold was to be of the highest quality, assessed to be more than 90% pure;

(d)     upon completion of the refining process the gold purchased would be worth up to thirty percent (30%) more than the original investment and the Plaintiffs would realize considerable profits upon the completion of the refining process within a few months after the initial investment; and

(e)     upon the completion of the refining process, Plaintiffs would be able to realize cash in the amount of the investment plus the forecasted profits.

85.     As consideration of the foregoing, the Plaintiffs made the investments described above.

86.     Watts and Indico breached the contracts with the Plaintiffs by failing to deliver the items described in Paragraph 78 above.

87.     As a direct and proximate result of these breaches, Plaintiffs have suffered damages in an amount not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT X
## BREACH OF FIDUCIARY DUTY BY WATTS

88.     Plaintiff re-alleges and incorporates by reference each of the foregoing allegations.

89.      Watts assumed broad fiduciary obligations to the Plaintiffs that extend beyond the individual transactions for at least the following reasons:

(a)     Plaintiffs placed trust and confidence in the faithful integrity of Watts to act as the gatekeeper and monitor with respect to investments in gold, who as a result gained superiority or influence over the Plaintiffs;

(b)     Watts represented to Plaintiffs that he had considerable experience and expertise in making investments in gold and in representing investors in the gold market;

(c)     Watts assumed control and responsibility over Plaintiffs' purported gold investment portfolio;

(d)     Watts assumed a duty to act for and/or give advice and guidance to Plaintiffs on matters falling within the scope of the relationship;

(e)     The investment advisor relationship assumed by Watts has traditionally been recognized as involving fiduciary duties.

90.     As a fiduciary, Watts could not in any way and under any circumstances act for himself or for anyone else other than the Plaintiffs without first making full and complete disclosure of the material facts to the Plaintiffs.  Watts was required to exercise the utmost good faith, loyalty, and honesty toward the Plaintiffs, and implicitly represented to Sledge that it had an adequate basis for the opinions or advice being provided.

91.     Watts breached his fiduciary duty to the Plaintiffs for among other reasons failing to disclose and affirmatively concealing the inherent conflicts of interest that existed in the purported gold investments.  Watts also breached his fiduciary and acted in bad faith through his self-dealing and knowing recommendation of fraudulent and materially defective investments which were contrary to the best interests of the Plaintiffs.  Watts also breached his fiduciary obligation to monitor properly the performance of the Plaintiffs' purported gold investments.

92.     As a direct and proximate result of these breaches, Plaintiffs have suffered

damages in an amount not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT XI
## NEGLIGENCE BY WATTS

93.     Plaintiff re-alleges and incorporates by reference each of the foregoing allegations.

94.     By virtue of his relationship with the Plaintiffs, Watts was obligated to perform his services with reasonable care to avoid causing injury to Plaintiffs.  Watts was required to use reasonable diligence and best judgment in an effort to accomplish the purpose of the engagement.

95.     Watts breached his obligations and was therefore negligent by, among other things, the following:

(a)     Recommending that Plaintiffs invest in the investments described above which at the time Watts knew, or should have known, were poor investments and contrary to the best interests of the Plaintiffs;

(b)     Failing to monitor properly the above described investments which at the time Watts knew, or should have known, were poor or extremely risky investments;

(c)     Failing to recommend in a timely manner that Plaintiffs withdraw and/or cease to make the above investments because, as Watts knew or should have known, such investments were poor investments and contrary to the best interests of Plaintiffs.

96.     As a direct and proximate result of these breaches, Plaintiffs have suffered damages in an amount not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT XII
## FRAUDULENT CONVEYANCE CLAIM AGAINST WATTS

97.     Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

98.     On information and belief, Defendant Indico has transferred real and/or personal property to Watts.

99.     All of the foregoing transfers were made with the intent or purpose to delay, hinder or defraud creditors of Indico, including the Plaintiffs, of their just and lawful debts owed within the meaning of Tenn. Code Ann. § 66-3-101.  All of the foregoing transfers were made with the actual intent to hinder, delay or defraud either present or future creditors, including the Plaintiffs, within the meaning of Tenn. Code Ann.  § 66-3-308.

100.    Further, all of the foregoing transfers of the transferred property were fraudulent as to the Plaintiffs without regard to actual intent under Tenn. Code Ann. § 66-3-305.

101.    Each of the foregoing transfers was made without fair consideration as defined by Tenn. Code Ann. § 66-3-304.

102.    Each of the foregoing transfers was made by Indico at a time when it was or was thereby rendered insolvent within the meaning of Tenn. Code Ann. § 66-3-302.

103.     Watts received such transfer with knowledge of the fraudulent nature of the conveyance and without paying fair consideration therefor.

104.    The Plaintiffs were prejudiced by the conveyances of the transferred property. Prior to the conveyances, the transferred property was unencumbered.  The transferred property is non-exempt valuable property which, in the absence of the conveyances, could have been used to satisfy debts owed to Plaintiffs.

105.    In accordance with Tenn. Code Ann. § 66-3-310 all of the foregoing conveyances should be set aside and annulled, and disregarded by this Court.  Said transfers are void pursuant to Tenn. Code Ann. § 66-3-101.

106.    As a direct and proximate result of these transfers, Plaintiffs have suffered damages in an amount not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation.

## COUNT XIII
## PUNITIVE DAMAGES AGAINST WATTS

107.    Plaintiffs re-allege and incorporate by reference herein as though fully set forth herein all of the foregoing paragraphs of this Complaint.

108.    Watts' bad faith conduct was reprehensible especially in light of the trust and confidence reposed in Watts by Plaintiffs.  Watts intentionally concealed his misconduct and has made no effort to make amends for his wrongful conduct.  Watts acted (1) intentionally, (2) fraudulently, (3) maliciously, and/or (4) recklessly, in deceiving Plaintiffs and in wrongfully misappropriating Plaintiffs' funds.

109.    Accordingly, an award of punitive damages in an amount of not less than $5 million is warranted and necessary in order to deter similar behavior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests the following relief:

1.    That process issue and that Defendants be made to answer or otherwise respond to the allegations of the Complaint.

2.    That the Plaintiffs be granted an award of damages to be proved at trial but not less than $5,293,500, plus additional amounts to be proved at trial, plus pre-judgment interest and costs and expenses of this litigation, plus punitive damages,

plus treble the damages awarded to Plaintiffs pursuant to the Tennessee Consumer

Protection Act.

3.     Any other relief to which Plaintiffs may be entitled.

Respectfully Submitted,

_s/ Darrell N. Phillips_____

PIETRANGELO COOK PLC
Anthony C. Pietrangelo BPR # 15596
John J. Cook BPR # 17725
Darrell N. Phillips BPR #30299
6410 Poplar Avenue, Suite 190
Memphis, TN 38119
901.685.2662
901.685.6122 (fax)
*dphillips@pcplc.com*
**Attorneys for Plaintiffs**