## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

---

**MARY PHILLIPA SLEDGE, MARY JANE**
**PIDGEON SLEDGE TRUST, and PIDGEON SLEDGE FAMILY**
**LIMITED PARTNERSHIP**

**Plaintiffs,**

**v.**

**INDICO SYSTEM RESOURCES, INC. and**
**CLEAL WATTS, III**

**Defendants.**

Civ. 2:13-cv-2578

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs submit this Memorandum in opposition to the Motion to Dismiss (Doc. No. 11) filed by Cleal Watts, III ("Watts") and Indico System Resources, Inc. ("Indico") and state as follows:

Defendants argue that this Court lacks jurisdiction because they were never physically present in Tennessee. This argument is without merit. For more than 20 months, Watts repeatedly called Plaintiff Mary Phillipa Sledge in Tennessee, and during those calls he misrepresented his experience in the gold industry, the purported value and the scheduled shipments of the alleged gold, and the events (e.g. threatened coup, fraudsters, Ghana court orders) that allegedly delayed the Plaintiffs' gold shipments. Over this period, Watts also sent emails to Ms. Sledge in Tennessee with false documents to support his fraud. Throughout, Watts continued to solicit millions from Plaintiffs. Where, as here, a defendant purposefully directs fraudulent communications into the forum that cause injury within the forum, a court has

jurisdiction even if he is never physically present in the State.  *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001).

**FACTS**

In November 2011, the Plaintiff Mary Phillipa Sledge (Ms. Sledge) first began speaking with Watts.  Ms. Sledge wanted to diversify her family's portfolios to include gold, and had been referred to Watts by a family friend.  In November and December 2011, Watts made several calls to Ms. Sledge in Memphis calling her number which had a "901" area code.  During these calls, Watts told Ms. Sledge that he and Indico were in the business of acquiring gold from Ghana, refining it at their refinery in Dallas and generating huge profits for themselves and others. During these calls, Watts said that he could do the same for Ms. Sledge's family and proposed to sell gold to them.  Watts said he had personal relationships with various African "chiefs", enabling him to obtain gold from Ghana more easily and cost effectively than others.  During these calls, Watts also said that the gold Ms. Sledge would purchase was 95% pure and had a built-in net profit of 30%, which would be realized within (at the latest) only a few months. [Declaration of Mary Phillipa Sledge ("Sledge Dec.") at ¶¶ 5-6, 9-10, attached as Exhibit A hereto].

In November 2011, Ms. Sledge told Watts that she and her mother Mary Jane Pidgeon Sledge lived in Memphis.  She told him that her mother was in her 80's, had multiple sclerosis, and was homebound.  Ms. Sledge told Watts that her own home was close to her mother and that, since 2003, when her father died, Ms. Sledge had spent the majority of her time caring for her mother in Memphis.  The statements in Watts's Affidavit implying that Ms. Sledge was a Kentucky resident or that Watts believed that she was a Kentucky resident are not true.  Ms. Sledge is a Tennessee resident and has never been a Kentucky resident.  Ms. Sledge did tell

Watts that her mother owned a house and several horses in Kentucky, and that occasionally Ms. Sledge would go there for short periods, but at all times Watts knew that the Plaintiffs were Tennessee residents.  Ms. Sledge gave Watts all of their contact information, including her home telephone number in Memphis, her personal cell phone number, and her mother's telephone number in Memphis, all of which had a "901" area code.  In addition to all of the Tennessee numbers, Ms. Sledge also gave Watts the Kentucky phone number.  [Sledge Dec. at ¶¶ 7-8].

On November 23, 2011, in reliance on Watts's representations, Ms. Sledge decided to send $250,000 to Indico, purportedly to purchase gold.  On November 29, 2011, Watts sent an email to Ms. Sledge in Memphis with a document describing the gold purchased as 95% pure with a built-in 30% net profit.  At the same time, Watts told Ms. Sledge that her family could purchase more gold of the same quality and value.  Ms. Sledge decided to invest more personally and on behalf of her mother's living trust ("MJPS Trust") and the family's limited partnership ("PSFLP").[1]  On December 1 and 5, 2011, in reliance on Watts, Ms. Sledge wired $1,750,000 to Indico purportedly to purchase gold. [Sledge Dec. at ¶¶ 14-15, 17].

On December 10, 2011, Watts sent an email to Ms. Sledge in Memphis with a schedule entitled "Philapa and Entities Au Buy/Sell Transactions", purportedly confirming the gold purchases.  "Au" is the element symbol for Gold.  Watts's email also stated that by year end he planned to fly to Ghana to pick up the gold shipment to bring to Dallas.  Watts had said that refining usually was completed within 48 hours from arrival in Dallas.  [Sledge Dec. ¶¶ 18-19].

Shortly after, Watts called Ms. Sledge in Memphis and said that her family could purchase more gold on the upcoming shipment.  Therefore, on December 21-23, 2011, Ms. Sledge wired $1 million to Indico, purportedly for the purchase of gold.  [Sledge Dec. ¶ 19].

---

[1] The Co-Trustees of MJPS Trust Ms. Sledge and her mother resided in Tennessee.  PSFLP was also domiciled in Tennessee.  [Sledge Dec. ¶¶ 3-4].

Over the next 18 months Watts made dozens of calls and sent numerous emails to Ms. Sledge in Memphis containing misrepresentations concerning the purported gold investments, and soliciting additional funds for investment.  The following table summarizes some of those.

| Date | Additional Fraudulent Communications sent to Tennessee |
|------|--------------------------------------------------------|
| 1/2012 | Watts called Ms. Sledge in Memphis and told her that he flew to Ghana to pick up the gold, but that on the way, his trip was cancelled and the plane returned due to the fear of a coup. Watts said that the shipment would occur soon, and that the Sledges could further participate in the upcoming shipment by wiring additional funds by January 11, 2012. [Sledge Dec. ¶ 20]. |
| 1/8/12, 1/13/12, 1/31/12 | Watts sent emails to Ms. Sledge in Memphis with schedules purportedly confirming Sledge family's gold purchases, along with schedules listing Memphis as residence of Ms. Sledge and PSFLP.  [Sledge Dec. ¶¶ 21, 23 and 25]. |
| 2/1/12 | Watts sent email to Ms. Sledge in Memphis stating that the Sledge gold was scheduled to be shipped from Ghana on that day and expected to arrive in Dallas on February 3, 2012. [Sledge Dec. ¶ 26]. |
| 2/3/12 | Watts sent email to Ms. Sledge in Memphis with a schedule identifying the particular gold investments purportedly on the shipment coming from Ghana.  [Sledge Dec. ¶ 28]. |
| 2/2012 | Watts called Ms. Sledge in Memphis and told her that shipment scheduled for 2/3/12 had been delayed.  [Sledge Dec. ¶ 29]. |
| 3/6/12 | Watts sent email to Ms. Sledge in Memphis with a schedule purportedly confirming Sledge family's gold purchases.  [Sledge Dec. ¶ 33]. |
| 4/9/12 | Watts sent email to Ms. Sledge in Memphis with a schedule purportedly confirming Sledge family's gold purchases, and purportedly showing that the gold purchased was 95% pure and had a 30% built-in profit.  The email also stated that the Sledge family's gold was scheduled to be shipped soon.  [Sledge Dec. ¶¶ 34-35]. |
| 4/2012 | Watts called Ms. Sledge in Memphis and told her that additional investment was necessary to ensure that gold would be shipped soon.  [Sledge Dec. ¶ 36]. |
| 4/2012 | Watts called Ms. Sledge in Memphis and told her that an attempt to ship gold had been made but that the plane did not have the required range and had to land in Antigua.  According to Watts, the gold was returned to Ghana.  [Sledge Dec. ¶ 37]. |
| 6/5/12 | Watts sent emails to Ms. Sledge in Memphis with an attached picture of gold bricks, representing that this gold was in Ghana and had been offered to him and Indico because of their good reputation for facilitating gold investments in Ghana.  [Sledge Dec. ¶ 39]. |
| 6/8/12 | Watts called Ms. Sledge in Memphis and said another shipment had been ready to leave Ghana but had been detained as a result of a court order.  Watts said three fraudsters had attempted to abscond with the gold, but had been intercepted by authorities and were facing criminal proceedings.  Watts said that the court in Ghana had ordered that the gold shipment be stayed pending the resolution of the criminal proceedings.  [Sledge Dec. ¶ 41]. |
| 6/8/12 | Watts sent an email to Ms. Sledge in Memphis with an attachment purporting to be a copy of a June 8, 2012 article entitled "Gold Fraudsters Passport Ceased" published in a Ghana newspaper known as the Ghana Daily Guide.  The article described the criminal proceedings and the court order staying shipment that Watts had also described.  [Sledge Dec. ¶ 42] This article was subsequently determined to be fraudulent.  [See Declaration of Stephen Zoure, reporter and editor for Ghana Daily Guide, attached as Exhibit B hereto]. |
| 6/2012 7/2012 | Watts called Ms. Sledge in Memphis several times and told her about the proceedings involving the 3 fraudsters.  Watts sent emails to Ms. Sledge with copies of articles and other documents which purportedly supported his story about the fraudsters and the order |

| | prohibiting shipment of the gold. [Sledge Dec. ¶ 44]. |
|---|---|
| 7/12/12 | Watts sent an email to Ms. Sledge in Memphis stating that the shipment with her family's gold was scheduled to leave Ghana on the evening of July 12, 2012 and would arrive in Dallas the following morning.    [Sledge Dec. ¶ 45]. |
| 7/2012 | Watts called Ms. Sledge in Memphis and told her that the plane with the shipment of her family's gold had left Ghana, but was forced to land in Guinea and then return to Ghana, by order of the Ghana "High Court of Justice."  According to Watts, the Ghana court issued the order at the request of Chief Alimany Kamara, the former owner of the gold who was seeking reimbursement of costs incurred in connection with the fraudster court proceedings. [Sledge Dec. ¶ 46]. |
| 7/2012 | Watts sent emails to Ms. Sledge in Memphis with documents purporting to support his story about the order and injunction issued by the Guinea Court.   [Sledge Dec. ¶ 47]. |
| 8/2012 | Watts called Ms. Sledge in Memphis and said matters involving the Ghana court had ended and that he expected that the shipment would leave Ghana soon.  [Sledge Dec. ¶ 48]. |
| 8/1/12 | Watts sent email to Ms. Sledge in Memphis with attached picture of what Watts claimed to be the plane he was going to charter for the gold shipment. [Sledge Dec. ¶ 48]. |
| 8/2012 | Watts called Ms. Sledge in Memphis and said that the plane with the gold shipment had left Ghana but that while en route the plane had mechanical problems and caught fire and the pilot had to make an emergency landing in Togo, Africa. [Sledge Dec. ¶ 49]. |
| 8/5/12 8/7/12 | Watts sent emails to Ms. Sledge in Memphis with attached documentation purportedly supporting his story about the emergency landing in Togo. [Sledge Dec. ¶ 50]. |
| 8/2012 9/2012 10/2012 | Watts made numerous telephone calls to Ms. Sledge in Memphis telling her that he was working very hard with various high level customs officials and others in order to arrange for the shipment of gold from Africa to Dallas.  He informed Ms. Sledge that significant additional costs had been incurred and that additional funds were necessary in order to arrange for the shipment. [Sledge Dec. ¶ 51]. |
| 12/3/12 | Watts sent an email to Ms. Sledge in Memphis with an attachment prepared by Watts showing the Sledge family's gold investments to be 95% pure with a built-in net profit of 30%. [Sledge Dec. ¶ 54]. |
| 12/4/12 | Watts sent an email to Ms. Sledge in Memphis with attachments that Watts identified as the "Ghana valuation papers" which included documents purporting to be an insurance policy issued with respect to the gold purchased by the Sledge family.  The purported policy was issued by a London company known as "Ince & Co."   [Sledge Dec. ¶ 55]  This document was later determined to be fraudulent.   [*See* Declaration of Benjamin Patrick Ogden, representative of Ince & Co., attached as Exhibit C hereto]. |
| 12/2012- 7/2013 | Watts continued to make numerous telephone calls and send numerous emails to Ms. Sledge in Memphis telling her the status of the purported gold investments and reporting on the unsuccessful efforts to get the shipments of gold to Dallas. [Sledge Dec. ¶ 57]. |

During this time, Watts solicited additional investments and assured Ms. Sledge that the gold was safe and told her that the only way to lose was to "give up."  In reliance on Watts' representations, the Plaintiffs made additional investments during the period from January to October 2012.  Also, during this time, when Ms. Sledge expressed concern over the delays and

5

her family's need for liquidity, Watts said that she could "borrow" some funds out of future profits.  At various times, Watts returned some of the funds.  [Sledge Dec. at ¶¶ 30-31, 38].

No gold has ever been shipped.  In July 2013, Ms. Sledge discovered that the information from Watts was false.  Watts had not used the funds for the purchase of gold, but rather he had converted the funds to his own personal use.  There had not been any shipments.  Moreover, none of the events Watts blamed for shipment delays had actually occurred.  [Sledge Dec. at ¶ 58]

The Plaintiffs' total investment with Defendants, reduced by the returned funds, is $5,293,500.  Prior to filing this lawsuit, the Plaintiffs requested that the Defendants return their investment to them, but the Defendants refused to do so.  [Sledge Dec. ¶ 59].

## LAW AND ARGUMENT

### I.      Rule 12(b)(2).

Defendants seek dismissal pursuant to Fed. R. Civ. Proc. 12(b)(2) for lack of *in personam* jurisdiction.  The plaintiff bears the burden of establishing jurisdiction. *ACH Food Companies, Inc. v. Wiscon Corp.*, 2005 WL 2114056, at *3 (W.D. Tenn. 2005).  Absent an evidentiary hearing on the issue of personal jurisdiction, the plaintiff "need only make a prima facie showing of jurisdiction." *Id.* (citing *Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir.2002)). The plaintiff may make a *prima facie* showing through presentation of specific facts, by affidavit or otherwise. *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991).  If there is no evidentiary hearing, the court will not consider facts from the defendant in conflict with those offered by the plaintiff, and will construe facts in the light most favorable to the plaintiff.  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  Under these circumstances, the plaintiff's burden is "relatively slight."  *American Greetings Corp. v. Conn*, 839 F.2d 1164, 1169 (6th Cir.

1988).  The Court, however, is not required "to ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiff." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997).  Nevertheless, "[d]ismissal in this procedural posture is proper only if *all* the specific facts which the plaintiff ... alleges collectively fail to state a *prima facie* case for jurisdiction." *ACH Food Companies,* 2005 WL2114056 at * 3.

## II.     This Court may exercise personal jurisdiction over the Defendants.

A federal court's exercise of personal jurisdiction in a diversity case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the 14th Amendment.  *Neogen Corp.*, 282 F.3d at 888.  In Tennessee, the long-arm statute extends the personal jurisdiction of Tennessee courts to the limits of Due Process.  TENN. CODE ANN. § 20-2-214(a)(6).  Therefore, the court need only determine whether the assertion of personal jurisdiction over the Defendants would violate the Due Process Clause.

Personal jurisdiction may be either general or specific.  General jurisdiction arises when "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Third Nat'l Bank v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989).  Specific jurisdiction, on the other hand, arises from contacts that are related to the specific cause of action. *ACH Food Companies,* 2005 WL 2114056 at * 8.

With respect to specific jurisdiction, the Sixth Circuit maintains a three-part test (known as the "Mohasco test") to determine whether a Court can exercise jurisdiction over a defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). Each part of the <u>Mohasco</u> test is satisfied in this case, and therefore this Court has specific jurisdiction over each Defendant.

> **A. Watts and Indico purposefully availed themselves of the privilege of acting in Tennessee or causing a consequence in Tennessee.**

Watts and Indico purposefully availed themselves of the privilege of acting or causing a consequence in Tennessee. "The 'purposeful availment' requirement is satisfied when the defendant's contacts with the forum state proximately result from actions by the defendant [itself] that create a substantial connection with the forum State, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1263 (6th Cir. 1996).

> 1. *Watts's fraudulent phone calls and emails sent to Plaintiffs in Tennessee constitute purposeful availment.*

Defendants contend that they did not "purposefully avail" themselves because they were never physically present in Tennessee and, according to Defendants, their telephone communications and emails to the Plaintiffs do not warrant a finding of specific jurisdiction. [<u>See</u> Defendants' Memorandum in Support ("Def. Memo") pp. 9-11].

Contrary to the Defendants' contention, making phone calls and sending false information into the forum, standing alone, **<u>can be sufficient</u>** to confer jurisdiction on the foreign defendant where, as here, such communications form the bases for the action. *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001). "When the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment. It is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'" *Id.*

In *Neal*, the plaintiffs owned a horse they wished to sell. *Id*. at 330. In 1997, the *Neal*

8

plaintiffs engaged the defendant as selling agent for the horse, which at the time was boarded in the Netherlands.  *Id*.   The *Neal* plaintiffs were Tennessee residents and met with the defendant in Florida.  *Id*.   The defendant was a citizen of Belgium who owned a house in Florida.  The defendant never came to Tennessee, but he made calls and sent facsmilies to the plaintiffs in Tennessee.  *Id*.

In January 1998, the *Neal* defendant called the plaintiffs' son in Tennessee about a possible buyer who offered $310,000.  *Id*.  The plaintiff's son said that was too low, but the defendant said that the plaintiffs had an unrealistically high value on the horse.  *Id*.  Later, the defendant called the plaintiffs' son again to say that the prospective buyer would pay $312,000. *Id*.  The defendant also said that because he had been unable to find a buyer at the plaintiffs' price, he would forgo his commission if plaintiffs accepted $312,000.  *Id*.  The plaintiffs therefore instructed defendant to sell the horse for $312,000, with no commission.  *Id*.  The plaintiffs subsequently learned, without disclosure from the defendant, that the buyer had actually paid the defendant $480,000 and the defendant had kept the difference between that and the money sent to the plaintiffs.  *Id*.

The *Neal* plaintiffs filed suit in the Middle District of Tennessee, and the defendant moved to dismiss on jurisdictional grounds.  The court denied the motion and, and the defendant appealed.  *Id*. at 330-331.  The Sixth Circuit found that even though the defendant was never physically present in Tennessee, he nevertheless "purposefully availed" himself of the privilege of acting or causing consequences in Tennessee.  According to the Court, because the actual content of the defendant's communications into Tennessee (*i.e.* misrepresentations about the price for the horse) gave rise to an intentional tort, those communications alone constituted purposeful availment.  *Id*. at 331-332.  The Court further noted that the actions of sending false

information into Tennessee had foreseeable effects in Tennessee and were directed at individuals in Tennessee. The Court found that the false representations were "the heart of the lawsuit--they were not merely incidental communications sent by the defendant into Tennessee." *Id*. at 332.

Similarly, in the present case, Watts and Indico "purposefully availed" themselves of the privilege of acting or causing a consequence in Tennessee by Watts' numerous fraudulent telephone calls and emails to the Plaintiffs in Tennessee.[2] For more than 20 months, Watts repeatedly telephoned Ms. Sledge in Tennessee and misrepresented his and Indico's experience in the gold industry, the purported value and the scheduled shipments of the gold, and the various events (such as the fraudsters, the Ghana court orders, a threatened coup) that allegedly prevented the Plaintiffs' shipments from leaving Ghana. Watts also sent emails to Ms. Sledge in Tennessee with falsified newspaper articles and other documents to support his fraud. Throughout this period, Watts continued to solicit and receive millions of dollars from the Plaintiffs.

As in *Neal*, these communications into Tennessee form the bases of the fraud claims, and were knowingly directed at, and affected, residents of Tennessee. The communications from Watts are "the heart of the lawsuit----they were not merely incidental communications sent by the defendant into Tennessee." These communications are therefore sufficient to show that Defendants purposefully availed themselves of the privilege of acting or causing consequences in Tennessee. *Neal v. Janssen*, 270 F.3d at 331-332.[3]

---

[2] Because Watts's was the president and owner of Indico, his contacts may be imputed to Indico for jurisdictional purposes. Further, as explained in Section III.A.4 below, Watts's fraudulent communications directed to Tennessee also warrant jurisdiction over him individually.

[3] *See also MedApproach Holdings, Inc. v. Hawkins*, 2012 WL 6568793, at *7 (M.D. Tenn. 2012) (finding purposeful availment where an out-of-state defendant made telephone calls containing fraudulent misrepresentations to plaintiff in Tennessee); *Mark Hanby Ministries, Inc. v. Lubet*, 2007 WL 1004169, at *11 (E.D.Tenn. 2007) (personal jurisdiction over defendant proper because she sent defamatory e-mails directed at a Tennessee resident

> 2. *Jurisdiction is proper regardless of whether Plaintiffs or Defendants made the first call because Watts "chose to deal" with the Plaintiffs and thereafter perpetrated a $5 million 20-month fraudulent gold scheme.*

In their Motion, the Defendants do not mention *Neal*, but instead cite *Rice v. Karsch*, 154 Fed. Appx. 454 (6th Cir. 2005), in support of the argument that there is no jurisdiction because, according to Defendants, the Plaintiffs initiated the first contact to Watts.  [Def. Mem. at 8-9].

As explained below, the facts in *Rice v. Karsch* are materially distinguishable from the case at hand.  Moreover, contrary to the Defendants' contention, the Sixth Circuit has stated that on the question of jurisdiction "the dispositive fact is ***not*** whether the plaintiff or the defendant initiated the contact between the parties, but whether the defendant ultimately 'chose to deal' with the plaintiff." *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 796 (6th Cir.1996) (emphasis added). Other Circuits have also recognized that a defendant need not initiate the "minimum contacts" to be regarded as purposefully availing himself of the privileges of acting in the forum state.[4]

Plaintiffs are not certain whether they or the Defendants made the *first* telephone call. However, for a 20-month period after that first call, Watts made dozens of telephone calls and sent numerous emails on his own initiative to Ms. Sledge in Memphis which contained fraudulent representations and false information regarding the purported gold investment.  By

---

and these emails were "the heart of the action"); *Phoenix Mining & Mineral LLC v. Treasury Oil Corp.*, 2007 WL 951866, at *5 (S.D.Tex. 2007) (finding that emails sent to plaintiff's representatives in Texas containing allegedly fraudulent statements were sufficient to establish personal jurisdiction).

[4] *See e.g. Christian Science Board of Directors v. Nolan*, 259 F.3d 209, 216–17 (4th Cir. 2001) (upholding exercise of personal jurisdiction where out-of-state defendant was invited to do business "within the context of his friendship and ongoing correspondence" with forum state resident, and "deliberately entered into a collaborative enterprise" with resident of the forum state); *Gen'l Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3rd Cir. 2001) ("It is not significant that one or the other party initiated the relationship. In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration."); *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir.1996) ("the constitutionality of jurisdiction does not turn on which party 'started it.' Rather, pinning down which party initiated the transaction is merely one helpful factor in the jurisdictional equation").

doing so, Watts and Indico were able to fraudulently convince Plaintiffs to invest $5 million. These communications were not merely incidental in response to a communication from the Plaintiffs, but rather were integral to Watts's deliberate efforts to establish and maintain his $5 million fraudulent gold scheme. Thus, even if the Plaintiffs did make the first call, it is irrelevant because the Defendants affirmatively "chose to deal" with the Plaintiffs and thereafter engaged in a 20-month scheme to defraud them out of $5 million. *Nationwide Mut. Ins.*, *supra*.

Defendants cite *Rice v. Karsch* contending there is no personal jurisdiction if the plaintiff makes the first communication with the defendant. [See Def. Memo. p. 8]. However, an accurate reading of that decision reveals that it does not support Defendants' contention in this case.

In *Rice*, the defendant Merchantonline.com was a Florida-based company that contracted with the plaintiff Pagan Lewis Motors, Inc., based in Tennessee, to sponsor Pagan Lewis's race-car team. *Rice,* 154 Fed.Appx. at 456. Merchantonline.com promised to pay Pagan Lewis $1.53 million over five months. *Id.* To secure performance, the defendant pledged its own stock and placed it in escrow with the plaintiff's broker Paine Webber. *Id*.

The *Rice* defendant breached the contract, so the plaintiff began efforts to liquidate the stock collateral. *Id*. at 456-457. On August 17, 2000, the plaintiff's representative contacted Michael Karsch, the general counsel for Merchantonline.com, and requested that he issue a notice authorizing transfer of the shares. *Id*. In response, Karsch notified plaintiff on August 31, 2000 that Karsch would instruct the transfer agent to place a stop transfer on the shares. *Id*. On September 15, 2000, Karsch spoke by telephone with plaintiff's broker at Paine Webber, and told her that she was not authorized to sell any shares on behalf of plaintiff. *Id*. Karsch then sent a confirmation email to the broker, who was allegedly located in Tennessee. *Id*.

The plaintiff filed suit in the Western District of Tennessee against Merchantonline.com,

and Karsh individually. *Id.* Karsch who had never been to Tennessee filed a motion to dismiss. *Id*. at 457. The District Court granted the motion, and the Sixth Circuit affirmed holding that the very few communications by Karsch into Tennessee were insufficient to constitute "purposeful availment." *Id.* at 463. The Court based its decision on the facts that the small number of communications made by Karsch in August and September 2000 were merely direct responses to the plaintiff's request to release the stock, that Karsch's contacts in Tennessee were not for the purpose of furthering his personal business or to create "continuous and substantial consequences there", and that there was no evidence that Karsch knew that the broker holding the stock was located in Tennessee. *Id*. at 462-463.

In the present case, by contrast, Watts's communications were not simply a response to a one-time request by the Plaintiff. Rather, Watts <u>deliberately and continuously</u> over 20 months telephoned and emailed Ms. Sledge in Memphis on his own initiative with fraudulent and false information to perpetrate his $5 million gold scam. In contrast to *Rice*, Watts's contacts *were* for the purpose of furthering his personal business or to create "continuous and substantial consequences" in Tennessee, namely his 20-month scheme to solicit and defraud the Plaintiffs out of $5 million.[5] Also, in contrast to the facts in *Rice*, there *is* evidence that Watts knew that the Plaintiffs were residents of Tennessee.

Another important distinction between *Rice* and the present case is the fact that the communications made by the defendant in *Rice* were not fraudulent and did not form "the heart of the lawsuit" as is the case here and in *Neal v. Jansen*. Because Watts purposefully directed the fraudulent communications into Tennessee and caused injury here, jurisdiction is proper.

---

[5] Watts's relationship with and impact on the Plaintiffs in this case was longer and more substantial (20 months, $5 million) than the relationship between the defendant and the plaintiffs in *Neal v. Jansen* (1 year or less, $480,000), where the court found that jurisdiction was appropriate. 270 F.3d at 330.

*Neal v. Jansen*, 270 F.3d at 333.   Where, as here, the action sounds primarily in fraud, the question of who initiated the first contact is even less significant in the jurisdictional analysis. *See MedApproach Holdings, Inc. v. Hawkins*, 2012 WL 6568793, at *6 (M.D.Tenn. 2012).   For these reasons, the holding in *Rice* is not applicable to the case at hand.

   *3.      Watts knew that the Plaintiffs were Tennessee residents.*

   The Defendants also contend that jurisdiction is not proper because at some point Ms. Sledge was a Kentucky resident. [Def. Memo at 9].   This is simply not true.   As her Declaration, driver's license and voter registration card show, Ms. Sledge was a Tennessee resident at all times relevant to the Complaint.   She has never been a Kentucky resident.   Further, Ms. Sledge told Watts in November 2011, that both she and her mother lived in Memphis.   Ms. Sledge told Watts that her mother was in her 80's and homebound in Memphis, that Ms. Sledge's home was just a few miles away, and that since 2003 when her father died, Ms. Sledge had spent the majority of her time caring for her mother. [Sledge Dec. at ¶¶ 7-8].

   Ms. Sledge did tell Watts that her mother owned a house and several horses in Kentucky, and that occasionally Ms. Sledge would go there for short periods, but at all times Watts knew that they were both Tennessee residents and sent fraudulent communications to Ms. Sledge while she was in Tennessee.[6]   In the course of their conversations, Ms. Sledge gave Watts all of their contact information, including Ms. Sledge's home telephone number in Memphis, her cell number, and her mother's number in Memphis, all of which had a "901" area code.   In addition to the Tennessee numbers, Ms. Sledge also gave Watts the Kentucky number.   [Sledge Dec. at ¶8].

---

[6]   In addition to Ms. Sledge's testimony that Watts knew the Plaintiffs were located in Memphis, there is documentary evidence showing that Watts knew the Plaintiffs were Tennessee residents. [Sledge Dec. ¶¶ 16, 21, 23 and 25]   Further, Watts arranged for flowers to be delivered to Mrs. Sledge at her Memphis home.   [Sledge Dec. ¶ 53]

The Plaintiffs have proffered evidence showing that at all relevant times the Defendants knew that the Plaintiffs were residents of Tennessee and directed their fraudulent communications to the Plaintiffs in Tennessee.  Where a court does not conduct an evidentiary hearing, <u>the court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff, and will construe the facts in the light most favorable to the plaintiff</u>. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  Thus, in such circumstances, the Defendants' claim that Ms. Sledge was a Kentucky resident should not be considered for purposes of the Motion to Dismiss.

> 4.     *This Court has jurisdiction over Watts individually.*

Defendants also argue that the Court does not have jurisdiction over Watts because he was only acting as a corporate officer for Indico.  [Def. Memo at 13].  This argument is without merit.  While it is true that "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation," the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those individuals.  *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683, 698 (6th Cir. 2000).  Where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; *i.e.*, whether he purposely availed himself of the forum and the reasonably foreseeable consequences of that availment.  *Id*.

In the present case, Watts was personally involved in the conduct giving rise to the claim--the fraudulent misrepresentations and false information regarding the gold scheme.  Indeed, Watts was the only agent of Indico involved in the fraudulent communications which form the

basis of this lawsuit and, for the reasons stated herein, such communications warrant the exercise of jurisdiction. *See FRC Intern., Inc. v. Taifun Feuerloschgeratebau und Vertriebs GmbH*, 2002 WL 31086104, at *6-7 (N.D. Ohio 2002) (finding jurisdiction over foreign corporation and its sole shareholder where the communications between the shareholder and the plaintiff formed the basis for the plaintiff's fraud and RICO claims).[7]

### B.   Plaintiffs' cause of action arises from the Defendants' Tennessee activities.

The second <u>Mohasco</u> requirement -- that the cause of action arise from the Defendants' forum state activities -- is also met in this case. The Defendants argue to the contrary stating that the Plaintiffs' cause of action arises from the alleged actions or inactions of Indico in supplying gold, which was to occur primarily in Africa and Dallas, not Tennessee. [Def. Mem. at 11].

The Defendants' argument is without merit because it mischaracterizes the Plaintiffs' claims. Here, as in *Neal*, the Plaintiffs' fraud and other claims arise out of the misrepresentations concerning the purported gold investment that the Defendants communicated to the Plaintiffs in Tennessee. In reliance on these communications, Plaintiffs invested over $5 million in the fraudulent gold scheme. Where, as here, a non-resident defendant purposefully directs fraudulent communications into the forum state which cause injury in that state, the second jurisdictional requirement for specific jurisdiction is satisfied. *Neal*, 270 F.3d at 332-333.[8]

---

[7]  *See also FlagHouse, Inc. v. ProSource Development, Inc.*, 528 Fed.Appx. 186 (3rd Cir. 2013) (finding that jurisdiction over foreign corporation's CEO was consistent with due process in suit alleging fraud where CEO made the alleged misrepresentations in the course of contacts with forum state); *Champion Food Service, LLC v. Vista Food Exchange*, 2013 WL 4046410 *4 (N.D. Ohio 2013) (sales manager who was personally involved with the alleged torts, including fraud, in the course of his employment with the corporation was subject to jurisdiction).

[8] *See also Erwin v. Piscitello*, 627 F.Supp.2d 855, 861 (E.D.Tenn. 2007) (concluding that court had jurisdiction over non-resident defendant who sold the plaintiff a car through eBay, because plaintiff's fraud claims arose from defendant's telephone calls and emails to the plaintiff in Tennessee misrepresenting the condition of the vehicle); *Mark Hanby Ministries, Inc. v. Lubet*, 2007 WL 1004169, at *11 (E.D.Tenn. Mar. 30, 2007) (personal jurisdiction over defendant was proper because she sent defamatory e-mails directed at a Tennessee resident and these emails were "the heart of the action").

**C.   The Defendants' $5 million fraudulent gold scheme has a substantial enough connection with Tennessee to make the exercise of jurisdiction reasonable.**

The third <u>Mohasco</u> requirement--that the Defendants' activities have a substantial connection to Tennessee such that the exercise of jurisdiction is reasonable--is also satisfied. "[W]here, as here, the first two criter[ia] are met, an inference of reasonableness arises and only the unusual case will not meet" the reasonableness prong. *Schneider v. Hardesty*, 669 F.3d 693, 703 (6th Cir. 2012). "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the [controversy]." *Id*. at 703-4.

All of these weigh in favor of jurisdiction in the present case.  First, as to burden, Defendants state that "litigating this matter in Tennessee would impose a great burden on Watts, a Texas resident", but they do not specify any reason why there would be such a "great burden." Further, "modern transportation and communications make it much less burdensome today for nonresident defendants to litigate and defend themselves in Tennessee where the defendants have purposefully engaged in business or economic activity in Tennessee."  *Erwin v. Piscitello*, 627 F.Supp.2d 855, 859 (E.D.Tenn. 2007).  The fact that Defendants reside in Texas is not sufficient to preclude jurisdiction, because courts have consistently upheld specific jurisdiction even where doing so forced the defendant to travel. *See, e.g., Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 911–12 (6th Cir.1988) (upholding jurisdiction in Michigan over Illinois defendant); *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170–71 (6th Cir. 1988) (allowing jurisdiction in Michigan over California defendant).

Second, "[Tennessee] has an interest in ensuring that its residents have adequate recourse for harms inflicted by nonresidents." *Schneider*, 669 F.3d at 704.  Third, Plaintiffs have a significant interest in recovering $5 million lost in connection with the Defendants' gold scheme.

Finally, while Texas may have an interest in adjudicating claims involving one of its residents, "this interest does not override the other factors suggesting that personal jurisdiction in [Tennessee] is reasonable." *Bird v. Parsons*, 289 F.3d 865, 876 (6th Cir. 2002).  Therefore, the Defendants have not shown that this is an "unusual case" justifying a departure from the inference of reasonableness that already exists.

For the aforementioned reasons, the Court's exercise of jurisdiction over the Defendants is in accordance with Due Process, and the Defendants' Motion should be denied.

### III.   The Court may also exercise personal jurisdiction pursuant to federal securities law.

An additional basis for jurisdiction arises under the federal securities laws without the necessity of demonstrating that Defendants had "minimum contacts" with Tennessee.  *See United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993) (holding that section 27 of Securities Exchange Act confers personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States).

Defendants challenge this by arguing that the Plaintiffs' investment with the Defendants did not involve a "security" under the securities laws as defined by the test articulated in *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946).  In determining the existence of a "security", the test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.  *Id.*

Defendants rely on *SEC v. Belmont Reid & Co.,* 794 F.2d 1388 (9th Cir.1986), which held that contracts for the purchase of gold coins were not securities because they failed to meet

*Howey*'s third prong.  The contracts there were made during a period when the value of gold was appreciating rapidly and investors "had as their primary purpose to profit from the anticipated increase in the world price of gold" rather than from the efforts of others. *Id.* at 1391. Defendants contend that the Plaintiffs in this case were not relying on the efforts of others, but rather were expecting profits "strictly from market fluctuations."  [Def. Memo at 16].

Defendants' reliance on *Belmont* is misplaced.  A more analogous case is *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125 (9th Cir. 1991).  The investment in that case (the Moreland Gold Program) offered investors the opportunity purchase unrefined gold ore *and* a refining contract.  *Id.* at 1133.  Importantly, the Court read the gold ore sales contract and the refining contract together in determining that the Moreland Gold Program was a "security".  *Id.* at 1133-1134.  The Court noted that *Howey's* requirement, an expectation of profits produced by the efforts of others, is met when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id*. (citations omitted).  The Court found that the requirement was met because the defendant undertook "essential managerial efforts", which included the construction and operation of the refining plant to refine the investor's gold ore.  *Id.*

The *R.G. Reynolds* Court distinguished *Belmont*, in which the investors had "had as their primary purpose to profit from the anticipated increase in the world price of gold." *Id.* at 1134 *citing Belmont*, 794 F.2d at 1391.  In contrast to *Belmont*, investors in the Moreland Gold Program were not depending on increases in the market price of gold for their profits, but instead expected profits to come primarily from the discount below the current price of gold at which the gold ore was being offered, and upon the defendant's efforts in refining the gold ore to realize profits from that discount.  *Id.* at 1135.

19

Similarly, in the present case, the Plaintiffs were not relying primarily on increases in the market price for gold for their profits.  Rather, as in *R.G. Reynolds*, the Plaintiffs expected the profits to come from the discount in the price of the unrefined gold (Watts represented that there was a 30% built in net profit) and upon the Defendants' efforts in refining the gold to realize the profits from the discounts.  The Plaintiffs were also relying on Watts's purported unique expertise, established personal relationships and efforts in order to procure the unrefined gold from Ghana in the first place.  [Sledge Dec. ¶¶ 9-10].  Because the Plaintiffs were relying primarily on Defendants' "essential managerial efforts" their investment was a "security" under *Howey*.  *R.G. Reynolds Enterprises, Inc.*, 952 F.2d at 1135.  Therefore, the Plaintiffs have adequately stated a claim under the federal securities laws, and the Court may exercise personal jurisdiction over the Defendants regardless of their contacts with Tennessee. *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993).

## CONCLUSION

For the aforementioned reasons, the Motion to Dismiss should be denied.

Respectfully Submitted,

/s/ Darrell N. Phillips
PIETRANGELO COOK PLC
Anthony C. Pietrangelo BPR # 15596
John J. Cook BPR # 17725
Darrell N. Phillips BPR #30299
6410 Poplar Avenue, Suite 190
Memphis, TN 38119
901.685.2662
901.685.6122 (fax)
*jcook@pcplc.com*
**Attorneys for Plaintiffs**

20

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that on this 30th day of December 2013, a copy of the foregoing electronically filed document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

          Bruce A. McMullen
          165 Madison Ave., Suite 2000
          Memphis, Tennessee 38103

                    /s/ Darrell N. Phillips