UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
_____

**MARY PHILLIPA SLEDGE, MARY JANE PIDGEON SLEDGE TRUST, and PIDGEON SLEDGE FAMILY LIMITED PARTNERSHIP**

**Plaintiffs,**

v.

**INDICO SYSTEM RESOURCES, INC. and CLEAL WATTS, III**

**Defendants.**

Civ. 2:13-cv-2578

_____

**PLAINTIFFS' SUR-REPLY IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**
_____

Plaintiffs submit this Sur-Reply in opposition to the Motion to Dismiss (Dkt. No. 11) and Reply (Dkt. No. 17) filed by Cleal Watts, III ("Watts") and Indico System Resources, Inc. ("Indico") and state as follows:

Plaintiffs submit this Sur-Reply to address the new factual assertions and legal arguments raised by Defendants in the Reply. In the initial Motion to Dismiss, Defendants asserted that personal jurisdiction was not proper in large part because one of the Plaintiffs, Mary Phillipa Sledge, was a Kentucky resident. In the initial Motion, Defendants state definitively that "[a]t that time [of the investment], **Ms. Sledge was a resident of Kentucky**…." and "…when Plaintiff Sledge first initiated conversations, **she resided in Kentucky** …" [*See* Defendants' Memorandum, pp. 3, 9, Dkt. no. 11-1 (emphasis added)]

The Defendants have changed this assertion in the Reply and now state that "Defendants **do not assert** that Plaintiff Sledge was a Kentucky citizen or resident at the time of the parties'

interactions …" [*See* Reply, p. 2, Dkt. no. 17 (emphasis added)].

Importantly, the Defendants do not deny that Watts knew the Plaintiffs resided in Tennessee. Instead, Defendants now claim that at any given time Watts did not know whether Ms. Sledge was in Tennessee when he sent his emails and made calls to her, and therefore jurisdiction is not proper. [*See* Reply, p.2, Dkt no. 17]. The Defendants' claim is without merit.

I.  **Watts's knew that Plaintiffs were Tennessee residents and would receive communications in Tennessee.**

Watts in his Declaration in support of the Reply claims that when he "called Ms. Sledge's "901" cell phone number, [he] did not know whether she was in Tennessee or not." [*See* Watts' Declaration, ¶4, Dkt. no. 17-1] While on occasion this may have been true due to the nature of cell phones, most of the time Watts knew that Ms. Sledge was in Memphis when he called her cell phone. It was not unusual during this period for Ms. Sledge and Watts to talk several times per day. In addition to the gold investment, Watts and Ms. Sledge developed what appeared to Ms. Sledge to be a friendship. In part because Watts claimed to be a physician, Ms. Sledge frequently discussed with him details of the day concerning her care for her mother who was homebound in Memphis. Many of the times Watts telephoned Ms. Sledge on her "901"-based cell phone, he knew that she was in Memphis because of their earlier conversations on that same day or on the days preceding the call. Many of Watts' fraudulent representations described in Ms. Sledge's initial Declaration (Dkt. no. 14) were made during these conversations when he knew that she was in Memphis. [*See* Second Declaration of Mary Phillipa Sledge (Second Sledge Dec.) ¶ 3]

At the time of and/or very shortly after many of their telephone conversations, Watts emailed most of the fraudulent documents described in Ms. Sledge's previous Declaration (Dkt. no. 14) to her, knowing that she was in Memphis at the time of sending the emails. While Ms.

Sledge does have a phone that is capable of receiving emails and may have checked some of the emails remotely, all of the emails sent by Watts to Ms. Sledge were also received by her at her home in Memphis. [*See* Second Sledge Dec. ¶ 4]

In addition to the above, Plaintiffs have submitted testimony and documentation showing that Watts knew the Plaintiffs resided in Memphis, and thus he knew or should have known that his fraudulent communications over the 18 month period would likely be received by, and adversely affect, the Plaintiffs in Tennessee. *See Felland v. Clifton*, 682 F.3d 665, 676 n. 3 (7th Cir. 2012) (noting that the defendant purposefully sent the emails at issue to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin).

Ms. Sledge has provided detailed testimony concerning her conversations with Watts and the fact that he knew all of the Plaintiffs resided in Tennessee, and that she spent the majority of her time in Memphis caring for her mother. [*See* Sledge Dec., ¶¶ 7-8, Dkt. no. 14] Plaintiffs have also submitted substantial documentation supporting the fact that Watts knew the Plaintiffs resided in Tennessee. For example, on November 22, 2011, Ms. Sledge sent an email to Watts with contact information for her personal banker, Brandon Cooper, at Trustmark National bank in Germantown, Tennessee. [*See* Sledge Dec., ¶16, Dkt. no. 14 and November 22, 2011 emails, attached as Exhibit 3 thereto]

Also, on December 25, 2011, Ms. Sledge emailed pictures to him of her sister and of the family's Christmas tree that she took at her mother's Memphis home while they were celebrating Christmas Eve. Ms. Sledge also called him that day, telling him that the family was at their mother's home celebrating Christmas. [*See* Second Sledge Dec., ¶6, and December 25, 2011 email, attached as Exhibit 1 thereto].

On January 8, 2012, Watts sent an email to Ms. Sledge identifying a wire transfer from

3

the MJPS Trust, which lists the residence of the trust as "Memphis". [*See* Sledge Dec., Dkt. 14, Ex. 5, p. 34 of 116]

Further evidence that Watts knew that the Plaintiff's resided in Memphis, and that they would likely receive his fraudulent communications in Tennessee, can be found on the emails sent by him to Ms. Sledge on January 8, 2012, January 13, 2012, January 31, 2012, and February 3, 2012. These emails included schedules purportedly confirming the Sledge family's gold purchases, as well as schedules prepared by Watts identifying the various wire transfers made by the Sledge family to Indico for the purchase of gold. On each of the wire transfer schedules, Watts listed the residence of Plaintiffs as "Memphis" multiple times. For example, on the wire transfer schedule sent on February 3, 2012, Watts listed the residence for Ms. Sledge as "Memphis" four (4) times, the residence of the MJPS Trust as "Memphis" one (1) time, and the residence of PSFLP as "Memphis" two (2) times. The schedules also contain references to the Plaintiffs' First *Tennessee* accounts. [Sledge Dec., Dkt. no. 14, ¶¶ 21, 23, 25, and 28 and Exhibits 5 (p. 37), 6 (p. 41), 7 (46), 8 (51), thereto][1]

On March 7, 2012, Watts received an email from Ms. Sledge directing him to wire funds for the MJPS Trust to an account at First Tennessee, located in Memphis, TN. The email also invites Watts to call Ms. Sledge at her "901" cell phone number with any questions. *See* Second Sledge Dec., ¶7, and March 7, 2012 email, attached as Exhibit 2 thereto] Another specific fact showing that Watts knew the Plaintiffs resided in Memphis is his gift of flowers sent to Mrs. Sledge's home in Memphis in December 2012. [Sledge Dec., ¶ 53, Dkt. no. 14]

---

[1] In the Reply, Defendants argue that wire transfers alone are not sufficient to confer jurisdiction. [*See* Reply, Dkt. no. 17, p. 5]. Defendants are missing the point. Watts's wire transfer schedules demonstrate that he knew the Plaintiffs resided in Tennessee. This knowledge, *combined with* 18 months of Watts' fraudulent communications by telephone and email to the Plaintiffs in Tennessee, form the basis of this Court's jurisdiction. *Neal v Jansen*, 270 F.3d 328, 333 (6th Cir. 2001).

On April 25, 2013, Ms. Sledge sent an email to Watts regarding a piece of medical equipment that he had arranged to order for her mother.  The email requests that he arrange for shipment of the equipment to her mother's home in Memphis, and contains her mother's address and Ms. Sledge's "901" telephone number.  [*See* Second Sledge Dec., ¶ 8, and April 25, 2013 email, attached as Ex. 3 thereto]

Although the Defendants never expressly deny that Watts knew the Plaintiffs were Memphis residents, in their Reply they point to two emails with Kentucky references to support their jurisdictional challenge.  The first email is dated March 23, 2012, which is well after the dates upon which Watts had prepared and sent schedules to Ms. Sledge which listed "Memphis" as the Plaintiffs' residence multiple times.  This email from Ms. Sledge states the following:

> I'm on plane headed for Paris then Minneapolis then Louisville.
> Been up 24 hrs already and just beginning the main voyage home.
> Whew
> Anyway
> Looks like Monday we will need the wire for $450k to Spencer
> At some point today I will wire you info
> Hope all good on your end
> I'm wiped out
> Thank you
> Phillipa
> Tried to call but cell phone is restricted
> UNREAL SECURITY measures

[*See* Watts' Declaration, ¶9, and Exhibit A thereto, Dkt. no. 17-1]

Defendants are attempting to use the phrase "main voyage home" in the third line to show that Watts *might* have believed from this email that Ms. Sledge was a Kentucky resident.  Defendants' attempt is unavailing because it ignores the other substantial evidence that Watts did in fact know that Memphis was where the Plaintiffs, including Ms. Sledge, resided.

Additionally, the "main voyage home" refers to Ms. Sledge's return to the United States

from a trip she had made to India. This trip began from her true home in Memphis. As mentioned in the Plaintiffs' Response, the Sledge family had business interests in Kentucky consisting primarily of a horse operation. On her return from India, Ms. Sledge flew into Kentucky to check on those interests. She spent four days in Kentucky, before returning to Memphis. [*See* Second Sledge Dec., ¶ 11]

The second email that Defendants point to is a May 24, 2013 email from Ms. Sledge to Watts. Defendants contend that the email contains a "signature block" listing a "502" area code phone number as her "primary contact information" [*See* Reply, Dkt. No. 17, p. 3, Ex. B, Declaration of Cleal Watts, III ("Watts Dec.")]. Again Defendants are attempting to demonstrate that Watts *might* have believed from this email that Ms. Sledge was a Kentucky resident.

As an initial point, the "502" number listed was not, nor has it ever been Ms. Sledge's primary telephone number. Her primary telephone number was the "901" number that she had given to Watts and which was the one that he used for most of his telephone calls to her. At the time of this email, Ms. Sledge was typically carrying two cell phones with her, the "901" phone, which was her primary number, and this "502" phone. The "502" phone had the capacity to receive emails, but her "901" phone did not. [*See* Second Sledge Dec., ¶ 13]

Ms. Sledge put her "502" number at the bottom of some of her outgoing "gmail.com" messages because at the time she believed, mistakenly, that she had to put that number on the emails because it was the only phone that could receive emails. The "502" number was only listed on some of Ms. Sledge's "gmail.com" messages and only for a very short period of time. Her "aol.com" email account, which was her primary email and the one that Watts primarily used, did not reference the "502" number on it. [*See* Second Sledge Dec., ¶ 14]

6

Importantly, Ms. Sledge's "502" number was very rarely called by Watts or anyone else for that matter. Usually, the only time she received calls on the "502" number would be on the occasional times when the voice mail box on her "901" phone was full. [*See* Second Sledge Dec., ¶ 15]

Plaintiffs have provided evidence that Watts knew the Plaintiffs were Tennessee residents when sending fraudulent communications by telephone and email over an 18 month period, and that he knew that they would receive his fraudulent communications in Tennessee. Where, as here, a plaintiff provides evidence that the out-of-state defendant knew that the plaintiff resided in the forum state, jurisdiction may be predicated on fraudulent telephone and email communications sent by the defendant to the plaintiff. *Neal v Jansen*, 270 F.3d 328, 333 (6th Cir. 2001). *See also Felland v. Clifton*, 682 F.3d 665, 676 n. 3 (7th Cir. 2012) (noting that the defendant purposefully sent the emails at issue to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin); *Global Acquisitions Network v. Bank of America Corp.*, 2013 WL 3450402 *4 (C.D.Cal. 2013) (finding jurisdiction over non-resident defendant who sent fraudulent emails to individuals he knew resided in California).

**II.     Plaintiffs have satisfied the "common enterprise" element of the *Howey* test.**

In their initial Motion to Dismiss, the Defendants argued that the Plaintiffs could not state a claim under the federal securities laws, because they did not demonstrate that the gold investment was an "investment contract" under the *Howey* test. [Def. Mem., pp. 15-16, Dkt. no. 11-1]. In the Reply, the Defendants make new factual assertions and present a new argument that the securities claims are deficient because, according to the Defendants, the "common enterprise" element of the *Howey* test is not satisfied. [Reply, pp. 9-10]

7

The Defendants' contention that Plaintiffs cannot show facts tending to support a "common enterprise" under *Howey* is without merit. As the attached Second Declaration of Mary Phillipa Sledge reflects, Defendants' fraudulent investment scheme did indeed, "tie the fortunes of each investor in a pool of investors to the success of the overall venture." *Union Planters Nat. Bank of Memphis v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir. 1981).

As a threshold point, the Plaintiffs themselves represent three (3) unique investors in the Defendants' gold scheme. Morever, the Plaintiffs were *just three* among *multiple* investors in Defendants' fraudulent gold refinement scheme. Watts represented to Ms. Sledge on multiple occasions that there were several other investors in the particular gold dust purchase from Ghana in which Plaintiffs had invested. Watts, in fact, said that he himself was an investor. At one point, Watts gave her the name of one of the other investors, but told her that he could not divulge the names of the other investors. He would also routinely represent to Ms. Sledge that the status of the group's investment would be in jeopardy, if she did not supplement her investment with smaller increments to finance alleged legal counsel in Ghana and other charges. [*See* Second Sledge Dec. ¶16].

Further, an April 9, 2012 email from Watts refers to "other investors" in the same shipments of gold dust intended for Plaintiffs. [*See* Ex. 10 to Sledge Dec., Dkt. no. 14]

Following are some of the specific statements that Watts made about the other investors:

> On January 6, 2013, Watts left Ms. Sledge a voicemail telling her that he had another source of funds for the gold investment, totaling four sources. On this voicemail, he said that he also has a verbal commitment for funds from an investor in Hong Kong.
> On May 21, 2013, Watts left Ms. Sledge a voicemail in which he indicated that he was forcing the "Israelis" to cash out of the investment. He also said the "lady's partners in Chicago" are coming up with cash and that they were having to liquidate securities to raise cash to join the investment.
> On May 24, 2013, Watts left Ms. Sledge a voicemail where he discussed how it may be difficult

| |
|---|
| to get "funding partners" in the United States to wire money during the holiday weekend. Watts said if the funding partners are at Bank of America, they could do an electronic transfer even on the weekend and then he can get a "commit for wiring" after the holiday weekend. |
| On June 11, 2013, Watts left Ms. Sledge a voicemail where he explained that his "manager" in Freetown has been able to raise $60,000 and is working to raise more. He further states that his "emissary" is talking with another investor to raise an additional $30,000. |
| On June 26, 2013, Watts left Ms. Sledge a voicemail where he explains that his "manager" is helping his "emissary" to gather larger amounts of money and that they will be meeting with more investors. He further said that a potential investor is flying in from France tomorrow and that most of the people they are "going to finish up with" are at the United Nations. |
| At the end of June 2013, Ms. Sledge had a telephone conversation with Watts during which he told her that he is working to raise additional money for our investment, that there is a Chicago lady who may come through, and that his "manager" is going to Freetown to get more. |
| Around this same time, Ms. Sledge had a telephone conversation with Watts during which he told her that the other investors in the gold shipment participated at the same level that the Plaintiffs did, that they "paid their 20%" just like the Plaintiffs did, and that he is still working to find even more investors. |
| On June 28, 2013, Ms. Sledge had a telephone conversation with Watts, during which he told her that he needed an additional $70,000 to complete one shipment. During this call, he described his "manager's" efforts going from country to country to raise money for the gold investment. Watts said he has a friend from France who may be a source of funds, and that others were headed to Sierra Leone to raise money. Watts said there were prospects in Canada and Hong Kong, as well. |
| On July 1, 2013, Ms. Sledge had a telephone conversation with Watts, where he complained that the "emissary's" friend from France had only provided $25,000, instead of $29,000. She asked Watts if all of the people we were dealing with were trustworthy. He told her, "oh yeah, they're putting up their own money." The "emissary", Watts said, has already spent his own money several times, as has their "manager." |

[*See* Second Sledge Dec. ¶ 17].

As contemplated by the Sixth Circuit, these facts typify a "pooled investment" and "horizontal commonality." The court in *Stone v. Kirk*, 8 F.3d 1079, 1085-86 (6th Cir. 1993), held that the "horizontal commonality" requirement means only that funds of two or more investors must go into "a common pool from which all may benefit." *Id*. That Court further held:

> Each of the joint ventures into which Mr. Stone put his money had three or more investors . . . and funds from the common pool were to be used in each instance to

9

> exploit a master recording for the benefit of all members of the venture. If these joint ventures had nothing else, they had horizontal commonality.

*Stone v. Kirk*, 8 F.3d 1079, 1085-86 (6th Cir. 1993). In 1984, the Sixth Circuit noted a case which was exemplary of the requirement:

> In *Joiner,* the defendant offered investors leasehold interests with the promise to drill an oil well "so located as to test the oil-producing possibilities of the offered leaseholds." The Court held that the transactions were securities. The Court found that the investors were all linked together in the common venture to drill a test well. "[T]he undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." Without the drilling enterprise, "no one's leases had any value."

*Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004-05 (6th Cir. 1984) (internal citation omitted).

As Ms. Sledge's Declaration clearly reflects, Watts advised her repeatedly that she was one of many investors whose fortunes were tied to his ability to import a particular shipment of gold dust from Ghana and to refine it in the United States. The alleged obstacles he created put Ms. Sledge's investment and the investments of the other ostensible investors in jeopardy. To borrow from the Sixth Circuit in *Hart*, "the investors were all linked together in the common venture to" import a particular shipment of gold dust from Ghana to be refined by Defendants and resold in the United States. *See Hart*, 735 F.2d at 1004-05. Without the particular shipment of gold dust from Ghana, no one's investment had any value. *Id.*

Because the pleadings, combined with the sworn statements of Plaintiff Mary Phillipa Sledge, clearly show that the Defendants' fraudulent gold scheme "tied the fortunes of each investor in a pool of investors to the success of the overall venture," the horizontal commonality requirement is satisfied and the Defendants' scheme is an "investment contract" under *Howey*, and therefore a "security" under the federal securities laws. Accordingly, Defendants' scheme subjects Defendants to personal jurisdiction before this Court.

          Respectfully Submitted,

          /s/ Darrell N. Phillips
          PIETRANGELO COOK PLC
          Anthony C. Pietrangelo BPR # 15596
          John J. Cook BPR # 17725
          Darrell N. Phillips BPR #30299
          6410 Poplar Avenue, Suite 190
          Memphis, TN 38119
          901.685.2662
          901.685.6122 (fax)
          *jcook@pcplc.com*
          *dphillips@pcplc.com*
          **Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

  The undersigned hereby certifies that on this 31st day of January 2014, a copy of the foregoing electronically filed document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

    Bruce A. McMullen
    165 Madison Ave., Suite 2000
    Memphis, Tennessee 38103

          /s/ Darrell N. Phillips