EXHIBIT B

PORTIONS OF DEPOSITION TRANSCRIPT

DEPOSITION OF MIKE BYRD

CONDUCTED JUNE 9, 2015

```
1                     UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TENNESSEE
2

3    MARY PHILLIPA SLEDGE, et al,  *
                                   *
4         Plaintiff,               *
                                   *   Civil Action No.
5    VS.                           *
                                   *   13-2578-STA
6    CLEAL WATTS, III, et al,      *
          Defendant.               *
7

8

9

10   ********************************************************

11              VIDEO DEPOSITION OF MICHAEL BYRD

12   ********************************************************

13

14

15

16

17        ANSWERS AND DEPOSITION OF MICHAEL BYRD, produced as

18   a witness at the instance of the Plaintiff, taken in the

19   above-styled and -numbered cause on the 9th day of June,

20   2015, A.D., beginning at 9:35 a.m., before Rachel J.

21   Payne, a Certified Shorthand Reporter in and for the

22   State of Texas, in the offices of Esquire Deposition

23   Solutions, located at 1700 Pacific Avenue, Suite 1000,

24   Dallas, Texas, in accordance with the Rules of Civil

25   Procedure and the agreement hereinafter set forth.
```



```
1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4       Mr. Darrell Phillips
        Mr. Anthony Pietrangelo
5       PIETRANGELO COOK, PLC
        6410 Poplar Avenue, Suite 190
6       Memphis, Tennessee  38119
        901.685.2662
7       901.685.6122 (Fax)

8

9
    FOR THE DEFENDANT:
10
        (No one present.)
11

12

13

14

15

16

17  ALSO PRESENT:

18      CODY MODRO - Videographer

19      MARY PHILLIPA SLEDGE - Plaintiff

20

21

22

23

24

25
```



```
 1                           I N D E X

 2                                                    PAGE

 3   Appearances . . . . . . . . . . . . . . . . .      2

 4   Exhibit Index . . . . . . . . . . . . . . .        4

 5   MICHAEL BYRD

 6        Examination by Mr. Darrell Phillips . . . .    5

 7   Signature and Corrections. . . . . . . . . . .     64

 8   Reporter's Certificate . . . . . . . . . . . .     65

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MICHAEL BYRD                                          June 09, 2015
SLEDGE VS. WATTS, III                                            4

1                    E X H I B I T S

2  NO.   DESCRIPTION                                PAGE

3  A     Contract for investment                      37

4  B     Copy of a transfer receipt from Sea West to
          Indico System Resources                     38
5
   C     Chase receipts                               39
6
   D     Wells Fargo receipts                         40
7
   E     E-mails                                       44
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                THE VIDEOGRAPHER:  This is the videotaped
 2   deposition of Mike Byrd held in Dallas, Texas.  The time
 3   is now 9:35 a.m. on June 9, 2015.  At this time, we are
 4   now on record.
 5                At this time, will the counsel please
 6   introduce themselves and whom they represent, and the
 7   witness will then be sworn in.
 8                MR. PHILLIPS:  My name is Darrell
 9   Phillips.  I will be taking this deposition on behalf of
10   the plaintiff, Phillipa Sledge, or one of the
11   plaintiffs.  My colleague, Anthony Pietrangelo, is also
12   in the room.  And the witness is named Mike Byrd, who is
13   here pursuant to subpoena without counsel.
14                THE WITNESS:  Correct.
15                     MICHAEL BYRD,
16   having been first duly cautioned and sworn to testify
17   the truth, the whole truth and nothing but the truth,
18   testified on his oath as follows:
19                      EXAMINATION
20   BY MR. PHILLIPS:
21       Q.   Good morning, Mr. Byrd.
22       A.   Good morning.
23       Q.   I recognize this may be inconvenient for you.
24   I appreciate you being here even though it's pursuant to
25   subpoena, but we will try to be as efficient as
```

MICHAEL BYRD
SLEDGE VS. WATTS, III

June 09, 2015

9

1    Q.   And what is your current's wife?

2    A.   Canda, C-A-N-D-A.

3    Q.   Yeah.

4    A.   Byrd.

5    Q.   Byrd.  Okay.  How long have you been married

6  to Mrs. Byrd?

7    A.   Two and a half years.  Well, it'll be three

8  years next month, so...

9    Q.   Okay.  And just briefly before we move too far

10  afield, what does Mrs. Byrd do for a living?

11    A.   Occupational therapy assistant.

12    Q.   Okay.  Do you work together?

13    A.   No.

14    Q.   Okay.  And this may seem irrelevant.  Do you

15  know what her annual gross income is?

16    A.   Approximately $80,000.

17    Q.   Okay.  Okay.  Thank you.  So you've been

18  involved in two prior divorces and there were no

19  depositions in those divorces, correct?

20    A.   Correct.

21    Q.   Okay.  Have you ever been charged with a

22  crime?

23    A.   No.

24    Q.   Have you ever filed for bankruptcy protection?

25    A.   No.



```
 1       A.    No.

 2       Q.    You don't own that property?

 3       A.    No.

 4       Q.    So it's a rental?

 5       A.    Yes.

 6       Q.    Okay.  Do you own any property?

 7       A.    I own a residential lot in my hometown of

 8  Kerens, Texas, K-E-R-E-N-S.  I don't own it.  It's my

 9  father's.  He's passed away.  I'm the executor of his

10  will.  I'm managing it until we --

11       Q.    Is there anything on that lot?

12       A.    No.

13       Q.    Okay.  You plan to develop that lot?

14       A.    No.

15       Q.    So it's just an empty lot?

16       A.    Correct.

17       Q.    It's zoned residential?

18       A.    Correct.

19       Q.    Okay.  And how old are you?

20       A.    57.

21       Q.    57.  Okay.  You said you worked for RehabCare.

22  And you work full-time?

23       A.    No.

24       Q.    What do -- what is your schedule like

25  typically?
```



 1      A.    I work what's referred to as PRN, as needed.

 2  They call me when they need me.

 3      Q.    What does a typical week look like for you?

 4      A.    It varies.  It could be no days a week.  It

 5  could be every day -- every day.

 6      Q.    Seven?

 7      A.    Seven -- well, five, usually not weekends.

 8      Q.    How many days did you work last week?

 9      A.    Three.

10      Q.    Okay.  And do you -- do you remember what your

11  gross income was last year?

12      A.    Gross, I don't.  I'd just be speculating.  I'd

13  say maybe 20,000.

14      Q.    Okay.  And other than -- other than your work

15  as a physical therapy assistant, do you have any other

16  sources of income?

17      A.    No.

18      Q.    Okay.  Did you have any other sources of

19  income last year?

20      A.    Same.

21      Q.    Same.

22      A.    For the last three years, same -- same income.

23      Q.    It's just this PRN physical therapy

24  assistant's work?

25      A.    Correct.



1     Q.    What is Byrd's Eye Enterprises?

2     A.    That's the S corporation, consulting fitness,

3  exercise, nutrition.

4     Q.    And do you have any -- I assume you are a --

5  you founded that entity?

6     A.    Correct.

7     Q.    Are there any other -- any other officers?

8     A.    No.

9     Q.    Any other directors?

10     A.    No.

11     Q.    Any other employees?

12     A.    No.

13     Q.    So it's just you?

14     A.    Correct.

15     Q.    And are you currently active with the State of

16  Texas?

17     A.    Yes.

18     Q.    Okay.  And do you generate any -- any revenue

19  from Byrd's Eye Enterprises?

20     A.    It kind of goes back and forth, sometimes a

21  loss, sometimes a gain.  Annual, I think maybe $3,000.

22     Q.    Okay.  And so you have clients -- you have

23  consultancy clients?

24     A.    They come and go.  I don't have consistent

25  clients at this time.



MICHAEL BYRD                                      June 09, 2015
SLEDGE VS. WATTS, III                                      14

1       Q.   What -- without asking you to identify who

2    they are, because I don't know that it's necessarily

3    relevant, what kind of a client would you have as a

4    consultant for Byrd's Eye Enterprises?

5       A.   Anyone who is interested in a personal fitness

6    program --

7       Q.   So is it an individual --

8       A.   -- health, nutrition.  Individually, yes.

9       Q.   So that sounds a bit like you might be a

10   personal trainer?

11      A.   Something more than that.  My credentials are

12   a little bit beyond a personal trainer, but, yes, very

13   similar to a personal trainer.

14      Q.   Okay.  I'm going to ask you about that in just

15   a second.  And in the -- in the context of your -- your

16   fitness consulting enterprise, Byrd's Eye Enterprises,

17   have you provided any of these fitness consulting

18   services to any member of the Watts family?

19      A.   No.

20      Q.   Okay.  When did you form Byrd's Eye

21   Enterprises?

22      A.   1997.

23      Q.   So has it always been used for the same

24   purpose?

25      A.   Correct.



1    Q.   Have you talked to Mr. Watts about the

2    lawsuit?

3    A.   No.

4    Q.   And when was the last time you spoke with

5    Mr. Watts?

6    A.   Probably -- yesterday.

7    Q.   Yesterday.  What was the substance of that

8    conversation?

9    A.   Well, as you know, I have invested with

10   Mr. Watts and having to do with a shipment -- delays in

11   the shipment.

12   Q.   So you spoke with him yesterday about your

13   investment?

14   A.   Correct.

15   Q.   Did you discuss with him your intended

16   appearance here for the deposition?

17   A.   No.

18   Q.   Have you ever discussed with him your subpoena

19   or your appearance for the deposition?

20   A.   Yes.

21   Q.   And what -- when was that?

22   A.   Several times over the last few weeks since I

23   received the subpoena.

24   Q.   And what has -- if -- I had asked you to

25   generalize them.  Now I'm going to ask you to be more



1    A.   Well, you know, I don't know.  I haven't seen

2  his medical degree, but he's discussed with me his

3  medical education and so I trust him.

4    Q.   Okay.  Have you ever known him -- since you've

5  known him since college, have you ever known him to

6  practice medicine?

7    A.   No.

8    Q.   Okay.  Have you ever notice -- known him to

9  write prescriptions?

10    A.   No.

11    Q.   Okay.  How frequently would you say you speak

12  with him?

13    A.   I'd say it's safe to say daily.

14    Q.   Daily?

15    A.   Pretty much.

16    Q.   Is he your best friend?

17    A.   No.

18    Q.   Okay.  Is he --

19    A.   My wife is my best friend, but he's a -- he's

20  a close friend.

21    Q.   Is he one of your best friends?

22    A.   I suppose so.

23    Q.   Was he a groomsman at your wedding?

24    A.   Yes.

25    Q.   Okay.  Was he a groomsman at your first



1   wedding?

2        A.    Yes.

3        Q.    And your second wedding?

4        A.    Yes.

5        Q.    And your third wedding?

6        A.    No.

7        Q.    Okay.  Other than the investments that we're

8   going to talk about in a second, have you ever given him

9   money for any reason?

10       A.    No.

11       Q.    Okay.  Has he ever given you money for any

12  reason?

13       A.    No.

14       Q.    Okay.  So I'm going to ask you this question,

15  knowing the answer, but I think it'll get us started.

16            Have you invested with Cleal Watts?

17       A.    Yes.

18       Q.    Okay.  And when was that?

19       A.    I think it's about a year ago --

20       Q.    Okay.

21       A.    -- about a year.

22       Q.    Would it have been around July of 2014?

23       A.    Possibly.

24       Q.    And how did that come up?

25       A.    I -- I was -- I guess I was discussing with



1   investors?

2       A.    Yes.

3       Q.    When did he tell you that?

4       A.    Just in the course of discussing my gold, you

5   know, the gold -- the investment that I made and the way

6   that he conducted the business, that there were multiple

7   investors.  That's about it.

8       Q.    And did he ask you for a specific amount?

9       A.    No.

10      Q.    And did he make you any promises about a

11  return on investment?

12      A.    No.

13      Q.    Did he suggest any --

14      A.    He suggested there would be returns, yes.  He

15  didn't give me an exact amount.  He said 20 percent,

16  basically, I think is the number that he has continued

17  to suggest.

18      Q.    He's continued as recently as when?

19      A.    It's never been anything other than that.

20      Q.    Okay.

21      A.    I expect the -- you know, I'm not being

22  irrational, but I know things can fluctuate, but I'm

23  expecting approximately a 20 percent return.

24      Q.    Okay.  How much did you invest with him last

25  year?



1      A.   Well, 250,000, plus I've also added to that

2   some money for expenses with shipment delays and whatnot

3   over the past several months.  And I haven't kept track

4   of the total on that, but --

5      Q.   Do you have a ballpark sense of what that

6   might be?

7      A.   I'm going to guess maybe $20- to $30,000.

8      Q.   Okay.  And tell me a little bit about the

9   shipment delays.  I know you've provided some documents.

10  I'm going to ask you about them later.  But how would

11  these conversations about delays come up?  Would you

12  call him and say, Where's the gold, or would he call you

13  and say, Hey, I have some bad news?

14     A.   Either way.  That's, I guess, the purpose of

15  our conversations on a regular basis, is, How are things

16  going.

17     Q.   And what are some of the shipment delays?

18     A.   Expenses with taxes or bonds or, you know,

19  some type of related expenses, delays in transportation,

20  delays due to medical issues.

21     Q.   Whose medical issues?

22     A.   Well, Ebola in west Africa.

23     Q.   Right.

24     A.   And the gentleman that he has in west Africa

25  working with him apparently has some medical issues.



1    Q.   Has he ever indicated that he needed legal

2 assistance in Ghana?

3    A.   No.

4    Q.   Did he ever tell you that he's ever been to

5 Ghana?

6    A.   No.

7    Q.   Okay.  Do you know if he's ever been to west

8 Africa?

9    A.   I do not know.  He's -- he's told me that he

10 has been to west Africa.

11    Q.   Okay.  Before we get too far afield, where did

12 you get the money to invest with him?

13    A.   Business, my business.

14    Q.   Which business?

15    A.   Byrd's Eye Enterprises.

16    Q.   The Byrd's Eye Enterprises that you said

17 generates $3,000 a year?

18    A.   Yeah.

19    Q.   You've collected $250,000 in that?

20    A.   Through prior investments, yeah.

21    Q.   So Byrd's Eye also made investments?

22    A.   Right.

23    Q.   Okay.  Well, tell me about that a little bit.

24    A.   I took money from -- that I had in savings and

25 moved it into the business and invested.



1      Q.   What did you invest in?

2      A.   I invested in an organization called Front

3  Sight in Nevada alone, which I earned interest on,

4  and -- and then once that matured, then I reinvested it

5  with Dr. Watts.

6      Q.   Is Front Sight affiliated with Watts in any

7  way, to your knowledge?

8      A.   No.

9      Q.   Okay.  Has -- has -- I'm going to refer to him

10  as Mr. Watts for the purposes of this deposition.

11      A.   Okay.

12      Q.   Has he given you any money to date?

13      A.   No.

14      Q.   Have you ever seen any gold --

15      A.   Yes.

16      Q.   -- from him?

17      A.   He -- yes.  He took me to the airport with him

18  and picked up some gold.

19      Q.   In what form?

20      A.   It looked like -- it wasn't dust, but it

21  wasn't brick or anything.  It was unrefined or, to some

22  degree, unrefined gold.

23      Q.   When was this?

24      A.   Maybe a month ago.

25      Q.   Okay.  And was that your gold?



```
 1        A.    No.

 2        Q.    Whose gold was that?

 3        A.    I have no idea.

 4        Q.    Do you have any idea what's become of that

 5   gold?

 6        A.    No.

 7        Q.    Did he ever tell you that he was going to

 8   refine it in Dallas?

 9        A.    Yes.

10        Q.    Did he tell you where he was going to refine

11   it?

12        A.    No.

13        Q.    Have you ever heard of Millennium Refinery?

14        A.    No.

15        Q.    Okay.  Have you spoken with anybody else about

16   this -- about Mr. Watts?

17        A.    My wife.

18        Q.    Have you been contacted by the FBI?

19        A.    No.

20        Q.    Has Mr. Watts told you that the FBI has been

21   contacting people?

22        A.    No.

23        Q.    So you have no knowledge of whether or not

24   that's true?

25        A.    Correct.
```

1      A.    As far as I know.  He and I haven't kept up

2  over the years, you know.  It's just been sporadic,

3  so -- but I know Debbie -- he and Debbie have been in

4  some type of relationship for -- since 1995.

5      Q.    Okay.

6      A.    Don't know the nature of it.

7      Q.    Have you ever talked to Mr. Watts about gold

8  at his house?

9      A.    No.

10     Q.    Have you ever talked about it within earshot

11 of Debbie?

12     A.    Not to my knowledge.

13     Q.    So most of your conversations with him

14 happened over the phone?

15     A.    Over the phone or, you know, we've had lunch

16 several times.

17     Q.    And where do you usually get together for

18 lunch?

19     A.    It varies.

20     Q.    When you sent him additional funds over these

21 last few months, how did you get them to him?

22     A.    I -- I'd just withdraw it from the bank and

23 hand it to him.

24     Q.    So you gave him cash?

25     A.    Right.



1      Q.    Okay.  Where do you bank?

2      A.    Chase.

3      Q.    Chase.  And does Byrd's Eye bank at Chase as

4  well?

5      A.    Yes.

6      Q.    Do you have accounts with any other financial

7  institutions?

8      A.    Wells Fargo and Sea West Coast Guard Federal

9  Credit Union.

10     Q.    And are those in your name or Byrd's Eye?

11     A.    My name.

12     Q.    Okay.  Does Byrd's Eye have an account?

13     A.    No.  Byrd's Eye has an account at Chase.

14     Q.    Okay.

15     A.    Oh, well, my -- also, the account at Wells

16  Fargo is a self-directed 401(k), so that's in Byrd's Eye

17  Enterprises.

18     Q.    Okay.  And it's a self-directed 401(k).  And

19  the -- the Byrd's Eye account at Chase, is there

20  anything in it?

21     A.    Yes.

22     Q.    Approximately how much?

23     A.    $7- or $8,000.

24     Q.    Okay.  Would you say that your combined

25  household income with your current wife is $110,000 a



1      Q.    Kamora?

2      A.    No.

3      Q.    Okay.  What do you know about Indico System

4   Resources?

5      A.    Nothing, other than he tells me the gold and I

6   think -- I mean, I'm just speculating, so really that's

7   about it.  I don't really know anything about it.

8      Q.    Have you ever heard of Secured Asset

9   Management or SAME?

10      A.    Yeah.  That was named in the subpoena, I

11   believe, but that's -- I don't know anything about it.

12      Q.    Okay.  Do you know what -- what -- do you have

13   an opinion about -- or any personal knowledge about what

14   Mr. Watts does for income?

15      A.    No.

16      Q.    When he asked you to invest with him in the

17   gold, did he ever discuss any sort of fee he would take

18   as a result of executing that investment?

19      A.    No.

20      Q.    Okay.  And was there any -- any doubt between

21   you two that it was, in fact, an investment as opposed

22   to some kind of down payment or a loan?

23      A.    No.

24      Q.    It's an investment, pure and simple?

25      A.    Right.



1    A.   So I had some reservations, but having

2  known -- known him for a while, I -- I didn't feel

3  overly hesitant.

4    Q.   So you didn't conduct what you would call any

5  kind of due diligence about the investment or about him

6  or about the people with whom he would be dealing?

7    A.   No -- well, no.

8    Q.   So it was -- a decision was based largely on

9  your relationship with him and your faith in him?

10    A.   Correct.

11    Q.   Okay.  Do you have any reason today to doubt

12  that the investment is a valid investment?

13    A.   No.

14    Q.   Okay.

15         MR. PHILLIPS:  Let's mark that as

16  Exhibit A, if we can, to this deposition.

17         (Deposition Exhibit A marked.)

18    Q.   (BY MR. PHILLIPS)  I'm going to hand you a

19  document that says "Sea West."

20    A.   Correct.

21    Q.   Can you tell me what that is?

22    A.   That's a $12,000 transfer -- copy of a

23  transfer receipt from Sea West to Indico System

24  Resource -- Resources, Bank of America.

25    Q.   Is it a wire transfer?



```
 1        A.   I think this is a document -- actually, it
 2   didn't go to Bank of America because the wire transfer
 3   was going to take too long, so I think ultimately it was
 4   transferred to my account at Chase.  I don't recall.
 5   It's been a while.  And then -- to tell you the truth, I
 6   can't remember how it was handled, but he -- he did get
 7   the money.
 8        Q.   Okay.  And what is the date of that -- of that
 9   purported transfer?
10        A.   February 25, 2015.
11        Q.   So that would have been three or four months
12   ago?
13        A.   Right.
14        Q.   Okay.
15             MR. PHILLIPS:  Let's mark that as
16   Exhibit B, if we can.
17             (Deposition Exhibit B marked.)
18        Q.   (BY MR. PHILLIPS)  You also provided this
19   document which has the words "Chase" across the top?
20        A.   Right.
21        Q.   What is this?
22        A.   These are two receipts for funds that were
23   provided to Dr. Watts for expenses related to the gold
24   investment.
25        Q.   Okay.  And were those -- are those withdrawal
```



1      A.    These are transfers from the Wells Fargo

2 account to Dr. Watts or Indico Systems.

3      Q.    They're transfers?

4      A.    They're not transfers.  Again, we -- we did it

5 in cash.  So I went to the bank and took that money out

6 and handed it to Dr. Watts.

7      Q.    And so each one of those receipts reflects

8 money that you took out of your accounts that you gave

9 to him?

10      A.    Correct.

11      Q.    And that's on top of the 250 that was wired to

12 him in 2014?

13      A.    Correct.

14      Q.    Did this come out of your personal account or

15 Byrd's Eye?

16      A.    This is the Byrd's Eye.  All -- all of it, to

17 my recollection, has been from Byrd's Eye.  The $12,000

18 was not, because that came out of my personal account at

19 Sea West.

20      Q.    Okay.

21      A.    I think that's the only amount.

22            MR. PHILLIPS:  I'm going to mark this as

23 Exhibit D.

24            (Deposition Exhibit D marked.)

25      Q.    (BY MR. PHILLIPS)  You've also provided some



1          Q.   (BY MR. PHILLIPS)  Okay.  Mr. Byrd, thank you

2   for your patience.  I'm going to try to wrap this up.  I

3   have a couple of follow-up questions based on some of

4   the things we talked about earlier.

5                    Before I ask you that, when was the last

6   time you spoke with Beverly Parfitt?

7          A.   2007 or '8.

8          Q.   Okay.  So she -- she hasn't mentioned to you

9   that I've spoken with her?

10         A.   No.

11         Q.   Did you -- have you inherited any money?

12         A.   No.

13         Q.   Can you tell me a little bit more about the

14  Nevada investment.  You said the company was called

15  Front --

16         A.   Front Sight.

17         Q.   Front Sight?

18         A.   Yes.

19         Q.   How did you find out about that?

20         A.   I was -- Beverly and I were in Las Vegas on

21  a -- I guess you'd say a vacation, and I was looking for

22  something to do, saw that in one of their magazines and

23  went out and took a two-day course.

24         Q.   What kind of an investment was it?

25         A.   Development investment would be the way I'd



1  characterize it, you know, help build -- multiple

2  investors, help grow the resort.

3      Q.   So it was a resort?

4      A.   Yeah.  At the time, it was just -- I'm not

5  sure what his plans were at the time, but yeah.

6      Q.   When was this?

7      A.   '97, maybe.

8      Q.   And you and Beverly Parfitt were still

9  married?

10     A.   Correct.

11     Q.   How much did you invest in Front Sight?

12     A.   I didn't invest then.  I just took a course.

13  I didn't invest in Front Sight until -- I don't

14  remember -- maybe sometime between '97 and 2000.

15     Q.   Okay.  And how much did you invest?

16     A.   I don't -- it was a very -- maybe $3,000.  I

17  don't -- I don't recall.

18     Q.   Okay.  Do you remember -- do you remember what

19  the return on your investment was, what you -- what you

20  left with?

21     A.   $250,000.

22     Q.   So you invested $3,000 and walked away with

23  $250,000?

24     A.   I reinvested over -- over the years different

25  amounts.



1  of -- when you took it out of Front Sight, where did you

2  put it, in the Byrd's Eye account?

3      A.   Right.   That was Byrd's Eye's money in the

4  first place.   That's money that I put in for my personal

5  income into Byrd's Eye, and I used it for that purpose,

6  to invest in Front Sight.

7      Q.   Do you routinely file tax returns for Byrd's

8  Eye?

9      A.   Yes.

10      Q.   And on your tax return, did you report that

11  profit as income?

12      A.   That was in -- that was a loan, so my CPA

13  advised me that that was a loan -- a return of principal

14  and interest.   Anyway, that it was not necessary to

15  report that.

16      Q.   Okay.   Do you -- do you happen to know, if I

17  go on the internet, will I be able to find anything out

18  about Front Sight --

19      A.   Yes.

20      Q.   Is it a fairly well-known --

21      A.   It should be easy to --

22      Q.   Okay.   You mentioned that you had a

23  self-directed 401(k) with Wells Fargo.   Did you use any

24  of that money with -- with Watts?

25      A.   Yes.   The -- the receipts in there, those



 1  someone who has had any success in business would live

 2  in?

 3       A.   No.

 4       Q.   Okay.  Why, then, would you feel comfortable

 5  investing so much money with him?

 6       A.   Well, just because I know him.

 7       Q.   Okay.  How -- how would you -- what portion of

 8  your net worth would you say that $250,000 represents?

 9       A.   Half.

10       Q.   So you've got another quarter of a million

11  or --

12       A.   No.  It's more than half.  It's probably -- I

13  mean, I'm just guessing.  It's probably three-quarters.

14       Q.   So, I mean, it's kind of your life savings?

15       A.   Pretty much.  It was -- yeah.

16       Q.   So you -- you told me you didn't do any due

17  diligence; you didn't talk to anybody else.  He lives in

18  a house that probably is not one you would expect to be

19  occupied by someone who is in the business of making a

20  lot of money on gold investments, and you gave him what

21  you would characterize as a large part of your life

22  savings.

23       A.   Right.

24       Q.   I'm trying to understand why you would do

25  that, and the only answer you've given me is because



1    your plans with respect to getting your money back?

2        A.   Well, when the shipment comes in, I'll get my

3    money back.

4        Q.   All right.  And when will -- how long are you

5    willing to wait?

6        A.   Until I am convinced for some reason that it's

7    not going to happen.

8        Q.   And what's it going to take?

9        A.   Me coming to the conclusion that, you know, I

10   was wrong about Cleal Watts.

11       Q.   And you haven't reached that conclusion yet?

12       A.   No.

13       Q.   Okay.  So you still believe that you will

14   recognize some kind of return on your investment?

15       A.   Yes.  I'm 99.9 percent confident.

16       Q.   And that's strictly based on your history with

17   him?

18       A.   Right.

19       Q.   Nothing else?

20       A.   Uh-huh.  Him and his family.  I met his dad

21   and his mom and his whole family and they're a little,

22   you know, off the beaten path, but I trust them.  I know

23   their reputation.

24       Q.   Have you discussed your investment with any of

25   them?



```
 1  know, encouragement that, you know, this does happen.
 2       Q.   Okay.  Before we wrap up --
 3               MR. PHILLIPS:  Do I have time to ask one
 4  more question on this tape?
 5               THE WITNESS:  Two minutes.
 6       Q.   (BY MR. PHILLIPS)  Okay.  Before we wrap up,
 7  other than your faith in him as a friend, is there any
 8  other reason you can give me for why you believe that
 9  you trust this man with your -- with your life savings?
10  Has he said anything to you, have you seen anything, do
11  you have any knowledge or any reason to believe other
12  than your faith in him as a friend and your knowledge of
13  him over time?
14       A.   Other than our background, no.  I mean, I know
15  where he lived when we met, when I met his family, and
16  so the -- I just know the kind of person that he is.  I
17  trust him.
18               MR. PHILLIPS:  Okay.  We're good.  Thank
19  you.
20               THE WITNESS:  Okay.
21               THE VIDEOGRAPHER:  The time is now
22  10:50 a.m.  We are now off record.
23               (Deposition concluded at 10:50 a.m.)
24
25
```

