# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

      Plaintiffs,

v.                                  Case No. 2:13-cv-2578-STA-cgc

INDICO SYSTEM RESOURCES, INC. and
CLEAL WATTS, III,

      Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

In support of their Motion for Summary Judgment, Mary Phillipa Sledge, Mary Jane Pidgeon Sledge Trust, and Pidgeon Sledge Family Limited Partnership ("Plaintiffs") rely on the facts and law set forth herein (and the Statement of Undisputed Material Facts filed contemporaneously herewith and incorporated herein, "Facts") and specifically seek summary judgment as to each of the individual causes of action set forth in their original Complaint.[1] Additionally, Plaintiffs move this Court for a judgment for trebled *or* punitive damages. [2]  In sum, Plaintiffs move this Court for an award of damages in the amount of $22,232,700 (which amount includes invested amounts, prejudgment interest and trebled damages) plus a reasonable

---

[1] Plaintiffs note that on December 9, 2015, Defendants filed with the Court a document styled "Offer of Judgment" which contains the following admission: "Defendants stipulate that there is a factual basis for the allegations and causes of action set forth in Plaintiffs' Complaint filed with this Court on or about June 29, 2013."  (ECF. No. 132).

[2] Although Plaintiffs have asked for both punitive and trebled damages, Tennessee law prohibits Plaintiffs from obtaining *both* treble damages under their TCPA claim and punitive damages on their common law claims, "due to the punitive nature of the treble damages." *Branch Banking & Trust Co. v. Beams,* 2009 WL 113482, at *2 (E.D. Tenn. Jan. 14, 2009) (citing *Concrete Spaces, Inc. v. Sender,* 2 S.W.3d 901, 907 (Tenn.1999))

attorney's fee, as well as findings of fact and conclusions of law as set forth herein.

## FACTUAL BACKGROUND

This action arises out of a fraudulent gold scheme that Defendants Cleal Watts III ("Watts") and Indico System Resources, Inc. ("Indico") first directed at Plaintiffs in November 2011. The scheme was a practiced and nuanced drama that created and, month after month, *nurtured* a false and malignant confidence among Plaintiffs that *Defendants had experience bringing valuable gold dust into the United States* and that Plaintiffs were going to reap substantial returns. As shown herein, Watts' "investment opportunity" - to purchase unrefined gold dust from West Africa for import and sale in the United States - was all a fraud. Watts inveigled Plaintiffs to send more than $5 million dollars to him, some of which he pocketed, some of which he invested for his own benefit, and substantial portions of which he wired to a U.S. dollar account held by a foreign bank. It would take this litigation for Plaintiffs to discover that years before Plaintiffs invested with Watts, he had already taken hundreds of thousands of dollars from other investors who he defrauded in schemes similar to the one he perpetrated on Plaintiffs.

## LEGAL ARGUMENT

As illustrated below, there are no genuine disputes over the material facts that comprise the causes of action in this matter. Because there is no genuine dispute as to any material fact, Plaintiffs are entitled to judgment as a matter of law.

## I.    Summary Judgment Standard.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Caldwell v. George,* 2015 WL 5838622, at *2 (M.D. Tenn. 2015) (citing Rule 56). A "genuine issue of

material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict

for the non-moving party. *Id*. In reviewing a motion for summary judgment, the Court must view

the evidence and all inferences drawn from underlying facts "in the light most favorable to the

party opposing the motion." *Id*. The moving party has the burden of showing the absence of

genuine factual disputes from which a reasonable jury could return a verdict for the non-moving

party. *Id*.

Further, when appropriate, courts in the Sixth Circuit and beyond have granted summary

judgment to plaintiffs on their fraud claims. *See e.g., Bruss N. Am., Inc. v. Robertson*, 2015 WL

5680411 at *3 (W.D.Ky. 2015) (granting summary judgment on fraud claim relating to

embezzlement scheme); *Gardner v. Randall Mortgage Servs., Inc.*, 2009 WL 3756340, at *7-8

(S.D.Ohio 2009) (granting summary judgment on claims relating to fraudulent loan scheme).[3]

## II.    Plaintiffs are entitled to summary judgment on their fraud claims.

To establish a claim for fraudulent misrepresentation, a plaintiff must show that:  (1) the

defendant made a representation of an existing or past fact; (2) the representation was false when

made; (3) the representation was in regard to a material fact; (4) the false representation was

made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied

on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387

S.W.3d 525, 548 (Tenn.Ct.App. 2012).[4]  "Recklessness" means carelessness as to whether the

facts are true or false or without belief in their truth. *Menuskin v. Williams*, 145 F.3d 755, 764-65

---

[3]*See also F.T.C. v. Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir. 2002) (affirming summary judgment on FTC's fraud claim);  *S.E.C. v. Brown*, 579 F. Supp. 2d 1228, 1236 (D. Minn. 2008) *aff'd*, 658 F.3d 858 (8th Cir. 2011) (granting summary judgment to plaintiff on securities fraud claim); *Cole v. Am. Capital Partners Ltd., Inc.*, 2008 WL 2986444, at *6 (S.D. Fla. 2008) (granting summary judgment to plaintiff on fraud claim).
[4] A party asserting a fraud claim must show its elements by a preponderance of the evidence.  *Elchlepp v. Hatfield*, 294 S.W.3d 146, 150 (Tenn. Ct. App. 2008).

(6th Cir. 1998). Importantly, "fraud by its nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence." *Edwards v. Travelers Ins. of Hartford,* 563 F.2d 105, 112 (6th Cir.1977) (citation omitted).

### A.     Watts knowingly or recklessly misrepresented Defendants' ability to supply African gold to Plaintiffs.

Watts misrepresented the fact that Defendants were "ready and able" to supply Plaintiffs with more than $5 million of gold from Africa, which was 91% pure and had a built-in 30% net profit. [*Facts, ¶ 20*].[5] Where, as here, a defendant misrepresents his ability to perform a service or to provide a product, there lies an action for fraud.  *See e.g. Gizzi v. Marinov,* 79 F.3d 1148 (6th Cir. 1996) (affirming fraud finding where defendant induced plaintiffs to invest by misrepresenting his ability to produce high quality gem stones).   Moreover, "strong circumstantial evidence of fraud in a business context occurs when a defendant continues to offer merchandise or services with the knowledge that the defendant's business is insolvent, has defaulted on prior debts, or has left promises to previous customers unfulfilled."  Haddad, Jr., Frank E. and Wallace, Jerome E., *The Appeal of a Federal Mail Fraud Conviction*, 42 AM. JUR. TRIALS § 1 (1991).[6]

---

[5]As a threshold matter, Watts was, at all relevant times, an employee, agent, or servant of Indico and was acting both in his individual capacity as well as in his capacity as president, employee and/or agent of Indico.  Further Watts' individually made all of the oral and written misrepresentations which form the bases for Plaintiffs' claims.  [*Facts, ¶¶1-5, 8-21, 29-31, 34-37*]   Accordingly, he is personally liable for the claims asserted against him. *Cooper v. Cordova Sand & Gravel Co.,* 485 S.W.2d 261, 272 (Tenn. Ct. App. 1971) ("If, however, a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby") (citation omitted).

[6]*U.S. v. Kyle*, 257 F.2d 559, 563 (2nd Cir. 1958) (involving a mail fraud prosecution of subscription toy club that repeatedly solicited subscriptions with the knowledge that it could not supply the promised toys and that it was insolvent at the time).

      1.    *Watts represented that Defendants were "ready and able to supply"*
                *Plaintiffs with more than $5 million in gold dust from Africa.*

In November 2011, Watts proposed an investment opportunity to Plaintiffs to purchase unrefined gold dust from Ghana.  In November and December 2011, and at various times in 2012, Watts represented to Plaintiffs that Defendants were "ready and able to supply" Plaintiffs with more than $5 million worth of unrefined gold dust. These and other representations were made orally and were also contained in documents called "Soft Corporate Offers" emailed by Watts to Plaintiffs.  Watts represented that the millions of dollars' worth of gold to be supplied was more than 91% pure, and had a built in net profit of 30 to 45%. Also, Watts represented to Plaintiffs that he was an experienced gold importer.  [*Facts, ¶¶ 2-3*].  Watts represented that the gold purchased by the Plaintiffs was ready for pick up and would be delivered into the U.S. as early as December 31, 2011. [*Facts, ¶ 4*].  In reliance on these representations, Plaintiffs wired millions of dollars to Defendants to be used to purchase the gold that Watts had described. [*Facts, ¶¶ 25, 28, 32, 37*].  To date, after more than four years, no gold has been delivered. [*Facts, ¶ 6*]

      2.    *Watts' representations were false and were made with knowledge of their*
                *falsity, or at least recklessly, in light of Defendants' History of Failing to*
                *Deliver Gold Promised to Investors.*

Although Plaintiffs did not know it, at the time that Watts represented that he was an experienced gold importer, and that Defendants were "ready and able to supply" Plaintiffs with more than $5 million of 91% pure gold from Ghana, Watts, according to his own deposition testimony, had never successfully delivered gold for anyone else.  In fact, Watts had been soliciting other investors – and taking their money - for 5 years prior to Plaintiffs' investments, but he had never successfully imported gold or produced a return for those investors.  For example in 2006, Defendants solicited Peter Belsky to invest $30,000 to import raw diamonds

from Africa, but never produced any diamonds or return on Mr. Belsky's investment. In 2007, Defendants solicited Ed Pritzkau to invest $53,000 to import unrefined gold dust from Africa and similarly never produced any gold or return on that investment. That same year, Chris Harris gave Defendants $50,000 and John Chu gave $25,000 to import unrefined gold dust from Africa and similarly Defendants never produced any gold or return on that investment. Debra Koper invested $15,000 with Defendants that year, also for gold dust, and also with the same negative results. [*Facts, ¶¶ 8-14*].

In 2008, Defendants solicited Richard Carey to invest $66,000 in another iteration of the same investment and similarly never produced any gold or return on that investment. In 2009, Defendants solicited Sergio Melconian who invested, and lost, $15,000 to the same investment. Tim Williams gave Defendants $50,000 based on these same promises. Neither Melconian nor Williams has seen any gold or money. In 2010, Celene Dutzman invested $39,100 in Defendants' gold investment and in early 2011, Lisa Bartlett gave Defendants $10,000 in reliance on the same promises. Like the others, Dutzman and Bartlett were left empty-handed. [*Facts, ¶¶ 15-19*].

In *Gizzi v. Marinov*, the 6th Circuit analyzed allegations of fraud in light of a defendant's historic conduct. The *Gizzi* Court's rationale is directly applicable here.

> The district court further found that defendant misrepresented to plaintiffs that he had a "perfected process." The district court stated: "It appears to this Court that defendant has some knowledge of gemstones and was trying to perfect a process to make natural looking stones out of small sapphires, but he had never really perfected it. What he was doing was hoping and trying to do it and using other peoples' money with the false statement that he had already done it." J.A. 128 n. 4 (emphasis in original). The district court relied on the facts that defendant had attempted a similar scheme with investors in Virginia and that, during the course of the scheme, Dr. Joel Arem, one of the investors who had a Ph.D. from Harvard University, had confronted defendant prior to plaintiffs' investment. Therefore, the district court concluded that plaintiff knew that his representation regarding his "perfected process" was false when he made it, and we agree.

6

We find no error in the district court's conclusion that all the elements of a fraud claim were present. Defendant made two material representations that were false, and he knew they were false at the time he made them. It also is clear that defendant made these misrepresentations in order to induce plaintiffs to invest with him and that plaintiffs' decisions to invest were based on his background and his ability to produce the high-quality stones. Finally, it is clear that plaintiffs were injured by defendant's fraud. We therefore conclude that the district court did not err in holding defendant liable for fraud in the inducement.

*Gizzi v. Marinov*, 79 F.3d 1148 (6th Cir. 1996).

For five years preceding the representations to Plaintiffs, Defendants had consistently failed to deliver on their promises to supply African gold to investors. Thus, at the time Defendants solicited money from Plaintiffs for gold purchases, Defendants were in fact not "ready and able" to supply the gold as Watts had represented. To the contrary, Defendants had repeatedly failed to consummate any of the ostensible gold "investment" opportunities they had offered to others. Watts' scheme was fraudulent because he *knew* he could not import such a large quantity of gold or, at least, acted with a reckless disregard as to whether he would be able to supply the gold that he told Plaintiffs he was "ready and able to supply". [*Facts, ¶ 20*].[7]

> 3.    *Further evidence of fraud arises from Watts' fabricated excuses for delays in shipments and contradictory statements regarding gold.*

Further evidence of the fraudulent scheme arises from numerous deceptions and fabricated excuses used by Watts to explain the delays in the delivery of Plaintiffs' alleged gold shipment. More specifically, on December 10, 2011, after Plaintiffs had initially invested $2 million, Watts sent Plaintiffs a schedule purportedly confirming Plaintiffs' gold purchases. Watts stated that by December 31, 2011, he and the "Chief" would be bringing in gold shipments

---

[7]*Gizzi v. Marinov*, 79 F.3d 1148 (6th Cir. 1996); *S.E.C. v. AIC, Inc.*, 2014 WL 3810667, at *1 (E.D.Tenn. 2014) (finding fraudulent investment scheme based upon defendant's misrepresentations regarding ability to repay notes). *See also U.S. v. Kyle*, 257 F.2d 559, 563 (2nd Cir. 1958) (mail fraud prosecution of subscription toy club that repeatedly solicited subscriptions with the knowledge that it could not supply the promised toys, and that it was insolvent at the time).

with a total value of more than \$23 million, which included Plaintiffs' gold. Days later, in reliance on Watts' representations, Plaintiffs wired another \$1 million to purchase more gold which would purportedly be part of the upcoming shipment. [*Facts, ¶¶ 26-28*].

However, no gold was delivered in December 2011. According to Watts, he had flown to Africa to pick up the gold, but while en route the owner of the chartered plane had learned of a coup in one of the African countries and ordered that the pilot divert the plane to a safer location. As a result, according to Watts, he was unable to pick up the gold shipment. [*Facts, ¶ 29*].

Despite failing in December 2011, for months Watts told Plaintiffs that he was still working on it and continued to solicit additional funds from Plaintiffs for the purchase of more gold. When the promised gold was not delivered, Watts gave Plaintiffs various explanations as to why the gold had not been delivered. For example, in June and July 2012, Watts sent articles to Plaintiffs purportedly from Ghanaian newspapers, with other documents, describing delays in the shipment caused by an alleged theft attempt and related criminal proceedings. In August 2012, Watts sent Plaintiffs additional documents and articles describing further alleged delays due to mechanical problems with the plane transporting the gold. [*Facts, ¶¶ 30-31*].

At the time, Plaintiffs believed the articles and documents from Watts and his statements regarding the delays were true, and continued to invest based upon his representations that additional funds were necessary to bring in the gold shipment. However, shortly after filing this lawsuit, Plaintiffs obtained the declaration of a reporter for one of the Ghanaian newspapers who testified that the articles sent by Watts were fraudulent. Even Watts during his deposition admitted that the articles were likely fabricated, and that he may have known this as early as June 2012, but he nevertheless continued thereafter to forward articles and related documentation to Plaintiffs to explain the constant delays in the gold shipments. [*Facts, ¶¶ 32-34*].

8

Additionally, on December 4, 2012 Watts sent a purported insurance policy covering the gold which Watts called Plaintiffs' "trump card". The purported policy was issued by a London company known as "Ince & Co." After the commencement of this litigation, Plaintiffs confirmed with a representative of Ince & Co. that this document was fraudulent. [*Facts, ¶ 35*].

From December 2012 through July 2013 when this lawsuit began, Watts continued to give reports regarding the status of Plaintiffs' purported gold and the multiple unsuccessful efforts to get the gold to the U.S. Throughout this period, while Plaintiffs were making their investments, Watts frequently told Plaintiffs that "the only way you lose in this is if you quit." After four years, countless excuses, and more than $5 million invested, no gold has been received. [*Facts, ¶¶ 36-37*]. As he did with Plaintiffs, Watts also told his previous gold investors stories about endless delays of the purported gold shipments, providing further evidence that he knowingly perpetrated a fraudulent scheme. [*Facts, ¶¶ 10-11, 14, 16-17*].[8]

In addition to deception regarding the shipments, Watts has contradicted his own statements regarding the Plaintiffs' gold. For example, during his deposition Watts was asked whether he had filed an insurance claim or whether he or Indico had an insurance policy with respect to the Plaintiffs' gold. Watts responded "No. No. Never", and stated that any insurance on Plaintiffs' gold would have to be in the name of an African party. But Watts did testify that he had paid insurance premiums on behalf of the Plaintiffs. Later during this deposition, however, Watts was confronted with an insurance policy he sent to Plaintiffs on December 4, 2012, which he had referred to as Plaintiffs' "trump card." Contrary to Watts' earlier testimony, on this purported policy, Defendants are, in fact, the named insureds. Moreover, as noted above, this policy was fabricated. [*Facts, ¶¶ 46-47*].

---

[8]*See U.S. v. Price*, 623 F.2d 587, 593 (9th Cir. 1980) (finding that defendant's use of fabricated excuses and misleading statements demonstrated that defendant had knowledge and intent to defraud).

Also, at his deposition Watts was asked about the "Chicago investor" group, a group of investors who Watts had told Plaintiffs about prior to the lawsuit. Watts testified that he had no idea who the "Chicago investor" group was. When confronted with a voicemail he had left for Plaintiffs however, wherein Watts can be heard representing that he was waiting for a Chicago investor group to support the investment, Watts changed his story. [*Facts, ¶ 48*].

Also during his deposition, Watts described a meeting he had had with a "Chief Alimamy Kamara" and a "Chief Ibrahim Kamara" in Africa to discuss gold. However, several months prior to the deposition, in response to Request for Admissions, Watts admitted that he had never met in person with "Chief Alimamy Kamara" or with "Chief Ibrahim Kamara." When confronted with his contradictions during the deposition, Watts began to claim, for the first time, that there were *multiple* chiefs with the same name and that he would "have to make a phone call" to determine which was which. [*Facts, ¶¶ 49-51*].

The many self-contradictory statements made by Watts regarding the purported gold investment provide further and substantial evidence that Defendants have perpetrated a fraudulent scheme.[9]

4.    *Defendants' insolvency and misuse of Plaintiffs' funds provide further evidence of a fraudulent scheme.*

During his deposition, Watts revealed that he had no regular source of income, that he had never earned more than $25,000 a year in his life, and that he has never owned a home or significant personal property other than a pick-up truck given to him by his mother. Further, Watts has never received a W-2 or held a full-time job, and does not have a personal bank account. Also, immediately prior to the Plaintiffs' investments, Defendant Indico had less than $300 in its bank account. [*Facts, ¶¶ 5, 23-24*].

---

[9]*See also U.S. v. Galasso*, 50 F. App'x 488, 489-90 (2d Cir. 2002) (defendant's own "multiple contradicting statements" supported conviction for mail fraud).

In a business context like the present one where the Defendants had a history of failing to deliver gold to others, the fact of the Defendants' insolvency provides strong circumstantial evidence of an intentional fraudulent scheme.[10] Indeed, the financial condition of Defendants is contrary to Watts' representations to Plaintiffs that Defendants were experienced gold importers and that they were "ready and able to supply" more than $5 million in gold dust from Africa.

Defendants' fraudulent actions were also evidenced by their misuse of Plaintiffs' funds. For example, beginning in December 2011 and through 2012, Defendants frequently sent statements to Plaintiffs purportedly showing the Plaintiffs' gold purchases. [*Facts, ¶¶ 38, 45*]. In reality, however, Defendants' bank records show that Watts was using Plaintiffs' funds to pay his own personal expenses, to invest $1 million in U.S. based investment accounts owned by Defendants, and to pay certain U.S. based individuals; none of these had anything to do with purchasing gold from Ghana. [*Facts, ¶¶ 38-41*]. Further, Defendants sent the majority of the funds to a Nigerian bank's U.S. Dollar correspondent bank account. [*Facts, ¶¶ 41*].[11] Although the correspondent account is not titled in Defendants' names, Watts revealed in a letter to Bank of America that Defendants control the account and are using the funds for multiple business purposes, which do not include purchasing gold for the Plaintiffs. [*Facts, ¶¶ 42-43*].

---

[10] *See U.S. v. Kyle*, 257 F.2d 559, 563 (2nd Cir. 1958) *cert den Gardner v. U.S.*, 358 U.S. 927 (1959) (mail fraud prosecution of subscription toy club that repeatedly solicited subscriptions with the knowledge that it could not supply the promised toys, and that it was insolvent at the time).

[11] Correspondent accounts like the one used by Defendants have been described as follows:

> Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions….Because interbank accounts can be used to complete transactions in the United States without the need to directly establish an account in the United States, **they can be vehicles for money laundering** …

*United States v. Union Bank For Sav. & Inv. (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007) (emphasis added).

In sum, Plaintiffs have submitted undisputed evidence showing that (1) Defendants' misrepresentations that they were experienced gold importers and were "ready and able to supply" Plaintiffs more than $5 million in gold from Ghana were false in light of Defendants' repeated failures to deliver gold from Africa to other investors during the preceding five years; (2) Defendants provided fabricated excuses to Plaintiffs regarding delays in gold shipments and provided a fraudulent insurance policy which Watts told Plaintiffs was the "trump card" to protect their investment; (3) Watts made multiple self-contradicting statements regarding his efforts to obtain Plaintiffs' gold; (4) Defendants were virtually insolvent prior to the Plaintiffs' investments and since that time have deceptively misused Plaintiffs' funds for their personal purposes and for other expenditures which were not authorized by Plaintiffs; and (5) after more than four years none of the promised gold has been delivered.  In addition, on November 18, 2015, the United States Department of Justice sent Watts a letter notifying him of a parallel criminal investigation and asserting that the gold investment was a fraudulent scheme.  [*Facts, ¶ 52*].

The foregoing is strong evidence that Watts knowingly or recklessly misrepresented Defendants' ability to supply African gold to Plaintiffs.

**B.    Watts' misrepresentations were in regard to a material fact; Plaintiffs reasonably relied on the misrepresented fact; and Plaintiffs suffered damages as a result of the misrepresentations.**

Plaintiffs have submitted undisputed evidence satisfying the remaining elements of their fraud claims. To wit, Watts' misrepresentations were in regard to a material fact, Plaintiffs reasonably relied on the misrepresented fact, and Plaintiffs suffered damages as a result.

A fact is material if a reasonable person would attach importance to it in determining his action.  *Lowe v. Gulf Coast Dev., Inc.,* 1991 WL 220576, at *8, (Tenn.Ct.App. 1991).  The

misrepresentations made by Watts are material because any reasonable investor would have attached importance to representations that Defendants were experienced gold importers and were "ready and able to supply" more than $5 million in pure gold from Ghana.

Reasonable reliance is frequently defined as "what would be reasonable for a prudent man to do under those circumstances." *Field v. Mans*, 516 U.S. 59, 63, (1995). Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach. *Allied Sound, Inc. v. Neely,* 58 S.W.3d 119, 123 (Tenn.Ct.App. 2001). Plaintiffs reasonably relied on the representations. Plaintiffs were introduced to Watts by a longtime friend who had given good investment advice in the past. The friend vouched for Watts and said he came from a well-respected Texas family. Plaintiffs had several calls with Watts before making their initial investments. [*Facts, ¶ 6*]. Also, Plaintiffs' only source of information about the status of their investments was Watts. [*Facts, ¶ 54*]. Further, at least 10 other investors made similar investments with Watts. [*Facts, ¶¶ 10-19*].

Where a defendant's fraudulent misrepresentations caused actual damages, courts allow a "general measure" of compensatory pecuniary damages. Restatement (Second) of Torts § 549(1) and cmt. a. In such cases, special, consequential or indirect damages may also be recoverable. Restatement (Second) of Torts § 549(1)(b) and cmt. d (1977). These additional damages are defined as those "that might reasonably be expected to result from reliance upon the misrepresentation. Restatement (Second) of Torts § 549 cmt. d (1977). It is undisputed that Plaintiffs suffered the loss of at least $5,293,500 as a direct result of Watts' fraudulent misrepresentation. [*Facts, ¶ 25*]. In addition, Plaintiffs never received the thirty percent (30%) benefit promised to them by Watts as part of each contract to purchase gold. [*Facts, ¶ 37*].

13

Plaintiffs have also suffered special, consequential and indirect damages, which are sought elsewhere herein.

In conclusion, because the facts necessary to prove Plaintiffs' claim for fraud against Watts are undisputed, Plaintiffs are entitled to summary judgment.[12]

### III.    Plaintiffs are entitled to summary judgment on their Conversion, Trover and Misappropriation Claim against Watts.

Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012). Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Id.* Property may be converted in three ways. *Id.*   First, a person may personally dispossess another of tangible personalty. *Id.* Second, a person may dispossess another of tangible property through the active use of an agent. *Id.* Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for "receiving a chattel." *Id.*   Trover lies for the conversion of <u>determinate sums</u>, such as tax receipts or insurance premiums, <u>where there is an obligation to keep the money intact or to deliver it</u>. *PNC Multifamily*

---

[12] To the extent Defendants argue that their conduct merely sounds in contract and not tort, Tennessee Courts have held conduct similar to that herein to be fraud, or *promissory fraud*, when the offeror has no "present intention to carry out the promise" at the time the promise is made. *See e.g. Steed Realty v. Oveisi,* 823 S.W.2d 195, 200–201 (Tenn.Ct.App.1991) (finding promissory fraud when real estate vendor induced vendees to purchase property by promising to make certain improvements, when evidence demonstrated vendor never intended to make the improvements)).  Further, promises of future action "can be the basis of fraud if there is no present intention **or ability to perform them**." *St. v. J.C. Bradford & Co.*, 886 F.2d 1472, 1483 (6th Cir. 1989) (emphasis added).  In the instant case Defendants never had any intent or ability to carry out their promises as demonstrated by:  the history of Defendants' failures in delivering gold to other investors and their failure to do so in the present case; Watts' transfer of Plaintiffs' funds to Indico's private brokerage accounts; Watts' extensive personal use of Plaintiffs' funds and Watts' fabricated excuses and multiple self-contradicting statements regarding Plaintiffs' purported gold.

*Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553-54 (Tenn. Ct. App. 2012).  Where the defendant is under an obligation to deliver specific money to the plaintiff and fails or refuses to do so, or when wrongful possession of it has been obtained by the defendant, there is a conversion for which trover lies. *Id.* Misappropriated funds placed in the custody of another for a definite purpose may be subject to suit for conversion.  *Id.*

Defendants transferred Plaintiffs' funds to Defendants' own brokerage accounts, and used the funds for Watts' personal expenses and for other unauthorized purposes, without the knowledge or consent of Plaintiffs. [*Facts, ¶¶* 33-45]  Defendants were obligated to produce gold or to rescind the transactions and an action for conversion and trover is therefore appropriate.

**IV.    Plaintiffs are entitled to summary judgment on negligent misrepresentation claim.**

To show negligent misrepresentation one must prove: (1) that the defendant was acting in the course of its business, profession, or employment, (2) that the defendant supplied false information for the guidance of others in its business transactions, (3) that the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) that the plaintiff justifiably relied on the information. *Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn.Ct.App. 2004).  For the reasons set forth in Section II above, Plaintiffs are entitled to summary judgment on their intentional misrepresentation claims.  To the extent this Court finds that Defendants are not liable for intentional misrepresentation, they are liable for negligent misrepresentations.

**V.    Plaintiffs are entitled to summary judgment on their TCPA claim.**

Under the Tennessee Consumer Protection Act ("TCPA") the plaintiff must prove that: (1) the defendant engaged in an unfair or deceptive act, and (2) the defendant's conduct caused an "ascertainable loss." TENN.CODE ANN. § 47–18–109(a)(1)).  If the defendant's conduct is

15

willful, treble damages may be awarded. TENN.CODE ANN. § 47–18–109(a)(3). A deceptive act

is one that causes a consumer to believe what is false or that misleads a consumer as to a matter

of fact. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115-17 (Tenn.Ct.App. 2005).   An act is

unfair if it causes substantial injury." *Id.*   Defendants made myriad false representations to

Plaintiffs in order to induce Plaintiffs to invest in a bogus gold scheme.   Defendants' conduct

satisfies the standard under the TCPA as it was both deceptive <u>and</u> unfair.   Defendants' conduct

also warrants trebled damages because it was willful and knowing.

**VI.**   **Plaintiffs are entitled to summary judgment on their securities claims.**

**A.**   **Violation of §10(B) of the Securities & Exchange Act Of 1934 and Rule 10b-5**

Section 10(b) of the Securities and Exchange Act expressly provides that "it shall be

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of

interstate commerce, or of the mails or of any facility of any national securities exchange,(a) To

employ any device, scheme, or artifice to defraud,(b) To make any untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading, or (c) To engage in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon any

person, in connection with the purchase or sale of any security.   15 U.S.C. § 78j(b) (the "Act").

An investment contract is a "security" for purposes of both the Securities Act and the

Securities Exchange Act if the contract meets three criteria:  (1) an investment of money (2) in a

common enterprise (3) with a reasonable expectation of profits to be derived solely from the

efforts of others. *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946).  The contracts at issue clearly

involved the "investment of money," meeting the first *Howey* element.

Next, to determine whether there is a "common enterprise" for the purposes of the *Howey* test, the Sixth Circuit follows the "horizontal commonality" approach. *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir. 1989). Horizontal commonality exists if the "funds of two or more investors ... go into a 'common pool from which all may benefit.'" *Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir.1993). This accurately describes the investment scheme perpetrated by Defendants. The investments at issue were made by three separate Plaintiffs.[13] Additionally, it is undisputed that the particular investments involving Plaintiffs' funds *also* involved the funds of other investors. [*Facts, ¶ 7*].

Finally, Defendants' scheme promised profits as a result of Defendants' own efforts and the efforts of others in Africa. [*Facts, ¶¶ 2-4, 8*].

It is undisputed that Watts made untrue statements of material fact <u>and</u> omitted to disclose material facts necessary to make his statements not misleading. Defendants' conduct operated as a fraud or deceit upon Plaintiffs in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). For these reasons, Plaintiffs are entitled to summary judgment against Defendants under the Securities and Exchange Act of 1934.

### B.    Violation of §20(A) of the Securities And Exchange Act of 1934 by Watts.

Section 20(a) of the Securities and Exchange Act of 1934 expressly provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."15 U.S.C.A. § 78t. In order to prove a case under section 20(a), a plaintiff must prove a primary violation of federal securities laws and that the targeted defendants exercised actual

---

[13] For these purposes, the three Plaintiffs are considered separate and distinct investors even if there is some common ownership or affiliation between them. *See Investors Credit Corp. v. Extended Warranties, Inc.*, 1989 WL 67739, 27 (M.D.Tenn. 1989).

power or control over the primary violator. *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F.

Supp. 2d 334, 356 (W.D. Tenn. 2001). It is undisputed that Watts was in complete control of

Defendant Indico. [*Facts, ¶ 1*]. Watts is therefore liable for Indico's conduct.

      **C.**    **Claim under §12(1) of the Securities Act of 1933 against Indico and Watts.**

Section 12(1) of the Securities Act of 1933 expressly provides that "[a]ny person who…

offers or sells a security in violation of section 77e of this title...shall be liable...to the person

purchasing such security from him…" 15 U.S.C.A. § 77l(a)(1). Section 77e deals with the

failure to register securities and the failure to meet prospectus requirements. 15 U.S.C.A. § 77e.

To recover, Plaintiffs need only show that the securities were unregistered. *Riedel v. Acutote of*

*Colorado*, 773 F. Supp. 1055, 1063 (S.D. Ohio 1991). Because Defendants did not register the

Plaintiffs' investments, [*Facts, ¶ 53*], Plaintiffs are entitled to summary judgment.

      **D.**    **Claim under §12(1) of the Securities Act of 1933 against Indico and Watts.**

Section 12(1) is also violated if a person "offers or sells a security...by the use of any

means or instruments of transportation or communication in interstate commerce or of the mails,

by means of a prospectus or oral communication, which includes **an untrue statement of a**

**material fact or omits to state a material fact necessary in order to make the statements**…."

15 U.S.C.A. § 77l(a)(2)(emphasis added). Defendants made untrue statements of material fact

and omitted to disclose other material facts to Plaintiffs by use of electronic mail in order to sell

their investments to Plaintiffs. Therefore, summary judgment in favor of Plaintiffs is warranted.

**VII.**  **Plaintiffs are entitled to summary judgment on breach of contract claim.**

A breach of contract claim includes the following elements: (1) an enforceable contract;

(2) breach of the contract, and (3) damages caused by the breach. *ARC LifeMed, Inc. v. AMC-*

*Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn.Ct.App. 2005). The agreements at issue were

18

enforceable, Defendants have breached the agreements by not delivering the promised gold and profit, and Plaintiffs have suffered damages as a result. Plaintiffs are therefore entitled to summary judgment on the breach of contract claim.

## VIII.  Plaintiffs are entitled to summary judgment on breach of fiduciary duty and negligence claims.

A claim for breach of fiduciary duty requires a relationship where confidence is reposed by one party in another who exercises dominion and influence and who has the duty to act primarily for the benefit of the reposer. *Fugate v. United Tel. Se., Inc.*, 2007 WL 1345443, at *2 (M.D. Tenn. 2007). A fiduciary has "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients."  *S.E.C. v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985). Plaintiffs reposed confidence in Watts. Watts was acting primarily for Plaintiffs. [Facts No. 25] Watts' breached his fiduciary duties by concealing his history of failure, by representing he was "ready and able" to supply gold, and by misappropriating Plaintiffs' funds.  Accordingly, Plaintiffs are entitled to summary judgment.

The elements of negligence are: (1) a duty of care owed by defendant, (2) a breach of this duty, (3) an injury or loss, (4) a cause-in-fact connection between the injury or loss and defendant's conduct, and (5) the existence of proximate or legal cause. *Draper v. Westerfield,* 181 S.W.3d 283, 290 (Tenn.2005).  Watts owed Plaintiffs certain duties by virtue of his representations to them, his relationship with them and his status as agent with regard to the ostensible gold transactions.  Watts breached these duties by misrepresenting his history and qualifications and omitting material facts and by misusing Plaintiffs' funds.  Plaintiffs have suffered damages as a proximate result, and are therefore entitled to summary judgment.

19

**IX.**   **Plaintiffs are entitled to summary judgment on fraudulent transfer claims.**

The elements of a fraudulent transfer claim are that (1) Creditor's claim arose before the transfer; (2) Debtor makes a transfer for which it did not receive a reasonably equivalent value in exchange; and (3) the Debtor was insolvent or rendered insolvent by the transfer. *Stone v. Smile*, 2009 WL 4893563, *4 (Tenn. Ct. App. 2009); Tenn. Code Ann. § 66-3-306.  It is undisputed that Plaintiffs' funds were wired to Defendant Indico and that Watts, caused Indico to transfer funds to bank accounts from which Watts paid his own substantial *personal* expenses and made certain other unauthorized expenditures.  These transfers were made without Watts providing to Indico a fair consideration and with the effect of rendering Indico insolvent.  Plaintiffs are therefore entitled to summary judgment against Watts for these fraudulent transfers.

**X.**   **Plaintiffs are entitled to punitive damages.**

A court may award punitive damages if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992).  The undisputed facts, taken together, clearly show intentional bad conduct.  This is particularly true in light of the following undisputed facts described in greater detail elsewhere herein:  Watts misrepresented his ability to import gold, concealed his history of failure, did not disclose that he was transferring  Plaintiffs' funds to  Defendants' personal brokerage accounts instead of sending them to Africa, and diverting Plaintiffs' funds for his personal use. Because Defendants' conduct was indisputably reckless, and most likely intentional, Plaintiffs are entitled to summary judgment as to their claim for punitive damages.

**XI.**   **Plaintiffs are entitled to total damages of not less than $22,232,700.**

In addition to the findings of fact and conclusions of law sought herein, Plaintiffs seek a total damages award of $22,232,700, plus reasonable attorneys' fees and costs.  This amount

includes the amount of Plaintiffs' investments, pre-judgment interest, trebled damages, pre-judgment interest and a reasonable attorney's fee.

TENN.CODE ANN. § 47-14-123 permits an award of prejudgment interest not to exceed ten percent per annum. The purpose of prejudgment interest is not punitive, but to fully compensate a prevailing plaintiff for the loss of the use of those funds to which he was entitled. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998). Equity must be the trial court's guiding principle when determining whether an award of prejudgment interest is warranted. *Id.* Some of the equitable principles which may be considered include whether the amount owed by the defendant was easily ascertainable, whether the plaintiff unreasonably delayed filing suit, whether the plaintiff delayed the proceedings after filing the action, whether the defendant had full access to and use of the money, and whether the plaintiff has been otherwise compensated for the loss of use of the funds. *Scholz v. S.B. Intern., Inc.,* 40 S.W.3d 78, 84 (Tenn.Ct.App.2000). An award of prejudgment interest is within the sound discretion of the trial court. *Myint,* 970 S.W.2d at 927(citations omitted).

Pre-judgment interest may also be awarded in the case of a violation of the Tennessee Consumer Protection Act. *Solomon v. Hager,* 2001 WL 1657214, at *13 (Tenn. Ct. App. 2001). Finally, Plaintiffs seek an award of a reasonable attorney's fee, as permitted by the Tennessee Consumer Protection Act, to be determined subsequent to a finding of summary judgment.  The total damages are calculated as follows

| Amount | Nature of Damages |
|---|---|
| $5,293,500 | Amount Invested |
| $2,117,400 | Pre-Judgment Interest at 10% per annum from December 2011 |
| $14,821,800 | Trebled damages (actual damages *times* two - to be added to actual) |
| $22,232,700 | **Total** |

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs summary judgment as to their entire Complaint, to include an award of damages in the amount of $22,232,700, plus reasonable attorneys' fees and costs incurred in this litigation.

Respectfully Submitted,

/s/ Darrell N. Phillips
PIETRANGELO COOK PLC
Anthony C. Pietrangelo BPR # 15596
John J. Cook BPR # 17725
Darrell N. Phillips BPR #30299
6410 Poplar Avenue, Suite 190
Memphis, TN38119
901.685.2662
901.685.6122 (fax)
*dphillips@pcplc.com*
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of January 2015, a copy of the foregoing electronically submitted document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

Randall Fishman
Richard Townley
Ballin, Ballin & Fishman
200 Jefferson Ave., Suite 1250
Memphis, TN 38103

/s/ Darrell N. Phillips