# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

    Plaintiffs,

v.   Case No. 2:13-cv-2578-STA-cgc

INDICO SYSTEM RESOURCES, INC. and
CLEAL WATTS, III,

    Defendants.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Mary Phillipa Sledge, Mary Jane Pidgeon Sledge Trust, and Pidgeon Sledge Family Limited Partnership ("Plaintiffs"), by and through counsel, hereby file this Statement of Undisputed Material Facts, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, in support of its Motion for Summary Judgment against Indico System Resources, Inc. and Cleal Watts III ("Defendants").

    1.    At all relevant times, Defendant Cleal Watts ("Watts") was an employee, agent, or servant of Defendant Indico System Resources, Inc. ("Indico") and was acting both in his individual capacity as well as in his capacity as sole shareholder, president, an employee and/or agent of Indico. *Affidavit of Cleal Watts*, (**"Watts Affidavit"**), dated November 22, 2013 (ECF No. 11-2), **Exhibit A**, *¶¶ 3, 4, 14, 29; Declaration of Phillipa Sledge (***"Sledge Decl"***), Exhibit B, ¶ 3; Deposition of Cleal Watts, (***"Watts Depo"***), Exhibit C hereto, p. 66:10-11.*

**Watts' representations regarding Defendants' ability to supply gold to Plaintiffs**

*2.* In November 2011, Watts proposed an investment opportunity to Plaintiffs whereby Plaintiffs would purchase unrefined gold dust from Ghana. In November and December 2011, and at various times in 2012, Watts represented to Plaintiffs that Defendants were "ready and able" to supply Plaintiffs with over $5 million worth of unrefined gold dust. These and other representations were made orally and were also contained in documents called "Soft Corporate Offers" emailed by Watts to Plaintiffs. *Watts Depo, Ex. C hereto, pp. 110-118; Sledge Decl, Ex. B, ¶¶ 7, 8.*

3. Watts represented that the millions of dollars' worth of gold dust to be supplied was more than 91% pure, and had a built in net profit (ROI) of 30 to 45%. *See Sledge Decl, Ex. B, ¶¶7-9.* Also at the time, Watts represented to Plaintiffs that he was an experienced gold importer. *Watts Depo, Ex. C, p.113:17-22; Sledge Decl, Ex. B, ¶10.*

4. Watts represented that the gold purchased by the Plaintiffs was ready for pick up and would be delivered into the United States as early as the end of December 2011. *Sledge Decl, Ex. B, ¶11.*

5. Watts did not tell Plaintiffs that at the time of these solicitations, he had fewer than $300 in Defendant Indico's bank account. *Watts Depo, Ex. C, p. 111-112; Sledge Decl, Ex. B, ¶13.*

6. Plaintiffs were introduced to Watts by a longtime friend who had given Plaintiffs good investment advice in the past. This friend vouched for Watts and told Plaintiffs that Watts came from a prominent, well-respected Texas family. *Sledge Decl, Ex. B, ¶¶ 5, 6.* Plaintiffs had several calls with Watts before making their initial investments. *Id., ¶¶ 6, 14.* In reliance on Watts' representations, Plaintiffs wired millions of dollars to the Defendants' bank accounts

expecting that the funds would be used to purchase the gold that Watts had described. *Id., ¶15*. To date, after more than 4 years, no gold has been delivered. *Id., ¶¶ 26, 66*.

7.   At the time of Plaintiffs' investments, Plaintiffs' funds were combined with those of other investors. *Watts Depo, Ex.C, p. 304:1-12; Sledge Decl, Ex. B., ¶16*.

### **Defendants' History of Failing to Deliver Gold Promised to Investors**

8.   Although Plaintiffs did not know it, as of the time that Watts represented that he was an experienced gold importer, and that Defendants were "ready and able" to supply Plaintiffs with over $5 million of 91% pure gold from Ghana, in point of fact Watts, according to his own testimony, had never successfully delivered gold or returns on gold investments for anyone else. *Watts Depo, Ex. C, pp. 94-97; Sledge Decl, Ex. B., ¶¶ 17-18*.

9.   At the time of these representations, Watts knew that Defendants were <u>not</u> "ready and able to supply" $5 million worth of gold to Plaintiffs, or at least acted with a reckless disregard as to the truth of these representations. Watts had been soliciting other investors for 5 years prior to Plaintiffs' investments, but he had never successfully imported gold or produced a return for them. *Id.*

10.   For example, in 2006, Watts solicited Peter Belsky to invest $30,000 to import raw diamonds from Africa, and after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., Watts never produced any diamonds or return on Mr. Belsky's investment. *Declaration of Peter Belsky,* **Exhibit D***; Watts Depo, Ex.C, pp. 337-38.*

11.   In 2007 Watts solicited Ed Pritzkau to invest $53,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or return on that investment. *Deposition of Ed Pritzkau,* **Exhibit E** *hereto ("Pritzkau Depo"), pp. 6-10; Watts Depo, Ex. C, pp. 328-29.*

3

12. In 2007 Watts solicited Chris Harris to invest $50,000 to import gold dust from Africa and never produced any gold or return on that investment. *Pritzkau Depo, Ex. E, p. 12; Watts Depo, Ex. C, pp. 328-29; Deposition of John Chu,* **Exhibit F** *hereto ("Chu Depo"), pp.26-30.*

13. In 2007 Watts solicited Debra Koper to invest $15,000 to import gold dust from Africa and never produced any gold or return on that investment. *Deposition of Debra Koper,* **Exhibit G***, pp.33-34.*

14. In 2007 Watts solicited John Chu to invest $25,000 to import gold dust from Africa and, after reports from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or any return on that investment. *Chu Depo, Ex. F, 26, 30-32.*

15. In 2008 Watts solicited Richard Carey to invest $66,000 to import gold dust from Africa and never produced any gold or return on that investment. *Watts Depo, Ex. C, pp. 272, 284, 286, 314:18-20; Miscellaneous Bank of America records,* **Exhibit J***, BANKOFAMERICA000701, BANKOFAMERICA000716, BANKOFAMERICA000737.*

16. In 2009 Watts solicited Sergio Melconian to invest $15,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or return on that investment. *Declaration of Sergio Melconian,* **Exhibit H***.*

17. In 2009 Watts solicited Tim Williams to invest $50,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or return on that investment. *Declaration of Tim Williams,* **Exhibit I***.*

18. In 2010 Watts solicited Celene Dutzman to invest $39,100 to import gold dust from Africa and never produced any gold or return on that investment. *Watts Depo, Ex. C, p. 118:12-16; p. 260:14-20; p. 263:22-25; p. 264; Miscellaneous Bank of America records, Ex. J, BANKOFAMERICA000810*; *Miscellaneous Chase records, Ex. K, CHASE000364, CHASE000368, CHASE000374.*

19. In 2011 Watts solicited Lisa Bartlett to invest $10,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or any return on that investment. *Deposition of Lisa Bartlett,* **Exhibit L***, pp.23, 33.*

### Defendants' Specific Misrepresentations to Plaintiffs

20. Despite all of these failures over the previous 5 years, in November and December 2011 and thereafter, Watts falsely represented to Plaintiffs that Defendants were experienced gold importers and that Defendants were "ready and able to supply" Plaintiffs with more than $5 million worth of gold dust from Africa. *Sledge Decl, Ex. B., ¶¶ 7-8, 10, 11; Watts Depo, Ex. C, pp. 94-97.*

21. Watts has never seen nor inspected Plaintiffs' purported gold, even though he represented that Plaintiffs were purchasing a certain quantity of gold and that the purported gold was 91% pure. Watts had no way of knowing the purity of the alleged gold dust. *Watts Depo, Ex. C, pp. 129-30; Sledge Decl, Ex. B. ¶19.*

22. At the time, Plaintiffs did not know these representations by Watts were false. *Sledge Decl, Ex. B. ¶20.*

23. Similarly, at the time Plaintiffs did not know, as Watts later revealed during his deposition in this case, that Watts had no regular source of income, that he had never earned

more than $25,000 a year in his life, and that he has never owned a home or any significant personal property other than a used pick-up truck given to him by his mother. *Sledge Decl, Ex. B. ¶21; Watts Depo, Ex. C, pp. 33, 40, 65, 361.*

24. Plaintiffs also did not know that:

(a) Watts has primarily lived with his parents and now with his lady friend, Debra Koper. He paid Koper rent in 2000 but has not paid her any rent since that time. *Watts Depo, Ex. C, pp. 33-36.*

(b) Watts has never received a W-2. *Watts Depo, Ex. C, p. 38.*

(c) Watts has never held a full-time job. *Watts Depo, Ex. C, p. 40.*

(d) Watts' only liquid asset is his pick-up truck. *Watts Depo, Ex. C, p. 65.*

(e) Watts does not even have a personal bank account. *Watts Depo, Ex. C, p. 71.*

25. In reliance on Watts' material misrepresentations, Plaintiffs advanced $5,293,500 to Defendants during the period of November 2011 through October 2012, purportedly for the purchase of unrefined gold dust. *Sledge Decl, Ex. B, ¶¶ 15, 23-25, 29, 30-31, 39, 40, 44, 56, 60, 66, 78.* Defendants were working on behalf of Plaintiffs in connection with the gold purchases. *Watts Depo, Ex. C, p. 122.* Plaintiffs placed trust and confidence in the faithful integrity of Watts as a result of his representations to Plaintiffs that he had considerable experience and expertise in making investments in gold and in representing investors in the gold market, and as a result Watts gained superiority or influence over the Plaintiffs. *Sledge Decl, Ex. B, ¶23.*

26. On or about December 10, 2011, after Plaintiffs had made initial investments of $2 million, Watts sent an email to Plaintiffs with a schedule purportedly confirming the Plaintiffs' gold purchases. The email had a schedule attached entitled "Philapa and Entities Au Buy/Sell Transactions". "Au" is the element symbol for Gold. Watts' email also stated that by

6

December 30 or 31, 2011, he and the "Chief" would be bringing in gold shipments totaling 614 kilograms. *Sledge Decl, Ex. B, ¶24.*

27. During Watts' deposition in this case, he testified that one kilogram of gold is worth $33,000. Based on this value, the 614 kilograms that Watts purportedly was bringing in December 2011 would have been worth $23.5 million. *Watts Depo, Ex. C., p. 93; Sledge Decl, Ex. B, ¶24.*

28. A few days later, in reliance on Watts' representations, on or about December 20, 2011, the Plaintiffs wired another $1 million to Defendants' bank accounts to purchase more gold which would purportedly be part of the upcoming shipment. *Sledge Decl, Ex. B, ¶25.*

29. No gold was delivered in December 2011. *Id., ¶26.* According to Watts, he had flown to Africa to pick up the gold, but while en route the owner of the chartered plane had learned of a coup in one of the African countries and ordered that the pilot divert the plane to a safer location. As a result, according to Watts, he was unable to pick up the gold shipment. *Id., ¶27; Watts Depo, Ex. C., pp. 201-02.*

30. Despite the failure to bring in the gold in December 2011, from January through October 2012, Watts told Plaintiffs that he was still working to bring in the gold shipment and he continued to solicit additional funds from Plaintiffs for the purchase of more gold. *Sledge Decl, Ex. B, ¶28.* When the promised gold was not delivered, Watts gave Plaintiffs various explanations as to why the gold had not been delivered. *Sledge Decl, Ex. B, ¶¶ 32, 39-40, 45-46, 48, 50, 52-53, 58, 60.*

31. For example, in June and July 2012 Watts emailed articles to Plaintiffs purportedly from Ghana newspapers, along with other documents, describing delays in the gold shipment caused by an alleged theft attempt and by related criminal proceedings. *Sledge Decl,*

*Ex. B, ¶46-47, 50.* In August 2012, Watts sent Plaintiffs additional documents and articles describing further delays due to mechanical problems with the plane transporting the gold. *Sledge Decl, Ex. B, ¶58-59.*

32. At the time, Plaintiffs believed that the articles and documents sent by Watts and his statements regarding the delays were true, and continued to invest based upon Watts' representations that additional funds were necessary in order to bring in the gold shipment. *Sledge Decl, Ex. B, ¶¶ 47, 48, 55-56, 60.*

33. However, shortly after filing this lawsuit, Plaintiffs obtained the affidavit of a reporter for one of the Ghana newspapers who testified that the articles sent by Watts were fraudulent. *Declaration of Stephen Zoure,* **Exhibit L** *hereto.*

34. Even Watts during his deposition admitted that the articles were likely fabricated, and that he may have known this as early as June 2012, but he nevertheless continued thereafter to forward articles and related documentation to Plaintiffs in an attempt to explain the constant delays in the gold shipments. *Sledge Decl, Ex. B, ¶50; Watts Depo, Ex. C, p.* 295-97.

35. In addition to the fraudulent articles and related documents, Watts sent a purported insurance policy to Plaintiffs on December 4, 2012, covering the gold shipment, which Watts referred to as their "trump card." *Watts depo, Ex. C, pp.276-78; Sledge Decl, Ex. B, ¶63.* As it turns out, this document too was fraudulent. The purported policy was issued by a London company known as "Ince & Co." After the commencement of this litigation, Plaintiffs confirmed with a representative of Ince & Co. that this document was fraudulent. *Watts depo, Ex. C, pp.277-78; Sledge Decl, Ex. B, ¶¶ 55, 64 (including opinion of expert Thomas Vastrick attached thereto); Declaration of Benjamin Patrick Ogden, Ince & Co.,* **Exhibit M** *hereto.*

36. From the period of December 2012 up to and through July 2013 when this lawsuit was filed, Watts continued to report to Plaintiffs regarding the status of their purported gold investments and the continuing unsuccessful efforts to get the gold to the U.S. Throughout the time period that Plaintiffs were making their investments, while Watts was making the various representations and describing his alleged efforts to get the gold, Watts frequently told Plaintiffs that "the only way you lose in this is if you quit." *Sledge Decl, Ex. B, ¶65; Watts Depo, Ex. C, p. 321.*

37. After more than 4 years, and over $5 million invested, no gold has ever been received by Plaintiffs. *Sledge Decl, Ex. B, ¶ 66.*

## Watts' Deceptive Use of Plaintiffs' Funds

38. In November and December 2011 and January 2012, Watts sent Plaintiffs various schedules purporting to show the initial $3 million of gold allegedly purchased by the Plaintiffs. *Sledge Decl, Ex. B, ¶¶ 24, 30.* However, in December 2011, instead of sending Plaintiffs' money to purchase gold from Africa as promised and as reflected on the schedules, Watts actually wired $1 million of Plaintiffs' funds to Defendant Indico's own investment accounts at Rosenthal Collins Group, a futures trading firm in Chicago, and at Stifel, Nicolaus & Company, a brokerage firm based in the United States. *Id., ¶ 68; Miscellaneous Chase documents, Ex. K, CHASE000419.* Watts did not tell Plaintiffs about the transfers of their funds to the Defendant's investment accounts, but instead sent Plaintiffs statements showing that their funds had been used to purchase gold. *Sledge Declaration, ¶ 68.*

39. The Defendants' bank records also show that Watts used hundreds of thousands of dollars of Plaintiffs' funds to pay his own personal expenses and other expenditures which

were not for the purchase of Plaintiffs' gold.  *Summary of Watts' personal use of Plaintiffs' funds,* **Exhibit N**.

40.     Watts also used Plaintiffs' funds to pay the following amounts to the following payees instead of using the funds to purchase gold as he had told Plaintiffs:

| Date(s) | Payee | Amount[1] |
|---|---|---|
| Feb 2012 – Feb 2013 | Bristol 5 Group, LLC, a New Jersey limited liability company | $43,500 |
| Jan-Feb 2012 | Edward Adlam | $15,000 |
| May 2012 | Celene Dutzman | $10,000 |
| Aug 2012 | Darrow Dickey | $2,000 |
| Aug 2012 | Mark Hamilton | $1,500 |

41.     Additionally, Watts transferred over four million dollars of Plaintiffs' funds to a correspondent U.S. dollar account at CommerzBank (herein the "Correspondent Bank Account") held by the African bank Guaranty Trust Bank (GT Bank) in the name of Sheku Kondeh. *See Sledge Decl, Ex. B, ¶71; Summary of Defendants' transfers to Commerzbank,* **Exhibit O** *hereto.*[2]

42.     According to a letter that Watts sent to Bank of America, the funds transferred to the Correspondent Bank Account were also not used for purchasing Plaintiffs' gold, but rather were used for Defendants' own purposes.  *Sledge Decl, Ex. B, ¶72; Watts' letter to Bank of America, (*"**BOA Letter**"*) Exhibit P*.  The letter, dated August 15, 2012, was written in response to a bank inquiry concerning the large transfers by Watts into the Correspondent Bank Account. *BOA Letter, Ex. P*.  Watts' letter states that the funds transferred were to be used for various business activities of the Defendants, but conspicuously omits any reference to gold.  *Id.* Watts provided the following explanation:

---

[1] *Miscellaneous Bank of America records,* Exhibit J hereto, BANKOFAMERICA000226, BANKOFAMERICA000230, BANKOFAMERICA000235, BANKOFAMERICA000240, BANKOFAMERICA000258; *Miscellaneous Chase records,* Exhibit K hereto, CHASE000426, CHASE000432, CHASE000449, CHASE000457, CHASE000465.

[2] CommerzBank is a German bank with a branch in the Southern District of New York.  GT Bank is a Nigerian bank, which does not have a branch in the U.S.

> ISR was started in Feb. 1996 as a high tech company, we are partners with; Micro Soft, Intel, AMD, NVidias, IBM and many other companies…We have been consulting on and off for 30 years in West Africa and in the proses [sic] of opening operations in Sierra Leone for the last 5 years. Our offices our [sic] just about ready to move in. **this is what has been causing us to have frequent wires back and forth. Things like, "Oh, you want electricity in your office all the time, you need a generator station then". Things do not move forward as fast in third world countries. Costs are more for some things and I will say much less for others.** When to get what from where is how prudent business pays off in the long run.
>
> Timing is working out about right over there. ISR is the lead company because technology is fastest on line…November they will turn on our fiber optic, this is as fast as our server farms here in the U.S. ISR's offices will have been up and running by then with computers sales from the Dallas, TX office.
>
> They also need infrastructure bad, this is where our construction company and manufacturing heavy earth moving equipment comes in. The contracts already look to be worth the effort we have made.

*Id.*

43. Watts' August 15, 2012 letter also referred to the Correspondent Bank Account as belonging to Defendant Indico, even though the account was titled for "security reasons" in the name of Sheku Kondeh, one of Indico's managers.

> Since I have not had the time in Freetown were [sic] our offices are being finished, I was in surrounding countries the last few trips, our Corporate US Dollar Account for ISR, is titled as our managers name, Sheku Kondeh for security reasons. He is the signatory. Only he with his passport can access the account there without me. This will change next trip and accounts will be titled In ISR's name with appropriate security measures setup there in Freetown. So we can wire to same name accounts.

*Id.*

44. [Reserved].

45. Defendants never disclosed that they were using Plaintiffs funds for their own personal and other business purposes, rather than for purchasing gold for Plaintiffs. To the contrary, throughout the relevant time period Watts sent Plaintiffs periodically amended spreadsheets purporting to reflect Plaintiffs' growing investment in the subject gold, which made

11

no reference to any of the actual unauthorized expenditures that the Defendants were in fact making with the Plaintiffs' funds. *Sledge Decl, Ex. B., ¶¶24, 36-37, 62, 68.*

### **Defendants' Contradictory Statements During Litigation**

46. During his deposition Watts was asked whether he had filed an insurance claim or whether he or Indico had an insurance policy with respect to the Plaintiffs' gold. *Watts depo, Ex. C, p. 135.* Watts responded "No. No. Never", and stated that any insurance on the Plaintiffs' gold would have to be in the name of an African party. *Id.* Watts also testified that he had paid insurance premiums on behalf of the Plaintiffs. *Watts Depo, Ex. C, pp. 280-81.*

47. Later during this deposition, however, Watts was confronted with an insurance policy he sent to Plaintiffs on December 4, 2012, which he had referred to as Plaintiffs' "trump card." *Watts depo, Ex. C, pp. 276-78.* Contrary to Watts' earlier testimony, on this policy Defendants are, in fact, the named insureds. *Watts depo, Ex. C, pp. 278-84.* Moreover, as noted in Statement 35 above, this policy was fabricated.

48. Also, at his deposition Watts was asked about the "Chicago investor" group, a group of investors who Watts had told Plaintiffs about prior to the lawsuit. Watts testified that he had no idea who the "Chicago investor" group was. When confronted with a voicemail he had left for Plaintiffs however, wherein Watts can be plainly heard representing that he was waiting for a Chicago investor group to liquidate securities and raise funds to support the investment, Watts changed his story. *Watts depo, Ex. C, pp. 347-48, 355-57.*

49. Also during his deposition, Watts talked about a meeting he had had with Chiefs "Alimamy Kamara" and "Ibrahim Kamara" in Africa to discuss the Plaintiffs' gold. *Watts depo, Ex. C, pp. 205-206.*

50. However, several months prior to the deposition, in response to the Plaintiffs' Request for Admissions, Watts had stated that he had never met in person with "Chief Alimamy Kamara" or with "Chief Ibrahim Kamara." *Watts depo, Ex. C, pp. 205-206.*

51. When confronted with the inconsistency during the deposition, Watts began to claim, for the first time, that there were multiple chiefs with the same name and that he would "have to make a phone call" to determine which was which. *Watts depo, Ex. C, pp. 206-208, 209:18-19.*

### DOJ Cease and Desist Letter

52. On November 18, 2015, the United States Department of Justice ("DOJ") sent Defendant Watts a letter notifying him of a parallel criminal investigation and asserting that the gold investment was a fraudulent scheme. The DOJ letter instructs Watts to cease and desist from any further solicitations of funds or transfers of same to Africa for ostensible gold purchases. *Letter from DOJ,* **Exhibit Q**.

### Other Facts

53. Defendants did not at any time file any documents or reports whatsoever with the Securities and Exchange Commission relative to the sale of the investments to Plaintiffs. *Watts' Responses to Requests for Admission,* **Exhibit R**, *No. 56.*

54. At all relevant times, Plaintiffs had no way of knowing the truth about Watts' background and were never invited or permitted to communicate with any of Watts' alleged contacts in Africa. Plaintiffs' only source of information about the status of their investments was Watts.

                                            Respectfully Submitted,

                                            /s/ Darrell N. Phillips_____

PIETRANGELO COOK PLC
Anthony C. Pietrangelo BPR # 15596
John J. Cook BPR # 17725
Darrell N. Phillips BPR #30299
6410 Poplar Avenue, Suite 190
Memphis, TN 38119
901.685.2662
901.685.6122 (fax)
*dphillips@pcplc.com*
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of January 2016, a copy of the foregoing electronically submitted document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

Randall Fishman
Richard Townley
Ballin, Ballin & Fishman
200 Jefferson Ave., Suite 1250
Memphis, TN 38103

                                                   /s/ Darrell N. Phillips