# EXHIBIT

# B

Declaration of Phillipa Sledge

in Support of Motion for Summary Judgment

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

        Plaintiffs,

v.                                    Case No. 2:13-cv-2578-STA-cgc

INDICO SYSTEM RESOURCES, INC. and
CLEAL WATTS, III,

        Defendants.

## DECLARATION OF MARY PHILLIPA SLEDGE

        I, Mary Phillipa Sledge, pursuant to the provisions of 28 U.S.C. §1746, do hereby declare:

1.    At all relevant times, I was an adult resident citizen of Memphis, Tennessee.

2.    I have personal knowledge of the facts set forth herein and I am willing to testify to the same if called upon to do so.

3.    At all relevant times, Defendant Cleal Watts ("Watts") represented himself to me to be an employee, agent, or servant of Defendant Indico System Resources, Inc. ("Indico") and was acting both in his individual capacity as well as in his capacity as an employee and/or agent of Indico.

4. At all relevant times, I was acting in my individual capacity, as well as in my capacity as Trustee of the Mary Jane Pidgeon Sledge Trust ("MJPS Trust") and as an authorized agent of the Pidgeon Sledge Family Limited Partnership ("PSFLP").

5. In or around October/November 2011, I was referred to Watts by a long-time family friend, William ("Bill") Hamilton. At the time, I managed the investments for MJPS Trust and PSFLP (along with me, collectively, the "Plaintiffs"). Because of the extreme volatility in the stock market at that time, I was hoping to diversify these portfolios, as well as my own, by investing in gold. I mentioned this to Bill Hamilton when we were talking one day and he suggested that I talk to Watts who, according to Bill Hamilton, was from a fine family in Dallas and had experience in the gold market. Bill Hamilton was also from Dallas. Over the years, Bill had previously given me and my family favorable business and investment recommendations. Bill Hamilton vouched for Watts.

6. Because of Bill Hamilton's positive reference, I spoke by telephone numerous times with Watts in November 2011.

7. In November 2011, Watts proposed to me an investment opportunity to purchase unrefined gold dust from Ghana. In November and December 2011, and at various times in 2012, Watts told me that he and Indico (collectively, the "Defendants") were "ready and able" to supply us, the Plaintiffs, with more than $5 million worth of unrefined gold dust. *See Emails and Soft Corporate Offers, Ex. A, hereto.*

8. Watts made these and other representations orally and also made them in writing, in documents called "Soft Corporate Offers" emailed by Watts to me for the review and consideration of Plaintiffs. *Id.*

2

9.      Watts represented that the millions of dollars' worth of gold dust to be supplied was more than 91% pure and had a built in net profit (ROI) of 30 to 45%.  *Id.*

10.     Also at the time, Watts represented that he was an experienced gold importer.

11.     Watts represented that the gold purchased by the Plaintiffs was ready for pick up and would be delivered into the United States as early as the end of December 2011. *See Email, December 10, 2011, Ex. B, hereto.*

12.     Watts represented that he owned a refinery in the Dallas area where the gold dust would be refined.

13.     I did not know, and would not discover until long after the commencement of this litigation that at that time, in November 2011, Watts had fewer than $300 in Indico's bank account and did not own a bank account of his own.  *See Indico Bank Statement for November 2011, Ex. C hereto.*

14.     I had several calls with Watts before we (the Plaintiffs) made our initial investments.

15.     In reliance on Watts' material misrepresentations, however, the Plaintiffs together advanced millions of dollars to Defendants during the period of November 2011 through October 2012, purportedly for the purchase of unrefined gold dust.

16.     Watts told me that at the time of our (the Plaintiffs') investments, our funds were combined with those of other investors.

17.     Although I did not know it, at the time Watts was making these representations about his readiness and ability to provide gold from Ghana, he had never successfully delivered gold for anyone else.

3

18.     I similarly did not know that Watts had been soliciting other investors for 5 years prior to our (the Plaintiffs') investments, and had taken their money, but that he had never successfully imported gold or produced a return for any of them.

19.     It is now clear to me that Watts had never seen nor inspected our (the Plaintiffs') purported gold and that he had no way of knowing the purity of the alleged gold dust when he first proposed the investment.

20.     At the time Watts made all of these representations to me however, I did not know they were false.

21.     Similarly, I did not know at the time, and would not learn until Watts' deposition in this case, that Watts had no regular source of income, that he had never earned more than $25,000 a year in his life, and that he did not own any realty or any significant personal property other than a pick-up truck.

22.     In fact, I had no way of knowing the truth about Watts' background and was never invited or permitted to communicate with any of Watts' alleged contacts in Africa. My only source of information about the status of Plaintiffs' investments was Watts.

23.     Individually and on behalf of the other Plaintiffs, I placed trust and confidence in the faithful integrity of Watts as a result of his representations that he had considerable experience and expertise in making investments in gold and in representing investors in the gold market; as a result Watts gained superiority or influence over the Plaintiffs.

24.     On or about December 10, 2011, after the Plaintiffs had made initial combined investments of $2 million, Watts sent me an email with a schedule purportedly confirming our gold purchases. The email had a schedule attached entitled "Philapa and Entities Au Buy/Sell Transactions". "Au" is the element symbol for Gold. Watts's email also stated that by

4

December 30 or 31, 2011, he and the "Chief" would be bringing in gold shipments totaling 614 kilograms. *See Email, Ex. B hereto.*

25.     A few days later, in reliance on Watts's representations, on or about December 20, 2011, the Plaintiffs wired another $1 million to Defendants' bank accounts to purchase more gold which would purportedly be part of the upcoming shipment.

26.     No gold was delivered in December 2011.

27.     According to Watts, he had flown to Africa to pick up the gold, but while en route the owner of the chartered plane had learned of a coup in one of the African countries and ordered that the pilot divert the plane to a safer location. As a result, according to Watts, he was unable to pick up the gold shipment.

28.     Despite the failure to bring in the gold in December 2011, from January through October 2012, Watts told the Plaintiffs that he was still working to bring in the gold shipment and he continued to solicit additional funds from the Plaintiffs for the purchase of more gold.

29.     In order to take advantage of the upcoming shipment, on or about January 11, 2012, the Plaintiffs wired an additional $1,800,000 to Indico's bank account for the purchase of gold from Ghana to be refined at Watts' Dallas refinery.

30.     On January 31, 2012 and on February 1, 2012, Watts emailed me that the shipment was scheduled to leave immediately from Ghana and expected to arrive in Dallas on February 3, 2012. *See January 31, 2012 and February 1, 2012 emails, Ex. D hereto.*

31.     At or about this time, Watts also informed me that the Plaintiffs could purchase additional amounts of gold that would be included on this shipment. In reliance on this information and on the prior representations made by Watts, in February 2012, I arranged for an

5

additional $1,470,000 to be wired to Indico's bank account for the purchase of gold from Ghana to be refined at Watts' Dallas refinery.

32.    Later in February 2012, Watts called me and told me that the shipment which was scheduled to arrive on February 3, 2012 would be delayed.

33.    In our conversations at the time, when I expressed concerns about the delay, Watts told me that the only way to lose money is to give up. In or around the second half of January 2012, I began to express to him growing concerns about my family's liquidity because I had expected to realize returns on our investments sooner (based on Watts' promises). To allay my concerns about liquidity, Watts told me that the Plaintiffs could "borrow" limited amounts against our future profits and that the "borrowed" sums could be paid back upon realization of the value of the gold investments.

34.    Consistent with this proposal, Watts arranged for the following funds to be wired to the Plaintiffs' accounts in January, February and March 2012:

| Party | Date | Amount | Account |
|---|---|---|---|
| PSFLP | 1/20/2012 | 1,500,0000 | Trustmark - Germantown |
| Phillipa Sledge | 2/9/2012 | 50,000 | First Tennessee - Memphis |
| MJPS Trust | 2/21/2012 | 30,000 | First Tennessee – Memphis |
| PSFLP | 2/21/2012 | 525,000 | Union Bank |
| MJPS Trust | 3/2/2012 | 25,000 | First Tennessee - Memphis |
| MJPS Trust | 3/8/2012 | 40,000 | Chase - Memphis |
| MJPS Trust | 3/9/2012 | 50,000 | Chase - Memphis |
| MJPS Trust | 3/12/2012 | 530,500 | Trustmark - Germantown |
| MJPS Trust | 3/12/2012 | 250,000 | Bank of Amer. - Memphis |
| MJPS Trust | 3/13/2012 | 50,000 | Chase - Memphis |
| PSFLP | 3/13/2012 | 40,000 | Bank of Amer. - Memphis |
| MJPS Trust | 3/26/2012 | 450,000 | Bank of Amer. - Memphis |
| MJPS Trust | 3/29/2012 | 60,000 | First Tennessee – Memphis |
| MJPS Trust | 3/29/2012 | 25,000 | First Tennessee – Memphis |

35.    During February and March 2012, Watts again assured me that he was working to arrange for the gold we had purchased to be shipped from Ghana as soon as possible.

6

36.     On March 6, 2012, Watts sent an email message to me with a schedule purportedly confirming the funds invested by the Plaintiffs for gold purchases. *See March 6, 2012 Email, Ex. E, hereto.*

37.     On April 9, 2012, Watts sent an email message to me with another schedule purportedly confirming the funds invested by the Plaintiffs for gold purchases. According to this schedule, the gold we purchased was 95% pure and had a built in profit of 30%. *See April 9, 2012 Email Ex. F, hereto.*

38.     The April 9, 2012 email from Watts also stated that the shipment with the Plaintiffs' gold was scheduled to be shipped from Ghana soon. *Id.*

39.     In April 2012, Watts told me that in order to cause the shipment of gold to leave Ghana, there needed to be another significant investment. He assured me that the shipment was scheduled to leave soon, but that additional funds were necessary. In reliance on these statements and the other representations made by Watts, in April and May 2012, the Plaintiffs wired an additional $1,400,000 to Indico's bank account for the purchase of gold from Ghana to be refined at Watts' Dallas refinery.

40.     In or around April and May 2012, Watts told me that there had been another attempt to ship the Plaintiffs' gold from Ghana. However, according to Watts, the chartered plane that had picked up the gold from Ghana did not have the required range to make it all the way to Dallas and therefore had to land in Antigua. Watts told me the gold was thereafter returned to Ghana and he would have to again go through the complicated process of arranging for its shipment out of Ghana.

41.     Although I was somewhat concerned about the delays, Watts assured me at the time that the Plaintiffs gold investments were safe and that it was only a matter of time before we

would receive the shipment. Watts also said that the Plaintiffs could continue to "borrow" against future profits on the investment. Consistent therewith, Watts arranged for the following funds to be wired to the Plaintiffs' accounts in April, May and June 2012:

| Party | Date | Amount | Account |
|-------|------|--------|---------|
| MJPS Trust | 4/25/2012 | 50,000 | First Tennessee - Memphis |
| MJPS Trust | 5/11/2012 | 106,000 | First Tennessee – Memphis |
| MJPS Trust | 5/14/2012 | 200,000 | First Tennessee – Memphis |
| MJPS Trust | 5/14/2012 | 40,000 | Bank of Amer. – Memphis |
| MJPS Trust | 6/4/2012 | 65,000 | First Tennessee - Memphis |

42.     On or about June 5, 2012, Watts sent emails to me with an attached picture of gold bricks purportedly weighing a total of three metric tons. Watts represented in the email message that this gold was in Ghana and had been offered to him and Indico because of the good reputation Defendants had for facilitating gold investments in Ghana. *See June 5, 2012 Email Ex. G, hereto.*

43.     Watts continued to tell me that the shipment with our (the Plaintiffs') gold would be coming in very soon.

44.     In addition to, and contemporaneous with, the gold investments, Watts claimed that Indico had an established and successful money management division and that the Plaintiffs could earn substantial returns in a relatively short period of time by investing there. In reliance on this, in June 2012, I arranged for $1,175,000 to be invested in Indico's purported money management division.

45.     On or about June 8, 2012, Watts told me that yet another shipment had been ready to leave Ghana for Dallas, but had been detained as a result of a court order. According to Watts, three individuals had attempted by fraudulent means to abscond with the gold. However, Watts told me that these individuals had been intercepted by authorities and were facing criminal

8

proceedings. Watts further told me that the criminal court in Ghana had ordered that the gold shipment be stayed pending the resolution of the criminal proceedings.

46.     On June 8, 2012, in order to validate this story, Watts sent an email to me in Memphis with an attachment purporting to be a copy of a June 8, 2012 article entitled "Gold Fraudsters Passport Ceased" published in a Ghana newspaper known as the <u>Daily Guide</u>. The article described the criminal proceedings and the court order staying shipment that Watts had also described. *See June 8, 2012 email Ex. H hereto.*

47.     At the time, I believed what Watts had told me about the Ghana gold fraudsters, and I thought that the article was legitimate. However, after the filing of this lawsuit, I confirmed, through my attorneys, that this article was, in fact, fraudulent. I also leared that other purported <u>Daily Guide</u> articles sent to me by Watts were fake.

48.     In June 2012 and continuing through July 2012, Watts told me that the court proceedings involving the fraudsters had been continued several times for various reasons. As a result, Watts told me that the shipment of the Plaintiffs' gold would continue to be delayed. Also, in June and July 2012, Watts continued to send me emails with various attachments purporting to be Ghanaian newspaper articles, allegedly supporting his story that the Ghana court proceedings had been delayed for various reasons, but that ultimately the fraudsters were found guilty and sentenced to 5 years. *See June and July 2012 Emails, Ex. I, hereto.*

49.     These documents were similarly not authentic. *See Opinion of expert Thomas Vastrick, Ex. J hereto.*

50.     Even Watts during his deposition admitted that the articles were likely fabricated, and that he may have known this as early as June 2012, but he nevertheless continued thereafter

to forward articles and related documentation to me in an attempt to explain the constant delays in the gold shipments.

51.    On July 11, 2012, Watts emailed me that the shipment with the Plaintiffs' gold was scheduled to leave Ghana on the evening of July 12, 2012 and would arrive in Dallas the following morning.    *See June and July 2012 Emails, Ex. I.*

52.    Shortly thereafter however, Watts called me and told me that the plane with the shipment of the Plaintiffs' gold had left Ghana, but was forced to land in Guinea and then return to Ghana, by order of the Ghana "High Court of Justice."   According to Watts, the court issued the order at the request of Chief Alimany Kamara, the former owner of the gold who was seeking reimbursement of costs incurred in connection with the fraudster court proceedings.

53.    Watts then emailed me documents purporting to support his story about the order and injunction issued by the Ghana Court.   *See June and July 2012 Emails, Ex. I.*

54.    Subsequent to the start of this litigation, I retained the services of an expert, Thomas Vastrick, who opined that certain insurance documents and court documents sent to me by Watts were likely not genuine. *See Opinion of expert Thomas Vastrick, Ex. J hereto.*

55.    At the time I received the documents from Watts however, I believed them to be real.

56.    During July 2012, Watts also solicited additional investments from me which he claimed to be necessary to pay the additional costs so that the gold could be shipped to Dallas. Watts assured me we would still realize profit on all of the additional funds invested.  Believing Watts, in July 2012 the Plaintiffs wired an additional $350,000 to Indico for the purchase of gold from Ghana.

57.     In early August 2012 Watts told me that the matters involving the Ghana court had been resolved and that he expected that the shipment would leave Ghana soon.  On August 1, 2012, Watts sent me an email with an attached picture of what Watts claimed to be the plane he was going to charter for the gold shipment. *See August 1, 2012 Email, Ex. K hereto.*

58.     On or about August 5, 2012, Watts called me and told me that the plane with the gold shipment had left Ghana but that while en route the plane began to have mechanical problems, caught on fire, and the pilot had to make an emergency landing in Togo, a country in West Africa that shares a border with Ghana.

59.     On August 5, 2012, Watts sent me an email with attached documentation purportedly supporting his story about the emergency landing in Togo. *See August 5, 2012 Emails, Ex. L hereto.*

60.     In August, September and October 2012, Watts repeatedly told me that he was working very hard with various high level customs and other officials in order to arrange for the shipment of gold from Africa to Dallas.  He informed me that significant additional costs had been incurred and solicited additional funds from us (the Plaintiffs) which he said were necessary in order to arrange for the shipment.   Watts also insisted that the Plaintiffs' $1,175,000 investment which was held in Indico's alleged money management division needed to be transferred to the gold investments in order to enable the gold to be shipped.  He assured me that we (the Plaintiffs) would still realize profit on all of the additional funds invested.  Believing Watts, and feeling that I had to do whatever was necessary to get the gold to the United States, upon Watts' direction, I arranged for an additional $185,000 to be sent to Indico for the purchase of gold from Ghana, and authorized Watts to transfer the $1,175,000 from the purported money management division to the gold investments.

11

61.    In October, November and December 2012, Watts continued to tell me that he was working with highest level of customs and governmental officials in order to facilitate the gold shipment.

62.    On December 3, 2012, Watts sent me an email with an attachment prepared by Watts purporting to show the value of the Plaintiffs' gold investments. According to the schedule, the gold owned by the Plaintiffs' was 95% pure and had a built-in net profit of 30%. *See December 3, 2012 Emails Ex. M hereto.*

63.    On December 4, 2012, Watts sent me an email with attachments that Watts identified as the "Ghana valuation papers." The attachment included documents purporting to be an insurance policy issued with respect to the gold purchased by the Plaintiffs. In this email, he called this policy the Plaintiffs' "trump card." The purported policy was issued by a London company known as "Ince & Co." (the "Ince Policy"), *See December 4, 2012 Email, Ex. N hereto*; *See also Opinion of expert Thomas Vastrick, Ex. J hereto.*

64.    At the time, I believed that the Ince Policy was legitimate. However, after the filing of this lawsuit, I confirmed that this policy was in fact fraudulent. After the filing of the lawsuit, my attorneys contacted "Ince & Co." and obtained a declaration from one of its representatives confirming that the document was fraudulent. *See Declaration of Benjamin Patrick Ogden, attached to Plaintiffs' Statement as Exhibit M.*

65.    From the period of December 2012 up to and through July 2013 when this lawsuit was filed, Watts continued to report to us (the Plaintiffs) regarding the status of our purported gold investments and the continuing unsuccessful efforts to get the gold to the U.S. Throughout the time period that we (the Plaintiffs) were making our investments, while Watts was making

the various representations and describing his efforts to get the gold, Watts frequently told us (the Plaintiffs) that "the only way you lose in this is if you quit."

66.   After more than four years, and more than $5 million invested, no gold has ever been received.

67.   During discovery in this litigation, I learned what Watts was really doing with most of our (the Plaintiffs') funds.

68.   For example, I learned during discovery that in December 2011, instead of sending Plaintiffs' money to purchase gold from Africa as promised and as reflected on the schedules he sent me, Watts actually wired $1 million of Plaintiffs' funds Defendants' Bank of America to Defendant Indico's own investment accounts at Rosenthal Collins Group, a futures firm in Chicago, and at Stifel, Nicolaus & Company, a brokerage firm based in the United States. *See Brokerage Statements, Ex. O hereto*. Watts did not tell me about any of this.

69.   I also learned during discovery that Watts had used hundreds of thousands of dollars of our (the Plaintiffs') funds to pay for his own personal expenses and other expenditures which had nothing to do with the purchase of the Plaintiffs' gold.

70.   Additionally, I learned during discovery that Watts had used the Plaintiffs' funds to pay certain amounts to individual payees unknown to me instead of using the funds to purchase gold as he had told the Plaintiffs.

71.   Most alarmingly, I learned in discovery that Watts transferred more than four million dollars of the Plaintiffs' funds to a correspondent U.S. dollar account at CommerzBank (herein the "Correspondent Bank Account") held by the African bank Guaranty Trust Bank ("GT Bank") in the name of an individual named Sheku Kondeh. Watts had rarely mentioned the name Sheku Kondeh to me, but would occasionally tell me that Indico had an "ambassador" or an

13

"emissary" assisting with the gold purchase in Africa. I learned during discovery that Sheku Kondeh did not live in Ghana, where the gold was supposed to be coming from, but in Sierra Leone.

72.    I also learned during discovery that Indico's primary bank, Bank of America, had inquired about these large transfers to Africa and that Watts lied to Bank of America about the true purpose of the transfers (to purchase gold for Plaintiffs) and further lied to Bank of America about what his business, his experience and the purpose of the transfers.

73.    In fact, Watts made a number of statements during his deposition which contradict his earlier statements to me and his discovery responses.

74.    He contradicted his earlier statements about whether any of Plaintiffs' gold was ever insured and whether he had ever paid insurance premiums.

75.    He contradicted his earlier statements to me about other investors who he had once claimed were also talking to him about making payments toward the gold purchase.

76.    Also, at his deposition, Watts was asked about the "Chicago investor" group, a group of investors who Watts had told me about prior to the lawsuit. Watts testified that he had no idea who the "Chicago investor" group was. When confronted with a voicemail he had left for me however, wherein Watts can be plainly heard representing that he was waiting for a Chicago investor group to liquidate securities and raise funds to support the investment, Watts changed his story. *See Excerpts of Watts' Deposition, attached to Plaintiffs' Statement as Exhibit C, pp. 347-48, 355-57.*

77.    Critically, he has changed his statement repeatedly about whether he had ever actually met the "chiefs" from whom he was allegedly buying the gold dust on behalf of the Plaintiffs.

78.    The Plaintiffs' total net investment with Defendants, reduced by the returned funds, is $5,293,500.  Of this amount, I paid Defendants $1,015,000.00.  MJPS Trust paid $2,793,500.00.  PSFLP paid $1,485,000.00.

79.    Together, the Plaintiffs have also incurred significant attorney's fees, which continue to accrue.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on this _6_ day of January, 2016.

_Mary Phillipa Sledge_
MARY PHILLIPA SLEDGE

**EXHIBIT A**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Wednesday, November 16, 2011 2:58 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO Draft FROM Doc By Bill |
| **Attachments:** | SCO -Draft- Indico Buy-Sell 1M .doc |

NEED ANY THING JUST CALL ME.

DOC
214 659-2197

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

## SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO**, by management contract with our client are ready and able to supply you_____ at _____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $1,000,000.00 (one Million Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Wednesday, November 16, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| a) **COMMODITY:** | Aurum Utallum (Gold), Au |
| b) **FORM:** | Au Dust |
| c) **PURITY:** | 91% minimum value |
| d) **FINENESS:** | 22+ karats plus |
| e) **ASSAY:** | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) **ORIGIN:** | Americas, Asia, and Africa |
| g) **PACKING:** | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) **S.G.:** | Specific Gravity- 18.2 |
| i) **DISCOUNT:** | Twenty percent (20%) Gross, minus costs (S/H), anticipated net ~6-9% |
| j) **QUANTITY:** | Quantity held by Ernest monies (20%), first come first served |
| **PRICE:** | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

_**Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $1,000,000.00 (One Million Dollars).**_

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $1,000,000.00 Investment amount leveraged 5 times = $5,000,000.00 actual value generating gains ($1,000,000.00 x 30%{if 6%x5} = $300,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $300,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_____ Date: 16/11/2011          _____ Date: __/__/__

Approved by: Dr. Cleal Watts III; CFO. INDICO          Buyer: _____

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, November 21, 2011 3:39 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO -MPS & Indico Buy-Sell $100k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $100k .doc |

I did not know what name or address to use in the contract so I left them blank for you to fill in. Below is the wiring instructions and I will send the speed sheet for you to play with the numbers and see what the results can be. Availability, paper work and timing are the crucial parts, as to how often this can be turned around and re dun.

Sincerely yours,
Dr. Cleal T. Watts III   "Doc"


**<u>Wiring Instructions</u>**
Bank Name:        Chase Dallas Texas / Casa Linda banking Branch
Account Name:    Indico System Resources
Comp. Address:   8926 Forest Hills Blvd., Dallas, TX, 75218
Account #:           3064030419
ABA #:                111000614

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

## SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO**, by management contract with our client are ready and able to supply you_____ at _____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $100,000.00 (One Hundred Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Monday, November 21, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| a) **COMMODITY:** | Aurum Utallum (Gold), Au |
| b) **FORM:** | Au Dust |
| c) **PURITY:** | 91% minimum value |
| d) **FINENESS:** | 22+ karats plus |
| e) **ASSAY:** | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) **ORIGIN:** | Americas, Asia, and Africa |
| g) **PACKING:** | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) **S.G.:** | Specific Gravity- 18.2 |
| i) **DISCOUNT:** | Twenty percent (20%) Gross, minus costs (S/H); anticipated COST ~11-14% |
| j) **QUANTITY:** | Quantity held by Ernest monies (20%), first come first served |
| **PRICE:** | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

***Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $100,000.00 (One Hundred Thousand Dollars).***

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $100,000.00 Investment amount leveraged 5 times = $500,000.00 actual value generating gains ($100,000.00 x 30%{if 6%x5} = $30,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $30,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S Watts III_ Date: 21/11/2011                    _____ Date: __/__/__

Approved by: Dr. Cleal Watts III; CFO. INDICO          Buyer:

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, November 21, 2011 5:47 PM |
| **To:** | MPS-BillFr |
| **Subject:** | spreed sheet promised. sorry had to remake a new one. |
| **Attachments:** | For Investers MOU & Calaulating $-Toz .xlsx |

| Specific Shipments | Estimated X #'s | |
|---|---|---|
| **Shipment Kgs. (Before Refining)** | | 10.5 |
| **Gold % Pure** | | 95% |
| **Gold Toz. Pure (Refined)** | | 320.70 |
| **Spot Price of Gold (At Refining)** | $ | 1,677.30 |
| **Gross Cash Value Pure** | $ | 537,915.91 |
| **Gross Cash Value Available (after Selling)** | $ | 532,536.75 |
| **Gross Cash Value/Kg (after Selling)** | $ | 50,717.79 |
| **Investor $ Invested/Shipment (<1/5 Avail)** | $ | 100,000.00 |
| | | |
| **Gross % Discount of Au to Inv** | | 20% |
| **% Cost of Shipment (Est. 11-14%)** | | 14% |
| **% Net to Inv of Shipment (Est. 6-9%)** | | 6% |
| **$ Value of Au Reserved Per Inv $1** | $ | 5.00 |
| | | |
| **Total $ Value of Au Reserved For Inv** | $ | 500,000.00 |
| **$ Cost of Total Au Reserved For Inv** | $ | 400,000.00 |
| **Total Au Toz. Reserved For Inv** | | 298.098 Toz. |
| **Investors % Profit per $1 Invested** | | 30% |
| **Investors $ Profit per $ Invested** | $ | 30,000.00 |
| **A) Total $ return to Investors (PI in Cash)** | $ | 130,000.00 |
| **B) Total Au Toz if Bullion Taken (PI in Au)** | | 77.51 Toz. |
| **OR** | | |
| **Receive (X) Toz. Au (PI + Up to Reserved Toz.)** | | 20.000 Toz. |
| **& Balance Due Investor in Cash (-$ If Over PI)** | $ | 103,163.20 |
| | | |

| **Ledger** |
| --- |
| **Estimated #'s** |
| **TBD #'s by Investor** |
| **INFO** |
| **Return & Balance** |
| **Reserved Au #'s** |

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Tuesday, November 22, 2011 6:43 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: SCO -MPS & Indico Buy-Sell $250k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $250k .doc |

I did not know what name or address to use in the contract so I left them blank for you to fill in. Below is the wiring instructions and I will send the speed sheet for you to play with the numbers and see what the results can be. Availability, paper work and timing are the crucial parts, as to how often this can be turned around and re dun.

Sincerely yours,
Dr. Cleal T. Watts III   "Doc"


**Wiring Instructions**
Bank Name:        Chase Dallas Texas / Casa Linda banking Branch
Account Name:   Indico System Resources
Comp. Address:  8926 Forest Hills Blvd., Dallas, TX, 75218
Account #:         3064030419
ABA #:              111000614

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

# SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO**, by management contract with our client are ready and able to supply you_____ at_____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's **$250,000.00 (Two Hundred and Fifty Thousand Dollars) Ernest Payment**, which is 20% of desired quantity of Au refined value for that day.

**Date: Tuesday, November 22, 2011**                    **Offer good/available for 5 Days**

## COMMODITY SPECIFICATIONS:

| | |
|---|---|
| a) **COMMODITY:** | Aurum Utallum (Gold), Au |
| b) **FORM:** | Au Dust |
| c) **PURITY:** | 91% minimum value |
| d) **FINENESS:** | 22+ karats plus |
| e) **ASSAY:** | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) **ORIGIN:** | Americas, Asia, and Africa |
| g) **PACKING:** | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) **S.G.:** | Specific Gravity- 18.2 |
| i) **DISCOUNT:** | Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14% |
| j) **QUANTITY:** | Quantity held by Ernest monies (20%), first come first served |
| **PRICE:** | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately:  **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

***Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $250,000.00 (Two Hundred and Fifty Thousand Dollars).***

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $250,000.00 Investment amount leveraged 5 times = $750,000.00 actual value generating gains ($250,000.00 x 30%(if 6%x5) = $75,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $75,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S. Watts III_ ___Date: 22/11/2011___                    _____ Date: _/_/_
Approved by: Dr. Cleal Watts III; CFO. INDICO                    Buyer:

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Tuesday, November 22, 2011 6:54 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: Fwd: SCO -MPS & Indico Buy-Sell $250k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $250k B .doc |

I did not know what name or address to use in the contract so I left them blank for you to fill in. Below is the wiring instructions and I will send the spreed sheet for you to play with the numbers and see what the results can be. Availability, paper work and timing are the crucial parts, as to how often this can be turned around and re dun.

Sincerely yours,
Dr. Cleal T. Watts III   "Doc"


**<u>Wiring Instructions</u>**
Bank Name:        Chase Dallas Texas / Casa Linda banking Branch
Account Name:   Indico System Resources
Comp. Address:  8926 Forest Hills Blvd., Dallas, TX, 75218
Account #:          3064030419
ABA #:                111000614

**INDICO SYSTEM RESOURCES, INC.**

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

# SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO**, by management contract with our client are ready and able to supply you_____ at _____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $250,000.00 (Two Hundred and Fifty Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Tuesday, November 22, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| a) **COMMODITY:** | Aurum Utallum (Gold), Au |
| b) **FORM:** | Au Dust |
| c) **PURITY:** | 91% minimum value |
| d) **FINENESS:** | 22+ karats plus |
| e) **ASSAY:** | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) **ORIGIN:** | Americas, Asia, and Africa |
| g) **PACKING:** | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) **S.G.:** | Specific Gravity- 18.2 |
| i) **DISCOUNT:** | Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14% |
| j) **QUANTITY:** | Quantity held by Ernest monies (20%), first come first served |
| **PRICE:** | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

***Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $250,000.00 (Two Hundred and Fifty Thousand Dollars).***

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $250,000.00 Investment amount leveraged 5 times = $1,250,000.00 actual value generating gains ($250,000.00 x 30%{if 6%x5} = $75,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $75,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S Watts III._ Date: 22/11/2011                    _____ Date: _/_/_

Approved by: Dr. Cleal Watts III; CFO. INDICO                    Buyer: _____

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Tuesday, November 29, 2011 4:44 PM |
| **To:** | MPS-BillFr |
| **Subject:** | For Investors MOU & Calculating $-Toz  .xlsx |
| **Attachments:** | For Investors MOU & Calculating $-Toz .xlsx |

This shows if they just brought 14.5 Kg. instead of 25 Kg. and the cost was 14%.

The blue is the numbers that are on the shipment, you can change these to see what results can be. (ie...25Kg, 50Kg, 100Kg,or spot price, %, or $ taken already)

The purple are the amounts you chose, you can change those to.(Amount you invest and/or Amount taken in Gold )

The green is the calculated amount that is available foe investment

The red and black are the calculated results of the inputs and are therefor locked so they wont get corrupted. should work fine let me know if something does not work and I will be sure to get it fixed.

Doc

| Specific Shipments | Estimated X #'s |
|---|---|
| Shipment Kgs. (Before Refining) | 14.5 |
| Gold % Pure | 95% |
| Gold Toz. Pure (Refined) | 442.88 |
| Spot Price of Gold (At Time of Refining) | $ 1,715.70 |
| Gross Cash Value Refined | $ 759,842.70 |
| Gross Cash Value (after Selling) | $ 752,244.28 |
| Gross Cash Value/Kg (after Selling) | $ 51,878.92 |
| Total Investment Opportunity for Shipment | $ 151,968.54 |
| Investment Opportunity for Shipment Taken | $ - |
| Investment Opportunity for Shipment Available | $ 151,968.54 |
| Investor $ Invested/Shipment (To Nearest $10K) | $ 150,000.00 |
| | |
| Gross % Discount of Au to Inv | 20% |
| % Cost of Shipment (Est. 11-14%) | 14% |
| % Net to Inv of Shipment (Est. 6-9%) | 6% |
| $ Value of Au Reserved Per Inv $1 | $ 5.00 |
| | |
| Total $ Value of Au Reserved For Inv | $ 750,000.00 |
| $ Cost of Total Au Reserved For Inv | $ 600,000.00 |
| Total Au Toz. Reserved For Inv | 437.139 Toz. |
| Investors Total Est % Profit per $1 Invested | 30% |
| Investors $ Profit For Total Investment | $ 45,000.00 |
| A)  Total $ return to Investors (PI in Cash) | $ 195,000.00 |
| B)  Total Au Toz if Bullion Taken  (PI in Au) | 113.66 Toz. |
| OR | |
| Receive (X) Toz. Au (PI + Up to Reserved Toz.) | .000 Toz. |
| & Balance Due Investor in Cash (-$ If Over PI) | $ 195,000.00 |
| | |

| Ledger | Cell Status |
|---|---|
| Estimated #'s | Eval |
| TBD #'s by Investor | Open |
| INFO | Locked |
| Return & Balance | Locked |
| Reserved Au #'s | Locked |
| Calculated Results | Locked |

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, December 03, 2011 10:21 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO -MPS & Indico Buy-Sell $250k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $250k .doc |

# SOFT CORPORATE OFFER

We, Indico System Resources, Inc. hereafter known as INDICO, by management contract with our client are ready and able to supply you_____ at_____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $250,000.00 (Two Hundred and Fifty Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Saturday, December 03, 2011**                                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| a) COMMODITY: | Aurum Utallum (Gold), Au |
| b) FORM: | Au Dust |
| c) PURITY: | 91% minimum value |
| d) FINENESS: | 22+ karats plus |
| e) ASSAY: | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) ORIGIN: | Americas, Asia, and Africa |
| g) PACKING: | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) S.G.: | Specific Gravity- 18.2 |
| i) DISCOUNT: | Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14% |
| j) QUANTITY: | Quantity held by Ernest monies (20%), first come first served |
| PRICE: | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately:  **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

**_Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $250,000.00 (Two Hundred and Fifty Thousand Dollars)._**

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $250,000.00 Investment amount leveraged 5 times = $1,250,000.00 actual value generating gains ($250,000.00 x 30%(if 6%x5) = $75,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $75,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S Watts III._  Date: 03/12/2011                                    Date: _/ /_
Approved by: Dr. Cleal Watts III; CFO. INDICO          Buyer:

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, December 03, 2011 10:23 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO -MPS & Indico Buy-Sell $500k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $500k .doc |

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

## SOFT CORPORATE OFFER

We, Indico System Resources, Inc. hereafter known as **INDICO**, by management contract with our client are ready and able to supply you_____ at_____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $500,000.00 (Five Hundred Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Saturday, December 03, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| **a) COMMODITY:** | **Aurum Utallum (Gold), Au** |
| **b) FORM:** | **Au Dust** |
| **c) PURITY:** | **91% minimum value** |
| **d) FINENESS:** | **22+ karats plus** |
| **e) ASSAY:** | **Final assay by third party refinery, this value will be accepted by both Buyer and Seller** |
| **f) ORIGIN:** | **Americas, Asia, and Africa** |
| **g) PACKING:** | **Export Package Boxes or any other suitable packaging commonly used in the trade** |
| **h) S.G.:** | **Specific Gravity- 18.2** |
| **i) DISCOUNT:** | **Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14%** |
| **j) QUANTITY:** | **Quantity held by Ernest monies (20%), first come first served** |
| **PRICE:** | **US Spot Price (At Time of Refinement Plus S/H), Minus Discount** |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

***Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $500,000.00 (Five Hundred Thousand Dollars).***

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $500,000.00 Investment amount leveraged 5 times = $2,500,000.00 actual value generating gains ($500,000.00 x 30%{if 6%x5} = $150,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $150,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

*Cleal S Watts III*  Date:12/3/2011                    _____ Date: _/_/_
Approved by: Dr. Cleal Watts III; CFO. INDICO          Buyer:

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, December 03, 2011 10:26 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO -MPS & Indico Buy-Sell $750k .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $750k .doc |

Case 2:13-cv-02578-STA-dkv Document 48-1 Filed 05/11/15 Page 37 of 118    PageID 1195

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218, Tel: 214 659-2197, Email: sami@usisr.com

# SOFT CORPORATE OFFER

We, Indico System Resources, Inc. hereafter known as INDICO, by management contract with our client are ready and able to supply you_____ at_____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $750,000.00 (Seven Hundred and Fifty Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Saturday, December 03, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| a) COMMODITY: | Aurum Utallum (Gold), Au |
| b) FORM: | Au Dust |
| c) PURITY: | 91% minimum value |
| d) FINENESS: | 22+ karats plus |
| e) ASSAY: | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) ORIGIN: | Americas, Asia, and Africa |
| g) PACKING: | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) S.G.: | Specific Gravity- 18.2 |
| i) DISCOUNT: | Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14% |
| j) QUANTITY: | Quantity held by Ernest monies (20%), first come first served |
| PRICE: | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately:  **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

_**Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $750,000.00 (Seven Hundred and Fifty Thousand Dollars).**_

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $750,000.00 Investment amount leveraged 5 times = $3,750,000.00 actual value generating gains ($750,000.00 x 30%{if 6%x5} = $225,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $225,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S Watts III._____ Date: 03/12/2011                    _____ Date: _/_/_
Approved by: Dr. Cleal Watts III; CFO. INDICO                    Buyer:

Page 1 of 1

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, December 03, 2011 10:30 PM |
| **To:** | MPS-BillFr |
| **Subject:** | SCO -MPS & Indico Buy-Sell $1M .doc |
| **Attachments:** | SCO -MPS & Indico Buy-Sell $1M .doc |

1

**INDICO SYSTEM RESOURCES, INC.**

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

# SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO**, by management contract with our client are ready and able to supply you_____ at _____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $1,000,000.00 (One Million Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Saturday, December 03, 2011**                    **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**
| | |
|---|---|
| a) COMMODITY: | Aurum Utallum (Gold), Au |
| b) FORM: | Au Dust |
| c) PURITY: | 91% minimum value |
| d) FINENESS: | 22+ karats plus |
| e) ASSAY: | Final assay by third party refinery, this value will be accepted by both Buyer and Seller |
| f) ORIGIN: | Americas, Asia, and Africa |
| g) PACKING: | Export Package Boxes or any other suitable packaging commonly used in the trade |
| h) S.G.: | Specific Gravity- 18.2 |
| i) DISCOUNT: | Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14% |
| j) QUANTITY: | Quantity held by Ernest monies (20%), first come first served |
| PRICE: | US Spot Price (At Time of Refinement Plus S/H), Minus Discount |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b)**. Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

***Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $1,000,000.00 (One Million Dollars).***

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $1,000,000.00 Investment amount leveraged 5 times = $5,000,000.00 actual value generating gains ($1,000,000.00 x 30%{if 6%x5} = $300,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $300,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S Watts III_   Date: 03/12/2011                    _____ Date: _/_/_

Approved by: Dr. Cleal Watts III; CFO. INDICO                    Buyer: _____

**From:** Dr. Cleal Watts (Doc) <sami@usisr.com>
**Sent:** Saturday, December 03, 2011 10:36 PM
**To:** MPS-BillFr
**Subject:** SCO -MPS & Indico Buy-Sell $1.25M .doc
**Attachments:** SCO -MPS & Indico Buy-Sell $1.25M .doc

Dear Philapa,

 To change date just hover over date left mouse click, date will automatically update to current date. Both day and signature dates.

Doc

# INDICO SYSTEM RESOURCES, INC.

8926 Forest Hills Blvd. Dallas, TX 75218; Tel: 214 659-2197, Email: sami@usisr.com

# SOFT CORPORATE OFFER

We, **Indico System Resources, Inc. hereafter known as INDICO,** by management contract with our client are ready and able to supply you_____ at_____ with Alluvial Au (Raw Gold Ore, Dust) of very fine purity, we require Buyer's $1,250,000.00 (One Million Two Hundred and Fifty Thousand Dollars) Ernest Payment, which is 20% of desired quantity of Au refined value for that day.

**Date: Saturday, December 03, 2011**              **Offer good/available for 5 Days**

**COMMODITY SPECIFICATIONS:**

| | |
|---|---|
| **a) COMMODITY:** | **Aurum Utallum (Gold), Au** |
| **b) FORM:** | **Au Dust** |
| **c) PURITY:** | **91% minimum value** |
| **d) FINENESS:** | **22+ karats plus** |
| **e) ASSAY:** | **Final assay by third party refinery, this value will be accepted by both Buyer and Seller** |
| **f) ORIGIN:** | **Americas, Asia, and Africa** |
| **g) PACKING:** | **Export Package Boxes or any other suitable packaging commonly used in the trade** |
| **h) S.G.:** | **Specific Gravity- 18.2** |
| **i) DISCOUNT:** | **Twenty percent (20%) Gross, minus costs (S/H), anticipated COST ~11-14%** |
| **j) QUANTITY:** | **Quantity held by Ernest monies (20%), first come first served** |
| **PRICE:** | **US Spot Price (At Time of Refinement Plus S/H), Minus Discount** |

The total price to be paid by the Buyer is in two parts; at market price minus discount to be fixed time of refinement. Said Au is to be immediately: **a)** Sold, Buyer is paid their Earnings, **b)** Purchased, Buyer pays balance and Au is Delivered or **c)** Distributed as Principle and Profits, were Buyer is Paid/Receives in a Combination of, **a)** and **b).** Buyer's choice.

The Buyer and Seller are responsible for any and all of their own incidental costs & undisclosed commissions. All costs for Au from its origin, to its destiny are paid for and deducted from the 20% discount that includes; export, import, taxes, insurance, shipping/courier and refining. $1(20% earnest payment) controls $5; the net profit anticipated (ROI) is 30-45%.

*__Ernest monies, twenty percent (20%) of estimated refined market value is due at time of signing this document, as per Buyers preference of $1,250,000.00 (One Million Two Hundred and Fifty Thousand Dollars).__*

**i.)** If the Au is to be sold for the Buyer: The Buyer will be paid, immediately after sale of Au, the amount paid (Earnest Monies) plus the profit. The profit being the discount amount (20%) minus the costs (11-14%), as in a normal turnkey buy/sell transaction. Profits (6-9%) are X5 due to the earnest moneys; every $1 earnest controls $5 of Au for purchase. EXAMPLE: $1,250,000.00 Investment amount leveraged 5 times = $6,250,000.00 actual value generating gains ($1,250,000.00 x 30%{if 6%x5} = $375,000.00 anticipated ROI).

**ii.)** If the Buyer desires to take possession of the Au: The Balance is due at time of refinement. This price is calculated at Market price time of refinement, minus: **1.)** The earnest monies 20%, and **2.)** The estimated profit being (Ex: $375,000.00), the discount amount (20%) minus the costs. If Balance is not paid, within 72hrs, condition **[i]** Applies, and Au will be sold immediately with Buyers earnings paid out to them.

**iii.)** The Buyer also has the option to take whatever portion of the cash from **[i]** in any form of precious metals available they would like, i.e. Raw Au dust, bar, and Bullion or coin in: Silver, Au, or Platinum.

_Cleal S. Watts III._   Date: 03/12/2011         _____  Date: __/__/__

Approved by: Dr. Cleal Watts III; CFO. INDICO        Buyer:

Page 1 of 1

# EXHIBIT B

## TO DECLARATION OF PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, December 10, 2011 8:38 PM |
| **To:** | MPS-BillFr |
| **Subject:** | Philapa and Entities  Au Buy-Sell Transactions .xlsx |
| **Attachments:** | Philapa and Entities  Au Buy-Sell Transactions .xlsx |

Dear Philapa,

 this has the dates of the wires added in and the rest blanked for later to be filled in and updated as we go. It should auto calculate all the way through.

Doc

Ps: We are looking at 114 Kgs first shipment, to follow it should be about 500Kgs. The Chief is bringing the 1st shipment. I will get the 2ed with the plane leave 25/26 and come back on the 30/31. That is the plane right now.

1

## Philips and Entities Au Buy/Sell Transactions

*By Listed Per Example Only*
*Follow Investment Available for Each by Shipment*

| | Wires for Au Investment | Dates of Investment | Amount Available for Investment TBD per shipment | Amount Invested TBD per shipment | Au Shipment Formula | Return Investment TBD | Earnings of Investment to date |
|---|---|---|---|---|---|---|---|

**MIPS Personal Investments**

| Wires | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wire 1 | $ 250,000.00 | 11/23/2011 | $ n/a | $ n/a | n/a | $ n/a | $ n/a |
| Wire 2 | $ 250,000.00 | 12/1/2011 | $ n/a | $ n/a | n/a | $ n/a | $ n/a |
| Wire 3 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 4 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 5 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Subtotals | | | | | | | |
| Shipment 1 | | (TBD) | $ n/a | $ n/a | n/a | $ n/a | n/a |
| Shipment 2 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 3 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 4 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 5 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 6 | | | n/a | n/a | n/a | n/a | n/a |
| Subtotals | | | | | | | |
| Totals | $ 500,000.00 | | $ | $ | | $ | $ . |

**MIPS Trust Investments**

| Shipment Number | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wires | | | | | | | |
| Wire 1 | $ 500,000.00 | 12/1/2011 | $ n/a | $ n/a | n/a | $ n/a | $ n/a |
| Wire 2 | $ 750,000.00 | 12/5/2011 | n/a | n/a | n/a | n/a | n/a |
| Wire 3 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 4 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 5 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Subtotals | | | | | | | |
| Shipment Number | | | | | | | |
| Shipment 1 | | (TBD) | $ n/a | $ n/a | n/a | $ n/a | n/a |
| Shipment 2 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 3 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 4 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 5 | | | n/a | n/a | n/a | n/a | n/a |
| Shipment 6 | | | n/a | n/a | n/a | n/a | n/a |
| Subtotals | | | | | | | |
| Totals | $ 1,250,000.00 | | $ | $ | | $ | $ . |

**PSA (MILL) LTD Part Instruments**

| Shipment Number | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wires | | | | | | | |
| Wire 1 | $ 250,000.00 | 12/5/2011 | $ n/a | $ n/a | n/a | $ n/a | $ n/a |
| Wire 2 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 3 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 4 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Wire 5 | $ . | | n/a | n/a | n/a | n/a | n/a |
| Subtotals | | | | | | | |
| Shipment 1 | | | $ | $ | | | $ |
| Shipment 2 | | | . | . | | | . |
| Shipment 3 | | | . | . | | | . |
| Shipment 4 | | | . | . | | | . |
| Shipment 5 | | | . | . | | | . |
| Shipment 6 | | | . | . | | | . |
| Subtotals | | | | | | | |
| Totals | $ 250,000.00 | | $ | $ | | $ | $ |

**Wire Investments Totals**

| | | | | | | | | Earnings | Total Earnings |
|---|---|---|---|---|---|---|---|---|---|
| MIPS | $ 500,000.00 | | | | | | | | |
| Trust | $ 1,250,000.00 | | | | | | | | |
| F Ltd P | $ 250,000.00 | | | | | | | | |
| Total | $ 2,000,000.00 | | | | | | | | |

**EXHIBIT C**

TO DECLARATION OF
PHILLIPA SLEDGE

20-Mar-15

THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION
GROUP ID G 19Mar15-1203
Sequence number  Posting date  Amount

19Mar15-1203

## CHASE ○

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

November 01, 2011 through November 30, 2011
Account Number:   000003064030419

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-242-7338 |
| Hearing Impaired: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

INDICO SYSTEM RESOURCES, INC
8926 FOREST HILLS BLVD
DALLAS TX 75218-4001



Important information about your Chase Business Checking Account Statements
Starting November 14, 2011, we are making it easier to track your Chase ATM and debit card transactions. On your deposit statement, look for a new section called "ATM and Debit Card Summary" to see all of your ATM and debit card transactions organized by each authorized cardholder.

Please note that any ATM or Debit card transactions that post to your account before November 14, 2011 will not show under this new section. The "ATM and Debit Card Withdrawals" section will not change and will continue to display all of your ATM and debit card transactions in date order.

We value you as a Chase customer. If you have any questions, please call us at 1-800-CHASE38 (1-800-242-7338).

### CHECKING SUMMARY   Chase BusinessSelect Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $294.46 |
| Deposits and Additions | 8 | 253,249.54 |
| ATM & Debit Card Withdrawals | 37 | - 2,002.68 |
| Fees and Other Withdrawals | 5 | - 8,240.00 |
| Ending Balance | 50 | $243,291.32 |

Your monthly service fee was waived because you maintained an average checking balance of $7,500.00 or a minimum checking balance of $5,000.00 or more during the statement period.

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 11/03 | Card Purchase Return | 11/02 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | $97.68 |
| 11/03 | Card Purchase Return | 11/02 Alibris*Halfpricebks 510-550-609 CA Card 1295 | 5.99 |
| 11/14 | Card Purchase Return | 11/10 Cellphoneshop Hong Kong Card 1295 | 124.81 |
| 11/14 | Card Purchase Return | 11/11 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 12.18 |
| 11/14 | Card Purchase Return | 11/11 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 5.58 |

Page 1 of 6

CHASE000408



CHASE ⬠

November 01, 2011 through November 30, 2011
Account Number:    000003064030419

## BALANCING YOUR CHECKBOOK

**Note:** Ensure your checkbook register is up to date with all transactions to date whether they are included on your statement or not.

1. **Write in the Ending Balance shown on this statement:**          Step 1 Balance:  $_____

2. **List and total all deposits & additions not shown on this statement:**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
|      |        |      |        |      |        |
|      |        |      |        |      |        |

Step 2 Total:  $_____

3. **Add Step 2 Total to Step 1 Balance.**                           Step 3 Total:  $_____

4. **List and total all checks, ATM withdrawals, debit card purchases and other withdrawals not shown on this statement.**

| Check Number or Date | Amount | Check Number or Date | Amount |
|----------------------|--------|----------------------|--------|
|                      |        |                      |        |
|                      |        |                      |        |
|                      |        |                      |        |
|                      |        |                      |        |
|                      |        |                      |        |
|                      |        |                      |        |

Step 4 Total:  -$_____

5. **Subtract Step 4 Total from Step 3 Total.  This should match your Checkbook Balance:**  $_____

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
  • Your name and account number
  • The dollar amount of the suspected error
  • A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

🏛 JPMorgan Chase Bank, N.A. Member FDIC

Page 2 of 6

CHASE000409

# CHASE ⬤

November 01, 2011 through November 30, 2011
Account Number:   0000003064030419

## DEPOSITS AND ADDITIONS   (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/15 | Fed Wire Credit Via: Bank of America, N.A./026009593 B/O: Scott Wilmeth Plano TX 75023-3411 Ref: Chase Nyc/Ctr/Bnf=Indico System Resources, Inc Dallas, TX 752184001/Ac-000000030640 Rfb=88993824 Obi=Gold Transfer Imad: 1115B6B7Hu2R004064 Tm: 1926809319Fl | 3,000.00 |
| 11/23 | Fed Wire Credit Via: Trustmark National Bank/065300279 B/O: Mary Phillips Sledge Memphis, TN 38117-4010 Ref: Chase Nyc/Ctr/Bnf=Indico System Resources, Inc Dallas, TX 752184001/Ac-000000030640 Rfb=O/B Trustmark Ja Imad: 1123F5Qcz78C000087 Tm: 2542509327Fl | 250,000.00 |
| 11/28 | Card Purchase Return   11/25 Tims Boots 9159218398 TX Card 1295 | 3.12 |
| **Total Deposits and Additions** | | **$253,249.64** |



## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 11/04 | Card Purchase | 11/03 Pingo.Com/Ibasis 781-5057500 MA Card 1295 | $30.00 |
| 11/07 | Card Purchase | 11/04 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 4.99 |
| 11/07 | ATM Withdrawal | 11/06 100 N Central Expwy Richardson TX Card 1295 | 160.00 |
| 11/14 | Card Purchase | 11/11 Pingo.Com/Ibasis 781-5057500 MA Card 1295 | 30.00 |
| 11/16 | Card Purchase | 11/16 Mccormickschmicks Sea Dallas TX Card 1295 | 21.00 |
| 11/16 | Card Purchase | 11/15 Qt 902 Dallas TX Card 1295 | 35.11 |
| 11/16 | Card Purchase | 11/15 Wal-Mart #1800 Garland TX Card 1295 | 24.88 |
| 11/18 | Card Purchase | 11/17 Pingo.Com/Ibasis 781-5057500 MA Card 1295 | 30.00 |
| 11/21 | Card Purchase With Pin | 11/21 Wal-Mart #5823 Dalls TX Card 1295 | 49.76 |
| 11/22 | Card Purchase | 11/21 Pingo.Com/Ibasis 781-5057500 MA Card 1295 | 30.00 |
| 11/22 | Card Purchase | 11/22 Mccormickschmicks Sea Dallas TX Card 1295 | 19.00 |
| 11/22 | Card Purchase With Pin | 11/22 Wal-Mart #5823 Dalls TX Card 1295 | 57.29 |
| 11/22 | Card Purchase With Pin | 11/22 Wal-Mart #5823 Dalls TX Card 1295 | 17.57 |
| 11/25 | Card Purchase | 11/23 Maggiano's #1000001073 Dallas TX Card 1295 | 20.00 |
| 11/25 | Card Purchase With Pin | 11/23 Wal-Mart #5823 Dalls TX Card 1295 | 71.09 |
| 11/25 | Card Purchase | 11/25 Metropcs 877-315-6074 TX Card 1295 | 128.00 |
| 11/25 | Card Purchase | 11/24 Public Storage 24507 800-688-805 TX Card 1481 | 192.00 |
| 11/25 | Card Purchase | 11/24 Geico 800-841-3000 DC Card 1481 | 159.21 |
| 11/25 | Card Purchase With Pin | 11/24 Qt 913 Mckinney TX Card 1295 | 58.01 |
| 11/25 | Card Purchase With Pin | 11/25 7-Eleven Dallas TX Card 1295 | 15.26 |
| 11/28 | Card Purchase | 11/25 Tims Boots 915-921-8396 TX Card 1295 | 82.62 |
| 11/28 | Card Purchase | 11/26 Mccormickschmicks Sea Dallas TX Card 1295 | 17.00 |
| 11/28 | Card Purchase | 11/27 Pingo.Com/Ibasis 781-5057500 MA Card 1295 | 30.00 |
| 11/28 | Card Purchase | 11/27 Qt 913 Mckinney TX Card 1481 | 60.43 |
| 11/28 | Card Purchase | 11/28 Ginger Thai Restaura 214-887-617 TX Card 1295 | 18.00 |
| 11/28 | ATM Withdrawal | 11/27 6310 E Mockingbird Ln Dallas TX Card 1481 | 400.00 |
| 11/29 | Card Purchase | 11/29 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 5.90 |
| 11/29 | Card Purchase | 11/29 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 3.99 |
| 11/29 | Card Purchase | 11/29 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 3.00 |
| 11/30 | Card Purchase | 11/27 The Webstaurant Stor 717-392-747 PA Card 1295 | 51.21 |
| 11/30 | Card Purchase | 11/30 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 2.63 |
| 11/30 | Card Purchase | 11/30 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 2.09 |
| 11/30 | Card Purchase | 11/29 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 1.78 |
| 11/30 | Card Purchase | 11/29 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 15.98 |

CHASE000410

20-Mar-15

THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION
GROUP ID G 19Mar15-1203
Sequence number  Posting date  Amount

19Mar15-1203



November 01, 2011 through November 30, 2011
Account Number:  000003064030419

## ATM & DEBIT CARD WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/30 | Card Purchase          11/30 Amazon Mktplace Pmts Amzn.Com/Bi WA Card 1295 | 2.10 |
| 11/30 | Card Purchase With Pin  11/30 Wal-Mart #5823 Dalls TX Card 1481 | 129.82 |
| 11/30 | Card Purchase With Pin  11/30 Wal-Mart #5823 Dalls TX Card 1481 | 43.18 |
| **Total ATM & Debit Card Withdrawals** | | **$2,002.68** |

## ATM & DEBIT CARD SUMMARY

**DR Cleal T Watts  Card 1295**

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $823.25 |
| Total Card Credits | $145.69 |

**Cleal Thomas Watts III  Card 1481**

| | |
|---|---|
| Total ATM Withdrawals & Debits | $400.00 |
| Total Card Purchases | $584.44 |
| Total Card Credits | $0.00 |

**ATM & Debit Card Totals**

| | |
|---|---|
| Total ATM Withdrawals & Debits | $400.00 |
| Total Card Purchases | $1,407.69 |
| Total Card Credits | $145.69 |

## FEES AND OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/15 | 11/15 Withdrawal | $3,000.00 |
| 11/15 | Incoming Domestic Wire Fee | 15.00 |
| 11/23 | 11/23 Withdrawal | 5,000.00 |
| 11/23 | Incoming Domestic Wire Fee | 15.00 |
| 11/29 | 11/29 Withdrawal | 210.00 |
| **Total Fees & Other Withdrawals** | | **$8,240.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|
| 11/03 | $388.31 | 11/18 | 179.90 |
| 11/04 | 358.31 | 11/21 | 130.14 |
| 11/07 | 193.32 | 11/22 | 6.28 |
| 11/14 | 305.89 | 11/23 | 244,991.28 |
| 11/15 | 290.89 | 11/25 | 244,347.71 |
| 11/16 | 209.90 | 11/28 | 243,762.78 |

Page 4 of 6

CHASE000411

20-Mar-15
THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION
GROUP ID G 19Mar15-1203
Sequence number  Posting date  Amount
19Mar15-1203

## CHASE

November 01, 2011 through November 30, 2011
Account Number:  000003064030419

### DAILY ENDING BALANCE *(continued)*

| DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|
| 11/29 | 243,539.89 | 11/30 | 243,291.32 |



### SERVICE CHARGE SUMMARY

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|---|---|
| Checks Paid / Debits | 40 |
| Deposits / Credits | 2 |
| Deposited Items | 0 |
| Transaction Total | 42 |

| SERVICE FEE CALCULATION | AMOUNT |
|---|---|
| Service Fee | $15.00 |
| Service Fee Credit | -$15.00 |
| Net Service Fee | $0.00 |
| Excessive Transaction Fees (Above 200) | $0.00 |
| Total Service Fees | $0.00 |

CHASE000412

20-Mar-15
THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION
GROUP ID G 19Mar15-1203
Sequence number  Posting date  Amount
19Mar15-1203

**CHASE**

November 01, 2011 through November 30, 2011
Account Number:    000003064030419

This Page Intentionally Left Blank

Page 6 of 6

CHASE000413

**EXHIBIT D**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Wednesday, February 01, 2012 4:05 AM |
| **To:** | mpsjazzman@aol.com |
| **Subject:** | Re: Philipa and Entities  Au Buy-Sell Transactions .xlsx |

goal is to have come in today Wednesday, with Airway bill to request release from customs.

On 1/31/2012 9:19 PM, mpsjazzman@aol.com wrote:
Do you have any timetables yet?

Sent from my iPhone

On Jan 31, 2012, at 10:09 PM, "Dr. Cleal Watts (Doc)" <sami@usisr.com> wrote:


Dear Philipa,


hope your trip was good and short. This will be the latest chart adjusted DRAFT, were I deducted the wired ($1.5) out from the FLP and showed the $1.8 wired in to go under you, and added the management Fees. Best viewed on PC in Excel spreed sheet program.

Sincerely yours,
Doc
<Philipa and Entities Au Buy-Sell Transactions .xlsx>

**EXHIBIT E**

TO DECLARATION OF
PHILLIPA SLEDGE

**From:**            Dr. Cleal Watts (Doc) <sami@usisr.com>
**Sent:**            Tuesday, March 06, 2012 3:20 AM
**To:**              MPS-BillFr
**Subject:**         Philapa and Entities  Au Buy-Sell Transactions -Main Version- .xlsx
**Attachments:**     Philapa and Entities  Au Buy-Sell Transactions -Main Version- .xlsx

On the PC, this should give you an idea of what I am attempting to do.

# Phillips and Entities Au Buy/Sell Transactions

*It's Listed For Examples Only*
*Follow Investment Available for Each by Shipment =*

## MJPS Personal Investments

### Wires

| | Wire/As Investments | Date of $ in from | Amount Available for Investment | Amount Invested TBD per Shipment | % Entities Sold for Investment | Au Shipment Entities Sold for | Management for Current Earnings of Investment | Earnings of Investment |
|---|---|---|---|---|---|---|---|---|
| Wire 1 | $ 250,000.00 | 11/23/2011 TrustMart | | | | | | |
| Wire 2 | 250,000.00 | 12/1/2011 1st Tenn | | | | | | |
| Wire 3 | 100,000.00 | 12/21/2011 1st Tenn | | | | | | |
| Wire 4 | 55,000.00 | 12/22/2011 Trust Mart-B. | | | | | | |
| Wire 5 | 75,000.00 | 12/22/2011 TrustMart | | | | | | |
| Wire 6 | 50,000.00 | 12/22/2011 TrustMart | | | | | | |
| Wire 7 | 50,000.00 | 12/22/2011 TrustMart | | | | | | |
| Wire 8 | 50,000.00 | 2/22/2011 TrustMart | | | | | | |
| Wire 9 | 40,000.00 | 2/22/2011 1st Tenn Bank | | | | | | |
| Wire 10 | 10,000.00 | 2/3/2012 1st Tenn Bank | | | | | | |
| Wire 11 | (50,000.00) | 2/9/2012 1st Tenn Bank | | | | | | |
| Wire 12 | | | | | | | | |
| Wire 13 | | | | | | | | |
| Subtotals | $ - | | | | | | | |
| **Totals** | **$ 830,000.00** | | | | | | | |

### Shipment Number (TBD)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Shipment 1 | n/a | | $ 1,000,000.00 | $ 830,000.00 | 50% | $ 415,000.00 | $ 42,500.00 | $ 457,500.00 |
| Shipment 2 | n/a | | 4,000,000.00 | 1,287,500.00 | 30% | 386,250.00 | 406,875.00 | 793,125.00 |
| Shipment 3 | n/a | | n/a | n/a | | n/a | n/a | n/a |
| Shipment 4 | n/a | | n/a | n/a | | n/a | n/a | n/a |
| Shipment 5 | n/a | | n/a | n/a | | n/a | n/a | n/a |
| Shipment 6 | n/a | | n/a | n/a | | n/a | n/a | n/a |
| Subtotals | | | $ - | $ - | | $ - | $ - | $ - |
| **Totals** | | | $ 2,117,500.00 | | | 801,250.00 | 449,375.00 | $ 1,250,625.00 |

## MJPS Trust Investments

### Wires

| | Wire/As Investments | Date of $ in from | Amount Available for Investment | Amount Invested TBD per Shipment | % Entities Sold for Investment | Au Shipment Entities Sold for | Management for Current Earnings of Investment | Earnings of Investment |
|---|---|---|---|---|---|---|---|---|
| Wire 1 | $ 500,000.00 | 12/1/2011 JPM Chase | | | | | | |
| Wire 2 | 750,000.00 | 12/5/2011 JPM Chase | | | | | | |
| Wire 3 | 600,000.00 | 12/27/2011 JPM Chase | | | | | | |
| Wire 4 | 70,000.00 | 12/22/2011 Wells Fargo | | | | | | |
| Wire 5 | 500,000.00 | 1/13/2012 Wells Fargo | | | | | | |
| Wire 6 | 120,000.00 | 2/2/2012 Wells Fargo | | | | | | |
| Wire 7 | 500,000.00 | 2/8/2012 Wells Fargo | | | | | | |
| Wire 8 | (40,000.00) | 2/20/2012 Wells Fargo | | | | | | |
| Wire 9 | (25,000.00) | 3/1/2012 1st Tenn Bank | | | | | | |
| Wire 10 | - | | | | | | | |
| Subtotals | $ - | | | | | | | |
| **Totals** | **$ 2,985,000.00** | | | | | | | |

### Shipment Number (TBD)

| | | | | | Total Earnings | | | |
|---|---|---|---|---|---|---|---|---|
| Shipment 1 | | | $ 170,000.00 | $ 170,000.00 | 50% | $ 85,000.00 | $ (42,500.00) | $ 42,500.00 |
| Shipment 2 | | | 2,712,500.00 | 2,712,500.00 | 30% | 813,750.00 | (406,875.00) | 406,875.00 |
| Shipment 3 | n/a | | n/a | n/a | | n/a | n/a | n/a |
| Shipment 4 | | | - | - | | - | - | - |
| Shipment 5 | | | - | - | | - | - | - |
| Shipment 6 | | | - | - | | - | - | - |
| Subtotals | | | $ - | $ - | | $ - | $ - | $ - |
| **Totals** | | | $ 2,882,500.00 | | | $ 898,750.00 | $ (449,375.00) | $ - |

| Totals | | | | $ 449,375.00 |
|---|---|---|---|---|

**FS Family Ltd Part Investments**

**Wires**

| | | | | | |
|---|---|---|---|---|---|
| Wire 1 | $ 250,000.00 | 12/5/2011 Wells Fargo | n/a | n/a | n/a |
| Wire 2 | $ 1,300,000.00 | 1/11/2012 Wells Fargo | n/a | n/a | n/a |
| Wire 3 | $ (1,500,000.00) | 1/20/2012 Trust Mark | n/a | n/a | n/a |
| Wire 4 | $ 500,000.00 | 2/1/2012 SUNTRUST BANK | n/a | n/a | n/a |
| Wire 5 | $ 300,000.00 | 2/2/2012 Wells Fargo | n/a | n/a | n/a |
| Wire 6 | $ 300,000.00 | 2/21/2012 Union Bank | n/a | n/a | n/a |
| Wire 7 | $ (525,000.00) | | | | |
| Subtotals | $ - | | | | |
| Totals | $ 325,000.00 | | | | |

**Shipment Number** (TBD)

| | | All Shipments | SubGrost | Fee Adjusted Earnings |
|---|---|---|---|---|
| Shipment 1 | n/a | 50% $ - | $ - | $ - |
| Shipment 2 | n/a | 30% $ - | $ - | $ - |
| Shipment 3 | n/a | 0% $ - | $ - | $ - |
| Shipment 4 | n/a | 0% $ - | $ - | $ - |
| Shipment 5 | n/a | 0% $ - | $ - | $ - |
| Shipment 6 | n/a | 0% $ - | $ - | $ - |
| Subtotals | | $ - | $ - | $ - |
| Totals | | $ - | $ - | $ - |

**Wire Investments Totals**

| | | All Shipments | SubGrost | Fee Adjusted Earnings |
|---|---|---|---|---|
| MPS | $ 830,000.00 | $ 2,117,500.00 | $ 801,250.00 | $ 449,375.00 $ 1,250,625.00 |
| Trust | $ 2,985,000.00 | $ 2,882,500.00 | $ 898,750.00 | $ (449,375.00) $ 449,375.00 |
| F Ltd P | $ 325,000.00 | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - |
| Totals | $ 4,140,000.00 | $ 5,000,000.00 | $ 1,700,000.00 | $ - $ 1,700,000.00 |

**EXHIBIT F**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, April 09, 2012 3:01 PM |
| **To:** | MPS-BillFr |
| **Subject:** | Phillipa and Entities  Au Buy-Sell Transactions -Main Version- .xlsx |
| **Attachments:** | Phillipa and Entities  Au Buy-Sell Transactions -Main Version- .xlsx |

Dear Phillipa,

With the money you have left in, here is what we are looking at doing. I will split shipment in to 3 runs (treating as 3 shipments). 1st is all for you to make this work better, other investors will be in with you in 2ed. and expenses will fall on 2ed run, maximizing returns. There may be some thing else but so far this will work.


1st spread sheet; flow of wires and investment
2ed spread sheet; wires and transfers
3ed spread sheet;investment calculator

must view on PC.

The shipment will be corrected and sent when they open again on Tue. I managed to get money sent on Easter Saturday. This will minimize any more delay.

Sincerely yours,
Doc

## Philips and Entities Au Buy/Sell Transactions

### MP's Personal Investments

| | Wires for All Investments $ | Date of $ In From | Amount Available for Investment | Amount Invested TBD per Shipment | % | Au Shipment Earnings Solutions | Management Fee Earnings | Loaned for Interim Funding Fund | Earning of Investment |
|---|---|---|---|---|---|---|---|---|---|
| **Wires** | | | | | | | | | |
| Wire 1 | $ 250,000.00 | 11/23/2011 TrustMart | n/a | | | n/a | n/a | n/a | |
| Wire 2 | 250,000.00 | 12/1/2011 1st Tenn | n/a | | | n/a | n/a | n/a | |
| Wire 3 | 100,000.00 | 12/21/2011 1st Tenn | n/a | | | n/a | n/a | n/a | |
| Wire 4 | 55,000.00 | 12/22/2011 Trust Mart-B. | n/a | | | n/a | n/a | n/a | |
| Wire 5 | 75,000.00 | 12/22/2011 TrustMart | n/a | | | n/a | n/a | n/a | |
| Wire 6 | 50,000.00 | 12/22/2011 TrustMart | n/a | | | n/a | n/a | n/a | |
| Wire 7 | 50,000.00 | 12/22/2011 TrustMart | n/a | | | n/a | n/a | n/a | |
| Wire 8 | 50,000.00 | 2/2/2012 1st Tenn Bank | n/a | | | n/a | n/a | n/a | |
| Wire 9 | 40,000.00 | 2/2/2012 1st Tenn Bank | n/a | | | n/a | n/a | n/a | |
| Wire 10 | 10,000.00 | 2/9/2012 1st Tenn Bank | n/a | | | n/a | n/a | n/a | |
| Wire 11 | (50,000.00) | | n/a | | | n/a | n/a | n/a | |
| Wire 12 | | | | | | | | | |
| Wire 13 | | | | | | | | | |
| Subtotals | $ 830,000.00 | | | | | | | | |
| Totals | | | | | | | | **Total Earnings** | |
| | | | | | | | | | **Earnings** |
| **Shipment Number** | | (TBD) | | | | | | | |
| Shipment 1 | n/a | | $ 1,000,000.00 | $ 830,000.00 | 50% | $ 415,000.00 | $ 42,500.00 | | $ 457,500.00 |
| Shipment 2 | n/a | | 4,000,000.00 | 1,287,500.00 | 30% | 386,250.00 | 406,875.00 | | 793,125.00 |
| Shipment 3 | | | | | | | | | |
| Shipment 4 | n/a | | n/a | n/a | | n/a | n/a | | n/a |
| Shipment 5 | | | | | | | | | |
| Shipment 6 | n/a | | n/a | n/a | | n/a | n/a | | n/a |
| Subtotals | | | | | | | | | |
| Totals | | | $ 2,117,500.00 | | | $ 801,250.00 | $ 449,375.00 | | $ 1,250,625.00 |

### MP's Trust Investments

**$'s Listed For Example Only**
*Follow Investment Available for Each by Shipment #*

| | | Date of $ In From | | Amount Invested | | Au Shipment | Management Fee | Loaned for Interim Funding Fund | Earning of Investment |
|---|---|---|---|---|---|---|---|---|---|
| **Wires** | | | | | | | | | |
| Wire 1 | $ 500,000.00 | 12/1/2011 JPM Chase | | | | | | | |
| Wire 2 | 750,000.00 | 12/5/2011 JPM Chase | | | | | | | |
| Wire 3 | 600,000.00 | 12/21/2011 JPM Chase | | | | | | | |
| Wire 4 | 70,000.00 | 12/23/2011 Wells Fargo | | | | | | | |
| Wire 5 | 500,000.00 | 1/13/2012 Wells Fargo | n/a | | | n/a | n/a | | n/a |
| Wire 6 | 120,000.00 | 2/2/2012 Wells Fargo | | | | | | | |
| Wire 7 | 500,000.00 | 2/6/2012 Wells Fargo | | | | | | | |
| Wire 8 | (40,000.00) | 2/20/2012 1st Tenn Bank | | | | | | | |
| Wire 9 | (25,000.00) | 3/1/2012 1st Tenn Bank | | | | | | | |
| Wire 10 | | | | | | | | | |
| Subtotals | $ - | | | | | | | | |
| Totals | $ 2,985,000.00 | | | | | | | | |

| **Shipment Number** | | (TBD) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Shipment 1 | n/a | | $ 170,000.00 | $ 170,000.00 | 50% | $ 85,000.00 | $ (42,500.00) | | $ 42,500.00 |
| Shipment 2 | n/a | | 2,712,500.00 | 2,712,500.00 | 30% | 813,750.00 | (406,875.00) | | 406,875.00 |
| Shipment 3 | n/a | | | | | | | | n/a |
| Shipment 4 | n/a | | | | | | | | n/a |
| Shipment 5 | n/a | | | | | | | | n/a |
| Shipment 6 | n/a | | | | | | | | n/a |
| Subtotals | | | | | | | | | |
| Totals | | | $ 2,882,500.00 | | | $ 898,750.00 | $ (449,375.00) | | |

**PS Family Ltd Part Investments**

| Wires | | | | |
|---|---|---|---|---|
| Wire 1 | $ 250,000.00 | 12/5/2011 Wells Fargo | n/a | n/a |
| Wire 2 | $ 1,200,000.00 | 1/12/2012 Wells Fargo | n/a | n/a |
| Wire 3 | $ (1,500,000.00) | 1/20/2012 Trust Mark | n/a | n/a |
| Wire 4 | $ 500,000.00 | 2/1/2012 SINTRUST BANK | n/a | n/a |
| Wire 5 | $ 300,000.00 | 2/2/2012 Wells Fargo | n/a | n/a |
| Wire 6 | $ (525,000.00) | 2/21/2012 Union Bank | | |
| Wire 7 | | | | |
| Subtotals | | | | |
| Totals | $ 325,000.00 | | | |

| Shipment Number | | (TBD) | All Shipments | SubGross | Fee Adjusted Earning$ |
|---|---|---|---|---|---|
| Shipment 1 | n/a | 50% | $ 2,417,500.00 | $ 604,375.00 | |
| Shipment 2 | n/a | 30% | $ 2,382,500.00 | $ 898,750.00 | $ (449,375.00) |
| Shipment 3 | n/a | 0% | | | |
| Shipment 4 | n/a | 0% | | | |
| Shipment 5 | n/a | 0% | | | |
| Shipment 6 | n/a | 0% | | | |
| Subtotals | | | | | |
| Totals | | | | | |

| Wire Investments Totals | | All Shipments | SubGross | Fee Adjusted Earning$ |
|---|---|---|---|---|
| MPS | $ 830,000.00 | $ 2,417,500.00 | $ 604,375.00 | 1,250,625.00 |
| Trust | $ 2,985,000.00 | $ 2,382,500.00 | $ 898,750.00 $ (449,375.00) | 449,375.00 |
| F Ltd P | $ 325,000.00 | $ - | $ - | $ - |
| Totals | $ 4,140,000.00 | $ 5,600,000.00 | $ 1,700,000.00 | $ 1,700,000.00 |

| Totals | | | | | |
|---|---|---|---|---|---|
| | $ 449,375.00 | | | | |

**EXHIBIT G**

TO DECLARATION OF PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Tuesday, June 05, 2012 10:28 PM |
| **To:** | MPS-BillFr |
| **Subject:** | Au offering |
| **Attachments:** | pic(475).jpg |

**This was offered today because they can not get it done. And we now have the reputation for doing what others can't. It is 3 metric tones in Ghana now.**



# EXHIBIT H

TO DECLARATION OF
PHILLIPA SLEDGE

| From: | Dr. Cleal Watts (Doc) <sami@usisr.com> |
|---|---|
| Sent: | Friday, June 08, 2012 12:46 PM |
| To: | undisclosed-recipients: |
| Subject: | Fwd: DOCUMENTS ATTACHED |
| Attachments: | graphic3.jpg |

DEAR SIR,
I AM SENDING YOU BY ATTACHMENT GHANA PRESS REPORT ABOUT THE COURT PROCEEDINGS YESTERDAY.
I WILL KEEP YOU INFORMED ON ALL PROCEEDINGS FROM THE COURT.
KIND REGARDS,
DOCTOR P



# DAILY GUIDE

**Independent Newspaper**

NO.13212   FRIDAY, JUNE 8, 2012   GHc2.00

# Workers Pay In Danger

# FANTE CHIEF BEHEADED In Mills Hometown

•BRUTAL MURDER:
Nana Kojo Agyase

# Gold Fraudsters Passport Ceased

## By Stephen Zoure
Accra,

**Three suspected Gold fraudsters have been detained, passports ceased at an Accra Circuit High Court.**

The accused persons, Chief Mamanday Kondewa, Mr. Joseph Nyadebo and Mohammed Haruna all miners were charged with Five counts of making false allegations.

They pleaded not guilty to the charges and were remanded into police custody and passports ceased by the prosecutor to re-appear on Friday June 8.

The court was inform that 714 KG Gold concentrate originated from Sierra Leone belongs to Chief Alimamy Kamara. The Gold is presently with the Ghana customs to be shipped to Dallas Texas. The Gold which was intended to be shipped to Dr. Cleal Watts III 8926 Forest Hills Blvd, Dallas Texas 75218 – 4001 USA en-routes through L.F Wada international Airport Bermuda destination Dallas Texas is presently with the Ghana customs from a High Court order from Ghana.

Pending the High Court hearing in which the complainants Mamanday Kondewa claim

that no payment was made to him for his products 714 KG Gold Concentrate.

After 2 days court hearing, it has been proved that Mr. Kondewa is making false allegation to the court. The prosecutor recommended his passport to be ceased and detained. Mr. Joseph Nyadebo who is also testifying that his 44 Kg Gold Concentrate was not paid for, was also detained pending through investigations. Mr. Mohammed Harruna, another complainant was also detained and passport ceased.

The court hearing continuous on Friday when finale verdicts is to be issued by the High court Judge.



Indomie
BOX NOODLES
Instant Noodles
...tastes great
TOO BUSY?
GRAB A QUICK ONE
So tasty, so handy

**EXHIBIT I**

TO DECLARATION OF
PHILLIPA SLEDGE

**From:**        Dr. Cleal Watts (Doc) <sami@usisr.com>
**Sent:**        Friday, June 22, 2012 5:13 PM
**To:**        MPS-BillFr
**Subject:**        Fwd: SUPREME HIGH COURT APPEAL
**Attachments:**        FINALREF.jpg

The Magistrate typed the doc and put the 24th, it is on the 25th they will resume and finalize.

Doc

-------- Original Message --------
**Subject:** SUPREME HIGH COURT APPEAL
    **Date:** Fri, 22 Jun 2012 14:08:41 -0700 (PDT)
   **From:** com>
     **To:** Dr Cleal Watt <sami@usisr.com>

DEAR SIRS,

REFERENCE TO THE SUPREME HIGH COURT APPEAL TODAY IN THE MATTER BETWEEN CHIEF ALIMAMY KAMARA AND THE THREE JAILED COMPLAINANT FOR MISLEADING THE COURT WAS TODAY ADJOURN TILL MONDAY 25TH JUNE, 2012.

I AM FORWARDING YOU ADJOURNMENT SENT TO ME TODAY.
KIND REGARDS
DR. K.



HCJ No. 0177536-011



Republic of Ghana

HCJ Ref No. 04490714

High Street close,
Accra Central.
Ghana.

# High Court of Justice

I, JOHN BOSCO NABARESE, FIRST DEPUTY JUDICIAL SECRETARY OF THE JUDICIAL

SERVICE OF GHANA, DO HEREBY CERTIFY THAT IN THE CASE OF CHIEF ALIMAMY KAMARA

VERSUS THE COMPLAINANT MESSERS MAMADY  KONDEWA, JOSEPH NYADEBO AND

MOHAMMED HARUNA WHO WERE JAILED FOR FIVE YEARS EACH FOR MISLEADING THE

COURT AND THEIR LAWYERS SENT A WRITE OF APPEAL AT THE SUPREME HIGH COURT

HAVE ALSO ASKED THAT, THE PRODUCT 714KG AU METAL GOLD BE RETURNED TO ITS

COUNTRY OF ORIGIN HAVE BEEN GIVEN AN ADJOURNMENT TILL MONDAY 24TH JUNE FOR

FURTHER HEARING.

DATED THIS 22ND DAY OF JUNE, 2012. IS A NOTARY PUBLIC OF GHANA.

THIS ATTESTS TO THE STAMP. SIGNATURE OF THE NOTARY PUBLIC ONLY

AND NOT THE CONTENTS OF THE ATTACHED DOCUMENT.

GIVEN UNDER MY HAND AND THE SEAL OF THE

HIGH COURT OF JUSTICE THIS 22ND DAY OF

JUNE,  IN THE YEAR OF OUR LORD

TWO THOUSAND AND TWELVE (2012)

FIRST DEPUTY JUDICIAL SECRETARY

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, June 23, 2012 7:05 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Phillipa, the 1M did show up this morning in Account. Thank you  I sent the letter I received from the Magistrate to you yesterday |

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, June 23, 2012 7:31 PM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: Fw: DOCUMENTS ATTACHED |
| **Attachments:** | saturday graphic.jpg |

DEAR SIRS,

I AM FORWARDING YOU BY ATTACHMENT SATURDAY GRAPHIC NEWS PAPER THAT CONTAIN
FRIDAY COURT PROCEEDINGS,

REGARDS,

DR. K

6   **AFRICA/WORLD**                                                  Daily Graphic, Saturday, June 23, 2012.

# Paraguay's President impeached

PARAGUAYAN lawmakers voted to impeach President Fernando Lugo for his role in a deadly clash involving landless farmers, and announced that the former Roman Catholic bishop's trial would begin in the Senate.

Lugo, who was elected four years ago on promises that he would help the South American country's poor, went on national television to dismiss rumors that he would resign, and vowed to face the trial "with all its consequences."

The lower house voted 76-1 on Thursday to impeach the president. Hours later, the Senate announced that it would begin his trial on Friday.

In Paraguay, a poor, landlocked country with a history of political instability, the vote prompted frightened residents in the capital, Asuncion, to shutter businesses and pull children out of schools. Hospitals were put on alert, freeing up beds in case of possible violence.

Paraguayans were unnerved by the possibility that the looming showdown in the opposition-controlled Senate could spark violent street protests such as those that followed the March 1999 assassination of Vice President Luis Maria Argana.

continue on page 10

### SUPREME COURT FOLD FRAUDSTERS CASE APPEAL ARDJUN
Story: Mary Kumi

At the last supreme court hearing in the matter between Chief Alimamy kamara and the 3 jailed complenants, Mamanday Kondewa, Joseph Nyadebo and Mohammed Haruna which was arjuned till Monday 25ᵗʰ June 2012, has bought to light that the 3 jailed complenants were just misleading the court. Their lawyers made a request that the product been returend to the country of origin but eas rejected by Chief Alimamy kamara lawyer.

After hearing from both sides the preceeding judge arjuned the matter till Monday 25ᵗʰ June.



· Boko Haram leaders

# US designates Boko Haram leaders as terrorists

THREE leaders of Nigeria's Boko Haram Islamist group have been designated as terrorists by the US state department.

Abubakar Shekau leads the militant group, while Abubakar Adam Kambar and Khalid el Barnawi are thought to have ties with a branch of al-Qaeda.

The move means any assets belonging to the men in the US will be frozen, and contact with US citizens banned.

Boko Haram has said it carried out a number of attacks against churches and other establishments since 2009.

More than 640 people have died in the country so far in 2012 in attacks blamed on the group.

The move was likely to have little effect on the three men.

Boko Haram carried out a series of attacks against churches on Sunday, sparking a wave

of sectarian reprisals.

Gun battles also broke out in Damaturu after attacks by the group against security forces.

Boko Haram, whose name means "Western education is a sacrilege", is in the Hausa language, is based in the dominantly Muslim north of Nigeria.

The south of the oil rich country is mostly Christian.—BBC

# Mexican police arrest drug baron's son



· Jesus Alfredo Guzman Salazar

MEXICAN troops have arrested the son of the country's most-wanted drug suspect, Joaquin "El Chapo" Guzman.

Jesus Alfredo Guzman Salazar was arrested, with another person, in central Jalisco state in an operation by marines in the city of Zapopan.

His father is the boss of the powerful Sinaloa cartel.

"El Chapo", or "Shorty", Guzman has been in hiding ever since he escaped from prison in 2001.

Jesus Guzman and the other detainee, Kevin Beltran Rios, also accused of belonging to the Sinaloa cartel, were transferred to Mexico City, and paraded in front of the media.

A spokesman for the Mexican Navy, Jose Luis Vergara, said Jesus Guzman - known as "El Gordo", or "The Fat One" - was a growing force within the organisation.

"He controlled most of the Sinaloa cartel's illegal drug trade between Mexico and the United States," he said.

Mr Vergara said Jesus Guzman also managed most of his fathers' properties. "El Chapo" Guzman appears on Forbes magazine's world billionaires list.

Joaquin "El Chapo" Guzman escaped from prison in 2001 ,

Experts say the Mexican authorities seem to be trying to hurt Guzman by targeting his family. The same tactic was employed by the

Colombian army to get to the notorious drug baron, Pablo Escobar.

Jesus Guzman Salazar, 26, was indicted on drug trafficking charges in the US state of Illinois in 2009.

Earlier this month, the US treasury department imposed financial sanctions on him and his mother, Maria Alejandrina Salazar.

Last month, two other sons of Joaquin Guzman, Ivan and Ovidio, were also targeted by the treasury department. The measure means US citizens are not allowed to do business with them.

It is unclear whether Jesus Guzman Salazar will be tried in Mexico or extradited to the US.

With presidential elections due in Mexico on July 1, President Felipe Calderon's war on drugs will be under scrutiny.

More than 55,000 people have died in Mexico in drug-related violence since he declared war on the cartels.

El Chapo was jailed in 1993, but escaped from his maximum-security prison in a laundry basket eight years later.

He heads the Sinaloa cartel, which controls much of the flow of cocaine, marijuana and methamphetamine to the United States.

The US state department has offered a reward of up to $5 million (£3.2m) for information leading to his arrest.—AP

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Saturday, June 30, 2012 12:23 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: SUPREME COURT NOTIFICATION |
| **Attachments:** | REF (2).jpg |

-------- Original Message --------
**Subject:**SUPREME COURT NOTIFICATION
   **Date:**Fri, 29 Jun 2012 15:40:25 -0700 (PDT)
   **From:** K <gemproductsltd@yahoo.com>
      **To:**Dr Cleal Watt <sami@usisr.com>
      **CC:**Sekou Conde <sekoucondela200@yahoo.com>

DEAR SIRS,

I AM SENDING YOU BY ATTACHMENT SUPREME COURT NOTIFICATION AND DATE TO
APPEAR.

THANKS FOR YOUR CO-OPERATION.
KIND REGARDS.
DR.  K



**REPUBLIC OF GHANA**
JUDICIAL SERVICE
P. O. BOX 119
ACCRA-GHANA

I, JOHN BOSCO NABARESE, FIRST DEPUTY JUDICIAL SECRETARY OF THE JUDICIAL

SERVICE OF GHANA, DO HEREBY CERTIFY THAT IN THE CASE OF CHIEF ALIMAMY KAMARA VERSUS

THE COMPLAINAT MESSERS MAMADY KONDEWA, JOSEPH NYADEBO AND MOHAMED HARUNA. WHO

WERE JAILED TODAY FOR MISLEADING THE COURT, AN APPEAL FROM THE COMPLAINANT LAWYERS

HAVE SENT A WRITE OF APPEAL THAT THE CASE BE RE-VISIT AGAIN THE C OURT PROCEEDINGS.

THE HIGH COURT JUDGE WHO IS PRECIDING THE HIGH COURT APPEAL MATTER INVOLVED IN AN

ACCIDENT THIS MORNING WHEN COMING TO COURT. BECAUSE OF THE ACCIDENT THE MATTER WAS

ADJOURNED TO WEDNESDAY 4TH JULY, 2012 TO ENABLE THE HIGH COURT JUDGE RECOVER FULLY

FROM THE MINOR INJURIES HE RECEIVED.

THE APPEAL COURT IS INVITING BOTH COMPLAINANT AND THE ACCUSED TO APPEAR BEFORE THE

HIGH COURT ON WEDNESDAY MORNING FOR FINAL HEARING.

DATED THIS 29TH DAY OF JUNE, 2012 IS A NOTARY PUBLIC OF GHANA.

THIS ATTESTS TO THE STAMP. SIGNATURE OF THE NOTARY PUBLIC ONLY AND

NOT THE CONTENTS OF THE ATTACHED DOCUMENT.

GIVEN UNDER MY HAND AND THE SEAL OF THE

HIGH COURT OF JUSTICE THIS        29 TH       DAY OF

JUNE, IN THE YEAR OF OUR LORD

TWO THOUSAND AND TWELVE (2012)

FIRST DEPUTY  JUDICIAL SECRETARY

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Thursday, July 05, 2012 1:59 AM |
| **To:** | MPS-BillFr |
| **Subject:** | extension to Fri. |
| **Attachments:** | REF (2) (1).jpg |

DEAR SIRS.

I AM SENDING YOU BY ATTACHMENT NOTFICATION OF COURT PROCEEDING TO FRIDAY MORNING.

THANKS FOR YOUR CORPORATION.

KIND REGARDS.

DR. K

.

1



REPUBLIC OF GHANA
JUDICIAL SERVICE
P. O. BOX 119
ACCRA-GHANA

I, JOHN BOSCO NABARESE, FIRST DEPUTY JUDICIAL SECRETARY OF THE JUDICIAL

SERVICE OF GHANA, DO HEREBY CERTIFY THAT IN THE CASE OF CHIEF ALIMAMY KAMARA VERSUS

THE COMPLAINAT MESSERS MAMADY KONDEWA, JOSEPH NYADEBO AND  MOHAMED HARUNA. WHO

WERE JAILED  TODAY FOR MISLEADING THE COURT, AN APPEAL FROM THE COMPLAINANT LAWYERS

HAVE SENT A WRITE OF APPEAL THAT THE CASE BE RE-VISIT AGAIN THE C OURT PROCEEDINGS.

THE HIGH COURT JUDGE WHO IS PRECIDING THE HIGH COURT APPEAL MATTER INVOLVED IN AN

ACCIDENT THIS MORNING WHEN COMING TO COURT. BECAUSE OF THE ACCIDENT THE MATTER WAS

ADJOURNED TO WEDNESDAY 4TH JULY, 2012 TO ENABLE THE HIGH COURT JUDGE RECOVER FULLY

FROM THE MINOR INJURIES HE RECEIVED.

UNFORTUNATELY THE COURT JUDGE WAS NOT AVAILABLE AT THE COURT PROCEEDINGS BECAUSE

OF INJURIES HE RECEIVED.

THE APPEAL COURT IS INVITING BOTH COMPLAINANT AND THE ACCUSED TO APPEAR BEFORE THE

HIGH COURT ON FRIDAY MORNING FOR FINAL HEARING.

DATED THIS 4 TH  DAY OF JULY, 2012  IS A NOTARY PUBLIC OF GHANA.

THIS ATTESTS TO THE STAMP. SIGNATURE OF THE NOTARY PUBLIC ONLY AND

NOT THE CONTENTS OF THE ATTACHED DOCUMENT.

GIVEN UNDER MY HAND AND THE SEAL OF THE

HIGH COURT OF JUSTICE THIS        4TH      DAY OF

JULY,  IN THE YEAR OF OUR LORD

TWO THOUSAND AND TWELVE (2012)

FIRST DEPUTY  JUDICIAL SECRETARY

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Thursday, July 05, 2012 2:00 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: RE;SUPREME COURT CONCLUSION FEES |
| **Attachments:** | Suupreme Court 2.jpg |

DEAR SIR,

I AM FORWARDING YOU SUPREME COURT CONCLUSION FEES

AS THIS IS THE LAST COST FEES IT IS IMPERATIVE THAT THE COST BE PAID TOMORROW TO ENABLE THE COURT PROCEEDINGS COMES TO AN END.

KIND REGARDS,

DR. K



# SUPREME HIGH COURT OF JUSTICE
## REPUBLIC OF GHANA
### ACCRA – GHANA



In the Superior Court of Judicature,
High Court of Justice,
Accra-Ghana.

*Suit No: 028-012*
*4th July, 2012*

## SUPREME HIGH COURT PROCEEDING FEES INVOICE

| | |
|---|---|
| 1. *Conclusion fee* | *US$ 35,000.00* |
| 2. *Filing and Service of Documents* | - *US$25,000.00* |
| 3. *Commissioner for Oaths Fee* | - *US$15,000.00* |
| 4. *Affidavit* | - *US$5,000.00* |
| 5. *Miscellaneous Cost* | - *US$ 10,000.00* |
| *Total* | - *US$ 90,000.00* |



**BARRISTER COLLINS ADJEI**
*Attorney*



**COMMISSIONER FOR OATH**

*All parties to the proceeding in the court whose judgement is sought to be heard are entitled to pay the above mentioned fees.*

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Wednesday, July 11, 2012 3:38 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: Re: flight request |

DEAR SIR,
I HAVE ALREADY CONTACTED THE AIR LINE REPRESENTATIVE AND THEY HAVE INFORMED
ME THAT THE CARGO FLIGHT WILL LEAVE FOR DALLAS TEXAS TOMORROW AT 8:00PM
ARRIVING AT DALLAS AT 7:00AM EN-ROUTE THROUGH ANTIGUA AIRPORT.

THANKS FOR YOUR CO-OPERATION.
BEST REGARDS
DR. K

Dr K,

 If at all possible it would great if the flight could get in to Dallas in the early Am on Thursday this would give
me enough time to start my proses on the gold other wise I have to start on Monday, I can only work during the
work week.

the flight will probably be 14 hours with an additional 2 hours for fueling in Antigua minus the time difference
of 5 hours this leaves 11hours time wise. So if you left at 9:00 PM you would arrive here in Dallas at 8:00AM.
So if you can leave as soon as possible so you can arrive in Dallas early on Thursday that will give me time to
get started this week instead of having to wait till next Mon to start. The earlier the better, I do not know when
Antigua 's airport opens for fueling but if you arrive there just before they can fuel you up you can get here
quicker. This probably will Determine your flight plan and when you can leave Accra and ultimately arrive in
Dallas.

Doc

**From:**        Dr. Cleal Watts (Doc) <sami@usisr.com>
**Sent:**        Tuesday, July 17, 2012 11:42 AM
**To:**          MPS-BillFr
**Subject:**     Fwd: PERMISSION GRANTED FROM HIGH COURT
**Attachments:** Court Document.doc

Just got this in after your email came in.

 Doc


DEAR SIRS,
I AM FORWARDING YOU BY ATTACHMENT PERMISSION GRANTED FROM THE HIGH COURT TO
ALLOW 714KG GOLD CONCENTRATE BE SHIPPED TO DALLAS TEXAS.

KIND REGARDS.
DR.K

 

REPUBLIC OF GHANA
JUDICIAL SERVICE
P. O. BOX 119
ACCRA-GHANA

## <u>PERMISSION GRANTED TO ALLOW 714KG GOLD CONCENTRATE AT THE GHANA CUSTOMS WARE HOUSE TO BE SHIPPED TO DALLAS TEXAS INTERNATIONAL AIRPORT</u>

I, JOHN BOSCO NABARESE, FIRST DEPUTY JUDICIAL SECRETARY OF THE JUDICIAL SERVICE OF GHANA, WISH TO INFORM YOU THAT PERMISSION HAVE BEEN GRANTED FROM THE HIGH COURT TO ALLOW 714KG GOLD CONCENTRATE AT THE GHANA CUSTOMS WARE HOUSE BE SHIPPED TO DALLAS TEXAS INTERNATIONAL AIRPORT.

 YOUR CO-OPERATION IS HIGHLY SOLICITED.

DATED THIS 17TH DAY OF JULY, 2012 IS A NOTARY PUBLIC OF GHANA.

**THIS ATTESTS TO THE STAMP. SIGNATURE OF THE NOTARY PUBLIC ONLY AND NOT THE CONTENTS OF THE ATTACHED DOCUMENT.**

**GIVEN UNDER MY HAND AND THE SEAL OF THE HIGH COURT OF JUSTICE THIS 17TH DAY OF JULY, IN THE YEAR OF OUR LORD TWO THOUSAND AND TWELVE (2012)**



**FIRST DEPUTY JUDICIAL SECRETARY**

CC:

> ➤ GHANA CUSTOMS
> ➤ CITY LINK CARGO SERVICES
> ➤ DR. CLEAL T. WATTS III, 8926 FOREST HILLS BLVD, USA
> ➤ DR. PATRICK KOROMA, SIERRA LEONE EMBASSEY, GHANA.

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, July 23, 2012 2:20 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: Fw: New request |
| **Attachments:** | NEWREQUEST.jpg |

-------- Original Message --------
**Subject:** Fw: New request
   **Date:** Fri, 20 Jul 2012 13:29:23 -0700 (PDT)

DEAR SIRS,
 I AM SENDEING YOU BY ATTACHMENT NEW CHANGES FROM CHIEF ALIMAMY KAMARA FROM THE REP. OF GUINEA AUTHORITIES.

THE CUSTOM DIRECTOR ASKED THAT WE WAIT TILL THE HIGH COURT FROM GHANA SEND THEIR APPROVAL.

BE REST ASSURE  THAT ALL IS NOW UNDER CONTROL.

HAVE A NICE EVENING,

REGARDS,

DR. PATRICK KOROMA

# REPUBLIQUE DE GUINEE

Travail – Justice – Solidarite .
Ministere des Affaires Etrangeres

*Our Ref:* RDG/GUN/VOL1/07/12          *Your Ref:*          *Date:* 21ᵀᴴ JULY, 2012

**THE ATTORNEY GENERAL**
**GHANA HIGH COURT**
**PMB 854, ACCRA-GHANA**

**(NEW REQUEST)**

Dear Sirs,

The Republic of Guinea Embassy in Accra-Ghana, present its compliment to your High Court and wish to inform you that, in the case of Chief Alimamy Kamara Versus the complainant Messers Mamady Kondewa, Joseph Nyadebo and Mohammed Haruna who were jailed at a Court hearing for misleading the Court, have commended the High Court decision.

Chief Alimany Kamara, owner of the 714kgs Gold Concentrate, requested that US $300,000.00 should be be paid before the product arrived at the Dallas Texas International Airport, after which the rest of the amount cost of the Gold be paid to him. This Embassy have been informed that, workers in Chief Alimamy Kamara's Gold Mines have threatened to burn his house or kill him if part of the 714kgs gold concentrate is not paid to them.

The Embassy in collaboration with the High Court officers in Conakry, are asking that another injunction to the 714kgs Gold concentrate intended to be shipped to Dallas Texas-U.S.A. be stopped till the said amount is paid.

We wait for your co-operation.

Sincerely,

**MUSA TARAWALLY**
**First Secretary**
**Rep. of Guinea Embassy**

---

AMBASSADE DE LA REPUBLIQUE DE GUINEE
PO BOX 1236 A   ACCRA-GHNA

**EXHIBIT J**

TO DECLARATION OF
PHILLIPA SLEDGE

**Member:**
American Society of Questioned
  Document Examiners

American Academy of
  Forensic Sciences

Southeastern Association of
  Forensic Document Examiners
**Certified:**
American Board of Forensic
  Document Examiners

**E-MAIL**
*vastrick@yahoo.com*

# *Thomas W. Vastrick*

## Forensic Document Examiner

**Orlando, FL Office**
522 S Hunt Club Blvd  Suite 217
Apopka, FL  32703

(407) 234-3219

Fax in U.S.  (800) 216-9003

**Memphis, TN Office**
6025 Stage Rd.  Suite 42-182
Memphis, TN  38134

(901) 383-9282

September 11, 2015

Mr. Darrell N. Phillips
Pietrangelo Cook PLC
6410 Poplar Ave., Suite 190
Memphis, TN  38119

**File No. 153727**

## FORENSIC DOCUMENT EXAMINATION REPORT

### Examination Request

Determine whether or not he submitted questioned documents bear evidence of being genuine.

The submitted questioned documents consist of the following:

**Q-1**   Copy of one Ince & Co. Premium Policy dated October 24, 2012.
**Q-2**   Copy of one Ince & Co. Insurance Premium Policy Cover dated October 24, 2012.
**Q-3a**  Copy of one notarized statement dated July 6, 2012.
**Q-3b**  Copy of one notarized statement dated July 17, 2012.
**Q-3c**  Copy of one notarized statement dated June 22, 2012.
**Q-4a**  Copy of one notarized statement dated July 4, 2012.
**Q-4b**  Copy of one notarized statement dated June 29, 2012.
**Q-5**   Copy of one notarized statement dated June 14, 2012.

For comparison purposes the following documents were provided:

**K-1a**  Copy of one blank template correspondence bearing a dated of November 15, 2013.
**K-1b**  Copy of one computer slide print bearing two slides and an Ince & Co. insignia.

### Conclusions

It is probable that Exhibits Q-1 and Q-2 are not genuine.

It is probable that Exhibits Q-3a through Q-3c are not genuine.

It is probable that Exhibits Q-4a and Q-4b are not genuine.

It is probable that Exhibits Q-3a through Q-5 are of a common source.

**FORENSIC DOCUMENT EXAMINATION REPORT**
**File No. 153727**
**Page 2**

**Reasons and Bases**

This examination was conducted utilizing published standard methodologies as prescribed by ASTM International Standard E-2331 and by The Scientific Working Group for Forensic Document Examination (SWGDOC).

The conclusion stated above utilizes published standard terminology for stating conclusions in forensic document examination as per ASTM International Standard E-1658. The term "probable" is defined as meaning that the evidence points "rather strongly" toward the conclusion and reflects a high level of confidence.

Examination of the questioned Q-1 and Q-2 documents revealed numerous and significant characteristics of spuriousness to include the following:

1. The address is written as "1st Katharine way". On Exhibit K-1 specimens and on the Ince & Co. website the address is listed as 1 St Katharine's Way".
2. The postcode is listed as "E1 W1AY". The inward code should be three characters. Exhibit K-1a lists the postcode as "E1W 1AY".
3. The building name is incorrect. The questioned documents list the building as "International Home". Exhibit K-1a lists the building as "International House".
4. The handwritten date entry "24-10-12" on Exhibits Q-1 and Q-2 are exact replications. As such, they are copies of the same source handwriting. Therefore, at least one of these date entries is not, nor cannot, be an original ink entry and has been transferred from another document. It is also possible that this entry has been transferred to both documents from another source that has not been submitted.
5. The destination address on Exhibit Q-2 does not contain a country reference subsequent to either reference to the USA state of Texas.
6. Several instances of left margin nonuniformity.
7. Month/day/year order of date entry at the top, right portion of Exhibit Q-1.

Examination of the questioned Exhibits Q-3a through Q-3c document revealed the following:

1. Exact replication of the signature entries. Exact replication reflects that these signatures are copies of the same single source signature. As such, at least two (and possibly three) of these documents cannot, nor ever did, exist as presented in original form.
2. The seal images on Exhibits Q-3a through Q-3c are copies of the same seal.

Examination of the questioned Exhibits Q-4a and Q-4b document revealed the following:

1. Exact replication of the signature entries. Exact replication reflects that these signatures are copies of the same single source signature. As such, at least one of these (and possibly both) of these documents cannot, nor ever did, exist as presented in original form.
2. The seal images on Exhibits Q-4a and Q-4b are copies of the same seal.

The seal images on Exhibits Q-3a through Q-5 are copies of the same seal. As such, all of these documents are of a common source.



Thomas W. Vastrick
Forensic Document Examiner

**Member:**
American Society of Questioned
   Document Examiners

American Academy of
   Forensic Sciences
Southeastern Association of
   Forensic Document Examiners

**Certified:**
American Board of Forensic
   Document Examiners

**E-MAIL**
*vastrick@yahoo.com*

*Thomas W. Vastrick*

### Forensic Document Examiner

**Memphis, TN Office**
6025 Stage Rd.  Suite 42-182
Memphis, TN  38134
(901) 383-9282

**Orlando, FL Office**
522 S Hunt Club Blvd., Suite 217
Apopka, FL  32703
(407) 234-3219

FAX  (800) 216-9003

### CURRICULUM VITAE

## 1. Education and Training

Bachelor of Science in Forensic Science from California State University at Sacramento, 1977.

Two year, full-time, in-residence training program with the U.S. Postal Inspection Service Headquarters Crime Laboratory in Washington, DC from 1977 through 1979.

## 2. Experience

Full-time Forensic Document Examiner with the U.S. Postal Inspection Service Southern Region Crime Laboratory from 1980 through 1992.

Private consulting services in Forensic Document Examination since 1990.

Examinations involve handwriting, hand printing, alterations, typewriting, indented writing, counterfeiting, ink & paper analyses, burned document restoration, and mechanical impressions.

Research Manager, National Center for Forensic Science, University of Central Florida, Orlando, FL  2011 - 2015

## 3. Courtroom Testimony

Have testified as an expert in Forensic Document Examination over 300 times and have been accepted as an expert every time.  Have testified in federal, state and local courts along with military hearings, arbitration hearings and administrative law hearings.

Have testified in Federal District Court in:
   **Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.**

Have testified in the following state courts:
   **Alabama, Arkansas, Florida, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Oklahoma, Tennessee and Texas.**

## 4. Certification

Certified through technical testing by the American Board of Forensic Document Examiners (ABFDE) since 1982.  The ABFDE is the only certification body that is recognized by all federal government agencies employing Forensic Document Examiners along with many state and municipal law enforcement agencies. The ABFDE is also the only certification board that meets published ASTM standards for required education and training.  The ABFDE is accredited by Forensic Specialties Accreditation Board (FSAB).

Served on the ABFDE Board of Directors 1987 to 1995.

Served as Secretary of the ABFDE Board of Directors 1991 to 1995.

CURRICULUM VITAE
Thomas W. Vastrick
Page 2

## 5. Professional Affiliations

•American Society of Questioned Document Examiners (ASQDE)
  Newsletter Editor - 1983 through 1992
  Program Chairman – 1993
  Journal Editorial Staff – 2000 to present
  Regular Member

•American Academy of Forensic Sciences  (AAFS)
  Fellow - Questioned Documents Section
  Section Chairman – Questioned Documents Section – 2012 to present

•Southeast Association of Forensic Document Examiners (SAFDE)
  Program Chairman – 1997, 1998, 2000, 2011
  Workshop Facilitator – 1998, 2001
  Regular Member

•Scientific Working Group – Forensic Document Examination (Ceased Meeting 2014)
  Main SWGDOC Committee – 1999 to 2001
  Legal Issues Sub-committee Chairman – 1999 to 2001
  Executive Committee – 1999 to 2001
  Working Committee – 2001 to 2014

•Expert Working Group on Human Factors in Handwriting Examination
  U.S. Department of Commerce
  National Institute of Standards and Technology
  2015 - Present

## 6. Published Research Papers

• *A NON-DESTRUCTIVE PRELIMINARY TEST FOR THE DETERMINATION OF PAGE INSERTION OF A MULTIPAGED QUESTIONED DOCUMENT* - published in Identification News, Vol. 31, No. 9, September, 1981.

• *CHECKWRITER IDENTIFICATION - INDIVIDUALITY* - published in Journal of Forensic Science, Vol. 27, No. 1, January, 1982.

• *ILLUSIONS OF TRACING* - published in Journal of Forensic Science, Vol. 27, No.1, January, 1982.

• *THE EXAMINATION OF NOTARY SEALS* - published in Journal of Forensic Science, Vol. 27, No. 4, October 1982.

• *THE FORENSIC VALUE OF RIGHT-HAND JUSTIFICATION* - published in Forensic Science International, 1990.

• *FRAUD AND QUESTIONED DOCUMENT EXAMINATION* - Published in The White Paper, Vol. 7, No. 2, April-May, 1993.

• *SOLVE THE CROSS WORD PUZZLE* - Published in Security Management, December, 1994.

• *DEPOSING FORENSIC EXPERT WITNESSES: AN EXPERT'S VIEWPOINT* - Published in The Memphis Bar Association Magazine, December, 1995.

• *HAS THAT DOCUMENT BEEN ALTERED* - Published in The Florida Defender, Fall, 1998.

• *THE UNIQUENESS OF HANDWRITING* - Published in the inaugural edition of the Journal of American Society of Questioned Document Examiners, Vol. 1 No. 1, 1998.

• *INDENTED WRITING: THE INVISIBLE EVIDENCE* - Published in The Florida Defender, Fall, 1999.

• *SELECTING A QUALIFIED FORENSIC DOCUMENT EXAMINER* - Published in The Florida Defender, Fall, 2001.

CURRICULUM VITAE
Thomas W. Vastrick
Page 3

## 6. Published Research Papers (continued)

- *CLUES OF INK* - Published in FSA Times (The Institute of Internal Auditors), Vol. 2, No. 2, 2003.

- *ADMISSIBILITY ISSUES IN FORENSIC DOCUMENT EXAMINATION* - Published in The Journal of American Society of Questioned Document Examiners, Vol 7, No. 1, 2004.

- *IS IT REAL? PROVING (OR DISPROVING) THE AUTHENTICITY OF IMMIGRATION DOCUMENTS* – Published in the Tennessee Bar Journal, Vol. 42, No. 7, 2006.

- *MEASURING THE FREQUENCY OCCURRENCE OF HANDWRITING AND HAND PRINTING CHARACTERISTICS* – NIJ Award No. 2010-DN-BX-K273, 2015 (co-author)

- *FORENSIC HANDWRITING COMPARISON EXAMINATION IN THE COURTROOM* – Published in The Judges' Journal, American Bar Association, Vol. 54, No. 3, Summer 2015.

## 7. Presentation of Professional Papers

- *CHECKWRITER IDENTIFICATION* - ASQDE, Rochester, NY, 1979.

- *AN UPDATE OF MODEL DIFFERENTIATION OF CHECKWRITERS BY DOMESTIC MANUFACTURERS* - ASQDE - North Lake Tahoe, NV, 1983.

- *THE USE OF VIDEOTAPES TO ENHANCE COURTROOM PRESENTATIONS* - ASQDE, Montreal, Canada, 1985.

- *PLASTIC PAPER AS A QUESTIONED DOCUMENT* - ASQDE, Savannah, GA, 1986.

- *STANDARD REGISTER CHECKWRITERS* - ASQDE, San Jose, CA, 1990.

- *COMPARATIVE ANALYSES OF PHOTOGRAPHIC FILMS, PAPERS, CHEMICALS AND TECHNIQUES FOR USE ON DEMONSTRATIVE COURT CHARTS* - ASQDE, Kissimmee, FL, 1991.

- *A NEW DOMESTIC CHECKWRITER MANUFACTURER* - ASQDE, Ottawa, Canada, 1993.

- *COMPUTERIZED HANDWRITING* - ASQDE, Long Beach, CA, 1994.

- *THE UNIQUENESS OF HANDWRITING - SURVEY RESULTS* - ASQDE, Chicago, IL, 1995.

- *PRESENTATION SOFTWARE* - ASQDE, Chicago, IL, 1995.

- *A COLLECTION OF FAX FONTS, PART II* (Contributor) - ASQDE, Chicago, IL, 1995.

- *THE THIRD EXAMINER* - ASQDE, Phoenix, AZ, 1997.

- *AN OVERVIEW OF POINT AND SHOOT DIGITAL CAMERAS* – AAFS, San Francisco, CA, 1998.

- *THE EXPERT CRITIC IN A CIVIL MATTER* – SAFDE, Atlanta, GA, 1999.

- *A CRITICAL LOOK AT CRITICS* – MAFS/SWAFS joint meeting, Cape Gerardeau, MO, 1999.

- *THE SKILL LEVEL OF PSEUDO-TREMOR* – ASQDE, Ottawa, Ontario, Canada, 2000.

- *HOW KNOWN ARE THOSE KNOWNS* – AAFS, Atlanta, GA, 2002.

- *HANDWRITING IDENTIFICATION – BACK TO REALITY* – ASQDE, San Diego, CA, 2002.

- *THE PITFALLS OF BAD SCIENCE* – ASQDE, Memphis, TN, 2004.

- *CASE REVIEW: METHODOLOGY STANDARDIZATION* – ASQDE, Boulder, CO, 2007.

- *FREQUENCY OCCURRENCE OF VARIATION AS A TOOL FOR (DIS) ASSOCIATION OF HANDWRITING* – SAFDE, 2010

- *JUNK CRITICISM IN THE COURTROOM* – AAFS, Chicago, IL, 2011

- *INSTITUTIONAL PREJUDICE AGAINST INDETERMINATE CONCLUSIONS* – SAFDE, Atlanta, GA, 2011

CURRICULUM VITAE
Thomas W. Vastrick
Page 4

## 7. Presentation of Professional Papers (continued)

- *CURRENT STATUS OF FREQUENCY OCCURRENCE STUDY* – AAFS, Washington, DC, 2013

- *TACKY CONCLUSIONS – SIGNATURE TRANSFER BY TAPE?* – SAFDE, Atlanta, GA, 2013.

- *TRENDS IN FREQUENCY OCCURRENCE STUDY* – NIST, Gaithersburg, MD, 2013

- *DEVELOPMENT OF AN EXTENSIVE FORENSIC HANDWRITING DATABASE – STATISTICAL COMPONENTS* – Papers from the Seventh International Workshop on Statistical Simulation, Rimini, Italy (co-author, non-presenter)

## 8. Books

- *THE CLASSIFICATION AND IDENTIFICATION OF CHECKWRITERS* - a monograph published by The American Board of Forensic Document Examiners, 1991.

- *FORENSIC DOCUMENT EXAMINATION TECHNIQUES* – published by The Institute of Internal Auditors Research Foundation, 2004, ISBN 0-89413-541-4.

- *FORENSIC SCIENCE AND LAW: INVESTIGATIVE APPLICATIONS IN CRIMINAL, CIVIL AND FAMILY JUSTICE* – published by CRC Press, 2005, ISBN 0-8493-1970-6 (contributing author).

- *SCIENTIFIC EXAMINATION OF QUESTIONED DOCUMENTS – SECOND EDITION* – published by CRC Press, 2006, ISBN 0-8493-2044-5 (contributing author).

## 9. Teaching Experience

Have conducted lectures and workshops for Tennessee Bureau of Investigation, University of Memphis Law School, University of Central Florida, National Center for Forensic Science, State Technical Institute at Memphis, Institute of Police Technology & Management's Public Safety Institute Division, Insititue of Internal Auditors, state bar association conventions, district attorneys general convention, banks, insurance investigators, fraud investigators, private investigators, attorneys, law enforcement personnel and other document examiners concerning handwriting specimens, detecting forgeries and alterations and capabilities of Forensic Document Examiners.

Primary trainer for interns in forensic document examination from University of Central Florida.

Course Administrator for National Center for Forensic Sciences post graduate certificate course

Training officer for government document examiners supplemental training, Instituto de Ciencias Forenses de Puerto Rico.

Have conducted technical workshops concerning handwriting, signatures, legal issues and checkwriters at various regional and national conferences of forensic document examiners.

**Member:**
American Society of Questioned
    Document Examiners

American Academy of
    Forensic Sciences

Southeastern Association of
    Forensic Document Examiners

**Certified:**
American Board of Forensic
    Document Examiners

# Thomas W. Vastrick

### Forensic Document Examiner

**Memphis Office**
VDE Laboratory
6025 Stage Rd.  Suite 42-309
Memphis, TN  38134-3838

(901) 383-9282 (Memphis area)
(800) 544-0004 (Toll Free in U.S.)

FAX (800) 216-9003

**E-MAIL**
*vastrick@yahoo.com*

Additional Offices:
Orlando, FL
Kansas City, MO

## FEE SCHEDULE

### 1. Retainer Fee - $750.00
The retainer fee includes up to four hours of examination time and is non-refundable.  Field examinations involving significant travel may require a retainer equivalent to the the daily examination rate times the estimated number of days for the examination.  Any amounts above and beyond $750.00 (plus non-refundable expenses) is refundable.

### 2. Hourly Examination Fee - $150.00/hr. up to $1,500.00 per day
This charge is for all examination and travel time (outside Memphis area) in excess of the four hours covered by the retainer fee.  Examinations outside of the Memphis area are on a portal-to-portal basis.  Overnight travel will be billed at the daily rate for the initial travel date, return date and any additional appearance date(s).

### 3. Indented Writing Examinations - $25.00 per sheet
The examination for indented writings often involves the use of the Kinderprint Vacuum Box or Foster & Freeman Electrostatic Detection Apparatus.  There is a charge of $25.00 per image.  Any image with evidentiary value will be included with the written report.  This charge is for the images only.  Hourly rates apply to the time necessary to conduct these examinations.

### 4. Court Appearance Fees - $600 first 3 hours, $200 per hour thereafter, $1,800.00 per day
These fees apply on a portal-to-portal basis.  These fees apply to travel time, waiting to testify, courtroom testimony and testimony preparation whether testimony is actually given or not.  Testimony may require an advance equivalent to the approximated cost to include portal-to-portal time for travel and testimony, chart preparation, mileage, and lodging.  Overnight travel will be billed on a daily basis for the initial travel date, appearance date(s) and return date.

### 5. Deposition / Interrogatory Fees - $600 first 3 hours, $200 per hour thereafter, $1,800.00 per day
These fees apply on a portal-to-portal basis.  Fees for depositions and interrogatories are required in advance.  Local depositions (Memphis area) require an advance of $600.00.  Depositions outside of the Memphis area will require an advance equivalent to the approximated cost to include portal-to-portal time for travel and testimony, mileage, requested research time, and lodging.  Overnight travel will be billed on a daily basis for the initial travel date, appearance date(s) and return date.

### 6. "On-call" Fees - $50.00/hr.
While on-call for local testimony that does not require being on-site but does require immediate availability a fee of $50.00 per hour is charged.

### 7. Office Fees
Regular and customary charges are made for such items as long distance phone calls, photocopies and facsimile transmissions.

### 8. Travel Fees (no travel fees in the Memphis area)
A. Automobile travel - $0.40 per mile
B. Out-of-town travel
   * Coach class airline tickets are to be prepaid by client  unless other arrangements have been made.
     International travel will require business class or first class airline tickets prepaid by client.
   * Necessary car rental, hotel, taxi or meal expenses will be reimbursed to expert.  Stays exceeding three days
     may require prepayment of anticipated expenses.

**PRIOR TESTIMONY**

| CASE TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS |
|---|---|---|---|---|---|---|---|
| Eastern Savings v Pierpont | 2/28/2011 | W. Palm Beach, FL | Florida | | | | |
| UT v Walter | 3/2/2011 | Knoxville, TN | UT | UT Judiciary Counsel | Bray | Photocopy | |
| Soliwisch v. Pasco County | 3/10/2011 | New Port Richey, FL | Florida | Pasco Co. Circuit 3C | Gagliardi | sequence, alteration | |
| Capital One v J Bevin (pro se) | 3/14/2011 | Fort Myers, FL | Florida | Lee County Circuit 6C | | alteration | |
| Countrywide v B Bevan (pro se) | 4/11/2011 | Fort Myers, FL | Florida | Lee County Circuit 4G | | rubber stamp | |
| FL v Forbes et al | 5/1/2011 | Memphis, TN | Tennessee | Shelby Co. Circuit Civil, Sec. 9 | Benham | signature | |
| Estate of Ulysses Jones, Jr. | 8/31/2011 | Miami, FL | Florida | Dade Co. Probate Div. 1 | Bagley | signature | |
| TimePayment v Grayson | 11/8/2011 | Mesa, AZ | Arizona | Deposition | Potts | signature | |
| McClellan v Cooper | 12/9/2011 | Sanford, FL | Florida | Seminole County Circuit 3L | Alley | signature | |
| Castaliv v Catafi | 12/9/2011 | Mesa, AZ | Arizona | Mariposa Co. Superior Court | Potts | signature | |
| McClellan v Cooper | 12/19/2011 | Sanford, FL | Florida | Deposition | | signature | |
| Total Marketing v Paden | 2/10/2012 | Orlando, FL | Florida | Deposition | | handwriting, staples, alteration | by phone |
| State v Mark Allen | 2/10/2012 | Orlando, FL | Florida | Deposition | | handwriting, staples, alteration | |
| Estevos v Cordova | 2/22/2012 | Orlando, FL | Florida | Deposition | | elimination | |
| Ghanam v Ghanam | 3/26/2012 | Orlando, FL | Federal | Mid Dist. Of FL Bankruptcy 5A | Cohen | alteration | |
| Total Marketing v Paden | 3/26/2012 | Orlando, FL | Florida | Deposition | | signature | |
| Popa Veterinary v Walter | 4/2/2012 | Ocala, FL | Florida | Deposition | | signature | |
| Cotza v Alia Inac | 5/17/2012 | Memphis, TN | Tennessee | Shelby Co. Chancery 1 | Munyon | signature, electronic sign. | |
| TimePayment v Parks | 5/30/2012 | Birmingham, AL | Alabama | Jenson County Civil Div. | Hodges | signature | |
| Comercia Bank v. McKerchie | 9/17/2012 | Mesa, AZ | Arizona | Orange Co. Business Div. 43 | Evans | signature, elimination | |
| Santiago v Evans | 9/18/2012 | Ft. Lauderdale, FL | Florida | Marion County Circuit #5 | Privett | signature, non-original Q | |
| McKerchie | 11/7/2012 | Orlando, FL | Florida | Deposition | | signature, elimination | |
| Simmons v Simmons | 11/27/2012 | Ft. Lauderdale, FL | Federal | Deposition | | Folds | |
| FL v Forbes et al | 12/6/2012 | Orlando, FL | Florida | FL Ninth Judicial Circuit | Munyon | Signature, transfer | |
| FL Mens Medical v Bock | 3/12/2013 | Orlando, FL | Florida | Deposition | | Folds | |
| Diplomat Properties v Cesario | 3/14/2013 | Ft. Lauderdale, FL | Federal | Southern Dist of FL | | initials | |
| Jenkins Read v Parkinson | 4/29/2013 | Miami, FL | Florida | Deposition | | initials | |
| Mynatt v LeMarr | 9/8/2013 | Memphis, TN | Tennessee | Campbell Co. Chancery | Hillman | signature | guided hand |
| Unknown | 9**/2013 | Jacksboro, TN | Tennessee | Deposition | | signature | |
| Unknown | 9**/2013 | Miami, FL | Florida | Dade Co. | | signature | |
| Baker-Roberts v Pinellas Point | 10/21/2013 | St. Petersburg, FL | Florida | Pinellas | | signature | |
| State v Melissa Lewis | 5/21/2014 | Macomry, FL | Baker Co. | Deposition | | signature | |
| Estate of Gayle Smable | 5/28/2014 | Kansas City, MO | Missouri | Deposition | | Common Source | |
| Bernal v Soufard et al | 6/20/2014 | Orange Co | Orange Co | Probate Court | | Hand Printing | |
| State v Bowen | 8/1/2014 | Miami, FL | Dade Co | Felony Div. 1 | Oynamon | Hand Printing, cursive, numerals | |
| State v Bravo | 8/5/2014 | Gainesville, FL | Alachua Co | Felony Div. 1 | Sieg | Signatures | |
| Patterson v. Magafilm Co. | 2/2/2015 | Gainesville, FL | Alachua Co | Circuit Court | Colaw | HW Association | |
| Matter of Lance Saltzman | 3/12/2015 | Salyersville, KY | Kentucky | Circuit Court | Preston | Signatures | |
| PSP v Project Orlando | 4/7/2015 | Bushnell, FL | Florida | Business Court | | Signatures | |
| ALS IX v Hayward | 4/14/2015 | Orlando, FL | Florida | Business Court | | Common source | |
| Garland v Ford | 6/8/2015 | Orlando, FL | Florida | Deposition | Blackwell | Common Source | |
| Spencer v Dive One | 6/18/2015 | Sarasota, FL | Florida | Deposition | Blackwell | HP Signature | |
| Garland v Ford | 7/15/2015 | Cookeville, TN | Federal | Middle Dist. Of TN | Sharp? | Signature | |
| Trextor Bancruptcy | 8/6/2015 | Orlando, FL | Federal | Bancruptcy (videotaped in FL) | | Signature | |

**EXHIBIT K**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Wednesday, August 01, 2012 11:56 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: FALCON FX |
| **Attachments:** | 155923_800.jpg |

-------- Original Message --------
**Subject:** FALCON FX
  **Date:** Wed, 1 Aug 2012 02:57:41 -0700 (PDT)
  **From:** Peter Koroma <gemproductsltd@yahoo.com>
    **To:** Dr Cleal Watt <sami@usisr.com>

DEAR SIR,
ANOTHER CHOICE, IS THIS SUITABLE?

REGARDS
DR. KOROMA

.



**EXHIBIT L**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Sunday, August 05, 2012 6:28 PM |
| **To:** | MPS-BillFr |
| **Subject:** | Fwd: EMERGENCY LANDING |
| **Attachments:** | CITY LINK NEW2.jpg |

DEAR SIRS,

PLEASE BE INFORMED THAT FALCON 7X CARGO PLANE LEFT AT  THE KOTOKA
INTERNATIONAL AIRPORT YESTERDAY NIGHT EN-ROUTE TO DALLAS TEXAS, USA
ENCOUNTERED PROBLEM THAT COMPELLED THE PILOT TO MAKE AN EMERGENCY LANDING
AT THE LOME-TOKOIN AIRPORT (GNASSINGBE EYADEMA INT'L)

ATTACHED IS FULL DETAILED ACCOUNT.
KIND REGARDS.

P. GEORGE
(MANAGEMENT)

TEL: +233-246663842
EMAIL: citylink2000@yahoo.co.uk
citylink2000@gmail.com

5th August, 2012

**Dr. Cleal T. Watts III**
**8926 Forest Hills Blvd**
**Dallas Texas 75218-4001**
**U.S.A**
**PH. 1214 659 2197**

**DEAR SIRS,**

# **FALCON 7X EMERGENCY LANDING**

Falcon 7x Cargo plane from Kotoka International Airport, Accra- Ghana saturday 4th August between 9-10pm made an emergency landing at Lome-Tokoin Airport, Lome Togo (Gnassingbe Eyadema Int'l) few minutes after taking off.

The Falcon 7x Cargo plane started shaking when the pilot discovered that the wheels of the Aircraft were having problems to fold in. The Pilot then contacted the control aviation services personnel in Accra- Ghana, who advised that the plane should make an emergency landing at the Lome- Tokoin Airport.

There was smoke coming from the plane when it landed, there were no casualties but some crew members including Dr. Patrick Koroma suffered suffocation. Thanks for the proffessional landing made by the pilot.

The products in the Cargo plane are safe with the Lome-Tokoin Airport customs Officers. We have been advised by Dr. Patrick Koroma, who is recovering from the suffocation to advise you to send Mr. Sekou Conde to go to Togo at the Tokoin Airport Customs strongroom department and confirm the products.

Thanks for your co-operation and understanding.

Sorry for the inconviniece caused, no cause for alarm as everything is under control.

*Management*

CC: **Mr. Sekou Conde**
**Freetown- Sierra Leone**
**West Africa.**

**Dr. Patrick Koroma**
**Commercial Attache**
**Sierra Leone**

**EXHIBIT M**

TO DECLARATION OF
PHILLIPA SLEDGE

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, December 03, 2012 5:24 AM |
| **To:** | MPS-BillFr |
| **Subject:** | Philapa and Entities  Au Buy-Sell Transactions -Investment Calculator Version- .xlsx |
| **Attachments:** | Philapa and Entities  Au Buy-Sell Transactions -Investment Calculator Version- .xlsx |

1

| Specific Shipments | Estimated X #'s | |
|---|---|---|
| Shipment Kgs. (Before Refining) | | 714.0 |
| Gold % Pure | | 95% |
| Gold Toz. Pure (Refined) | | 21807.84 |
| Spot Price of Gold (At Time of Refining) | $ | 1,700.00 |
| Gross Cash Value Refined | $ | 37,073,319.72 |
| Gross Cash Value (after Selling) | $ | 36,702,586.53 |
| Gross Cash Value/Kg (after Selling) | $ | 51,404.18 |
| Total Investment Opportunity for Shipment | $ | 7,414,663.94 |
| Investment Opportunity for Shipment Taken | $ | 2,300,000.00 |
| Investment Opportunity for Shipment Available | $ | 5,114,663.94 |
| Investor $ Invested/Shipment (To Nearest $10K) | $ | 5,300,000.00 |
| | | |
| Gross % Discount of Au to Inv | | 20% |
| Controled | | 14% |
| % Net to Inv of Shipment (Est. 6-9%) | | 6% |
| $ Value of Au Reserved Per Inv $1 | | 5.00 |
| | | |
| Total $ Value of Au Reserved For Inv | $ | 26,500,000.00 |
| $ Cost of Total Au Reserved For Inv | $ | 21,200,000.00 |
| Total Au Toz. Reserved For Inv | | 15588.235 Toz. |
| | | |
| Investors Total Est. % Profit For Total Investment | | 30% |
| Investors $ Profit For Total Investment | $ | 1,590,000.00 |
| A) Total $ return to Investors (PI in Cash) | $ | 6,890,000.00 |
| B) Total Au Toz if Bullion Taken (PI in Au) | | 4052.94 Toz. |
| OR | | |
| Receive (X) Toz. Au (PI + Up to Reserved Toz.) | | .000 Toz. |
| & Balance Due Investor in Cash (-$ If Over PI) | $ | 6,890,000.00 |

| Ledger | Estimated #'s |
|---|---|
| TBD #'s by Investor | |
| INFO | |
| Return & Balance | |
| Reserved Au #'s | |
| Calculated Results | |

| Controled Au & Inv$ | | |
|---|---|---|
| # of Raw Kgs. | | 510.37 |
| INV % of shipment | | 71.48% |
| Net Cash Value (ROI) | $ | 1,590,000.00 |
| Returns $ (PI) | $ | 6,890,000.00 |
| Principal $ Inv | $ | 5,300,000.00 |
| Total Trans. Cash Out | $ 4,000,000.00 | < 75 Cash Out |
| Trans. Cash Balance | $ | 2,890,000.00 |
| Balance If in Au Kgs. | | 56.22 |
| " If in Au $12K/Kg | $ | 674,653.27 |
| $ Needed for (ROI) | $ 4,674,653.27 | < Dis $ (PI) |

| | |
|---|---|
| **From:** | Dr. Cleal Watts (Doc) <sami@usisr.com> |
| **Sent:** | Monday, December 03, 2012 5:38 AM |
| **To:** | MPS-BillFr |
| **Subject:** | that last Email was for you only it has a calculator algorithm in it. and other proprietary INFO |

**EXHIBIT N**

TO DECLARATION OF
PHILLIPA SLEDGE

**From:** Dr. Cleal Watts (Doc) <sami@usisr.com>
**Sent:** Tuesday, December 04, 2012 1:56 AM
**To:** MPS-BillFr
**Subject:** for your eyes only for now!
**Attachments:** 6.jpg; Insurance Policy Cover Certificate.jpg; Premium policy.jpg

Here is the Ghana valuation papers. this is your trump card do not let it out to any one or you loss your power. If need be you can elude to it. They can not tear down what they do not know about.

Doc

1

# BANK OF GHANA FOREIGN EXCHANGE FORM A2 (FEX 4A)
## TO BE COMPLETED FOR TRADITIONAL EXPORTS
## UNDER THE FOREIGN EXCHANGE ACT 2006, (ACT 723)

1. Name and Address of exporter Consigner......**LOCAL MINERS COPERATION**

   515 SEFADU ROAD KONO SIERRA LEONE WEST AFRICA

2. Tax Identification No. (TIN): 88X1015629

3. Name and Address of Local Bankers of Exporter Consigner:

   GHANA COMMERCIAL BANK LTD

   HIGH STREET

4. Exit Point: DALLAS TEXAS, USA

5. Description of Commodity:

   i) Quantity: 714KGS

   ii) Unit of Measure: KILOS

   iii) Unit FOB Price: $12,000.00/KGS

   iv) Currency Code: 840

   v) Commodity Code:

6. Total Value of Exports: $8,568,000.00

7. Cedi Equivalent:

   a. Exchange Rate: $1.498

   b. Total Amount: $8,568,000.00

8. Country of Origin: SIERRA LEONE

9. Country of Destination: DALLAS TEXAS, USA

10. Name and Address of Importer Consignee...DR. CLEAL T. WATTS III

    DR. CLEAL T. WATTS III 8926 Forest Hills Blvd. Dallas, Texas 75218-4001 USA Tel: 214-659-2197

11. Terms of Payment: CASH AGAINST DOCUMENTS

12. Percentage Retention: 4.25% - 5.25%

13. Name and Particulars of Collecting Bank of Export Proceeds:

    GHANA INTERNATIONAL BANK LIMITED

I/WE DELCARE THAT THE ABOVE STATEMENTS ARE TRUE

Applicant Completing Form:

Name:

CUSTOMS OFFICER

Signature:

CUSTOMS Stamp and Signature

**INCE & CO**

*Insurance / Reinsurance*

International Home

1st Katharine way, London
E1 WIAY
Tel:     +44 (0) 7933 919 195
          +233 264 599 443
Fax:     +233 233 599 443
P.O.Box: 3128 KIA Accra - Ghana

Policy No.... INCE/ACC/5752349

Your Ref. No......................................

To:

GHANA CUSTOMS, EXCISE PREVENTIVE SERVICE
P. O. Box 9046
K.I.A.

## **INSURANCE PREMIUM POLICY COVER**

I certify that...... Dr. Patrick  Kamra

Accra — Ghana

in conjunction with Ince & Co. has insured to ship. 714 Kilograms of

Gold Dust  (14 Boxes)

being exporting to. 89260 Forest Hills, Blvd Dallas TX .... for delivery to the

new owner. Dr Cleal T Watts ...... of  Texas

Note: This permission note should be brought by the Agent and

representative of the company before it can be release for shipment.

Thank you.                24 — 1 0 — 1 2

Mr.
for;
Ince and Co.
Accra : Ghana   **Sign/Date**

Administered by

SENIOR OFFICER IN - CHARGE
CEPS ACCRA - GHANA.
24/10/2012

EXPORT K.I.A

*Ince & Co's Insurance and Reinsurance is International Network Company lead from our offices in London, which over look the entire branches all over the network countries including Africa. our London office is based in the heart of the Shipping and Insurance Markets-markets that we have been serving since 1870.*

# INCE & CO

# Ince & Co

1st Katharine way, London

**International Home**
1st Katharine way, London
E1 WIAY
Tel. +44 (0) 7933 919 195
Ghana: +233 264 599 443
+233 233 599 443
P.O.Box: 3128 KIA Accra - Ghana

## Premium Policy

| | |
|---|---|
| Ince & Co<br>Insurance / Reinsurance<br>International House. | **State** **Product Number** **Policy Number**<br>AZ GPM 4638910IC 5752349 |

**Policy Period**

**Effective:** Oct 24, 2012 to Jan 24, 2013

**Operations:** Bymex Group Express

*Insured Name And Address.*

Dr. Cleal T. Watts III
8926 Forest Hills, Blvd. Dallas
TX. USA
TeL: 75218 4001

## Description Of Product (s)

| Month | Year | Description | Quantity | Price Per Kilo |
|---|---|---|---|---|
| 03 | 2012 | Gold Dust | 714kgs (14boxes) | xxx 12,000 USD |

*The Policy prices ONLY.*

The following Coverages with related
pricing noted

**% (Percentage)**

*Part 1 - Liability Injury*

option
option
option

*Percentage Of The Total Cost Value:*

$48,000.00 USD

*Part 2 - Uninsured*

option
option
option

*Part 3 -*

Physical Damage Coverage Comprehensive loss
Collision Loss Rental Reimbursement Theft.

Cost:
$48,000.00 USD

Percent:

*Discount Per Kilo*

Anti-Theft discount Air bags

INCE & CO.
24-10-12
Sign/Date

*Ince & Co's Insurance and Reinsurance is International Network Company lead from our offices in*
*London, which over look the entire branches all over the network countries including Africa. our*
*London office is based in the heart of the Shipping and Insurance Markets-markets that we have*
*been serving since 1870.*

**EXHIBIT O**

TO DECLARATION OF
PHILLIPA SLEDGE

## CERTIFICATE OF AUTHENTICITY OF RECORDS

I, _Michael Conti_ (Print Name), the undersigned, do hereby certify

that I am the _Chief Legal Officer_ (Title or Position) for

_Rosenthal Collins Group, LLC_ of _216 W. Jackson Blvd, Suite 400 Chicago, IL 60606_ (Address)

(the "Company") and that I have reviewed the records attached hereto.

In compliance with Rule 45 of the Federal Rules of Civil Procedure, I certify as follows:

1. I have authority to certify the subject records, I have knowledge of and a business duty to record or transmit these matters on behalf of the Company;

2. The copies, consisting of _____ pages (or other format, please list: _one ~~Thumbdrive~~ DVD_ ) are true and correct copies and comply with the request for records described in the *subpoena duces tecum* regarding *Sledge v. Watts et al.*, U.S. District Court of Western Tennessee, Case No. 13-2578-STA;

3. The attached records constitute a certified record of regularly conducted activity of this Company and were prepared by me or someone acting under my control and under the control of the Company, in the ordinary course of business;

4. My signature on this Certification constitutes an understanding of the intention of the parties hereto to use this record as evidence provided the records herewith are made available for inspection in advane of any such offer into evidence.

Further Affiant sayeth not.

Signature

STATE OF _Illinois_ }
                      } ss:
COUNTY OF _Cook_ }

The foregoing Certification was subscribed and sworn to before me by _Sophia Tamvakis_ on this _10_ day of _March_, 20_15_.

Notary Public

My Commission Expires: _5|6|2017_

OFFICIAL SEAL
SOPHIA ALEXA TAMVAKIS
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 05/06/20**



216 West Jackson Boulevard
Chicago, IL 60606
(312) 460-9200
FAX: (312) 795-7937

ACCOUNT NUMBER:  R N1040 952 81001
STATEMENT DATE:  DEC 30, 2011

****MONTHLY COMMODITY STATEMENT****

INTRODUCED BY
PIONEER FUTURES

INDICO SYSTEM RESOURCES INC-MNGD
ATTN CLEAL WATTS III
8926 FOREST HILLS BLVD
DALLAS TX 75218

DISCRETIONARY A/C

```
* * * * * * * * * * * * *  Y O U R   A C T I V I T Y   T H I S   M O N T H  * * * * * * * * * * * * * * * * * * * *
  DATE  AT     LONG    SHORT  DESCRIPTION                     PRICE/LEGND  CC       DEBIT         CREDIT
12/21/1 01                    WIRE TRANSFER RECEIVED          WIRE IN  US                       500,000.00

                              ** DOMESTIC USD **
BEGINNING BALANCE                          .00
  THIS MONTH'S ACTIVITY              500,000.00
ENDING BALANCE                       500,000.00

ACCOUNT VALUE AT MARKET              500,000.00
CONVERTED MARKET VALUE               500,000.00
```

Please report any differences to Rosenthal Collins Group, L.L.C. Customer Service Department at (312) 795-7919. If you have a complaint contact Rosenthal Collins Group, L.L.C. Compliance Dept. at (312) 795-7930. The failure to immediately exercise your right to have errors corrected will be deemed your agreement that this statement is correct and ratified.

RETAIN FOR TAX RECORDS                          SUBJECT TO TERMS AND CONDITIONS ON REVERSE SIDE

ROSENTHALCOLLINS000521

952-81001 Income Wires

| As of date | Detail Credit Transactions | Amount | Availability | Bank Ref. | Customer Ref. | Text |
|---|---|---|---|---|---|---|
| 12/21/2011 | Incoming Transfer | $500,000.00 | Distributed 0 Day: $500,000.00 1 Day: $0.00 2 Plus Day: $0.00 | 271926718 | 9252 95281001 | FED REF=005840 RECEIVED AT=2011/12/21 16:27 ORIG BANK ABA=021000021 ORIG BANK=JPMORGAN CHASE REC BANK ABA=071000288 REC BANK=BMO HARRIS BANK NA TRANS TYPE=CUSTOMER TRANSFER ORG=INDICO SYSTEM RESOURCES, INC 8926 FOREST HILLS BLVD DALLAS, TX 75218400 1 /AC-3064030419 BNF=ROSENTHAL COLLINS GROUP /AC-3964467 /INF/FAO: ROSENTHAL COLLINS GROUP C UST. SEG. FUNDS. ACCT# 3964467; F AO: INDICO SYSTEM RESOURCES ACCT #: 95281001 RFB=DCD OF 11/12/21 OBI=FAO: INDICO SYSTEM RESOURCES ACCT#: |
| 3/26/2012 | Incoming Money Transfer | $500,000.00 | Distributed 0 Day: $500,000.00 1 Day: $0.00 2 Plus Day: $0.00 | 271939224 | 7971 | FED REF=005936 RECEIVED AT=2012/03/26 16:15 ORIG BANK ABA=021000021 ORIG BANK=JPMORGAN CHASE REC BANK ABA=071000288 REC BANK=BMO HARRIS BANK NA TRANS TYPE=CUSTOMER TRANSFER ORG=INDICO SYSTEM RESOURCES, INC 8926 FOREST HILLS BLVD. DALLAS TX 75218-40 01 /AC-451388487 BNF=ROSENTHAL COLLINS GROUP CUST SEG FU /AC-3964467 /INF/FAO : INDICO SYSTE M RESOURCES (952-81001) RFB=DCD OF 12/03/26 OBI=CATERGORY 1 SAME DAY CASH VALUE |

ROSENTHALCOLLINS000519

| 6/25/2012 | Incoming Money Transfer | $700,000.00 | Distributed 0 Day: $700,000.00 1 Day: $0.00 2 Plus Day: $0.00 | 271931118 | FED REF=005804 RECEIVED AT=2012/06/25 11:26 ORIG BANK ABA=026009593 ORIG BANK=BK AMER NYC REC BANK ABA=071000288 REC BANK=HARRIS BANK TRANS TYPE=CTP INFO=ORG=CLEAL THOMAS WATTS III 8926 FOREST HILLS BLVD DALL    AS      TXUS /AC-03282975 OGB=INDICO SYSTEM RESOURCES, IN    C. PRIMARY ACCOUNT 8926 FOREST HILLS BLVD DALLAS TX 75218-4001 /AC-488    039131096    INS=/BC-BOFAUS3N BNF=ROSENTHAL COLLINS GROUP CUST SEG FU CHICAGO ILUS /    AC-3964467 RFB=011206250033306NN OBI=CATEGORY 1 SAME DAY CASH VALUE - F    A O INDICO 4425 SYSTEM RESOURCES 952-81001 |

ROSENTHALCOLLINS000520

## CERTIFICATE OF AUTHENTICITY OF RECORDS

I, _Lauren Beekman_ (Print Name), the undersigned, do hereby certify that I am the _Legal Assistant_ (Title or Position) for _Stifel, Nicolaus & Company, Inc_ of _501 N. Broadway, St. Louis, MO_ (Address) (the "Company") and that I have reviewed the records attached hereto.

In compliance with Rule 45 of the Federal Rules of Civil Procedure, I certify as follows:

1. I have authority to certify the subject records, I have knowledge of and a business duty to record or transmit these matters on behalf of the Company;

2. The copies, consisting of _292_ pages (or other format, please list: _____) are true and correct copies and comply with the request for records described in the *subpoena duces tecum* regarding *Sledge v. Watts et al.*, U.S. District Court of Western Tennessee, Case No. 13-2578-STA;

3. The attached records constitute a certified record of regularly conducted activity of this Company and were prepared by me or someone acting under my control and under the control of the Company, in the ordinary course of business;

4. My signature on this Certification constitutes an understanding of the intention of the parties hereto to use this record as evidence provided the records herewith are made available for inspection in advane of any such offer into evidence.

Further Affiant sayeth not.

_Lauren Beekman_
Signature

STATE OF _Missouri_ }
~~COUNTY~~ City OF _St. Louis_ } ss:

The foregoing Certification was subscribed and sworn to before me by _Lauren Beekman_ on this _14th_ day of _May_, 2015.

_Karen L Kehr_
Notary Public

My Commission Expires: _12-3-17_

KAREN L. KEHR
Notary Public
Commission # 13513838
St. Louis City
Notary Seal
STATE OF MISSOURI
My Commission Expires 12-03-2017

# STIFEL NICOLAUS

**2011 Annual Statement Summary**

## STIFEL PRESTIGE Plus ACCOUNT STATE

January 1 -
December 31, 2011
Account Number: TX25 1617-8517

Page 1 of 4

2636601  1318301  271122

**INDICO SYSTEM RESOURCES INC**
**ATTN DR CLEAL T WATTS III**
**8926 FOREST HILLS BLVD**
**DALLAS TX 75218-4001**

Your Financial Advisor:
CHRISTOPHER BLACK
Telephone: (214)706-9450

Office Servicing Your Account:
5956 SHERRY LANE
SUITE 875
DALLAS, TX 75225-8019

### TRADING TAX LOT RELIEF METHOD: First In, First Out

### PRIMARY INVESTMENT OBJECTIVE: Growth

For a full definition of this objective and risk tolerance, including the use of margin, please see www.stifel.com, IMPORTANT DISCLOSURES, or contact your Financial Advisor. If you have any questions concerning your investment objective or risk tolerance, or wish to make a change, please contact your Financial Advisor, or the Branch Manager for this office.

### ACCOUNT PROTECTION

Stifel, Nicolaus & Company, Incorporated provides up to $150 million of coverage for securities held in client accounts, of which $1.15 million may be in cash deposits. Ask your Financial Advisor for more details.

Thank you for allowing Stifel Nicolaus to serve you. In order to protect your rights, including rights under the Securities Investor Protection Act (SIPA), please promptly report, in writing, any inaccuracies or discrepancies in this account or statement to the Compliance Department of Stifel Nicolaus at the address below. If you have any questions regarding your account or this statement, please contact your Financial Advisor or the Branch Manager for this office. Please refer to the Client Agreement and the enclosed Investment Strategist newsletter for important disclosure information about your account.

| YOUR STIFEL ACCOUNT SUMMARY | Dec. 31, 2011 | Dec. 31, 2010 |
|---|---|---|
| Cash Equivalents | 499,996.23 | |
| Net Portfolio Assets held at Stifel | | |
| Net Portfolio Assets not held at Stifel | | |
| **Net Portfolio Value** | **$499,996.23** | |

| YOUR CHANGE IN PORTFOLIO VALUE | Dec. 31, 2011 |
|---|---|
| Net Cash Flow (Inflows/Outflows) 2 | 499,995.00 |
| Securities Transferred In/Out | |
| Income and Distributions | 1.23 |
| Change in Securities Value | |
| **Net Change in Portfolio Value** | **$499,996.23** |

**YOUR ASSET SUMMARY**

Net Cash Equivalents 100%

2 Does not include cost or proceeds for buy or sell transactions.

WATTS_STIFEL000001

WATTS_STIFEL000002

# STIFEL
# NICOLAUS

INDICO SYSTEM RESOURCES INC
ATTN DR CLEAL T WATTS III

January 1 -
December 31, 2011
Account Number:

Page 2 of 4
TX25 1617-8517

## ASSET SUMMARY

### Value as of December 31, 2011

| | At Stifel | Not at Stifel | Total | % of assets * | Gains/(-)Losses Unrealized Year-to-date | Realized Year-to-date |
|---|---|---|---|---|---|---|
| Cash | | | | | | |
| Money Market Funds | 499,996.23 | | 499,996.23 | 100.00% | | |
| Margin Balance | | | | | | |
| **Net Cash Equivalents** | **$499,996.23** | | **$499,996.23** | **100.00%** | | |
| Equities | | | | | | |
| Preferreds | | | | | | |
| Municipal Bonds | | | | | | |
| Corporate/Government Bonds | | | | | | |
| Mutual Funds | | | | | | |
| Unit Investment Trusts | | | | | | |
| Insurance Products | | | | | | |
| Alternative Investments | | | | | | |
| Other Investments | | | | | | |
| **Net Portfolio Assets** | **$0.00** | **$0.00** | **$0.00** | **0.00%** | **$0.00** | **$0.00** |
| **Net Portfolio Value** | **$499,996.23** | **$0.00** | **$499,996.23** | **100.00%** | | |

## INCOME & DISTRIBUTION SUMMARY

| | Year-to-date | | TAX INFORMATION SUMMARY | Year-to-date |
|---|---|---|---|---|
| Dividends Tax-Exempt | | Accrued Interest Paid Tax-Exempt | |
| Taxable | | Taxable | |
| Interest Tax-Exempt | 1.23 | Accrued Interest Tax-Exempt | |
| Taxable | | Received Taxable | |
| Capital Gain Distributions | | Gross Proceeds | |
| Return of Principal | | Federal Withholding | |
| Other | | Foreign Taxes Paid | |
| **Total Income & Distributions** | **$1.23** | Margin Interest Charged | |

* Please note "% of assets' figures are shown gross of any amounts owed to Stifel and/or net short positions.

WATTS_STIFEL000003

# STIFEL
## NICOLAUS

2636603  1318302  271122

INDICO SYSTEM RESOURCES INC
ATTN DR CLEAL T WATTS III

January 1 -
December 31, 2011
Account Number:

Page 3 of 4
TX25 1617-3517

## ASSET DETAILS

This section shows the cash equivalents and/or securities in your account. Prices obtained from outside sources are considered reliable but are not guaranteed by Stifel. Actual prices may vary and you may receive more or less than your original purchase price. Contact your Financial Advisor for current price quotes. Gain/Loss is provided for informational purposes only. Cost basis may be adjusted for, but not limited to, amortization, accretion, principal paydowns, capital changes, listed option premiums, gifting rules, inheritance step-up, or wash sales. The Gain/Loss information should not be used for tax preparation without the assistance of your tax advisor.

## NET CASH EQUIVALENTS

| | Current Value | Cost Basis | Estimated Annualized Income | Estimated Yield % |
|---|---|---|---|---|
| GENERAL MONEY MARKET | 499,996.23 | 499,996.23 | 50.00 | 0.01% |
| **Total Net Cash Equivalents** | **$499,996.23** | **$499,996.23** | **$50.00** | **0.01%** |

| | Current Value | Cost Basis | Estimated Annualized Income | Estimated Yield % |
|---|---|---|---|---|
| **Total Net Portfolio Value** | **$499,996.23** | **$499,996.23** | **$50.00** | **0.01%** |

No portfolio asset detail to report

## ACTIVITY SUMMARY

| Type of Activity | Activity | Year-to-date |
|---|---|---|
| | Opening Balance - Net Cash Equivalents | $0.00 |
| Buy and Sell Transactions | Assets Bought | |
| | Assets Sold/Redeemed | |
| Deposits | Deposits Made To Your Account | 500,000.00 |
| Withdrawals | Withdrawals From Your Account | |
| Income and Distributions | Income and Distributions | 1.23 |
| Margin Interest | Margin Interest Charged | |
| Other | Other Transactions | -5.00 |
| Cash Management Activity | Card Activity | |
| | ACH/ATM Activity | |
| Checkwriting Activity | Checks You Wrote | |
| | **Closing Balance - Net Cash Equivalents** | **$499,996.23** |
| Securities Transferred | Securities Transferred In/Out | |

WATTS_STIFEL000004

# STIFEL
# NICOLAUS

**2636604  1318302  271122**

INDICO SYSTEM RESOURCES INC
ATTN DR CLEAL T WATTS III

January 1 -
December 31, 2011
Account Number:

Page 4 of 4
TX25 1617-8517

## ACTIVITY DETAILS

### Opening Balance - Net Cash Equivalents

| | | | | Total |
|---|---|---|---|---|
| | | | | $0.00 |

### Deposits Made To Your Account

| Description | Date | Activity | Quantity | Total |
|---|---|---|---|---|
| FUNDS WIRED IN FROM | 12/22/2011 | Deposit | | 500,000.00 |
| JP MORGAN | AS OF 12/21 | | | |

**Total Deposits Made To Your Account** — 500,000.00

### Income And Distributions

| Description | Date | Activity | Quantity | Total |
|---|---|---|---|---|
| GENERAL MONEY MARKET | 12/30/2011 | Dividend | | 1.23 |
| 123011     499.995 | | | | |
| Cusip: 09999211 | | | | |

**Total Income And Distributions** — 1.23

### Other Transactions

| Description | Date | Activity | Quantity | Price | Total |
|---|---|---|---|---|---|
| PLUS ACCOUNT MONTHLY FEE | 12/30/2011 | Fee | | | -5.00 |

**Total Other Transactions** — -5.00

### Closing Balance - Net Cash Equivalents

| | Total |
|---|---|
| | $499,996.23 |

0 4