# EXHIBIT

# C

Excerpts of Deposition of

Cleal Watts III

**In The Matter Of:**

*MARY PHILLIPA SLEDGE vs.*
*INDICO SYSTEM RESOURCES, INC.*

---

*CLEAL T. WATTS, III*
*August 20, 2015*

---

*Alpha Reporting Corporation*
*236 Adams Avenue*
*Memphis, TN 38103*
*901-523-8974*



ALPHA REPORTING CORPORATION

Original File 35987ln.txt
Min-U-Script® with Word Index

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

     Plaintiffs,

Vs.           Case No. 2:13-cv-2578STA-cgc

INDICO SYSTEM RESOURCES, INC.
and CLEAL WATTS, III,

     Defendants.

---

THE VIDEO DEPOSITION OF CLEAL T. WATTS, III

August 20, 2015

---

ALPHA REPORTING CORPORATION
SHERYL G. WEATHERFORD, RPR
236 Adams
Memphis, Tennessee 38103
901.523.8974

1        The deposition of CLEAL T. WATTS, III,

2   taken on this, the 20th day of August, 2015, on

3   behalf of the Plaintiffs, pursuant to notice and

4   consent of counsel, beginning at approximately

5   8:29 a.m. in the law offices of Ballin, Ballin &

6   Fishman, 200 Jefferson, Suite 1250, Memphis,

7   Tennessee.

8        This deposition is taken in accordance

9   with the terms and provisions of the Federal Rules

10  of Civil Procedure.

11       All forms and formalities are waived.

12  Objections are [reserved/not reserved], except as

13  to form of the question, to be disposed of at or

14  before the hearing.

15       The signature of the witness is waived.

16

17

18

19

20

21

22

23

24

25

**Alpha Reporting Corporation**

3

1                     - APPEARANCES -

2

   For the Plaintiffs:
3
                    MR. ANTHONY C. PIETRANGELO
4                   MR. DARRELL N. PHILLIPS
                    MR. JOHN J. COOK
5                   Attorneys at Law
                    Pietrangelo Cook, PLC
6                   6410 Poplar Avenue
                    Suite 190
7                   Memphis, TN 38119
                    901-685-2662
8
   For the Defendants:
9
                    MR. RICHARD S. TOWNLEY
10                  Attorney at Law
                    Ballin, Ballin & Fishman, P.C.
11                  200 Jefferson
                    Suite 1250
12                  Memphis, TN 38103-2007
                    901-525-6278
13
   Also Present:
14
                    MS. MARY PHILLIPA SLEDGE
15                  MS. KRISTI CHATHAM
                    MR. MICHAEL STENGEL
16                  MR. STEVE CUMMINGS

17  Reported by:

18                  SHERYL G. WEATHERFORD
                    Registered Professional
19                   Reporter
                    Alpha Reporting Corporation
20                  236 Adams Avenue
                    Memphis, TN 38103
21                  901-523-8974

22

23

24

25

**Alpha Reporting Corporation**

33

1    did you move?

2    A.      I moved to another -- there is a time I

3    moved to another apartment, that time period, and

4    then there's a time I rented a room at a house

5    that was also there on Chimney Hill.

6    Q.      Have you ever owned a house?

7    A.      No.

8    Q.      After you moved into Chimney Hill for the

9    first time, did you ever move back with your

10   parents?

11   A.      I think I did.

12   Q.      When was that?

13   A.      I don't know.  I'm having a hard time

14   remembering.  I think I was there for a while.

15   Probably did in the nineties.

16   Q.      Do you remember when in the nineties?

17   A.      No, I don't.

18   Q.      Why did you move back with your parents?

19   A.      It was cheaper and they had room, and I

20   was around to help when they needed help.  Just

21   basic thing like that -- reasons like that.

22   Q.      So just -- I just want to make sure that

23   we -- that I have this clear for the record.  In

24   around '82 you moved out of your parents' house --

25   I'm sorry, around eight -- mid-eighties you moved

**CLEAL T. WATTS, III - August 20, 2015**

34

1   out of your parents' house; is that correct?

2   A.      Yes.

3   Q.      And moved to an apartment on Chimney Hill?

4   A.      Yes.

5   Q.      After that you have either lived at

6   Chimney Hill, another apartment near Chimney Hill,

7   or a house on Chimney Hill?

8   A.      The apartment wasn't near Chimney Hills.

9   Q.      Okay.

10  A.      But the house was on Chimney Hills.

11  Q.      Those are the only three places you would

12  have lived until the mid-nineties when you moved

13  back with your parents?

14  A.      It was probably early nineties come to

15  think of it.  Yeah, I believe that is right.

16  Q.      How long did you stay with your parents

17  when you moved back in in the early nineties?

18  A.      Yeah, would have been through the

19  nineties, most of the nineties, I guess.  Latter

20  part of the nineties I'm trying to remember if I

21  was still there or not.  I guess I was there

22  throughout most of the nineties.

23  Q.      Do you remember when you left?

24  A.      Not really.  Latter part of the nineties,

25  sometime latter part of the nineties.

**Alpha Reporting Corporation**

CLEAL T. WATTS, III - August 20, 2015

35

1    Q.       Where did you go?

2    A.       I guess I was still pretty much a resident

3    there.  I was doing some -- was I helping

4    the family?  It would have been through the

5    nineties -- been after the nineties I guess it

6    was -- this is strange, but it's not really

7    ringing a bell until I got to about the address

8    that I am at now, and at the first point rented a

9    room.  I guess my permanent address would have

10   still been at -- there in Preston Hollows.

11   Q.       At your parents' home?

12   A.       Yeah.

13   Q.       What is that address?

14   A.       It was 5809 Dusco Drive.

15   Q.       You mentioned the place you live now, is

16   that Debra Koper's house?

17   A.       Yes.

18   Q.       Okay.  So it's your testimony -- it's your

19   recollection that you moved from your parents'

20   house to Debra Koper's house?

21   A.       Yeah.  It was still my permanent address,

22   driver's license, everything.  I was trying to

23   think if there was -- you know, I might have

24   stayed in my brother's home -- a lot of times if I

25   was going to be doing -- working other jobs, like

1   if it was construction or something like that,
2   that would have been out of town so I would have
3   been out of town for that part.
4   Q.      And what is Debra Koper's address?
5   A.      8926 Forest Hills Boulevard.
6   Q.      And when did you move into that house?
7   A.      Right after she had bought it.  I
8   rented -- for the first part rented a room there
9   for office and staying there.
10  Q.      What year was that?
11  A.      That was right at 2000, give or take.
12  Q.      Were you in a romantic relationship with
13  her at the time?
14  A.      Yes.
15  Q.      But you say that you paid rent?
16  A.      Yes, I did.  For that part, yeah.
17  Q.      What was the amount of rent you paid?
18  A.      It was $500 a month, and I prepaid.
19  Q.      I don't understand what that means.
20  A.      In other words, I paid ahead for like a
21  year, year and a half.
22  Q.      So upon moving into Ms. Koper's house, you
23  paid her over $6,000; is that right?
24  A.      Yeah.  Somewhere around there.  I don't
25  remember exactly what the number was.

**CLEAL T. WATTS, III - August 20, 2015**

38

1   school?

2   A.      Yes.  That was -- all the mining was done

3   under HFCO's name.

4   Q.      I'm talking about after you came back to

5   Dallas after 1982 until the time when you moved in

6   with Debra Koper, did you ever have a full-time

7   job?

8   A.      Scottish Rite when I worked there for a

9   year.

10  Q.      But you didn't get paid.

11  A.      Didn't get paid.  I had to show up at 7:30

12  until closing.

13  Q.      Besides that?

14  A.      Paid full-time job, no, because everything

15  is contract.  Oh, I take that back, now, that's

16  not true.  Yes, it was full time at ISR as an

17  officer.  But it's only paid as -- because it was

18  the principal officer of it, it only got paid when

19  monies came -- when I made monies on the contracts

20  or things like that.

21  Q.      Did you ever get a W-2?

22  A.      No.

23  Q.      Have you ever gotten a W-2?

24  A.      I can't say.  I don't know.  I don't think

25  so.

**CLEAL T. WATTS, III - August 20, 2015**

40

1   penalty, I had to pay a penalty, that kind of

2   stuff.

3   Q.      Until 2000 when you moved in with Debra

4   Koper, did you ever have a year where you earned

5   more than $25,000 in a year?

6   A.      No.

7   Q.      Have you filed tax returns every year

8   since 2000?

9   A.      Can't say for sure, but I believe so.

10  Q.      Have you ever gotten W-2 income since

11  2000?

12  A.      No.

13  Q.      Have you ever had a year since 2000 where

14  you made more than $25,000?

15  A.      No.

16  Q.      How old are you, Mr. Watts?

17  A.      Fifty-eight.

18  Q.      I'm just trying to make sure I have got

19  the record clear.  You have never had a full-time

20  job; is that correct?

21  A.      No.  I did working with the coal mines and

22  construction and those.  Everything else was

23  contract services.

24  Q.      Okay.  You have never gotten a W-2 from

25  anybody in your life?

**CLEAL T. WATTS, III - August 20, 2015**

65

1    A.       After about a first year.  And then it was

2    under the assumption that, you know, when I get

3    monies or make monies or something, that I would

4    pay backwards.

5    Q.       Have you ever paid back any of that rent?

6    A.       No.  Not to date.  Or I have offered it,

7    let's put it that way.

8    Q.       What is your current net worth?

9    A.       I can't say because I -- anything that I

10   have other than a pickup is in the work that I'm

11   doing right now or the gold, the shipments that I

12   am working now.  Everything I have got is in that.

13   Q.       Well, okay.  Let me ask you about that

14   pickup.  Your mother didn't give you that pickup?

15   A.       Well, yeah, I guess she did.

16   Q.       You don't consider that a gift?

17   A.       I did.  I didn't think about that at the

18   time until you put it -- until you bring it -- you

19   know, put it in that format I guess.  Actually

20   it's still partially hers anyhow I think.

21   Q.       How so?

22   A.       Well, no, it's in my -- it's titled -- no,

23   I guess it would be a gift.  Yeah, you're right.

24   Q.       Have you ever prepared a personal

25   financial statement?

CLEAL T. WATTS, III - August 20, 2015

66

1    A.        No.  I don't think so.

2    Q.        Never given one to a bank?

3    A.        No.

4    Q.        I want to go back to this net worth

5    question.  Do you have any cash in the bank?

6    A.        No.  No.

7    Q.        Your assets -- what assets do you have

8    besides the pickup?

9    A.        That's it.

10   Q.        Are you a hundred percent owner of ISR?

11   A.        Yes.

12   Q.        Are you a hundred percent owner of SAMI?

13   A.        SAMI doesn't exist anymore.

14   Q.        And how would you say that you have a net

15   worth that's anything more than just the pickup

16   truck?

17   A.        Because of the gold that's in -- being

18   held -- the two basic shipments of gold that are

19   being held right now to be released.

20   Q.        Okay.  Is any of that my clients' gold?

21   A.        There's -- she's got -- she only paid for

22   retainer.  She hadn't bought any gold.  Just

23   retainer and, yes, some of that is in there too.

24   Q.        So let's say that gold comes in.

25   A.        Yes.

**CLEAL T. WATTS, III - August 20, 2015**

1          MR. TOWNLEY:  Let him go ahead and

2    ask the question.

3              (Whereupon, a document was marked as

4    Exhibit No. 13.)

5    A.      I know what this is now.

6    Q.      If you look on page 2 please, your

7    response to interrogatory number 3.

8    A.      (Witness reviews document.)  Okay.  That's

9    correct.

10   Q.      I'm going to say if you go to the second

11   to last page, you did swear to these answers being

12   correct, right?

13   A.      Yeah.  That's right.  That number 3 -- or

14   whatever that question is, that's correct.  I do

15   not have any personally, and the only bank

16   accounts that ISR has had or has are listed right

17   there.

18   Q.      Okay.  As we sit here today, do you have a

19   personal bank account?

20   A.      No, I do not.

21   Q.      Does ISR have a bank account?

22   A.      Yes.  It still has the -- well, except for

23   Chase.  It still has the ones listed.

24   Q.      So you closed the Chase account?

25   A.      Yes.

**CLEAL T. WATTS, III - August 20, 2015**

93

1    you can answer.

2    A.        The largest one where cash -- where it's

3    been sold for cash that's here in the United

4    States that came in is probably in these half

5    kilos, kilos, the ore samples.

6    Q.        How many times?

7    A.        Three, four.

8    Q.        And how much -- what is that worth?

9    A.        A kilo right now is worth probably about

10   33,000.  It varies depending on what spot is at

11   the time.

12   Q.        I just want to make sure I get this.

13   You're saying that three or four times you have

14   brought home a gold transaction worth

15   approximately $33,000; is that correct?

16   A.        Yeah.  The half kilo's would be worth half

17   that like the one the other day that you --

18   Q.        Seventeen thousand.

19   A.        Fifteen, seventeen, yeah.  Yeah, and it

20   depends on what spot is, and it depends on the

21   percentage of purity.  You multiply those numbers

22   together and you get it.

23   Q.        I'm not interested in all that.  I'm

24   interested in how many times you've brought

25   home --

**CLEAL T. WATTS, III - August 20, 2015**

94

1   A.      Four.

2   Q.      And those four transactions would be worth

3   approximately $78,000; is that correct?

4   A.      I guess, somewhere around there, yeah.

5   Q.      And that's in your history as a gold

6   importer, correct?

7   A.      Correct, for in the U.S.

8   Q.      Please tell me about each of those four

9   transactions.

10  A.      The first one coming in was about a

11  95 percent purity.

12  Q.      I'm sorry, let me ask a less open-ended

13  question so that we can move it along.  When was

14  the first time -- what was the first of these four

15  transactions date?

16  A.      I can't give you the exact date.

17  Pre-Phillipa.

18  Q.      Approximately 2008?

19  A.      Probably.  Maybe later than that.

20  Probably later than that.  I don't know.  I can't

21  tell you.

22  Q.      So how many transactions before you

23  started talking with Ms. Sledge?

24  A.      Where cash actually changed hands in the

25  U.S., one or -- probably just one.

**CLEAL T. WATTS, III - August 20, 2015**

95

1   Q.      One?

2   A.      Maybe two.

3   Q.      So a $17,000 transaction?

4   A.      Probably.  Something like that.  I can't

5   say for sure because I don't remember.  I remember

6   more about the purity and things itself rather

7   than cash --

8   Q.      Who got that money, that $17,000?

9   A.      That one was directly to me.  That was for

10  me.

11  Q.      Okay.  What about the other three?

12  A.      It may have been more than three.  Those

13  were generally right around half kilos.  I'm

14  sorry, can you please repeat the question?

15  Q.      Can you give me the date of the other

16  three transactions?

17  A.      No -- one of them was latter part --

18  Q.      One of them was last week, right?

19  A.      Yeah.

20  Q.      Okay.

21  A.      The one before that was about two, three

22  months ago, and then it was in 2014.  Yeah, I

23  think there was another one in there, but I don't

24  remember for sure.

25  Q.      Who got the money from the -- the

**CLEAL T. WATTS, III - August 20, 2015**

96

1   transaction last week you said that went to you,

2   right?

3   A.      It went to ISR, but it's being sent back

4   over because it's going for the other gold.

5   Q.      Sent back over where?

6   A.      To Africa to generate cash flow.

7   Q.      So Mike Byrd didn't get any of it?

8   A.      No.  He's -- he could have taken it.  He's

9   putting it back in.

10  Q.      What about the one from two, three months

11  ago?

12  A.      Same thing.  That's all the same thing.

13  It's all going --

14  Q.      So it went to ISR?

15  A.      Yes.  It all goes -- the money goes to ISR

16  and then back towards --

17  Q.      Okay.  What about 2014, same deal?

18  A.      Same deal.

19  Q.      So just to get the record clear as of the

20  time you first spoke with Ms. Sledge, you had

21  brought in one gold deal worth approximately

22  $17,000; is that correct?

23  A.      To the U.S.  The cash was changed hands.

24  Q.      Is that correct?

25  A.      Yes.

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

97

1  Q.      I mean, if the cash doesn't change hands,

2  you wouldn't consider that a successful gold deal,

3  would you?

4  A.      I would if it was accomplished what -- the

5  mark -- I mean, mark isn't necessarily for getting

6  cash.

7  Q.      You don't think my client was interested

8  in cash?

9              MR. TOWNLEY:  Objection.  Form.

10  A.      She's interested in cash, but she was

11  interested in getting gold as she frequently said

12  too.  It's not always about cash.

13  Q.      How much gold are you sitting on here in

14  the United States?

15  A.      Right now none, because any comes in, we

16  sell because we need the cash flow.

17  Q.      Right.  So besides these four

18  transactions, have you ever had transactions where

19  you got gold and held on to it?

20  A.      No.  Not as of yet.

21  Q.      Have you ever seen this gold that actually

22  came into the United States?

23  A.      Yeah.

24  Q.      All right.  On these four transactions,

25  besides you, who else has put their eyes on this

**CLEAL T. WATTS, III - August 20, 2015**

110

1   A.        When she called up and was asking about

2   it.

3   Q.        When was that?

4   A.        I think that was like November in 2011.

5   Q.        At that time did you think that Ms. Sledge

6   had any experience in investing in gold?

7   A.        Other than maybe jewelry or something or

8   maybe bullion pieces or something, no.

9   Q.        Were you a financial adviser for

10  Ms. Sledge?

11            MR. TOWNLEY:   Objection.   Form.

12  A.        She would ask questions about businesses

13  that she was in and for but not as a financial

14  adviser, but she did ask questions about it.

15  Q.        Did you have an opinion as to whether or

16  not a gold investment in November of 2011 was a

17  good idea for Ms. Sledge?

18  A.        Yes.

19  Q.        Did you think it was a good deal?

20  A.        Yes.

21  Q.        And it was good time to be buying gold?

22  A.        Yes.

23  Q.        How come you didn't put any of your money

24  in that transaction?

25  A.        Because I had already put all my money

**CLEAL T. WATTS, III - August 20, 2015**

1    into the transaction.  I didn't have the money to

2    put in.  If I did, it went in.

3    Q.      So basically ISR was broke in November of

4    2011, correct?

5                 MR. TOWNLEY:  Objection.

6    A.      It already had all the monies in.  It

7    wasn't broke because it had gold.  But it was --

8    wasn't where we could cash it out.

9    Q.      You had no cash?

10   A.      Had no cash.  Just gold.

11   Q.      Well, you didn't really have gold, did

12   you?

13   A.      Yes.

14   Q.      You could put your hands on gold?

15   A.      Well, if you went there and got permission

16   of the government, yes, you could put it --

17   because they were holding it, yes.

18   Q.      Why didn't you get the gold?

19   A.      Because I couldn't get it from the --

20   Q.      Exactly.  So you couldn't get the gold,

21   could you?

22   A.      If I had the monies to pick it up and pay

23   the demurrage and bring it in, yes.

24   Q.      What --

25   A.      You will have to clarify.

**CLEAL T. WATTS, III - August 20, 2015**

112

1   Q.     Whatever you said needed to happen, you

2  couldn't make it happen where you got gold in your

3  hands in November of 2011, correct?

4             MR. TOWNLEY:  Objection.

5   Q.     Otherwise you would have done it, right?

6             MR. TOWNLEY:  Objection.  Form.

7  A.     Was there gold?

8   Q.     No, that's not my question.

9  A.     Okay.  You're going to have to clarify

10  your question more then.

11   Q.     Listen to my question.

12  A.     I did.

13   Q.     Maybe I won't have to ask it three times.

14  A.     I did.

15   Q.     Whatever it is you say needed to be done

16  to get that gold that you had invested and you say

17  in 2007 range, 2008 range --

18  A.     Okay.

19   Q.     -- whatever you say needed to be done to

20  get that gold out of Africa, you couldn't do it in

21  November of 2011, could you?

22  A.     Well, it was out of Africa.

23   Q.     Wherever it was.  Where do you say it was?

24  A.     Holland.

25   Q.     Whatever needed to be done to get it out

**CLEAL T. WATTS, III - August 20, 2015**

113

1   of Amsterdam, you couldn't do that, could you?

2   A.      At that time -- okay.  No.  To answer your

3   question, the answer is no.

4   Q.      You couldn't sell any gold that was

5   sitting in Amsterdam, could you?

6   A.      Actually you probably could have, but I

7   wouldn't have.

8   Q.      So ISR all it had at that point in

9   November of 2011 --

10  A.      The assets were all out of the country,

11  yes.

12  Q.      In fact, would it surprise you -- and we

13  can look at the bank records -- we probably will.

14  That you had less than a thousand dollars in ISR's

15  account at the time?

16  A.      Sure, yeah, that's right.

17  Q.      But you felt comfortable passing yourself

18  off to Ms. Sledge as an experienced gold importer;

19  is that right?

20          MR. TOWNLEY:  Objection to the form.

21  A.      Having the know how to do it and what to

22  do, yes, I did.

23  Q.      Even though at the time you had only

24  probably in by your own testimony one deal worth

25  $17,000, correct?

**CLEAL T. WATTS, III - August 20, 2015**

114

1    A.        Into the U.S., correct.

2    Q.        And at the time you had less than a

3    thousand dollars in your bank account, correct?

4    A.        Correct.

5    Q.        Show you a document I have pre-marked as

6    Exhibit 8.

7              (Whereupon, a document was marked as

8    Exhibit No. 8.)

9              MR. TOWNLEY:  Is this the same thing

10   that was on the complaint, do you know?

11             MR. PIETRANGELO:  It's probably the

12   same form.

13   A.        There's one -- there's several of them.

14   BY MR. PIETRANGELO:

15   Q.        Can you identify this document?

16   A.        The form of the document, yes.  Which one

17   is this?  To be honest with you I don't remember

18   the PSFLP, but everything else I recognize.

19   Q.        Is that your signature in the lower

20   left-hand corner?

21   A.        Yes, it is.

22   Q.        Who drafted that document?

23   A.        I did.

24   Q.        Is that the first time you had ever signed

25   a Soft Corporate Offer?

**CLEAL T. WATTS, III - August 20, 2015**

115

```
 1    A.        No.

 2    Q.        List all the other times, please.

 3    A.        I don't remember them.  I get them all the

 4    time for -- I used to get them all the time, still

 5    do, where they're wanting me to bring stuff in,

 6    get it refined, get it sold or do something with

 7    it, and it's like, okay, as long as it meets what

 8    we can do and able to do.  They want a Soft

 9    Corporate Offer so I have a counter sign or

10    something like that.  Okay.  I will do that.

11    Q.        Had you ever prepared a Soft Corporate

12    Offer before Exhibit 8?

13    A.        Yes.

14    Q.        When?

15    A.        Probably every couple of months or a year

16    for several years.

17    Q.        Who signed them?

18    A.        I would if it was one I prepared.  Is that

19    your question?

20    Q.        Well, did Richard Carey ever sign one?

21    A.        No.

22    Q.        Anybody you ever got to invest in gold

23    ever sign one?

24    A.        Oh, oh, oh.  We did do something -- I did

25    sign something with Richard.  I don't -- I think
```

**CLEAL T. WATTS, III - August 20, 2015**

116

1    it was one of these or is a handwritten one on a

2    piece of paper.  I don't remember which.  I can't

3    tell you.  I don't know.

4    Q.      What about John Chu, did he sign a Soft

5    Corporate Offer?

6    A.      I don't remember.  He may have.  May not

7    have.  Most people --

8    Q.      Does ISR maintain any sort of records?

9    A.      Other than the ones you guys have seen,

10   no, not really.

11   Q.      Do you have a file cabinet anywhere where

12   you keep folders of investors, of deals?

13   A.      No.  I just do it on the sheets like that

14   are on the Dropbox that you saw.  That you guys

15   should have.

16   Q.      You think that's good business practice

17   not to keep records of your transactions?

18            MR. TOWNLEY:  Objection to form.

19   A.      Any records of transactions are all kept

20   because everything goes in and out of the bank.

21   So that's all there.  Who, what, what monies come

22   in, what goes out, where it goes, all that is done

23   through there.

24   Q.      Is that Soft Corporate Offer an important

25   document?

**CLEAL T. WATTS, III - August 20, 2015**

117

1   A.        Yes, it is.

2   Q.        Okay.  So why don't you save those for

3   your other deals?  Is that good business practice?

4                   MR. TOWNLEY:  Same objection.

5   A.        Most of them, business deals and people I

6   deal with are handshake.  Aren't -- the piece of

7   document is only good --

8   Q.        You're not answering my question.

9   A.        You're not asking --

10  Q.        I asked you --

11                  MR. TOWNLEY:  I would ask if you

12  would let him complete his answer and then you can

13  follow up.

14                  MR. PIETRANGELO:  Actually, Richard,

15  with all respect this is my deposition.  If he

16  starts not answering my questions, I am going to

17  try to direct him to the right question.  I only

18  have a certain amount of time to do this.  But I

19  do hear what you're saying, and I want to be

20  mindful of that.

21  BY MR. PIETRANGELO:

22  Q.        Have you ever had anybody else sign a Soft

23  Corporate Offer?

24  A.        Like this, yes.

25  Q.        Okay.  That's not a handshake, is it?

**CLEAL T. WATTS, III - August 20, 2015**

118

1  A.      No.

2  Q.      Okay.  Do you think it's good business

3  practice not to save those Soft Corporate Offers

4  that have been signed by other people?  Do you

5  think that's a good business practice?

6  A.      No, it's not.

7  Q.      Did Mike Byrd sign a Soft Corporate Offer?

8  A.      Yes.

9  Q.      Did Darrow Dickey sign a Soft Corporate

10 Offer?

11 A.      No, didn't do any business with him.

12 Q.      Did Celene Dutzman sign a Soft Corporate

13 Offer?

14 A.      No.  I don't think she did.

15 Q.      But she was an investor, right?

16 A.      Yes.

17 Q.      Isn't it true that there is nothing in

18 that document that says what ISR is going to make

19 out of this deal?

20 A.      Actually that's correct.  I think --

21 Q.      And isn't it true, Mr. Watts, that the

22 reason there's nothing in there about what ISR

23 would make is because you didn't care about

24 putting that in there because you were going to

25 take everything --

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

129

1    Q.    Do you have any documents that would prove

2    that any of the plaintiffs' gold is sitting in

3    customs in Ghana?

4    A.    I think it's listed in some of those court

5    documents.  I believe that's it.  I believe it is.

6    Q.    So is it your testimony that you have

7    given us everything that you have that would

8    substantiate your testimony under oath today that

9    the plaintiffs' gold is sitting in customs in

10    Ghana?

11    A.    Everything --

12    MR. TOWNLEY:  I will object to the

13    form.  But go ahead and answer.

14    A.    I believe every single document I have and

15    everything -- all documents would have come

16    through on the email -- would have been by email,

17    and all those documents should be in the Dropbox.

18    It's very difficult to gather up stuff going

19    through emails and things.  Like I said, reading

20    there's thousands of emails and all -- there's

21    even going to be duplicates that you will have as

22    you will see -- if you don't already know.

23    Everything that I have on the documents

24    that come in that were sent there are in the

25    Dropbox, and it's certificates of origination, any

130

1  kind of documents, any permits, documents,

2  receipts that were sent through.  Now, there is a

3  bunch of them that are over there held by the

4  lawyer that's in litigation on that -- well, now

5  that the shipment has been released with the --

6  that was the acting ambassador that had taken

7  control of that shipment that Phillipa Sledge had

8  majority part of it are being held over there in

9  litigation.  There's still a court case going on

10  in that one.  There's only one that went through,

11  and there's still another one going on now.

12  Q.      Has anyone ever lied to you in connection

13  with your efforts to purchase the plaintiffs'

14  gold?

15  A.      Oh, yeah.

16  Q.      Who?

17  A.      Dr. Koroma -- I can't even give you all

18  the names.  Chief -- there was part of that came

19  in through her originally that -- the

20  714 kilograms was originally going to be about

21  three different shipments, and there was a chief I

22  think it's like Alimany Alamay.  Almost everybody

23  is some form of an Ala something or other and

24  Koroma, Karama or something else.  So it's the

25  good guys and the bad guys.  It's hard to --

**CLEAL T. WATTS, III - August 20, 2015**

135

1   Q.      Has any insurance claim been paid?

2   A.      No.  Didn't have to.

3   Q.      I don't understand why didn't --

4   A.      That's what I was trying to explain for

5   you.

6   Q.      Do you have insurance that would cover the

7   problems that you have encountered in getting

8   the --

9   A.      Yes, there's always insurance, yes.

10  Q.      Who is the carrier of that insurance

11  policy?

12  A.      It was different peoples at different

13  times, and I can't give you one or the other

14  because again you're asking for a name.

15  Q.      Was it your insurance policy?

16  A.      No.

17  Q.      You or ISR's insurance policy?

18  A.      No.  No.  Never.

19  Q.      You did not have insurance to protect

20  Ms. Sledge's investment?

21  A.      No.  It's required by -- again Africans

22  were -- Africans are shipping it coming over.

23  Africans have to get the insurance.  They have to

24  cover -- they don't have to cover.  The buyer has

25  to cover the taxes, but it's actually titled to

**CLEAL T. WATTS, III - August 20, 2015**

1  were bringing other people along with you on the
2  flight?
3  A.      Yeah, for security.
4  Q.      Unarmed security; is that right?
5  A.      Yeah.  I mean, I don't use armed.  No.
6  Q.      You don't use armed?
7  A.      Well, I could have hired an armed
8  security, but it would have cost another almost
9  $10,000 a day plus to do it.  I mean, there wasn't
10  a reason to because we had been working with the
11  government there and there's security there.
12  Q.      Now, what was your original destination of
13  this flight?
14  A.      Freetown, Sierra Leone.
15  Q.      But you didn't land in Sierra Leone?
16  A.      We couldn't.  The government shut it down,
17  and they cancelled -- in flight cancelled our
18  landing permit and told us not to come in because
19  they had an election coming up.  Told us not to
20  come in and so we can to go to Conakry, Guinea
21  instead.
22  Q.      So because they had an election, you
23  couldn't land?
24  A.      Well, no, it was because for security
25  reasons and things like that.  They wouldn't --

**Alpha Reporting Corporation**

202

```
 1   they cancelled the landing permit so we can go
 2   into Conakry which is about 90 miles away.
 3   Q.       And when you -- when you left Conakry, you
 4   didn't have any gold with you, did you?
 5   A.       No.   We were run out -- the gold -- yeah,
 6   the gold was sitting there at the airport.   The
 7   owner of the airplane said, take off now.   If
 8   they're not on the plane, leave them.   So we
 9   barely got on the plane and were allowed to fly
10   back.
11   Q.       Why didn't you take the gold with you?
12   A.       Because it taken -- it had been stolen.
13   They had swapped it with identical boxes,
14   identical serial numbers and everything.   Once we
15   saw it going on to load the plane, within about --
16   we knew instantly that it wasn't what we had
17   because of our security things that we do.   And
18   within 15 minutes we found the gold.   It was going
19   to have to go through customs and cleared and
20   re-acknowledged that that was the gold.   It was
21   going to take about two hours.   The owner says,
22   no, leave now.
23   Q.       Who owned that gold?
24   A.       That was some of the -- the chief -- well,
25   obviously the chief that was selling it still
```

**CLEAL T. WATTS, III - August 20, 2015**

205

1  A.      I don't know if all of them do.  I doubt

2  all of them do, but several of them do, yeah.

3  Like Sheku Kondeh, his mother is from one country,

4  his father is from another.  So he has a passport

5  for both.  Sheku Turay -- originally dealing

6  with -- he had dual citizenships, a lot of them

7  do.  It's a common thing over there.

8  Q.      Where did you meet when you met over

9  there?

10  A.      At the hotel we stayed in, the -- it's

11  called a Maria Dora.  I believe that's it.  Maria

12  something.  Something like that.  Maria Dora,

13  something like that.

14  Q.      So again besides Sheku Kondeh, tell me who

15  else you would have met?  Did you meet the chief?

16  A.      Yeah.  I met a couple chief -- I met the

17  chief, his brother who is another chief in another

18  area, and then there was a third person or chief

19  that was there.  All three of them had

20  different -- they're responsible for their areas

21  and the miners and the things there that they

22  take -- like both their mines and their gold as

23  well as other people's gold in setting up ongoing

24  contracts and do this on a, you know, monthly,

25  weekly, regular basis.

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

206

1   Q.        This is Chief Alimamy Kamara --

2   A.        Yeah.

3   Q.        -- who owns the gold?

4   A.        Yeah.

5   Q.        You met with him when you were --

6   A.        Yes.  And then his brother too but his

7   brother was the one -- since his brother is the

8   one that's more signed and higher educated and

9   spoke English better because Conakry is a French

10  country.  Met with his brother, I think it was

11  Ibrahim Kamara or something like that.

12  Q.        Marked as Exhibit 12.

13            (Whereupon, a document was marked as

14  Exhibit No. 12.)

15  Q.     Mr. Watts, these are requests for

16  admissions filed in this case where we asked you

17  questions and you either admitted or denied them.

18  A.        Okay.

19  Q.        All right.  Could you go to request number

20  33 please on page 5.

21  A.        Okay.

22  Q.        Can you read that request?

23  A.        That you had never met Chief Alimany

24  Kamara in person.

25  Q.        And what did you -- how did you answer

**CLEAL T. WATTS, III - August 20, 2015**

207

```
 1    that?
 2    A.        Answer that no.
 3    Q.        Please read the answer.
 4    A.        Yes.
 5    Q.        What does -- how did you answer that?
 6    A.        That's a different chief.
 7    Q.        I just asked you if Chief Alimamy Kamara
 8    is who you met with in --
 9    A.        Yeah, they're almost the same name.
10    Sorry.
11    Q.        You just admitted that you have never met
12    him in request number 33?
13    A.        This chief here I have not.
14    Q.        Please read the request number 33.
15    A.        I told you it's a different chief.
16    Q.        You did not read it accurately.
17    A.        "Admit that you have never met Chief
18    Alimany Kamara in person."  I have not met that
19    chief.
20    Q.        What did you answer to that question?
21    A.        When?
22    Q.        How did you answer it?
23    A.        When?
24    Q.        The document in front of you.
25    A.        I answered it, no, I had not met him.
```

**CLEAL T. WATTS, III - August 20, 2015**

208

```
 1              MR. PIETRANGELO:   Richard, you may
 2   want to help me out on this.
 3   A.      These are two different people.
 4   Q.      I'm not asking who the people are.  I'm
 5   asking you what --
 6   A.      Have I met this guy?  No.
 7   Q.      Request for admission number 33, does it
 8   or does it not say admit that you have never met
 9   Chief Alimany Kamara in person; is that what it
10   says?
11   A.      Yes.
12   Q.      And your answer is admitted, isn't it?
13   A.      "Admit that you have never met Chief
14   Alimany Kamara."  Yes.
15   Q.      Okay.  But yet you just testified that you
16   met Alimamy Kamara?
17   A.      No, that's a different Alimamy Kamara.
18   Q.      Oh, really.
19   A.      Yes.
20   Q.      Didn't I ask you if that was the same
21   Alimamy Kamara who owned the gold?
22   A.      He does own gold.  But it's different
23   gold.
24   Q.      So you have identified Alimamy Kamara
25   as --
```

**CLEAL T. WATTS, III - August 20, 2015**

209

1   A.        This is not the one with the 114

2   kilograms.  I thought you were talking about the

3   114 kilograms.

4   Q.        Okay.  Read the next one, please.

5   A.        Ibrahim Kamara.

6   Q.        Please read it.

7   A.        "Admit that you have never met Ibrahim

8   Kamara in person."

9   Q.        And how did you answer that?

10  A.        I answer that I admit that I never met

11  him.

12  Q.        Did you just testify that you met Ibrahim

13  Kamara?

14  A.        Again I thought this is a different --

15  this is a different one.  The ones that you're --

16  I was talking about -- and I confused the names

17  then.  Ibrahim Kamara -- or who I was thinking

18  about before -- the guy that was Ibrahim -- maybe

19  it wasn't Kamara.  I have to make a phone call.

20  Q.        We can move on.  We can move on.

21  A.        Sorry.  These are different people than

22  what I was answering.  That's what I mentioned

23  before they all have about the same first names

24  and last names, and I get them confused.  Same

25  thing like Lawrence did with Turay and Kondeh.

**CLEAL T. WATTS, III - August 20, 2015**

221

```
1    Q.      And that was all for gold, right?
2    A.      Yes.  Or -- well, no, not all of it.  Some
3    of it Phillipa borrowed back from the chief at 10
4    percent interest.
5    Q.      But it all related to the gold
6    transaction?
7    A.      Yeah.  Yeah.
8    Q.      Is there anything in this letter to the
9    bank where you talk about gold?
10   A.      No.  I don't see anything over -- wait a
11   minute.  Let me look.  Actually -- okay.  The gold
12   is -- let me clarify that.  No, there's not.  But
13   gold is not the primary source over in Africa once
14   the gold gets going.  It's actually for the
15   manufacturing of machinery and then sending it
16   over that does go for the mining but not just
17   gold.  It goes for iron, bauxite, uranium, the
18   construction for highways and everything.  That's
19   the bigger picture that ISR is going to.  But to
20   fund that, it takes the gold and gold transactions
21   to fund that because that's the most lucrative.
22   It's the quickest.
23           You could use diamonds, but if you --
24   problem with diamonds is there's 1600 grades, you
25   know.  If you want to sell them, it's going to
```

**CLEAL T. WATTS, III - August 20, 2015**

222

1   take forever to sell them.  Gold is something that
2   once it's refined, I pick up the phone, have a
3   certified assay --
4   Q.      You will agree with me that the word
5   "gold" does not appear in this letter anywhere?
6   A.      Yeah, I didn't see it.  Did you see it,
7   Richard?  I didn't -- it would take me eight
8   minutes to read this thing so -- if you say
9   they're not --
10  Q.      Well, if you see it in here, please let me
11  know.
12  A.      If you want me to read through it, I will.
13  Q.      The fifth paragraph --
14  A.      The fifth paragraph -- one, two, three,
15  four, five.  Okay.  Five.  Okay.
16  Q.      You say they also need infrastructure
17  bad -- I assume you're talking about Africa?
18  A.      Yes.
19  Q.      You say, "this is where our construction
20  company and manufacturing heavy earth moving
21  equipment comes in."
22  A.      Yes.
23  Q.      Does ISR -- is ISR a construction company
24  too?
25  A.      No, but it has ties to it.

**CLEAL T. WATTS, III - August 20, 2015**

1    Q.       Well, did you refer to it as "our
2    construction company"?
3    A.       Well, yeah.
4    Q.       Isn't it true that ISR has never engaged
5    in the construction business?
6    A.       No.  In manufacturing, no, because I just
7    got through telling you we make the valves
8    composites for the machinery which is construction
9    equipment.
10   Q.       My question -- that's not my question.
11   A.       You asked me if we ever and I said --
12   Q.       I said have you ever engaged in the
13   construction --
14   A.       Have I?  Yes.
15   Q.       Has ISR ever built anything?
16   A.       Yes.  Built the control valves for the
17   heavy machinery.
18   Q.       You think that's a construction company?
19   A.       No, but it ties to construction.  You
20   asked me -- okay.  Microsoft --
21   Q.       You also say that it manufactures heavy
22   earth moving equipment.
23   A.       Yes.
24   Q.       Has ISR ever manufactured -- has it ever
25   manufactured heavy earth moving component?

**CLEAL T. WATTS, III - August 20, 2015**

224

1    A.        Components for it, yes.  The equipment,

2    no.  But the equipment isn't manufactured anyhow.

3    No component -- even Caterpillar doesn't

4    manufacture all their components for it.  Somebody

5    else does.

6    Q.        And the next sentence of that paragraph

7    you say, "the contracts already look to be worth

8    the effort we have made."  What contracts are you

9    referring to?

10   A.        That was some of the original -- like I

11   was telling you the contract with the original

12   chief when I went over there the first time, some

13   of those, they had -- they're getting out of --

14   they were getting out of the civil war, and some

15   of those contracts they would go as high as when

16   we had the assets and availability of, you know, a

17   thousand kilos, which is a metric ton a month,

18   could be available with the structure in place and

19   still is.

20   Q.        Contracts to do what?

21   A.        Okay.  I assumed you were talking about

22   gold.

23   Q.        Well, you wrote the letter.

24   A.        Okay.

25   Q.        What are you talking about?

**CLEAL T. WATTS, III - August 20, 2015**

225

```
 1   A.        I told you I didn't read it because it
 2   would take me eight minutes.
 3   Q.        Please read that.
 4   A.        Okay.  Please tell me again and I will
 5   read it again for you.
 6   Q.        I read it to you.  I read it to you.
 7   A.        Oh, okay.  I'm sorry.
 8   Q.        Contracts already look to be worth the
 9   effort that we have made.
10   A.        Oh, that would have been the contracts for
11   the gold -- for the machinery for the gold.  Okay.
12   Go on here further.  The gold that is coming in
13   with the mines that we are getting it from from
14   the smaller stuff here now coming in need --
15   that's one of the reasons they're -- they would
16   sell to us.  They need machinery for mining to
17   make it quicker.
18   Q.        Gold needs machinery?
19   A.        Yes.
20   Q.        Who needs machinery?
21   A.        The gold miners need the machinery over
22   there.
23   Q.        Gold miners in Africa?
24   A.        Yes.
25   Q.        Okay.
```

**CLEAL T. WATTS, III - August 20, 2015**

226

| | | |
|---|---|---|
| 1 | A. | All right.  We manufacture machinery. |
| 2 | Q. | Where? |
| 3 | A. | Okay. |
| 4 | Q. | Where does ISR manufacture -- |
| 5 | A. | ISR doesn't. |
| 6 | Q. | Okay. |
| 7 | A. | We have manufacturer -- |
| 8 | Q. | You say we manufacture -- |
| 9 | | COURT REPORTER:  One at a time. |
| 10 | | MR. TOWNLEY:  Just answer his |
| 11 | questions. | |
| 12 | A. | Okay.  Ask the question again. |
| 13 | BY MR. PIETRANGELO: | |
| 14 | Q. | ISR does not manufacture machinery, does |
| 15 | it? | |
| 16 | A. | In the literal sense of that, yes, we do. |
| 17 | Heavy machinery, no.  Components of it, yes.  Is | |
| 18 | that your answer?  Is that what you want? | |
| 19 | Q. | I just want the truth. |
| 20 | A. | I'm trying to give you the truth but you |
| 21 | don't understand it. | |
| 22 | | MR. TOWNLEY:  Just answer his |
| 23 | questions. | |
| 24 | A. | Okay. |
| 25 | Q. | So we are back to the contracts.  What are |

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

227

1   the contracts that already look to be worth effort
2   that you have made?
3   A.      That's the contracts for the gold and the
4   agreement with that that in that we will be
5   supplying and selling them or leasing them heavy
6   machinery to continue and increase their mining
7   abilities.
8   Q.      Is it your testimony that you have a
9   written contract that calls for ISR to provide
10  machinery or equipment to anybody in Africa?
11  A.      The original equipment that was what it
12  was for.  It was a verbal --
13  Q.      What original equipment?
14  A.      I mean, original contract, I'm sorry.
15  Original contract.  That's what the whole thing is
16  for is medicine and machinery.  Gold is just a
17  transient to get to that point.
18  Q.      Medicine too?
19  A.      Yes, medicine too.
20  Q.      Do you have a written contract that has
21  you selling medicine to Africa?
22  A.      Verbal.  Almost everything is verbal.  We
23  don't do things written.  It's a handshake in
24  Africa.  Similar like in Texas many things are
25  handshake now.  That's what they do in Africa.

**CLEAL T. WATTS, III - August 20, 2015**

228

1   Q.      And how has that worked out for you, the

2   handshake deals in Africa?  Not very well, has it?

3   A.      Actually it's worked out pretty well.

4   Yes, it has.

5   Q.      Really?

6   A.      We got 100 -- well, there's 150 kilos in

7   Holland and 714 Ghana that isn't paid for that we

8   still have some rights to if we still have it

9   there that wasn't paid for.  So I guess it has

10  worked pretty well.  Wouldn't you say?  Okay.

11  Sorry.

12  Q.      In the last paragraph you say "since I

13  have not had the time in Freetown where our

14  offices are being furnished, I was in surrounding

15  countries the last few trips."

16  A.      Yes.  Actually it was two trips.  Sorry.

17  Couple trips.  It should say couple instead of

18  few.  Last two trips.

19  Q.      But you don't tell them that you were

20  diverted from Sierra Leone to Guinea?

21  A.      No.

22  Q.      Do you think that that fact would make a

23  bank more or less comfortable about the business

24  that you are doing?

25          MR. TOWNLEY:  Object to the form.

**CLEAL T. WATTS, III - August 20, 2015**

229

```
1    You can answer.
2    A.       It doesn't matter if it does or not.  It's
3    none of their business.
4    Q.       Well, that's why you write the letter
5    though --
6    A.       No.  I'm writing the letter of why we're
7    sending monies.  Not whether I should be there or
8    shouldn't be there or any of that part.
9    Q.       You also say "our corporate U.S. dollar
10   account for ISR is titled as our manager's name
11   Sheku Kondeh for security reasons."  Did you write
12   that?
13   A.       Yes.  That was to -- as a dyslexic to
14   shorten down from five paragraphs to half a line
15   what was over there.  His -- that bank account
16   over there --
17   Q.       My only question was, did you say that?
18   Okay.
19   A.       No.  Did I write that?  Yes, I wrote that.
20   Q.       You wrote that.
21   A.       And I need to clarify that.
22   Q.       Well, I'm going to -- I get to ask the
23   questions.
24   A.       I get to clarify any question you ask.
25   Q.       No.  I asked you if you wrote it and you
```

**CLEAL T. WATTS, III - August 20, 2015**

230

1    said you wrote it.

2                    MR. TOWNLEY:  Let him ask his

3    question.

4    A.        Okay.  Ask your question.

5    Q.        When you say "our corporate U.S. dollar

6    account for ISR," what account are you talking

7    about?

8    A.        There isn't one over there.

9    Q.        So that was a lie?

10   A.        What I was referring to was the account

11   that monies are sent to to handle over there that

12   is not ours and that part -- if you're calling

13   that part of it, yes, it's a lie.  But in the

14   transactions we're doing -- in our transactions

15   that we are dealing with, the institution account

16   that is theirs and belongs to them over there that

17   we deal with, which is ours, the whole thing is to

18   do business, is that account over there is under

19   Sheku Kondeh.  It's not our account.  We're not

20   the signatory on anything else, but it is who our

21   partners are that we're dealing with and getting

22   gold back and forth and eventually machinery and

23   everything else.

24   Q.        So why are you telling the bank that it's

25   your corporate U.S. dollar account?

**CLEAL T. WATTS, III - August 20, 2015**

260

1   Bloomberg, but I could be wrong.

2   Q.      And, of course, again it wasn't your money

3   so it didn't really matter that much to you, did

4   it?

5               MR. TOWNLEY:  Objection.  Form.

6   A.      It does matter.  It matters deeply.

7               (Whereupon, a document was marked as

8   Exhibit No. 3.)

9   Q.      It's a document we have marked as

10  Exhibit 3.  It appears to be a Bank of America

11  statement for Secured Asset Management for the

12  period of July 2010.  Would you agree with that?

13  A.      Yes.  Looks that way.

14  Q.      If you go on the second page, shows a

15  $25,000 wire in from Celene Dutzman; is that

16  correct?

17  A.      Hang on.  Let me find it.  Oh, okay.  Yes.

18  Q.      Why did that money come in from Celene

19  Dutzman?

20  A.      That was for investment in gold.

21  Q.      Did she sign a Soft Corporate Offer?

22  A.      No, I don't think she did.  I don't

23  remember.  I can't say.

24  Q.      Now, we have -- we have been talking about

25  ISR this whole time, right?

CLEAL T. WATTS, III - August 20, 2015

263

1   too far back.

2   Q.      Was this not all the chief's money?

3   A.      Yes.

4   Q.      It was?

5   A.      Yeah.  It would have gone to the chiefs,

6   yeah.

7   Q.      But you took 4500 of it out in cash?

8   A.      Yeah, because it was going to the chief

9   somehow.  I don't know what it was for.

10  Q.      On the next page you paid Dr. Dignan

11  again.

12  A.      Yeah.  Let's see.  Yeah.  Medical is paid.

13  Same thing as Security Asset Management.  The

14  medical has to be covered because there's no --

15  they don't pay for an insurance policy.

16  Q.      Golden Corral, Whataburger, Japan House,

17  McDonald's, you went to all those places?

18  A.      Yep.  All those places were meeting with

19  people at the times.

20  Q.      You had business meetings at Whataburger?

21  A.      Yep.  Why not?

22  Q.      Is this the only money that Celene Dutzman

23  ever invested?

24  A.      No.  She had other monies too.

25  Q.      How much more did she invest?

**CLEAL T. WATTS, III - August 20, 2015**

264

1   A.      I don't know.  I can't tell you offhand.

2   Q.      Has she ever gotten a return?

3   A.      No.

4   Q.      Has she ever asked about the money?

5   A.      Oh, yeah.  She's current, talk to her

6   fairly frequently about what's going on and

7   everything.

8   Q.      When is the last time you talked to her?

9   A.      Actually since you guys started deposing

10  it's probably been a couple of weeks.

11  Q.      What did y'all talk about?

12  A.      It was some research she was doing on

13  legal information I think is what it was.

14  Q.      Where does she live?

15  A.      She travels.  She doesn't live -- have

16  a -- I don't know what her fixed address is.  She

17  will go between Pennsylvania, Washington, D.C.,

18  Virginia, some other place.  It depends where her

19  job because she does like -- it might be a

20  one-week job or whatever.  So she will travel to

21  it.

22  Q.      What is her job?

23  A.      I'm sorry?

24  Q.      What is her job?

25  A.      Generally it's -- she did a lot of

**CLEAL T. WATTS, III - August 20, 2015**

272

1    Q.        Excuse me?

2    A.        I can't remember a female back then -- I'm

3    sorry, I can't remember a female back then.

4    Q.        Do you know a male named Wheeler or

5    Vaughn?

6    A.        Vaughn -- the name Vaughn sounds familiar.

7    But looking how it is spelled it throws me because

8    it's not registering Vaughn in my brain.

9    Q.        Let's go to the next one.  Richard Carey,

10   a wire of $12,070?

11   A.        Yes.  Yes.

12   Q.        Why was that money coming into SAMI?

13   A.        That was for a loan again for gold.  SAMI

14   was the active checking account at the time.

15   Q.        Was it a loan or was it for gold?

16   A.        It was a loan but it was going towards

17   gold.

18   Q.        Could you explain that transaction,

19   please.

20   A.        He was looking at it -- going into it as

21   an investment for gold, but rather than doing it

22   as an investment, he was just going to call it as

23   a straight loan to me to put in there.  It was for

24   me.  I was the one that was responsible for it

25   personally.

**CLEAL T. WATTS, III - August 20, 2015**

276

1    papers are?

2    A.      I can't read what this thing is.  I can

3    barely get this -- I can't tell what it is.

4    Something and go.

5    Q.      You also state "this is your trump card do

6    not let it out to anyone or you lose your power."

7    A.      I don't know what that would have been

8    for.  It might have been tracking or -- I don't

9    know.  That one doesn't make sense.

10   Q.      You also say in here "they cannot tear

11   down what they do not know about."  What are you

12   referring to?

13   A.      That's probably having to do with the

14   crooks and criminals that I mentioned -- we

15   alluded to earlier constantly trying to get

16   information to find out when a shipment is going,

17   and then they start lambasting you with like, you

18   know, this isn't accurate.  Some freight forwarder

19   trying to come in and take over a shipment.  Any

20   one of a number of things they try to do.  Try to

21   swap out.  They swapped out shipping labels.

22   Shipping in the high value area where they swap

23   out labels.  We don't want any information getting

24   out of the shipment going out.  The less

25   information out the less chance you have of

**CLEAL T. WATTS, III - August 20, 2015**

277

1    somebody causing a problem.

2    Q.        On the last page -- excuse me.   On the

3    last page looks like you have also sent Phillipa

4    Sledge an insurance policy declarations page; is

5    that right?

6    A.        Yes.   This is what I was sent from --

7    Q.        Ince & Company, right?

8    A.        This was -- what was the deal on this one?

9    This -- oh, wait, what is the kilos on here?   Oh,

10   here we go.   Yeah, yeah, yeah, yeah.   This would

11   have come from -- I probably would have got it

12   from Dr. Koroma for insurance.

13   Q.        And what did it cover?

14   A.        I don't know.

15   Q.        What did it cover?

16   A.        It would have covered -- it would have

17   been for the shipment, the 714 kilograms.

18   Q.        Was this the trump card you were talking

19   about?

20   A.        I don't know.   It doesn't correlate

21   together.   So I'm not sure.

22   Q.        But you sent it to Phillipa Sledge,

23   correct?

24   A.        Yes, but there's -- probably -- there was

25   other things that would have been with it, not

**CLEAL T. WATTS, III - August 20, 2015**

278

```
 1  just this, I think.  There's not enough here for
 2  me --
 3  Q.      And --
 4  A.      This might have been one of the bogus ones
 5  too that I was sent.
 6  Q.      Now, you're -- it shows that you're the
 7  insured on this, correct?
 8              MR. TOWNLEY:  He's on the last page.
 9  Q.      Last page.
10  A.      No, this shows that --
11  Q.      If you could turn to the last page,
12  please.
13  A.      Oh, I'm sorry.
14  Q.      About a third down on the left it says
15  insured's name and address, that's Dr. Cleal
16  Watts, III, correct?
17  A.      That would -- okay.  That's what -- yeah,
18  that's what it would have been written out for.
19  Q.      Now, earlier you testified that none of
20  the insurance was in your name.  That was all
21  Africa to Africa was all that?
22  A.      Ghana, sometimes they did it -- like Ghana
23  they went in and they were switching it because
24  Ghana isn't where the gold was coming from.
25  Q.      Are you the insured on this policy?
```

**CLEAL T. WATTS, III - August 20, 2015**

279

1    A.       This policy here according to what they
2    said, yes, but I don't know if this was --
3    Q.       Did you ever put in a claim?
4    A.       No.
5    Q.       Why not?
6    A.       Because the gold is still there.  You
7    can't put in a claim with the gold there.
8    Q.       With the gold where?
9    A.       In Ghana.
10   Q.       You said it was in Holland.
11   A.       No.  I said the 714 kilograms is in Ghana.
12   150 kilograms is in -- or right at 150 kilograms.
13   Q.       So what did this policy cover?  Remember,
14   you sent this to my client, right?
15   A.       Yes.  This was for her --
16   Q.       You told this was her trump card, right?
17   A.       I don't know -- again, you keep bringing
18   it up.  I don't know what else was in the email.
19   Q.       I'm bringing it up because you wrote it.
20   A.       Yes.
21   Q.       Did you say this was your trump card?
22   A.       I guess I did.  Now what I'm saying trump
23   card, I don't know if it's this.  I don't know
24   what was in the email.
25   Q.       What in here is her trump card?

**CLEAL T. WATTS, III - August 20, 2015**

280

1   A.        I don't know.  Is this the whole email?

2   Doesn't look like it.

3   Q.        What do you think is missing?

4   A.        I don't know.  How come these are so small

5   right here?  That shouldn't be.

6   Q.        Do you remember sending her this insurance

7   policy?

8   A.        I remember sending documents like this

9   that was coming from Dr. Koroma.  He was the one

10  that was -- that sent it.  He was the one that was

11  at the time had try control that I was trying to

12  wrestle it back.  I don't know -- I have to get

13  dates on here to tell -- to get an idea of what

14  was going on at the time.  I see this says 2014.

15  This is when Dr. Koroma had control -- had full

16  control and authority over the gold.  That was the

17  acting ambassador.

18  Q.        You've never paid an insurance premium,

19  have you?

20  A.        Yes.

21  Q.        For Phillipa Sledge?

22  A.        Yes.

23  Q.        To whom?

24  A.        Several times.  To the insurance companies

25  that were there.  You should have the documents in

**CLEAL T. WATTS, III - August 20, 2015**

281

1    your --

2    Q.        So why does it surprise you that you might

3    be a named insured from the Ince & Company?

4    A.        Because this is one where Dr. Koroma would

5    have done it and he tried to butter me up, he puts

6    it in my name instead of the owner's name for it

7    being sent out.  It's either going to be in one of

8    two things.  It's either going to be in the

9    owner's name or whether it is a chief or the

10   mining company or it will be in my name, one of

11   the two, is what it should be.

12   Q.        Did you look at these documents before you

13   sent them on to plaintiffs?

14   A.        Oh, yeah.

15   Q.        Okay.

16   A.        I told her I didn't know about them.  She

17   says, I want documents.  I said, well, these are

18   what I'm getting sent.  I will just send you what

19   they're sending me then.  So I sent a bunch of

20   documents.

21   Q.        But in reality that's not what you said.

22   Nothing in this first email says, I'm just sending

23   you what they sent me.

24   A.        That was verbal.

25   Q.        You said this is your trump card.  What

**CLEAL T. WATTS, III - August 20, 2015**

282

1   about this is a trump card?

2   A.      What I was told -- I guess this is

3   talking -- see again --

4   Q.      There is no trump card, is there,

5   Mr. Watts?

6               MR. TOWNLEY:   Object to the form.

7   You can answer his question.

8   A.      The trump card would be an insurance

9   policy.  If I'm sent this by an ambassador that

10  says this is the insurance policy, that's like,

11  okay, this is what I was told.  It says I got it.

12  That's probably what I'm referring to.  If this

13  was everything there.  I can't imagine being sent

14  an email with little biddy things like that out.

15  So something else -- something is wrong here.  I

16  don't know what it is.  But the trump card would

17  have been -- always been the insurance policy.

18  And this is what I was sent at this time period

19  would have been coming from the ambassador --

20  acting ambassador to Sierra Leone in Ghana that

21  would have had full authority over the

22  transaction.

23  Q.      If you couldn't put in a claim by your

24  testimony, why is it a trump card?  It sounds like

25  it is worthless.

**CLEAL T. WATTS, III - August 20, 2015**

283

```
1    A.       Because if it was lost, you can put in a
2    claim.   But it's not lost.
3    Q.       So why did you tell her it was a trump
4    card?
5    A.       Because it -- okay.  The big thing was if
6    something happens to it, what can I claim.
7    Q.       You didn't say that though.  You said this
8    is your trump card.  Not if something happens,
9    this could become your trump card.
10   A.       This is your trump card.  If something
11   happens to you, collect on it, from the insurance.
12   Q.       That's not what you said, is it?
13   A.       Yes, it is what I said.
14   Q.       Can we read it then?
15   A.       No.  That's what I wrote.  What I said and
16   what I wrote are two different things.
17   Q.       "This is your trump card do not let it out
18   to anyone or you lose your power."  That's what
19   you wrote?
20   A.       Yes, yes.  And that -- what I told --
21   Q.       That's not true, is it?
22   A.       Yes, it is true, but what I said was about
23   four or five pages spelled out.  I'm dyslexic.
24   I'm not going to write four or five pages.  She
25   asked what guarantee.  The guarantee is your
```

**CLEAL T. WATTS, III - August 20, 2015**

284

1    insurance policy.  This is what says insurance

2    policy.  The reason you don't let it out, because

3    if it does get out to somebody, which I don't know

4    who she would send it to, but she was talking

5    about securities or something.  You don't let it

6    out because this is also information that there's

7    714 kilograms -- should be saying where it's at

8    and will have information that ties to it.  That

9    you don't want anybody getting because that's when

10   they start causing problems.

11                  (Whereupon, a document was marked as

12   Exhibit No. 7.)

13   Q.      Please take a look at Exhibit 7.

14   A.      All right.

15   Q.      Appears to be a bank statement Secured

16   Assets Management for the period of July 2008?

17   A.      Okay.

18   Q.      Shows a wire from Richard Carey, it's a

19   little over $18,000; is that correct?

20   A.      Let me look and see.

21   Q.      First page, very bottom.

22   A.      First page, very bottom.  Yes.

23   Q.      Again why was he sending you that $18,000,

24   same answer as before?

25   A.      Yeah.  It was just part of -- that would

**CLEAL T. WATTS, III - August 20, 2015**

286

1   Dallas.  It is in Richardson I believe.  It's

2   Memphis and Awe Shucks.  Memphis is one side of it

3   I think.  That would have probably been what it

4   was.

5   Q.      Exhibit 6 appears to be a bank statement

6   for SAMI again for the period of April 2008.

7   A.      Okay.

8   Q.      These are some more payments from Richard

9   Carey, he wires in?

10  A.      Yep.

11  Q.      About $36,000; is that right?

12  A.      Yes.

13  Q.      And you believe that would be the first

14  two payments that he made because it's 001?

15  A.      18, yeah, exactly.  It would be first and

16  second payment.

17               (Whereupon, a document was marked as

18  Exhibit No. 39.)

19  Q.      Exhibit 39.

20  A.      Okay.

21               MR. PIETRANGELO:  We'll go over every

22  line, Richard.

23               MR. TOWNLEY:  I can't see this with

24  or without glasses.

25               MR. PIETRANGELO:  It's enlarged

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

1  Q.      Well, I can assure you that we didn't cut
2  it off.
3  A.      Somebody did because I don't send them out
4  like this.
5  Q.      How do you send them out?
6  A.      I send them out -- like I get them out, I
7  forward them and their email address and
8  everything to me is going to be at the top just
9  like this is.  You guys, it would be on top or
10  below that.
11  Q.      But you recall forwarding this?
12  A.      Oh, yeah, I -- well, not this particular
13  one but I sent several.  Quite a few that were
14  articles and things that were sent over.
15  Q.      When is it that you determined that Kamara
16  had lied to you?
17  A.      The first thing he did, he did was correct
18  and he was helping.  That's when the chief went
19  ahead about that point like a week or two
20  afterwards --
21  Q.      You're not answering my question.  When
22  did you determine that Kamara had lied to you?
23  A.      About the third -- latter part of maybe a
24  month after he was involved.  Maybe a week or two.
25  Q.      What date is that?

**CLEAL T. WATTS, III - August 20, 2015**

296

1    A.       I have no idea.

2    Q.       Well --

3    A.       I would have to look at documents.

4    Q.       He sent you this in June of 2012.

5    A.       I don't know when this came in what part.

6    I don't know if this was month one, month two.  If

7    you knew that, I could tell you.

8    Q.       Well, but you're saying --

9    A.       This part here I knew that he was -- that

10   probably if I didn't know, I knew something was

11   wrong this one here when I sent it out because the

12   type set is different right here.

13   Q.       So you knew there might be a problem with

14   this?

15   A.       Something is wrong, yeah, and that's when

16   I had the girl, the monies, was doing research on

17   the authors, the -- try to go -- see what she

18   could find on the newspaper website.  All that

19   kind of stuff.

20   Q.       And why did you send it to Phillipa

21   Sledge?

22   A.       Because she asked for documents.  I said,

23   look, this is what I am getting and she -- at that

24   time we had a bunch of conversations every night

25   for hours, and she wanted to started getting out,

**CLEAL T. WATTS, III - August 20, 2015**

297

1   and says, here, I will send you everything then if
2   you want.
3   Q.      Did you tell her it was bogus in your
4   opinion?
5   A.      No.  I told her it looked suspicious
6   because of the different typeset, but in Africa
7   they do all kinds of crazy things.  So you don't
8   know.
9   Q.      Did you put that in writing?
10  A.      No.  I don't put anything in writing --
11  again, it was on phone.  There was no way I
12  could --
13  Q.      Did you just say I don't put anything in
14  writing?
15  A.      Well, I'm sorry, I did not mean to.  I
16  probably did.  I did not mean to.  It takes me --
17  it takes seven or eight hours as a dyslexic to
18  write a half page letter.  Even emails are very
19  difficult to write just to get spellings correct
20  so it doesn't look like a joke.  So I do very
21  little in communicating by writing.  And when I
22  do, obviously you take the words out of context.
23  So again a good reason not to send emails or
24  writing.  I guess you're done with this.  Okay.
25  Q.      Mark this as Exhibit 28.

**CLEAL T. WATTS, III - August 20, 2015**

304

1    Q.        Who are the other investors that you're

2    referring to in that email?

3    A.        I don't remember at the time.  I think --

4    I can't say for sure.  There's a possibility -- I

5    can't say for sure.

6    Q.        But you -- there were other investors;

7    otherwise you wouldn't have said it, right?

8    A.        Yes.  Yeah.  Yeah, there were other

9    investors to pick up because she wanted the

10   majority of it, and what she didn't get, the other

11   investors were going to have.  I can't say.  I

12   don't remember for sure.

13   Q.        What is the most investors you've ever had

14   in play at any one time, 10, 20?

15   A.        At any one time in play, I don't know,

16   three or four, ten.

17   Q.        What about over the course of time?

18   A.        Over the course of time probably 10, 15,

19   maybe 20.

20             (Whereupon, a document was marked as

21   Exhibit No. 19.)

22   Q.        Show you Exhibit 19.

23   A.        Okay.  Oh, yeah.  We promptly blew this

24   one off.

25   Q.        Is this a true and correct copy of an

**Alpha Reporting Corporation**

CLEAL T. WATTS, III - August 20, 2015

314

1    Q.       What do you think they were worth?

2    A.       .45 probably -- I don't know what the guns

3    are worth nowadays.   The Browning was probably --

4    it was an old four digit serial number Browning

5    12-gauge.   It's probably worth quite a bit, but I

6    don't know how much.

7    Q.       Do y'all have an idea of what it was worth

8    for the purposes of the collateral for the loan?

9    A.       No.   It was just -- that's what I had.   So

10   I gave it to him.

11   Q.       Did he ask for it?

12   A.       He said I would like collateral this time

13   because of the -- you know, the other loans.

14   Sure.   Okay.   So I said, look, I got some guns you

15   can have, hold for collateral.

16   Q.       Where are those guns now?

17   A.       I don't know.   He's got them.

18   Q.       You have never paid him back any money on

19   his investment; is that correct?

20   A.       Correct.

21   Q.       And where is his gold?

22   A.       Holland.

23   Q.       You were a groomsman at Mike Byrd's

24   wedding; is that right?

25   A.       Yes.

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

321

```
1    friend to invest half of his net worth in a
2    venture that was, let's see, seven years since
3    you -- and you still --
4    A.      Yes.
5    Q.      -- haven't gotten your return?
6    A.      Sure it did.  He's my best friend and no
7    matter what some things can happen, but he also
8    knows if I am going to start something, I'm going
9    to finish it.  He's known me that long, and I
10   never -- I won't quit until it's done.  The only
11   way -- and I told Phillipa this time and time
12   again when she asked about it, the only way you
13   lose in this is if you quit because you will -- I
14   will eventually get it done or eventually you can
15   get it done.  You just have to stay after it.
16   Q.      But you took his money anyway even though
17   it give you pause?
18   A.      Oh, well, it didn't give me that much
19   pause, but he was wanting me to take it to invest.
20   And it was going -- and it will turn one way or
21   another.  From that we, you know, have gotten
22   two kilos in half kilo increments, but it will
23   be double --
24   Q.      Do you know Mike Byrd's current wife?
25   A.      Yes.
```

**CLEAL T. WATTS, III - August 20, 2015**

328

1  time.

2  Q.      Do you agree with that?

3  A.      Yeah.  Hell, yeah.  Always have.

4  Q.      So eight years -- it's been eight years

5  since he invested?

6  A.      Yes.

7  Q.      You don't think he's got a right to be

8  upset that he hasn't seen any money?

9  A.      Oh, yeah, he's got a right to be upset,

10 but not be upset because I take the money from

11 somebody else and pay it back.  Whether it's the

12 chief or anybody else.

13 Q.      Did he bring other investors to you?

14 A.      Yes.

15 Q.      Who?

16 A.      Chris, don't remember his last name, and

17 Ed.  I don't remember Ed's last name.

18 Q.      Did they invest money on top of that

19 $50,000 or did they comprise the 50,000?

20 A.      No.  It was on top of that 50,000.

21 Q.      How much more did they invest?

22 A.      They were about 50 -- I can't say for

23 sure, but I think it was about 50 and -- 50 or 50

24 or 30, something like that.  I can't say for sure.

25 Q.      Was Ed Ed Pritskow?

**CLEAL T. WATTS, III - August 20, 2015**

329

1   A.        Yeah.  I think that's -- I believe that's

2   right.  I'm sorry.  Yes, I believe that is right.

3   Q.        What about Chris's last -- you don't

4   remember Chris's last name?

5   A.        I mean, if I heard it, obviously yes or no

6   but --

7   Q.        Do you have records anywhere that show

8   what he invested?

9   A.        I had it written down.  John carries most

10  of those records.

11  Q.        John who?

12  A.        Chu.

13  Q.        So let's say that everything goes the way

14  you have been saying it's going to go and you get

15  money for the gold tomorrow.

16  A.        Uh-huh.

17  Q.        How do you know who Chris is if all you

18  know is his first name and you don't have any

19  records?  How is he going to get his money?

20  A.        I pick up John and say, hey, John, what is

21  Chris's current number?  I probably have it

22  written down a half dozen places, but it's easier

23  I pick up John.  Hey, John, it's here, get Chris

24  on the line.

25  Q.        Do you think that's a professional way to

**CLEAL T. WATTS, III - August 20, 2015**

337

1    Q.        Have you ever heard of Peter Blonski?

2    A.        Name is not ringing a bell.  Is there

3    anything more you can give me than that?

4    Q.        Has a Russian ever invested money with

5    you?

6    A.        Oh, no, he did -- if that's the Peter I'm

7    thinking of that was Russian, he did send monies

8    for some guy that was doing some -- it was a joint

9    venture.  They were doing something.  I don't

10   remember.  That was years and years ago.

11   Q.        How much money did he send you?

12   A.        I think he sent 30,000.  I believe that's

13   right.  Something along those lines.

14   Q.        Was that for gold?

15   A.        No, no, no, no.

16   Q.        What was it for?

17   A.        It was another -- he was doing a joint

18   venture with some guy was going to do something,

19   and he needed 30,000 to do the transaction for the

20   business or something.

21   Q.        Why does that explain how he sent you

22   $30,000?

23   A.        Because I was the one that it went

24   through.  He sent it to as a contact going through

25   to them for wiring the monies further to them.

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

338

1   Why it went to me before it went to them, I don't

2   remember to be honest with you.

3   Q.      Do you know Jack Kendall?

4   A.      Jack Kendall.  Can you give me a

5   connotation or something for that?

6   Q.      Possibly involved with an airplane company

7   in California?

8   A.      Jack Kendall.  That's ringing more of a

9   bell, but I still can't place it.

10  Q.      Do you know Mark Hamilton?

11  A.      Mark Hamilton.  Can you give me a context

12  for that one?

13  Q.      Do you remember him sending you $1500 in

14  2012?

15  A.      Oh, no, no, no, no.  That's -- I know, I

16  know Mark Hamilton.  No, I sent that to him.

17  That's backwards.

18  Q.      Why?

19  A.      That was for a compressor to be used over

20  in Africa.

21  Q.      Is he related to Bill and Melinda

22  Hamilton?

23  A.      No.

24  Q.      Why did you not appear at the deposition

25  in June in Dallas?

**CLEAL T. WATTS, III - August 20, 2015**

347

1    Q.      Have you ever done video Skype with
2    anybody?
3    A.      No.  They don't have enough band width to
4    do it over with there.  You know, I just got
5    through telling you they now upped to a T-1 for
6    six law firms, 20 other -- or, you know, plus 20
7    businesses and 650 rooms.  You can't do Skype.
8    Q.      When is the last time you talked to Sheku
9    Kondeh about Acheopon?
10   A.      Last night or this morning.
11   Q.      Have you made the request of Rack Space to
12   send us your emails?
13   A.      No, I've got -- Rack Space is going to
14   come to a lawyer here.  When they review it, then
15   you get it.
16   Q.      Did you just say, no, you have not made
17   the request?
18   A.      Oh, yes, I made the request.  It's all set
19   up to do.  Arrangements had already been made,
20   let's put it that way, if that's what you're
21   asking.
22   Q.      Did you ever invest with a ladies group
23   out of Chicago?
24   A.      A what?
25   Q.      Did a ladies group out of Chicago ever

**CLEAL T. WATTS, III - August 20, 2015**

348

1   invest with you?

2   A.      No.  I don't know what the heck that is.

3   Q.      Have you ever had any Hong Kong investors?

4   A.      No.

5               MR. PIETRANGELO:  Give me

6   two minutes.  We may be done.

7               THE VIDEOGRAPHER:  Going off the

8   record.  The time is 3:31 p.m.

9                  (Off the record.)

10              THE VIDEOGRAPHER:  We are now back on

11  the record.  The time is 3:35 p.m.

12  BY MR. PIETRANGELO:

13  Q.      You said that you spoke with Sheku Kondeh

14  within the last day or two about Acheopon; is that

15  right?

16  A.      Yeah.

17  Q.      What did y'all talk about?

18  A.      I was asking about is there some way we

19  can get that folder with all those receipts and

20  documents and all that kind of stuff without

21  having to pay, you know, the money.

22  Q.      What did he tell you?

23  A.      He said, no, the guy, you know, wants some

24  money to continue on.  I said, well...

25  Q.      How much is he owed?

**CLEAL T. WATTS, III - August 20, 2015**

355

1  that was a trouble and then later on he convinced
2  himself how helpful he was to the chief.  So the
3  chief because he's the ambassador -- well --
4  Q.      What country was he ambassador for?
5  A.      I'm sorry?
6  Q.      What country is he --
7  A.      Sierra Leone.
8  Q.      So he's a Sierra Leone ambassador that
9  lives where?
10  A.      In Ghana.  To the Sierra Leone -- to the
11  Sierra Leone embassy in Ghana.  He was the acting
12  ambassador.  He became -- I'm sorry, he became the
13  acting ambassador.  He started off -- the
14  ambassador was called back from something else so
15  he became the acting ambassador.
16              (The following is from a recorded
17  voice message played during the deposition.)
18              MR. WATTS:  Hey, Phillipa, sorry, I
19  was on the line when you were calling.  Basically
20  today's win is, you know, what we were expecting
21  where the emissary basically told the Israelis,
22  all right, come get your cash, you know, you're
23  out.  And they're going -- he's going to have to
24  come in.  I guess they're going to come tomorrow,
25  and, of course, they're saying just like they

**CLEAL T. WATTS, III - August 20, 2015**

356

1   expected no, no, no, they don't want to take the

2   cash.  They want to stay in.  He's like come get

3   your cash.  And, you know, they don't want to come

4   get it.  Try to leave it with him.  All he has to

5   do is they'll just leave it with the bank or one

6   of the government offices and then go pick it up

7   whenever they want.  But they're, you know,

8   basically out.

9              And the ladies, partners in Chicago

10  are coming forward too with the cash.  It sounds

11  like to me they're having to pull it out of

12  securities, to liquidate securities, that would be

13  a T plus three or something.  But I couldn't get

14  through on the last part, but he was driving so I

15  just got that information.  We are going to

16  re-talk when they got back to their house because

17  the weather is real bad there.  It's the shift

18  time for the rainy season, and the storms are real

19  bad, but they will be calling in the morning and I

20  will be able to get through easier too.

21             Anyway basically everything that we

22  talked, figured, you know, like you and I knew

23  would happen is what is happening.  You know, what

24  they try to do but -- the emissary is just fed up

25  with them and said, no, you guys are out, get out.

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

357

```
 1    So it's on track with the -- it's just the ladies
 2    group, they're actually out of Chicago, are
 3    liquidating to come in on the cash side.  Anyway
 4    give me a holler if you need.  I will talk to you
 5    later, bye.
 6                  (The recording concluded and the
 7    following is back on the video deposition record.)
 8    BY MR. PIETRANGELO:
 9    Q.      Did you leave that message for Phillipa
10    Sledge?
11    A.      Yes, sir.
12    Q.      Why did you leave that message?
13    A.      Because that was happening at the time.
14    Both that investor -- now, I know what you're
15    talking about.  That investor and the Israelis
16    weren't dealing with me.  They were dealing with
17    Mr. Kamara who was the attache with Guinea and
18    legal counsel, and he was the one that was
19    going -- I guess I didn't tell you this.
20                  In Holland that was -- having the
21    demurrage decreased, and he was going to get the
22    monies together to go over and pick it up, the
23    gold in Holland, and personally bring it back into
24    the United States.  And then he had a certain
25    amount that he was requesting for doing that.
```

**Alpha Reporting Corporation**

**CLEAL T. WATTS, III - August 20, 2015**

361

```
 1    A.        Not necessarily.  But could be.
 2    Q.        And you have zero income, correct?
 3    A.        Well, from small things that I may do or
 4    little things like whether somebody wants to order
 5    a computer or they want some work done or
 6    something like that.
 7    Q.        You done -- you done any of those deals in
 8    2015?
 9    A.        Oh, yeah.
10    Q.        Who are your customers?
11    A.        Mom.  I have got, oh, gosh -- in 2015.
12    I'm drawing a blank right now.
13    Q.        And Koper has no income, correct?
14    A.        What is that?
15    Q.        Debra Koper has no income?
16    A.        Yeah, she has income, but UPS is paying
17    for her to go to school to get retrained.
18    Q.        Where is her income from?
19    A.        UPS is paying for -- her income besides
20    going to school.  Spending money.
21    Q.        How much?
22    A.        I don't know.  It was -- I'm not privy to
23    that information.
24    Q.        Didn't UPS fire her?
25    A.        They laid her off because they moved
```

**Alpha Reporting Corporation**