# EXHIBIT

# F

Excerpts of Deposition of

John Chu

JOHN CHU Volume 1　　　　　　　　　　　　　　　August 11, 2015
SLEDGE VS. INDICO SYSTEM　　　　　　　　　　　　　　　　　　1

```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TENNESSEE
 2

   MARY PHILLIPA SLEDGE, MARY    )
 3 JANE PIDGEON SLEDGE TRUST,    )
   and PIDGEON SLEDGE FAMILY     )
 4 LIMITED PARTNERSHIP,          )
                                 )
 5           Plaintiffs,         )
                                 )  Civ. 2:13-cv-2578
 6 VS.                           )
                                 )
 7 INDICO SYSTEM RESOURCES,      )
   INC., and CLEAL WATTS, III,   )
 8                               )
             Defendants.         )
 9

10         ------------------------------------

11          ORAL AND VIDEOTAPED DEPOSITION OF

12                      JOHN CHU

13                   AUGUST 11, 2015

14                      VOLUME 1

15         ------------------------------------

16

...

25
                    Arden Bolak, CSR #8987
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        Darrell N. Phillips
          PIETRANGELO COOK
 5        640 Poplar Avenue
          Suite 190
 6        Memphis, Tennessee 38119
          901.685.2662
 7        Dphillips@pcplc.com

 8
     FOR THE DEFENDANTS:
 9
          Richard Townley
10        Ballin, Ballin & Fishman, PC
          200 Jefferson Avenue, Suite 1250
11        Memphis, TN 38103-2357
          Phone: 901-525-6278
12        Toll Free: 800-491-1913
          Fax: 901-525-6294
13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                            INDEX

 2                                                      PAGE

 3   Appearances                                          4

 4   JOHN CHU
            Examination by Mr. Phillips                   4
 5
     Signature and Changes                               78
 6
     Reporter's Certificate                              80
 7

 8
                             EXHIBITS
 9
     NO.    DESCRIPTION                                 PAGE
10
     A      Newspaper Articles                           47
11   B      Court Document                               49

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
                    P R O C E E D I N G S
             THE VIDEOGRAPHER:  We are on the record at 9:02
a.m. on August the 11th, 2015, for the deposition of John Chu,
in the matter of Sledge versus Watts, et all, in case number
2:13-cv-2578 in the United States District Court, Western
District of Tennessee.
             Counsel, please state your appearances and the
court reporter will then administer the oath.
             MR. PHILLIPS:  Good morning.  My name is Darrell
Phillips; I represent the plaintiffs in this matter.  One of
whom is Mary Phillipa Sledge.  She is present by phone for the
purposes of this deposition.
             MR. TOWNLEY:   Richard Townley, T-O-W-N-L-E-Y,
attending via Skype and telephone.  Can y'all hear me?
             MR. PHILLIPS:  Yes.
             THE WITNESS:  Uh-huh.
             MR. TOWNLEY:  I'm representing Indico System and
Cleal Watts.
                         JOHN CHU,
having been first duly sworn, testified as follows:
                        EXAMINATION
   Q.    (BY MR. PHILLIPS)  Good morning, Mr. Chu.  Thank you
for being here.  I know that you're here under subpoena and
I'll try to make this as efficient as possible and to be
mindful of your other obligations today.
```



1  Q.  You used the word "processing," did he talk about
2  refining the gold dust?
3  A.  Yes.
4  Q.  Did he say he was going to do that in Dallas?
5  A.  I believe so.
6  Q.  Did he make my representations to you, to your
7  memory, of where he was going to refine it?
8  A.  It was somewhere in Dallas but never, you know, has a
9  location specific-wise.  Because the, I guess, the buyer of it,
10 that was their processing.
11 Q.  So it was the buyer who was going to refine it?
12 A.  No, actually, he was going to refine it.  But the --
13 he was using the buyer's, I guess, processing facility to
14 facilitate and do all that.
15 Q.  Did Mr. Watts, to your recollection, ever make any
16 representations about himself owning a refinery?
17 A.  No.
18 Q.  Did he ever use the name Millennium Refinery?
19 A.  That's the first time I heard about that.
20 Q.  Okay.  So what happened with your $25,000?
21 A.  Well, I mean, time went on and, you know, had a
22 little of glitches and you know delays and so forth, which is,
23 you know, pretty much the par for the course.
24 Q.  Did you help Mr. Watts finds any other investors?
25 A.  Yes, I brought two other investors.



1　　Q.　And how much did they invest?
2　　A.　I don't know, because that was between them.  And so
3　I'm estimating, I would guess, you know, between 20 to maybe
4　30,000.
5　　Q.　Each?
6　　A.　Perhaps, yes.  Because I don't really know how much
7　they invested each.
8　　Q.　Who were they?
9　　A.　One was Ed Priscow and then the other one was Chris,
10　and I forget his last name.
11　　Q.　Chris?
12　　A.　Yes.
13　　Q.　And how did you meet these guys?
14　　A.　Ed Priscow was one of the clients that I raised money
15　for.  And Chris was the other client that I also raised money
16　for.
17　　Q.　And you don't remember his name?
18　　A.　Not the last name, I can't recall.  But Ed Priscow
19　was one that, you know, we had offices close by.  And, you
20　know, it was an elderly gentleman, nice gentleman, made an
21　impression.  And of course, last name being German and my
22　stepfather was German as well.  So I kind of remember that.
23　　Q.　Okay.  So Chris was the other one?
24　　A.　Yes.
25　　Q.　And so were the three of you the only ones who



1  invested in that tranche of gold?
2      A.   Uh-huh.
3      Q.   Yes?
4      A.   Yes.
5      Q.   And were you kind of a -- a trio with respect to
6  dealing with him, or would you each deal with him individually?
7      A.   Each would -- did the individual.  I did the
8  introduction and then, you know, to each his own.  And then I
9  was just want to clarify, you know, the investors, they have to
10 make their own decision.  Because obviously, if you're at adult
11 age you can make your own decision about whether it's a good
12 investment or not.
13     Q.   So that was in 2006 or 2007?
14     A.   Yes.
15     Q.   And the other two invested during those years, as
16 well?
17     A.   I don't recall if they invested in that same time
18 year or not.
19     Q.   Did they believe -- in your opinion, did they believe
20 that you were responsible for their investments in any way?
21     A.   No.
22     Q.   When they had complaints about the returns that
23 weren't coming in, did they talk to you about that or did they
24 go to Dr. Watts?
25     A.   Well, they actually had Dr. Watts' phone number and



1  so forth.  Initially, you know, they called and say, you know,
2  it's kind of hard to get ahold of him.  And then I guess I
3  recall one time, we scheduled a meeting between all three of
4  us.  We met at Starbucks.  So that way, you know, I want to
5  make sure that they both had a face and a voice and everything
6  together.  So they can meet and say, look, this is not some
7  invisible phantom guy that you gave the money to.  Here he is.
8            So they actually got to meet with him.  And
9  obviously, throughout the years, they have corresponded with
10 him.  And so from the last time, what I gathered was, you know,
11 seems like, you know, they had their own, you know, problems
12 like so do I.  So we all have to address our own issues, you
13 know, with Dr. Watts.
14      Q.   But you put them together?
15      A.   Yes.
16      Q.   You were the connection between them?
17      A.   Yes.
18      Q.   Okay.  And when was the Starbucks meeting?  Do you
19 remember that?
20      A.   I don't recall.
21      Q.   That's okay.  I mean, do you think it was within the
22 last two or three years, or was it longer?
23      A.   It was longer.
24      Q.   And have you spoken with Ed Priscow recently?
25      A.   No.

1  Q.  Do you remember the last time you spoke with him?
2  A.  About three or four years ago.
3  Q.  And what were the circumstances of that call?
4  A.  You know, he called and say, you know, how is
5  everything regarding gold and everything else. And, you know,
6  he's older gentleman so, you know, just was really worried
7  about everything. And, you know, that's when I called Doc to
8  say, Hey, any updates or news regarding that.
9          Chris and I are still young where we can recoup
10 our money. But Ed Priscow he was like 74, 75. He's an elderly
11 gentleman. So I want to make sure that, if anything else, at
12 least try to get some of his, if not, all of his money back.
13 Then, you know, Chris and I can wait, because we're still
14 young.
15 Q.  How did -- when you made those, were they all single
16 investments?
17 A.  Yes.
18 Q.  And how did you get the funds to him?
19 A.  Well I, you know, had his bank accounts. I, you
20 know, mailed some of the money, deposit the funds there or wire
21 transfer, you know.
22 Q.  You said it was one transfer in your case of $25,000?
23 A.  Yes.
24 Q.  So how did you get $25,000 to him?
25 A.  Oh, I -- let me think. It was either met with him.



1  Guess I gave him a cashier's check of 25,000.
2       Q.   You gave him a cashier's check. And is that -- is
3  that the form of -- of currency that he asked for?
4       A.   No. I mean, you know, I could have -- he could
5  have -- I could have done it a different way. And I don't want
6  to just give anybody cash, because that -- you'll never get
7  that -- there's no received record of it.
8       Q.   And do you have any knowledge about how Mr. Priscow
9  or Chris transferred their funds to him?
10      A.   Have no clue.
11      Q.   Okay. That would have done that directly with him?
12      A.   Yes.
13      Q.   Okay. What -- so you were investing in -- in gold
14 dust. What happened with that gold dust? Did you ever see it?
15      A.   No.
16      Q.   Has it come to the United States, to your knowledge?
17      A.   Not that I'm aware of.
18      Q.   Okay.
19      A.   Because I've, you know, heard it went from -- where
20 was that? Sierra Leone, and then went into Amsterdam and then,
21 the last four or five six years or I mean, every year -- it's
22 four or five years, it's been stuck at that location.
23      Q.   So your gold -- your gold is where now?
24      A.   It's in Amsterdam.
25      Q.   Okay.



1  A.    Because apparently there's different sets of gold at
2  different locations, depending on the investors.  So I think Ed
3  ended up having a different one for different location that he
4  invested and so did Chris.  So mine was stuck in Amsterdam.
5      Q.    And where is their gold?
6      A.    That I don't know.  I don't recall.
7      Q.    Has their gold come to the United States?
8      A.    Not that I recall any conversation about their gold
9  come to the United States.
10     Q.    Have you ever received any moneys from Mr. Watts at
11 all?
12     A.    No.
13     Q.    Never?
14     A.    No.
15     Q.    To your knowledge, has Mr. Priscow or Chris received
16 any money from Mr. Watts?
17     A.    No.
18     Q.    Okay.  Do you remember a telephone conversation with
19 me in August of last year?
20     A.    Somewhat.
21     Q.    Do you -- I'm going to read you from my notes.  Do
22 you remember telling me, We did a venture regarding about some
23 gold and so forth, but me and my investors, we all got paid out
24 on that one?
25     A.    Okay.

