IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

    Plaintiffs,

v.     Case No. 2:13-cv-2578-STA-cgc

INDICO SYSTEM RESOURCES, INC. and
CLEAL WATTS, III,

    Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR INJUNCTIVE RELIEF, INCLUDING ASSET FREEZE,
ACCOUNTING AND REPATRIATION OF ASSETS**

Plaintiffs Mary Phillipa Sledge, Mary Jane Pidgeon Sledge Trust, and Pidgeon Sledge Family Limited Partnership ("Plaintiffs") respectfully move this Court for an injunction freezing the assets of Defendants Cleal Watts, III ("Watts") and Indico System Resources, Inc. ("Indico" or "ISR") (together "Defendants"), requiring Defendants to provide an accounting of the current location of Plaintiffs' funds and any other assets of Defendants, and to repatriate and transfer foreign assets and other assets subject to Defendants' control, which could be available to satisfy a judgment entered in favor of Plaintiffs.

**PRELIMINARY STATEMENT**

This action arises out of a fraudulent gold scheme that Defendants perpetrated by misleading Plaintiffs to believe that Defendants had experience bringing valuable gold dust into the United States from Africa and that Plaintiffs were going to reap substantial returns.

Defendant Watts induced Plaintiffs to give him more than $5 million, some of which he pocketed, some of which he invested for his own benefit, and substantial portions of which (approximately $4 million) he wired to a U.S. dollar account held by a foreign bank which may be beyond the jurisdiction of this Court. It would take this litigation for Plaintiffs to discover that years before Plaintiffs invested with Watts, he had already taken hundreds of thousands of dollars from other investors whom he had defrauded in schemes similar to the one he perpetrated on Plaintiffs.

Plaintiffs are seeking preliminary and permanent injunctions to compel Defendants, among other things, to repatriate funds that they have transferred overseas. An *injunction to protect the damages* remedy is an appropriate form of relief where, as here, it is shown that the defendant is likely to be insolvent at the time of judgment, *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir.1995), or when there is evidence that a defendant has or may transfer assets offshore. *Peeler v. British Med. Trust Co.*, 2012 WL 5499423, at *1-2 (W.D.Tenn. 2012) *report and recommendation adopted,* 2012 WL 5498007 (W.D.Tenn. 2012). For the reasons set forth below, such injunctive relief is justified in this cause.

## FACTUAL BACKGROUND

Beginning in November 2011, Defendants induced Plaintiffs to send them $5,293,000 purportedly to pay for gold that Defendants promised to deliver from Africa. Defendants misrepresented their ability and experience in supplying gold and thereby fraudulently convinced Plaintiffs to invest in what turned out to be a scam. Instead of purchasing gold from Ghana as Defendants had told Plaintiffs they would do, Defendants used Plaintiffs' funds for their own

personal and investment purposes and deposited the majority of Plaintiffs' funds in a U.S. dollar account held by a foreign bank which may be beyond the reach of this Court.[1]

### 1. **<u>Defendants were insolvent prior to Plaintiffs' Investments</u>.**

During his deposition, Watts revealed to Plaintiffs for the first time that he had no regular source of income, that prior to meeting Plaintiffs he had never earned more than $25,000 a year in his life, and that he has never owned a home or significant personal property other than a pick-up truck given to him by his mother.  Further, Watts has never received a W-2 or held a full-time job, and does not have a personal bank account.  Also, immediately prior to the Plaintiffs' investments, Defendant Indico had less than $300 in its bank account. [*Facts, ¶¶ 5, 23-24*].  The Defendants' true financial condition was not known by the Plaintiffs at the time of the investments, and was contrary to Watts' representations to Plaintiffs that Defendants were experienced gold importers and that they were "ready and able to supply" more than $5 million in gold dust from Africa.

### 2. **<u>Defendants' dissipated and transferred Plaintiffs' funds to foreign account</u>.**

Beginning in December 2011 and through 2012, Defendants frequently sent statements to Plaintiffs purportedly showing the Plaintiffs' gold purchases. [*Facts, ¶¶ 38, 45*].  In reality, however, Defendants' domestic bank records show that Watts was using Plaintiffs' funds to pay his own personal expenses, to invest $1 million in U.S. based investment accounts owned by Defendants, and to pay certain U.S. based individuals; none of these had anything to do with purchasing gold from Ghana.  [*Facts, ¶¶ 38-41*].

---

[1] For a more detailed description of the facts and law applicable to this case and for a description of Plaintiffs' claims against the Defendants, Plaintiffs rely on the facts and law set forth in their Motion for Summary Judgment (ECF No. 138) and in their accompanying Statement of Undisputed Material Facts ("*Facts*") (ECF No. 138-2) and Memorandum of Law (ECF No. 138-1).

Further, from December 2011 through December 2012, Defendants deposited the majority of Plaintiffs' funds (over $4 million) into a U.S. Dollar correspondent bank account held by a foreign bank (herein the "Foreign Account"). [*Facts, ¶ 41*]. Correspondent accounts like the Foreign Account used by Defendants are often vehicles for money laundering and have been described as follows:

> Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions. Given the international importance of U.S. currency and the U.S. market, many foreign banks have such interbank accounts in the United States. There are banks that conduct virtually all transactions external to the bank through their U.S. interbank accounts.
>
> **Because interbank accounts can be used to complete transactions in the United States without the need to directly establish an account in the United States, they can be vehicles for money laundering**, with or without the complicity of the foreign bank. Before the 2001 enactment of section 981(k) [amendment to the Patriot Act], it was difficult for the U.S. government to seek the forfeiture of laundered funds in the interbank accounts of foreign banks. This was because the bank, like any other account holder, was considered the owner of the funds in its interbank account, and hence the bank was entitled to assert an innocent owner defense to an attempted forfeiture. In most cases, the bank was not criminally complicit in the underlying wrongdoing, and thus most such forfeitures would fail.

*United States v. Union Bank For Sav. & Inv. (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007) (citations omitted) (emphasis added).

The U.S. Dollar correspondent bank account wherein Plaintiffs' funds were deposited was located at CommerzBank, Account Number 400/8842023/00 USD.[2] CommerzBank is a German bank with a branch located in New York.[3] The correspondent bank account is held by Guaranty Trust Bank (SL) Ltd, which is the Sierra Leone branch of the Nigerian bank, Guaranty

---

[2] *See* Email from Watts, dated December 9, 2011, and attachment thereto, attached as Exhibit 1 hereto; *See also Facts ¶ 41* and supporting documentation.

[3] *See* website located at https://www.commerzbank.us/portal/en/cb/us/firmenkunden/usa.html a copy of which is attached as Exhibit 2 hereto.

Trust ("GT Bank").[4] The name on the GT Bank account is "Sheku Kondeh", and the internal GT Bank account number is 2041195210.[5]

### 3. Defendants control the Foreign Account.

Even though the Foreign Account has the name "Sheku Kondeh" associated with it, there is considerable evidence that Defendants control the account. For example, in August 2012, Watts revealed in a letter to Bank of America that Defendants control the account and are using the funds for multiple business purposes, which do not include purchasing gold for the Plaintiffs. The letter was written in response to a bank inquiry concerning the large transfers by Watts into the Foreign Account. Watts' letter states that the funds transferred were to be used for various business activities of the Defendants, but conspicuously omits any reference to gold. Watts provided the following explanation:

> ISR was started in Feb. 1996 as a high tech company, we are partners with; Micro Soft, Intel, AMD, NVidias, IBM and many other companies…We have been consulting on and off for 30 years in West Africa and in the proses [sic] of opening operations in Sierra Leone for the last 5 years. Our offices our [sic] just about ready to move in. **this is what has been causing us to have frequent wires back and forth. Things like, "Oh, you want electricity in your office all the time, you need a generator station then". Things do not move forward as fast in third world countries. Costs are more for some things and I will say much less for others.** When to get what from where is how prudent business pays off in the long run.
>
> Timing is working out about right over there. ISR is the lead company because technology is fastest on line…November they will turn on our fiber optic, this is as fast as our server farms here in the U.S. ISR's offices will have been up and running by then with computers sales from the Dallas, TX office.
>
> They also need infrastructure bad, this is where our construction company and manufacturing heavy earth moving equipment comes in. The contracts already look to be worth the effort we have made.

---

[4] *See* Exhibit 1 hereto and website located at http://www.gtb.sl/home/about-us/ a copy of which is attached as Exhibit 3 hereto.
[5] *See* Exhibit 1 hereto; *See also Facts ¶ 41* and supporting documentation.

[*Facts, ¶ 42*].

Watts' August 2012 letter also referred to the Foreign Account as belonging to Defendant Indico, even though the account was titled for "security reasons" in the name of Sheku Kondeh, one of Indico's managers.

> Since I have not had the time in Freetown were [sic] our offices are being finished, I was in surrounding countries the last few trips, **our Corporate US Dollar Account for ISR**, is titled as our managers name, Sheku Kondeh for security reasons. He is the signatory. Only he with his passport can access the account there without me. **This will change next trip and accounts will be titled In ISR's name with appropriate security measures setup there in Freetown. So we can wire to same name accounts.**

[*Facts, ¶ 43*] (emphasis added).

Thus, according to Watts' own statements, the Foreign Account belongs to Defendant Indico, he can access the Foreign Account and he has the authority to change the title of the account to Indico's name. Indeed, in the letter to Bank of America, Watts refers to the Foreign Account as "our corporate U.S. Dollar account for ISR."[6]

There is further evidence that Defendants control the Foreign Account. According to Defendants' bank records, on February 19, 2013, Watts arranged to have monies *sent back* from the Foreign Account to Indico's account at Bank of America.[7] Additionally, during his deposition Watts testified that there were no funds currently in the Foreign Account.[8] When asked how he knew that, Watts testified that he knew the balance because of conversations he had had with a GT Bank representative officer named Desmond.[9] Additionally, Plaintiffs have

---

[6] *See Facts, ¶ 43* and supporting documentation. A copy of the letter is also attached as part of Exhibit 4 hereto.
[7] *See* Bank of America Statement Feb. 2013 (BOA 000258), obtained from subpoena to Bank of America, a copy of which is attached as Exhibit 4.
[8] *See* Transcript of Deposition of Cleal Watts, III ("Watts Depo"), excerpts of which are attached as Exhibit 5, p. 163.
[9] *See* Watts Depo, Exhibit 5, p. 166.

6

obtained copies of emails that Watts sent to a representative of GT Bank named Andrew Sesay regarding funds that he was sending to the Foreign Account.[10]

Finally, in the letter to Bank of America and in the course of this litigation, Watts has referred to Sheku Kondeh, the individual named on the account, as his "manager" indicating Defendants control Kondeh.[11]

    **4.**    **Spoliation and refusal to provide records for Foreign Account.**

In the course of discovery, Plaintiffs' efforts to obtain additional information regarding the Foreign Account have been thwarted by Defendants' spoliation of their computer and by Defendants' evasive answers to discovery requests regarding the Foreign Account.

    (a)    Spoliation of Computer

In February 2015, <u>a year and a half after the commencement of this litigation</u> (and long after Defendants' duty to preserve evidence arose), Plaintiffs submitted discovery requests to Defendants regarding their computers, including a request to produce the computers for inspection. The requests and Defendants' responses are as follows:

> *INTERROGATORY NO. 18*. Identify all computers used by you between January 1, 2010 and July 1, 2014 and for each, identify the current location and condition/status.
>
> RESPONSE. During this time period, Defendant Watts used one computer. This computer is in Dallas and its hard drive crashed.[12]

---

> *REQUEST [FOR PRODUCTION] NO. 12*. Produce for inspection all computers used by you during the period of January 1, 2011 through July 1, 2014.

---

[10] *See* Emails from Watts to Sesay dated 3/27/2012 and 8/2/2012, obtained from subpoena to Rackspace, copies of which are attached as <u>Exhibit 6</u>.

[11] *See Facts, ¶ 43.*

[12] This interrogatory was included in the discovery requests propounded upon Defendants on February 10, 2015, to which Defendants responded on March 27, 2015. A copy of the interrogatory and the response is included a part of <u>Exhibit 7</u> hereto.

7

>RESPONSE.  Defendant Watts had some backed up and captured files on thumb drives, most of which came by email, and all of which he found and put into the dropbox provided to Plaintiffs.[13]

Thus, according to these responses Defendants' computer was in Dallas and the hard drive had crashed, but the Defendants had salvaged some files which were produced to Plaintiffs. At the time of these responses, Defendants presumably still had custody of the relevant computer/s.

However, rather than preserving and producing the computer to Plaintiffs for inspection as requested, Watts testified during his deposition in August 2015 (five months later) that he *simply gave the computer away* and no longer has it.  Watts explained the fate of the computer as follows:

>A. [Watts] The whole thing had crashed. I mean, if you want me, I will explain what all went wrong with it, but the power shorting out, the battery went. I had to get a new power supply, new batteries, and the power part of the circuit board got to where it was shorting out and eventually like the screen went, everything went. It was just useless.
>
>Q. ISR is a, as you call it, a high tech company; is that correct?
>
>A. Yes.
>
>Q. Did you have any backup?
>
>A. No. ….
>
>Q. Where is the computer now?
>
>A. Probably thrown away. I dropped it off at the just threw it away to Goodwill because there wasn't anything there. Somebody could get it and maybe use the memory, the CPU or something like that, but everything else was shot on it.  The battery wasn't any good. The screen had gone out. The motherboards were out. Just -- it was shot. There wasn't anything to it.
>
>Q. So it's your testimony that you brought it to Goodwill?

---

[13] This request was included in the discovery requests propounded upon Defendants on February 10, 2015, to which Defendants responded on September 10, 2015.  A copy of the request and the response is included as a part of Exhibit 8 hereto.

> A. Yeah, or thrift shop or something like that, yeah, just left it there. Somebody there could -- the memory is old stuff. The CPU is old stuff. Everything else was -- maybe they could use a screen. I mean, the hinges were broke on it. It was shot, but it was -- I was busy. I get busy and you just keep doing things, and I kept nursing it, and I get it back up and going like, okay, well, I will do it later.[14]

Watts had a duty to preserve the computer and knew in February 2015, that Plaintiffs sought to inspect it. As a result of Watts giving the computer away however, any information regarding the Foreign Account which may have been on the computer is not recoverable.

        (b)      <u>Refusal to provide information regarding the Foreign Account</u>.

In discovery, Plaintiffs asked Defendants to "[i]dentify all bank accounts, brokerage or trading accounts owned by you, or owned by any entity in which you have an interest, whether held inside or outside the United States, since 2011 and for each, provide the account number." Defendants responded:

> Defendant Watts does not have any bank, brokerage, or trading accounts. Defendant ISR has had bank accounts with Chase (2064030419), Bank of America (4880 3913 1096), and BBVA Compass (6714288707). Defendant ISR has had a brokerage account with Rosenthal Collins, LLC and Stifel Nicolaus since 2011.[15]

Although sworn, this Interrogatory response was not truthful (Defendant Watts had two accounts with Chase that were not disclosed). Further, as noted above, in his correspondence with Bank of America, Watts referred to the Foreign Account as "**our Corporate US Dollar Account for ISR**", but did not include it among the accounts listed in response to the above interrogatory. Additionally, Plaintiffs requested that Defendants "[p]roduce copies of all bank statements reflecting the transfer of funds from Plaintiffs to you (individually or on behalf of Indico System Resources, Inc.) <u>and from you to third-parties</u>." Plaintiffs also asked Defendants

---

[14] *See* Watts Depo at 193-195, attached as part of <u>Exhibit 5</u> hereto.
[15] This request was Interrogatory No. 3, and was included in the discovery requests propounded upon Defendants on February 10, 2015, to which Defendants responded on March 27, 2015. *See* <u>Exhibit 7</u> hereto.

to "[p]roduce copies of monthly bank statements for each account held by you or Defendant Indico System Resources, Inc. between January 2007 and January 2015 at . . . [a]ny foreign financial institution." Plaintiffs asked Defendants to "[p]roduce all Documents which reflect the current location of Plaintiffs' funds transferred to you."

Despite the foregoing requests, Defendants did not produce a single document relating to the Foreign Account. Plaintiffs then filed a Motion to Compel (ECF No. 110), which the Court granted by Order dated November 2, 2015 (ECF No. 126). Among other things, the Order required the Defendants within sixty (60) days to produce "[a]ny information related to the advent, management or control of the Guaranty Trust Bank (SL) account [to which Defendants have wired Plaintiffs' money] and any documents related thereto, and if no information is available, a sworn statement to that effect." As of the time of the filing of this Motion, Defendants <u>have not complied</u> with this Court's November 2, 2015 Order.

## **LEGAL ARGUMENT**

Plaintiffs are seeking a mandatory injunction from this Court requiring Defendants and their agents to repatriate assets sent overseas and to transfer all assets held by or under the control of either Defendant to the Clerk of this Court, and to provide an accounting regarding all assets held by or under the control of either Defendant. Plaintiffs are also seeking a prohibitory injunction, prohibiting Defendants and their agents from further dissipation of assets.

As with prohibitory injunctions, whether mandatory injunctive relief "is granted or refused [is left to] the exercise of a sound judicial discretion." *Moor v. Texas & N.O. Ry. Co.* 297 U.S. 101, 105 (1936); *See also Johnson v. Interstate Power Co.,* 187 F.Supp. 36, 39 (D.S.D.1960)("a federal district court, in exercising its general equity jurisdiction, has an inherent power to grant mandatory injunctions."). The standard for a mandatory injunction is the

same as it is for a prohibitive injunction. *PACCAR, Inc. v. TeleScan Techs., LLC,* 319 F.3d 243, 249 n. 4 (6th Cir. 2003).

Plaintiffs are seeking preliminary injunctions, prior to the entry of a final judgment, as well as permanent injunctions to be part of the final judgment in this cause.[16] Sometimes, the objective of a preliminary injunction is to preserve the *status quo* until the district court can hold a trial on the merits. *United States v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir. 2004). However, preserving the *status quo* is not always the purpose. The primary purpose is to prevent irreparable harm, as the Sixth Circuit explained in *Stenberg v. Cheker Oil Co.,* 573 F.2d 921 (6th Cir.1978):

> It must not be thought, however, that there is any particular magic in the phrase "status quo." The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. If [sic] often happens that this purpose is furthered by preservation of the status quo, *but not always.* If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.

*Id.,* at 925 (emphasis added) (citations omitted).

In determining whether a party is entitled to a preliminary injunction, the Court must consider the following four factors: (1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction will cause substantial harm to others if issued; and (4) whether the public interest is served by issuance of the injunction. *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884 (6th Cir.2000). "These factors are not

---

[16] Fed. R. Civ. P. 65(a) authorizes this Court to issue a preliminary injunction prior to final judgment. Such an injunction may bind parties, the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with any of the foregoing. Fed.R.Civ.P. Rule 65(d).

prerequisites, but are factors that are to be balanced against each other." *Edward Rose,* 384 F.3d at 261. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Craig v. Ezpawn Tennessee, Inc.*, 2010 WL 2521367, at *2 (W.D. Tenn. 2010) (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12 (1987)).

      1.      **Plaintiffs have demonstrated a substantial likelihood of success on the merits.**

As detailed in Plaintiffs' Memorandum in support of their Motion for Summary Judgment (ECF No. 138-1), Plaintiffs have demonstrated a substantial likelihood of success on the merits of their fraud-based and other claims asserted against Defendants. In November 2011, Defendants represented that they were experienced gold importers and that Defendants were "ready and able" to supply Plaintiffs with more than $5 million of gold from Africa, which was 91% pure and had a built-in 30% net profit. [*Facts, ¶ 20*]. In reliance on these representations, Plaintiffs sent more than $5 million to Defendants which Defendants ostensibly were to use for the purchase of gold from Africa. Now, more than four (4) years after these representations were made, no gold has been delivered and Plaintiffs have not received any of their money back. [*Facts, ¶ 6, 25, 28, 32, 37*].

Although Plaintiffs did not know it, at the time that Watts represented that he was an experienced gold importer, and that Defendants were "ready and able to supply" Plaintiffs with more than $5 million of 91% pure gold from Ghana, Watts, according to his own deposition testimony, had never successfully delivered gold for anyone else. In fact, Watts had been soliciting other investors (at least ten that Plaintiffs have discovered) for similar investment opportunities – and taking their money - for five years prior to Plaintiffs' investments, but he had never successfully imported gold or produced a return for those investors. [*Facts, ¶¶ 15-19*].

Courts have found fraud where, as here, a defendant misrepresents his ability to provide a service or product knowing that he has failed to deliver in the past. For example, in *Gizzi v. Marinov*, the Sixth Circuit analyzed similar allegations of fraud in light of a defendant's historic conduct. In that case, the defendant had misrepresented to the plaintiffs that he had a "perfected process" to produce high quality gem stones out of small less valuable sapphires. The Court affirmed the district court's finding that this was fraudulent because although the defendant was *trying* to perfect a process to make natural looking stones out of small sapphires, he had never *actually* perfected it. This finding was based on the clear facts that the defendant had attempted a similar scheme with investors in Virginia and that investment was also unsuccessful. Therefore, the district court concluded that the defendant knew that his representation regarding his "perfected process" was false when he made it, and the Sixth Circuit agreed. *Gizzi v. Marinov*, 79 F.3d 1148 (6th Cir. 1996) (unpublished opinion).

Similarly in this case, for five years preceding the representations to Plaintiffs, Defendants had consistently failed to deliver on their promises to supply African gold to investors. Thus, at the time Defendants solicited money from Plaintiffs for gold purchases, Defendants were in fact not "ready and able" to supply the gold as Watts had represented. To the contrary, Defendants had repeatedly failed to consummate any of the ostensible gold "investment" opportunities they had offered to others. Watts' scheme was fraudulent because he *knew* he could not import such a large quantity of gold or, at least, acted with a reckless disregard as to whether he would be able to supply the gold that he told Plaintiffs he was "ready and able to supply". [*Facts, ¶ 20*].

For these reasons and for those set forth in the Plaintiffs' Memorandum in support of their Motion for Summary Judgment, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims.

### 2. **Plaintiffs will suffer irreparable harm if the injunction is not issued**.

Plaintiffs will suffer irreparable harm if the injunction is not issued. "An injury is irreparable if it cannot be undone through monetary remedies." *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382 (6th Cir.1995) (citations omitted).[17] "As a general rule, a movant has not established irreparable harm where damages would adequately compensate the movant for the asserted harm." *Id*. However, an *injunction to protect the damages* remedy is an appropriate form of relief where, as here, it is shown that the defendant is likely to be insolvent at the time of judgment. *Id*.[18] Injunctions may also be warranted where there is evidence that a defendant has or may transfer assets offshore and therefore prevent a plaintiff from reaching the assets to satisfy a judgment. *Peeler v. British Med. Trust Co.*, 2012 WL 5499423, at *1-2 (W.D. Tenn. 2012) *report and recommendation adopted,* 2012 WL 5498007 (W.D. Tenn. 2012); *See also Bulgari, S.p.A. v. Partnerships & Unincorporated*

---

[17] It is worth noting that proving irreparable harm is not an absolute prerequisite to obtaining a preliminary injunction because a court *balances* four factors in assessing whether it should issue a preliminary injunction, and that the degree of proof necessary for each factor depends on the strength of the plaintiff's case on the other factors. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996).

[18] Several other circuit courts have also recognized the propriety of injunctive relief in such circumstances. *See Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986) (affirming district court's order enjoining defendant from distributing its assets in the process of liquidation where there was no assurance that there would be sufficient assets to satisfy a judgment; *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984) (the requirement that a plaintiff seeking a preliminary injunction show that an award of damages will be inadequate does not require a showing that damages will be wholly ineffectual, it is sufficient if damages will for some reason be seriously deficient as a remedy for the harm suffered, for example, because the defendant may become insolvent before a final judgment can be entered and collected); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir.1980) (even where plaintiff's remedy is limited to damages an injunction may issue to protect that remedy); *Foltz v. U.S. News & World Report,* 760 F.2d 1300, 1309 (D.C.Cir.1985) (a preliminary injunction enjoining distribution of cash from an employee profit-sharing plan, designed to freeze the status quo prior to a determination of liability and the extent of any damages, is not improper).

*Associations Identified On Schedule "A,"*, 2014 WL 3749132, at *7 (N.D. Ill. 2014) *report and recommendation adopted sub nom.* 2014 WL 3765854 (N.D. Ill. 2014) (granting preliminary injunction freezing defendants' U.S.-based financial accounts where there was the possibility that Defendants would move assets to an offshore account); *New York Land Co. v. Republic of Philippines*, 634 F. Supp. 279, 288 (S.D.N.Y.) *aff'd sub nom. Republic of Philippines v. Marcos*, 806 F.2d 344 (2nd Cir. 1986) (finding "strong showing of irreparable harm" where assets could be transferred overseas and beyond plaintiff's reach).

In situations involving offshore accounts, a district court has the authority to "freeze" a defendant's assets and/or to order the defendant to repatriate funds to the United States so that they will be within the court's jurisdiction. *See Kremen v. Cohen*, 2000 WL 1843239, at *1 (N.D. Cal. 2000) (granting preliminary injunction requiring defendant to repatriate $25 million from offshore accounts); *See also FTC v. Affordable Media,* 179 F.3d 1228, 1239 (9th Cir.1999) (affirming a finding of civil contempt against defendants for refusing to repatriate funds after the court in a temporary restraining order and preliminary injunction ordered the defendants to "transfer to the territory of the United States all funds, documents and assets in foreign countries held either: (1) by them; (2) for their benefit; or (3) under their direct or indirect control, jointly or singly."); *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 346 (9th Cir.1989) (affirming an injunction ordering a defendant to transfer foreign funds to an institution within the district of Nevada); *FTC v. SlimAmerica, Inc.,* 77 F.Supp.2d 1263, 1275–77 (S.D.Fla.1999) (ordering the repatriation of funds from a Bahamian bank account).[19]

---

[19] *See also S.E.C. v. Infinity Grp. Co.*, 27 F.Supp.2nd 559, 561 (E.D.Pa. 1998) (describing the "full panoply of equitable remedies" which may be awarded by a district court as including disgorgement, asset freezes, receivers, repatriation, constructive trusts, and restitution).

15

In the present case, there is evidence that the Defendants have few if any assets in the United States. [*Facts, ¶¶ 5, 23-24*].[20] Further, they have transferred the majority of Plaintiffs' funds to the Foreign Account which they directly or indirectly control. In the absence of injunctive relief, there may not be any funds available to satisfy Plaintiffs' judgment (estimated to be over $22 million, with trebled damages and prejudgment interest) against the Defendants and thus Plaintiffs will suffer irreparable harm. Therefore, under the aforementioned authority, it is appropriate for this Court to issue a preliminary injunction prohibiting Defendants from transferring any U.S.-based assets and requiring Defendants to re-patriate all foreign assets held (1) by them; (2) for their benefit; and/or (3) under their direct or indirect control, jointly or singly. Such assets should be paid to the clerk of this Court and held pending the resolution of these proceedings in order to avoid further dissipation by the Defendants.

### 3. Issuance of the injunction will not cause substantial harm to others.

The issuance of the requested injunctions will not cause substantial harm to others. This factor requires the Court to determine whether the harm that would be suffered by the plaintiffs if the Court did not grant the injunction outweighs the harm that would be suffered by the defendants or others if the injunction is granted. *See Aluminum Workers Int'l Union v. Consol. Aluminum Corp.,* 696 F.2d 437, 444 (6th Cir.1982).

Of course, the Defendants will not suffer substantial harm because they have wrongfully converted Plaintiffs' funds. Moreover, the person who is named on the Foreign Account, "Sheku Kondeh" (if there is such a person), will also not be harmed because the evidence shows that he works for the Defendants and may have likely participated in the fraudulent scheme. Further, the

---

[20] According to Defendants' most recent bank records, attached as Exhibit 9 hereto, the balance in their Bank of America Account was $32.46 as of September 30, 2015 [WATTS_NOVEMBER2015_BOA_ 0170], the balance in their Chase Account was $100.60 as of June 29, 2012 [CHASE000464], and the balance in their BBVA Compass Account was $1,922.93 as of January 31, 2015 [BBVACOMPAS000078].

16

injunction sought by Plaintiffs would not preclude "Mr. Kondeh" from asserting any competing rights in and to the funds.

### 4. The public interest is served by issuance of the injunction.

The public interest is served by issuance of the injunction requested by Plaintiffs. The public interest is served where, as here, defendants are prohibited from dissipating or concealing assets fraudulently obtained. *Clayton v. Heartland Res., Inc.*, 2009 WL 57140, at *6 (W.D.Ky. 2009) *amended sub nom. Clayton, Jr. v. Heartland Res., Inc.*, 2009 WL 790175 (W.D.Ky. 2009); *See also S.E.C. v. Asset Recovery & Mgmt. Trust, S.A.,* 340 F.Supp.2d 1305, 1311 (M.D.Ala. 2004) (recognizing that it is in the public interest "to protect against fraud and to make victims of fraud whole").

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, this Court should grant Plaintiffs' requests for preliminary and permanent injunctive relief and enter an Order:

(1) defining the term "assets" for purposes of the injunction Order to include all real and personal property of any Defendant, or held for the benefit of any Defendant, including, but not limited to "goods," "instruments," "equipment," "fixtures," "general intangibles," "inventory," "checks," or "notes" (as these terms are defined in the Uniform Commercial Code), and all cash, wherever located.

(2) restraining and prohibiting Defendants and their agents from dissipating or otherwise transferring (except as otherwise provided in the injunction Order) any assets held (a) by a Defendant; (b) for the benefit of a Defendant; and/or (c) under a Defendant's direct or indirect control, jointly or singly;

(3) requiring Defendants within ten (10) days following service of the injunction Order to provide Plaintiffs and the Court a full accounting along with supporting documentation verified under oath of all assets held (a) by a Defendant; (b) for the benefit of a Defendant; and/or (c) under a Defendant's direct or indirect control, jointly or singly;

(4) requiring Defendants within ten (10) days following service of the injunction Order to take all steps reasonably necessary as requested by Plaintiffs to obtain all available bank statements and other documentation relating to the Foreign Account and any other accounts held (a) by a Defendant; (b) for the benefit of a Defendant; and/or (c) under a Defendant's direct or indirect control, jointly or singly, with such steps to include without limitation Defendants' submitting appropriate written documentation to GT Bank and any other financial institution necessary to obtain such information for the benefit of Plaintiffs;

(5) requiring Defendants within ten (10) days following service of the injunction Order to take all steps reasonably necessary as requested by Plaintiffs to transfer and deposit with the Clerk of this Court all assets inside or outside the United States held, (a) by a Defendant; (b) for the benefit of a Defendant; and/or (c) under a Defendant's direct or indirect control, jointly or singly, with such steps to include without limitation Defendants' submitting appropriate written instructions to GT Bank and any other financial institution, person or entity holding any such assets, directing them to effect such transfers;

(6) requiring Defendants within ten (10) days following service of the injunction Order to provide Plaintiffs with all written agreements, and descriptions of all oral agreements, by and between any Defendant and Sheku Kondeh and any other person or entity holding funds or other assets for the benefit of a Defendant; and/or under a Defendant's direct or indirect control, jointly or singly;

(7) enjoining and prohibiting Defendants, their successors and assigns, and their officers, agents, servants, employees, affiliates, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction Order by personal service or otherwise, from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of any foreign or domestic assets held, (a) by a Defendant; (b) for the benefit of a Defendant; and/or (c) under a Defendant's direct or indirect control, jointly or singly, or in the hindrance of the repatriation and transfer required by Paragraph (4) above;

(8) requiring that any financial institution, or other entity or person served with a copy of the injunction Order to hold and retain, except as specifically provided in the injunction Order, any and all assets within such financial institution's, other entity's or person's control, and to prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of any assets held by or under such financial institution's, other entity's or person's control: (a) on behalf of, or for the benefit or use of, any Defendant; (b) in any account maintained in the name of, or subject to withdrawal by, any Defendant; or (c) that are subject to access or use by, or under the signatory power of, any Defendant; and

(9) providing to Plaintiff such other and further relief as is just.

Respectfully Submitted,

/s/ Darrell N. Phillips
PIETRANGELO COOK PLC
Anthony C. Pietrangelo BPR # 15596
John J. Cook BPR # 17725
Darrell N. Phillips BPR #30299
6410 Poplar Avenue, Suite 190
Memphis, TN 38119
901.685.2662

19

>901.685.6122 (fax)
>*dphillips@pcplc.com*
>**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of January 2015, a copy of the foregoing electronically submitted document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

| | |
|---|---|
| Cleal Watts, III | Indico Systems Resources, Inc. |
| 8926 Forest Hills Blvd. | 8926 Forest Hills Blvd. |
| Dallas, TX 75218 | Dallas, TX 75218 |

>/s/ Darrell N. Phillips

## CERTIFICATE OF CONSULTATION

The undersigned hereby certifies that on Friday, January 22, 2016, prior to filing this motion, he attempted to consult with Cleal Watts, the individual named Defendant and the authorized agent for the corporate Defendant and that Watts was completely unresponsive.

>/s/ Darrell N. Phillips