# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

MARY PHILLIPA SLEDGE,
MARY JANE PIDGEON SLEDGE TRUST,
and PIDGEON SLEDGE FAMILY LIMITED PARTNERSHIP,
Plaintiffs,

v.

Case No. 2:13-cv-2578-STA-cgc
INDICO SYSTEM RESOURCES, INC.
and CLEAL WATTS, III,
Defendants.

---

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Mary Phillipa Sledge, Mary Jane Pidgeon Sledge Trust, and Pidgeon Sledge Family Limited Partnership ("Plaintiffs"), by and through counsel, hereby file this Statement of Undisputed Material Facts, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, in support of its Motion for Summary Judgment against Indico System Resources, Inc. and Cleal Watts III ("Defendants").

1.      At all relevant times, Defendant Cleal Watts ("Watts") was an employee, agent, or servant of Defendant Indico System Resources, Inc. ("Indico") and was acting both in his individual capacity as well as in his capacity as sole shareholder, president, an employee and/or agent of Indico. Affidavit of Cleal Watts, ("Watts Affidavit"), dated November 22, 2013 (ECF No. 11-2), Exhibit A, ¶¶ 3, 4, 14, 29; Declaration of Phillipa Sledge ("Sledge Decl"), Exhibit B, ¶ 3; Deposition of Cleal Watts, ("Watts Depo"), Exhibit C hereto, p. 66:10-11.

## Watts' representations regarding Defendants' ability to supply gold to Plaintiffs

2.      In November 2011, Watts proposed an investment opportunity to Plaintiffs whereby

Plaintiffs would purchase unrefined gold dust from Ghana. In November and December 2011,

and at various times in 2012, Watts represented to Plaintiffs that Defendants were "ready and

able" to supply Plaintiffs with over $5 million worth of unrefined gold dust. These and other

representations were made orally and were also contained in documents called "Soft Corporate

Offers" emailed by Watts to Plaintiffs. Watts Depo, Ex. C hereto, pp. 110-118; Sledge Decl, Ex.

B, ¶¶ 7, 8.

**Deny:**  Gold was never from Ghana. Certificates of Origination show Guinea and Sierra Loene
as the countries of origin. See emails surrendered to Plaintiff.

3. Watts represented that the millions of dollars' worth of gold dust to be supplied was more than

91% pure, and had a built in net profit (ROI) of 30 to 45%. See Sledge Decl, Ex. B, ¶¶7-9. Also

at the time, Watts represented to Plaintiffs that he was an experienced gold importer. Watts

Depo, Ex. C, p.113:17-22; Sledge Decl, Ex. B, ¶10.

**Deny:**  An example is given in the "Soft Corporate Offer" that shows profits (ROI) of 30 to 45%
can be achieved if able to fully pay all monies required to comply with agreements, and bring
gold dust to the US for refining and final sale. According to agreements made by Plaintiff, a
deficit of $2,000,000 kept the gold from shipping to the US. As of last inquiry the contracted
gold remains in Ghana pending payment of taxes and demurrages, and shipping arrangements.
All records are held by the Ghanian attorney handling litigation of third party for embezzlement
and attempted theft. See Plaintiff's emails received directly from alleged Acting Ambassador
Patrick Koroma.

4. Watts represented that the gold purchased by the Plaintiffs was ready for pick up and would be delivered into the United States as early as the end of December 2011. Sledge Decl, Ex. B, ¶11.

5. Watts did not tell Plaintiffs that at the time of these solicitations, he had fewer than $300 in Defendant Indico's bank account. Watts Depo, Ex. C, p. 111-112; Sledge Decl, Ex. B, ¶13.

**Deny:** During the course of hundreds of phone conversations lasting for hours at a time, no detail was withheld from Plaintiff. Daily accounting was shared with Plaintiff, including amounts, transactions and movements of Indico assets invested in transactions at hand.

6. Plaintiffs were introduced to Watts by a longtime friend who had given Plaintiffs good investment advice in the past. This friend vouched for Watts and told Plaintiffs that Watts came from a prominent, well-respected Texas family. Sledge Decl, Ex. B, ¶¶ 5, 6. Plaintiffs had several calls with Watts before making their initial investments. Id., ¶¶ 6, 14. In reliance on Watts' representations, Plaintiffs wired millions of dollars to the Defendants' bank accounts Case 2:13-cv-02578-STA-cgc Document 138-2 Filed 01/08/16 Page 2 of 14 PageID 1142 expecting that the funds would be used to purchase the gold that Watts had described. Id., ¶15. To date, after more than 4 years, no gold has been delivered. Id., ¶¶ 26, 66.

**Deny:** As stated in "Soft Corporate Offer" and innumerable calls discussing the process and procedures, funds were not to be placed for an outright purchase of gold dust in Africa, but to facilitate the permitting, payment of taxes, exporting and importing, insurance, shipping, and whatever else might be required to import the dust and refine it to marketable gold bullion. See *Soft Corporate Offer*. Whatever costs that might be required must be covered by the contract holder (Plaintiff), per *Soft Corporate Offer*. The contract holder's obligation is not complete until the dust has been imported and refined to gold bullion. It is at that point only that the gold is fully purchased or sold to the contract holder's benefit. See *Soft Corporate Offer*.

7. At the time of Plaintiffs' investments, Plaintiffs' funds were combined with those of other investors. Watts Depo, Ex.C, p. 304:1-12; Sledge Decl, Ex. B., ¶16.

**Deny:** Plaintiff was fully briefed on multiple occasions in continuous conversations concerning how Plaintiff's funds were to be released to the owners of the gold (tribal chieftains) as a Good Faith retainer that the contract holder and buyer would pay all costs as contracted. As for Good Faith on part of gold owners, they put up 100% of their assets, not part, as did the Plaintiff. The gold owners allowed their received retainer to be held with Indico System Resources to manage until called for, according to agreed terms, until released as needed to facilitate transfer of the gold all the way through to refining and sale. It was anticipated that a 20% retainer would cover all costs, unless an unforeseen event trigged a Force Majeure. See *bank deposits and wires* indicating total amount deposited by Plaintiff fell short of that agreed 20% retainer by approximately $2,000,000.

### Defendants' History of Failing to Deliver Gold Promised to Investors

8. Although Plaintiffs did not know it, as of the time that Watts represented that he was an experienced gold importer, and that Defendants were "ready and able" to supply Plaintiffs with over $5 million of 91% pure gold from Ghana, in point of fact Watts, according to his own testimony, had never successfully delivered gold or returns on gold investments for anyone else. Watts Depo, Ex. C, pp. 94-97; Sledge Decl, Ex. B., ¶¶ 17-18.

**Deny:** Prior delivery of gold was evident when the plaintiffs' attorneys asked about the Millennium Refinery (*during* Watts deposition), which refined gold and wired money to Indico System Resources bank account. See *Watts Depo* and *Bank Records* and *Emails.* The larger shipments were either delivered offshore privately and cannot be evidenced, or held in Europe by the Dutch government until taxes and demurrages can be paid, and arrangements for shipping made. Defendant did not explain details during the deposition, because he was not specifically asked.

9. At the time of these representations, Watts knew that Defendants were not "ready and able to supply" $5 million worth of gold to Plaintiffs, or at least acted with a reckless disregard as to the truth of these representations. Watts had been soliciting other investors for 5 years prior to Plaintiffs' investments, but he had never successfully imported gold or produced a return for them. Id.

**Deny:**  It was never represented that INDICO Systems Resources was responsible for supplying the gold. In regard to the accusation of "reckless disregard as to the truth of these representations," Indico Systems Resources did indeed facilitate the acquisition and release of 714 kg of gold dust valued at over US$34,000,000, which the plaintiff verbally contracted and committed to pay for. See *Certificates of Origination, Certificates of Ownership and supporting Shipping Documents.* Said 714 kg of gold dust was detained in transit through Ghana enroute to Dallas for refining, due to attempted theft. Indico Systems Resources and Cleal Watts III had fully discharged their responsibilities to this point. Gold had been sourced, had been exported and was in transit. However, when Plaintiff failed to complete her commitments under the Soft Corporate Offer and did not forward committed funds in a timely manner, it was not possible at that time to free up the gold for delivery to Dallas. As for "soliciting other investors for 5 years," there was another large shipment that was rerouted through Holland by the owner, a tribal chief. The shipment was detained due to the owner's previous tax liabilities. The gold was still safely in custody in 2015 when it was tested and reconfirmed. It is being held in lieu of taxes and demurages. When paid by the owners, or buyers, the gold will be released. See emails

10. For example, in 2006, Watts solicited Peter Belsky to invest $30,000 to import raw diamonds from Africa, and after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., Watts never produced any diamonds or return on Mr. Belsky's investment. Declaration of Peter Belsky, Exhibit D; Watts Depo, Ex.C, pp. 337-38.

**Deny:** Peter Belsky had nothing to do with diamonds or gold. The referenced Belsky Declaration is not known to Defendants.

11. In 2007 Watts solicited Ed Pritzkau to invest $53,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any *gold or return* on that investment. Deposition of Ed Pritzkau, Exhibit E hereto ("Pritzkau Depo"), pp. 6-10; Watts Depo, Ex. C, pp. 328-29.

**Deny:** Mr. Pritzkau's consignment is part of a large gold shipment involving  group of people that was sourced and exported, but remains in Europe, confirmed by government officials, and held in Holland in lieu of taxes, demurrages and arrangements for shipping.

12. In 2007 Watts solicited Chris Harris to invest $50,000 to import gold dust from Africa and never produced any *gold* or return on that investment. Pritzkau Depo, Ex. E, p. 12; Watts Depo, Ex. C, pp. 328-29; Deposition of John Chu, Exhibit F hereto ("Chu Depo"), pp.26-30.

**Deny:**  This is part of the same consignment associated with Mr. Pritzkau. This shipment remains in long-term storage awaiting payment of fees..

13. In 2007 Watts solicited Debra Koper to invest $15,000 to import gold dust from Africa and never produced any gold or return on that investment. Deposition of Debra Koper, Exhibit G, pp.33-34.

**Deny:**  Debra Koper is part of this same group associated with Mr. Pritzkau.

14. In 2007 Watts solicited John Chu to invest $25,000 to import gold dust from Africa and, after reports from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or any return on that investment. Chu Depo, Ex. F, 26, 30-32.

**Deny:** John Chu is part of this same group associated with Mr. Pritzkau.

15. In 2008 Watts solicited Richard Carey to invest $66,000 to import gold dust from Africa and never produced any gold or return on that investment. Watts Depo, Ex. C, pp. 272, 284, 286, 314:18-20; Miscellaneous Bank of America records, Exhibit J, BANKOFAMERICA000701, BANKOFAMERICA000716, BANKOFAMERICA000737.

**Deny:**  Richard Carey did directly invest in gold, but made a personal loan to Defendant Watts, which was used to fund part of the consignment.

16. In 2009 Watts *solicited* Sergio Melconian to invest $15,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or return on that investment. Declaration of Sergio Melconian, Exhibit H.

**Deny:** Sergio Melconian is part of this same group associated with Mr. Pritzkau.

17. In 2009 Watts solicited Tim Williams to invest $50,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or return on that investment. Declaration of Tim Williams, Exhibit I. Case 2:13-cv-02578-STA-cgc Document 138-2 Filed 01/08/16 Page 4 of 14 PageID 1144

**Deny;** Tim Williams is part of this same group associated with Mr. Pritzkau.

18. In 2010 Watts solicited Celene Dutzman to invest $39,100 to import gold dust from Africa and never produced any gold or return on that investment. Watts Depo, Ex. C, p. 118:12-16; p. 260:14-20; p. 263:22-25; p. 264; Miscellaneous Bank of America records, Ex. J, BANKOFAMERICA000810; Miscellaneous Chase records, Ex. K, CHASE000364, CHASE000368, CHASE000374.

Deny; this is part of the consignment that was part of a large gold shipment that was produced and exported, but remains in Europe, confirmed by government official, and held up in Holland for taxes.

19. In 2011 Watts solicited Lisa Bartlett to invest $10,000 to import gold dust from Africa and, after many stories from Watts regarding the causes of multiple delays in shipments into the U.S., never produced any gold or any return on that investment. Deposition of Lisa Bartlett, Exhibit L, pp.23, 33.

**Deny:** Lisa Bartlett is part of this same group associated with Mr. Pritzkau.

## Defendants' Specific Misrepresentations to Plaintiffs

20. Despite all of these failures over the previous 5 years, in November and December 2011 and thereafter, Watts falsely represented to Plaintiffs that Defendants were experienced gold importers and that Defendants were "ready and able to supply" Plaintiffs with more than $5 million worth of gold dust from Africa. Sledge Decl, Ex. B., ¶¶ 7-8, 10, 11; Watts Depo, Ex. C, pp. 94-97.

**Deny:** Defendant *Watts has* been dealing with Sierra Leone since 1983. Defendants were not only able to acquire for contract five million dollars' worth of gold, but with the Plaintiff's retainer, Defendants were able to acquire and export 714 kilograms of gold dust valued in excess of $34,000,000 at that time. The exported gold dust and its value is evidenced by legitimate certificates of ownership, certificates of origination, certificates of export and shipping. These certificates are part of the record from emails admitted into evidence. Unfortunately, Defendants do not currently have access to emails, documents, or any pertinent citations, due to a yet unresolved computer crash. The obvious value of this large gold shipment is evidenced by

repeated attempts to steal it by Dr. Karoma and others. This is the shipment that remains in the custody of Ghanaian authorities pending payment of taxes and demurrages.

21. Watts has never seen nor inspected Plaintiffs' purported gold, even though he represented that Plaintiffs were purchasing a certain quantity of gold and that the purported gold was 91% pure. Watts had no way of knowing the purity of the alleged gold dust. Watts Depo, Ex. C, pp. 129-30; Sledge Decl, Ex. B. ¶19.

**Deny:** All gold dust originated in West Africa must obtain a government certified assay report as part of the lengthy process of certification for export. This particular shipment was re-assayed each time it was handled, or when a question of authenticity or possible theft arose. Whenever deemed necessary, Defendants brought in government assayers to break the seals, re-test, certify and apply new government seals for confirmation of shipment security. Although Defendant Watts has not personally seen the subject shipment, he has personally inspected large quantities of gold from some of the same sources. Defendants did not accept any gold that did not exceed 91% purity, as evidenced by government certified assays. See emails with photocopies of documentation. Original documents are held by the lawyers involved in litigation involving the theft of money and the and repeated attempted theft of the exported 714 kg of gold by Dr. Tombu Patrick, Dr. Karoma and others. Additional litigation is pending in Sierra Leone and Guinea West Africa.

22. At the time, Plaintiffs did not know these representations by Watts were false. Sledge Decl, Ex. B. ¶20.

**Deny:** Plaintiffs demanded daily accounting of the facts during continuous daily conversations that lasted for hours at a time. At one point Plaintiffs demanded to be sent current emails from declared acting ambassador Dr. Patrick Karoma, knowing they probably contained fraudulent statements and documentation. Once Defendants suspected foul play on the part of Dr. Karoma, they immediately started the process to revoke his Full Power of Attorney and control of the gold. This was a delicate process because he had been appointed by the signatory owner of the gold and recommended by the Sierra Leone Embassy in Ghana. The shipment was routed through Ghana because from there it could transship directly to the US. Plaintiffs knew that the validity of Dr. Karoma and his emails were in question. Nonetheless she wanted to see all the emails herself and Defendants complied.

23. Similarly, at the time Plaintiffs did not know, as Watts later revealed during his deposition in this case, that Watts had no regular source of income, that he had never earned more than $25,000 a year in his life, and that he has never owned a home or any significant personal property other than a used pick-up truck given to him by his mother. Sledge Decl, Ex. B. ¶21; Watts Depo, Ex. C, pp. 33, 40, 65, 361.

**Deny:** Plaintiffs had regular direct discussions with Defendant Watts regarding Defendants' frugality of not taking salaries or pulling funds out of projects unnecessarily. Plaintiff Sledge had

laughed many times about the extent Defendant Watts would go to in order to not have to spend money. She had received the benefit of regular disclosures regarding Defendants' intentional financial prudence and passion for projects. Plaintiffs were fully aware that Defendant Watts performed side jobs, small construction jobs, built computers and engaged in high tech sales, a fact supported by Plaintiff ordering a custom Ultra-Book computer not available anywhere else in the world at that time, along with a portable printer, neither of which she ever paid for.

24. Plaintiffs also did not know that:

(a) Watts has primarily lived with his parents and now with his lady friend, Debra Koper. He paid Koper rent in 2000 but has not paid her any rent since that time. Watts Depo, Ex. C, pp. 33-36.

(b) Watts has never received a W-2. Watts Depo, Ex. C, p. 38.

(c) Watts has never held a full-time job. Watts Depo, Ex. C, p. 40.

(d) Watts' only liquid asset is his pick-up truck. Watts Depo, Ex. C, p. 65.

(e) Watts does not even have a personal bank account. Watts Depo, Ex. C, p. 71.

**Deny:** Plaintiff did know that Defendant Watts lived at his home office Koper's house, because they called him on a daily basis at all times of day and night. Points (b) through (e) were never topics of conversation.

25. In reliance on Watts' material misrepresentations, Plaintiffs advanced $5,293,500 to Defendants during the period of November 2011 through October 2012, purportedly for the purchase of unrefined gold dust. Sledge Decl, Ex. B, ¶¶ 15, 23-25, 29, 30-31, 39, 40, 44, 56, 60, 66, 78. Defendants were working on behalf of Plaintiffs in connection with the gold purchases. Watts Depo, Ex. C, p. 122. Plaintiffs placed trust and confidence in the faithful integrity of Watts as a result of his representations to Plaintiffs that he had considerable experience and expertise in making investments in gold and in representing investors in the gold market, and as a result Watts gained superiority or influence over the Plaintiffs. Sledge Decl, Ex. B, ¶23.

**Deny:** The wording of Question 25 is a misrepresentation of the clear understanding that Plaintiffs enjoyed, as reflected in the Soft Corporate Offer. Plaintiff was fully briefed and engaged on a daily basis even in decision making over details of procedures. Per the Soft Corporate Offer, moneys advanced by Plaintiffs were part of the Earnest Payment, which should have been 20% of value, or $6.8 million. It was not advanced for the direct purchase of gold, because ownership of the gold was retained by the original owners until paid in full after refining. The 20% Earnest Payment was used to cover all costs from point of origination to refining in Dallas. In summary, Plaintiff committed to a verbal contract to advance an Earnest

Payment of $6.8 Million toward an investment valued in excess of $34,000,000 at that time. After advancing $2 Million, prior to executing a written agreement, Plaintiffs claimed that an additional $5 million to cover the balance would be coming from Gerber investments. Plaintiffs never advanced the full Earnest Money commitment, but remained short by approximately $1.8 Million.

26. On or about December 10, 2011, after Plaintiffs had made initial investments of $2 million, Watts sent an email to Plaintiffs with a schedule purportedly confirming the Plaintiffs' gold purchases. The email had a schedule attached entitled "Philapa and Entities Au Buy/Sell Transactions". "Au" is the element symbol for Gold. Watts' email also stated that by December 30 or 31, 2011, he and the "Chief" would be bringing in gold shipments totaling 614 kilograms. Sledge Decl, Ex. B, ¶24.

**Deny:** Plaintiff had made no gold purchases. She advanced portions of the Earnest Payments to cover the costs of exporting gold still owned by its sellers, who were willing to release control of their gold upon verification of adequate funds present to cover all costs through export/ import and refining, ergo the Earnest Payment. The "email schedule" was a spreadsheet with formulas that she could use to make her own calculations.

Defendants chartered an aircraft and left for Freetown, Sierra Leone to pick up the gold. The charter was diverted enroute to Conakry, Guinea, where alternate arrangements were made to have G4 deliver the gold there and then return to Dallas. According to the United States Embassy reports, there was threat of a coup that had made the owner of the charter aircraft nervous, so he called back the aircraft before the gold could be loaded. Had the Chief owner's brother not tried to swap the boxes, the shipment would have arrived in time. It took 2-hours to complete security protocols and recover the gold in High Security Storage, but the charter owner ordered the aircraft to leave with or without gold and Watts. Had it not been for the copilot's insistence, Defendant Watts would have been left behind.

27. During Watts' deposition in this case, he testified that one kilogram of gold is worth $33,000. Based on this value, the 614 kilograms that Watts purportedly was bringing in December 2011 would have been worth $23.5 million. Watts Depo, Ex. C., p. 93; Sledge Decl, Ex. B, ¶24.

**True?** These figures *were* accurate at the time of the deposition. However, most people know gold fluctuates in price. At times during 2011 gold was worth more than 50% more than today's value.

28. A few days later, in reliance on Watts' representations, on or about December 20, 2011, the
Plaintiffs wired another $1 million to Defendants' bank accounts to purchase more gold which
would purportedly be part of the upcoming shipment. Sledge Decl, Ex. B, ¶25.

**False:** Plaintiffs never wired funds to purchase gold. They did wire another $1 Million toward
their Earnest Payment for expenses to move the gold.

29. No gold was delivered in December 2011. Id., ¶26. According to Watts, he had flown to
Africa to pick up the gold, but while en route the owner of the chartered plane had learned of a
coup in one of the African countries and ordered that the pilot divert the plane to a safer location.
As a result, according to Watts, he was unable to pick up the gold shipment. Id., ¶27; Watts
Depo, Ex. C., pp. 201-02.

**True in part:** Defendant had a solution for the stated problem. Internationally renowned security
team G4 was contracted to move the gold immediately from Freetown, Sierra Leone to Conakry,
Guinea, where the charter had been diverted. After transfer to High Value Security Lockup,
someone went to a lot of trouble to swap the 50 kg boxes of gold dust with identical facsimiles
filled with salted gold. Within 15 minutes we had discovered the swap, found our boxes hidden
in the lockup, and had police and government officials involved to return the boxes to our
custody. It took 2 hours to correct the problem, but during that time, the charter owner had
ordered the plane to leave with our without the shipment and Defendant.

30. Despite the failure to bring in the gold in December 2011, from January through October
2012, Watts told Plaintiffs that he was still working to bring in the gold shipment and he
continued to solicit additional funds from Plaintiffs for the purchase of more gold. Sledge Decl,
Ex. B, ¶28. When the promised gold was not delivered, Watts gave Plaintiffs various
explanations as to why the gold had not been delivered. Sledge Decl, Ex. B, ¶¶ 32, 39-40, 45-46,
48, 50, 52-53, 58, 60.

**False:**  At no time did Defendants solicit additional funds "for the purchase of more gold." No
gold was ever purchased, nor intended to purchased prior to refining in Dallas, as previously
explained, and as was well known to Plaintiffs. Attempts were made to secure the balance of
Plaintiffs' Earnest Payment to cover costs of another charter. If Plaintiff had fulfilled their
commitment, the gold dust could have been delivered at that time. It was estimated at that time,
that it would take about $600,000 to receive the gold in Dallas. That was approximately
$300,000 in demurrages and $300,000 or less for the charter, far less than the estimated balance
of $2 Million dollars owed by Plaintiffs against their Earnest Payment commitment, which they
had contractually guaranteed to pay.

31. For example, in June and July 2012 Watts emailed articles to Plaintiffs purportedly from Ghana newspapers, along with other documents, describing delays in the gold shipment caused by an alleged theft attempt and by related criminal proceedings. Sledge Decl, Ex. B, ¶46-47, 50. In August 2012, Watts sent Plaintiffs additional documents and articles describing further delays due to mechanical problems with the plane transporting the gold. Sledge Decl, Ex. B, ¶58-59.

**True:** Continuous ongoing conversations informed Plaintiff Sledge of the facts in detail. It was at this time that Plaintiff Sledge demanded to be sent current emails from the declared acting Ambassador Dr. Patrick Karoma. That's when we suspected his involvement and began the revocation of the Power of Attorney given to him by the owners of the gold. Defendants succeeded in the revocation, obtained government certifications, and wrested the gold from his control and authority. Phillipa Sledge said she did not care whether the emails were true and valid, but just wanted to see them for herself. The original documentation from this time period is held by the attorneys involved in litigation procedures and recovery process in Ghana.

32. At the time, Plaintiffs believed that the articles and documents sent by Watts and his statements regarding *the delays* were true, and continued to invest based upon Watts' representations that additional funds were necessary in order to bring in the gold shipment. Sledge Decl, Ex. B, ¶¶ 47, 48, 55-56, 60.

**False:** Plaintiffs knew at that time that we believed the articles and emails to be fraudulent. They were cognizant of the fact that we were working on the Revocation of Power of Attorney for Dr. Karoma.

**True:** Plaintiffs believed that Watts' statements concerning the same were true.

33. However, shortly after filing this lawsuit, Plaintiffs obtained the affidavit of a reporter for one of the Ghana newspapers who testified that the articles sent by Watts were fraudulent. Declaration of Stephen Zoure, Exhibit L hereto.

34. Even Watts during his deposition admitted that the articles were likely fabricated, and that he may have known this as early as June 2012, but he nevertheless continued thereafter to forward articles and related documentation to Plaintiffs in an attempt to explain the constant delays in the gold shipments. Sledge Decl, Ex. B, ¶50; Watts Depo, Ex. C, p. 295-97.

**False:** As previously stated, Plaintiffs were organically involved in the process and had been informed of the suspicious nature of emails and articles transmitted from Africa. No fraudulent emails were offered to Plaintiffs, but were provided in response to direct requests to see the suspicious emails. Plaintiff was daily informed of the revocation process to strip Dr,. Karoma of his Power of Attorney.

35. In addition to the fraudulent articles and related documents, Watts sent a purported insurance policy to Plaintiffs on December 4, 2012, covering the gold shipment, which Watts referred to as their "trump card." Watts depo, Ex. C, pp.276-78; Sledge Decl, Ex. B, ¶63. As it turns out, this document too was fraudulent. The purported policy was issued by a London company known as "Ince & Co." After the commencement of this litigation, Plaintiffs confirmed with a representative of Ince & Co. that this document was fraudulent. Watts depo, Ex. C, pp.277-78; Sledge Decl, Ex. B, ¶¶ 55, 64 (including opinion of expert Thomas Vastrick attached thereto); Declaration of Benjamin Patrick Ogden, Ince & Co., Exhibit M hereto.

**True:** This was one of the indicators that brought Dr. Karoma under suspicion. This document was sent to Plaintiff at her request. We believe the "premium" was not actually paid to an insurance company, and this was a fraudulent receipt given for that money. We went to the authorities got the moneys returned during the process of removing Dr. Karoma. "Trump card" would be an accurate *term* for the legitimate insurance policy that actually helped us prevent an attempted theft. Insurance was paid for on 3 occasions.

36. From the period of December 2012 up to and through July 2013 when this lawsuit was filed, Watts continued to report to Plaintiffs regarding the status of their purported gold investments and the continuing unsuccessful efforts to get the gold to the U.S. Throughout the time period that Plaintiffs were making their investments, while Watts was making the various representations and describing his alleged efforts to get the gold, Watts frequently told Plaintiffs that "the only way you lose in this is if you quit." Sledge Decl, Ex. B, ¶65; Watts Depo, Ex. C, p. 321.

**True:** Success would have been swift had Plaintiffs fulfilled their Ernest Payment obligation. Notwithstanding the difficulties from being under funded, Defendants continued working to establish cash flow and successfully exported and imported at least 3 shipments by year end. Monies recovered from Dr. Koroma's embezzlement remain in the custody of Ghanaian authorities pending the outcome of litigation. Since all available moneys have been consumed with this domestic litigation, recovery efforts have been necessarily placed on hold. The virtual lockdown brought on by the Ebola Virus prevented direct efforts to establish additional cash flows until recently.

37. After more than 4 years, and over $5 million invested, no gold has ever been received by Plaintiffs. Sledge Decl, Ex. B, ¶ 66.

**True:** The Plaintiffs have evidently expected Defendants to complete the exportation on Plaintiffs' behalf, without fulfilling their own obligations to fund the costs. Plaintiffs desired to fund a very large shipment of gold dust. Without adequately funding the operation, according to projected costs and their funding commitment, the project cannot be completed.

## Watts' Deceptive Use of Plaintiffs' Funds

38. In November and December 2011 and January 2012, Watts sent Plaintiffs various schedules
purporting to show the initial $3 million of gold allegedly purchased by the Plaintiffs. Sledge
Decl. Ex. B, ¶¶ 24, 30. However, in December 2011, instead of sending Plaintiffs' money to
purchase gold from Africa as promised and as reflected on the schedules, Watts actually wired
$1 million of Plaintiffs' funds to Defendant Indico's own investment accounts at Rosenthal
Collins Group, a futures trading firm in Chicago, and at Stifel, Nicolaus & Company, a
brokerage firm based in the United States. Id., ¶ 68; Miscellaneous Chase documents, Ex. K,
CHASE000419. Watts did not tell Plaintiffs about the transfers of their funds to the Defendant's
investment accounts, but instead sent Plaintiffs statements showing that their funds had been
used to purchase gold. Sledge Declaration, ¶ 68.

**Deny:** Again, that gold was allegedly "purchased" is a false statement. Plaintiffs were
continuously aware that their money was to pay all costs associated with the export/ import and
refining of gold dust owned by other parties. Plaintiff's money was never purported to be used
for the purchase of gold.

Earnest Payments made by Plaintiffs are for the benefit of the gold owners as an assurance that
adequate funds are available to fund the export/import through refining. Some of those moneys
held in reserve for future expenses were placed in a Chicago trading account at the owners'
request, as a hedge to build up the capital balance. The Earnest Payment is not "Plaintiff's
money," but expensed to the project. It was deemed prudent to trade idle funds as a valuable
support for the project.

Other problems were caused by Plaintiffs when they borrowed money from the gold owners for
other investments. They borrowed short term loans @ 10% interest payable to the gold owners.
At one time they had borrowed $3.3 Million from the gold owners and failed to make interest
payments. Sledge herself was trying to get in on the financial trading. She had a conversation
with the trader.

39. The Defendants' bank records also show that Watts used hundreds of thousands of dollars of
Plaintiffs' funds to *pay his own* personal expenses and other expenditures which were not for the
purchase of Plaintiffs' gold. Summary of Watts' personal use of Plaintiffs' funds, Exhibit N.

**Deny:** Again, the accusation is based on the false premise that Plaintiff's funds were to be used
for the "purchase" of gold. All Earnest Payment funds were wired or otherwise delivered to the
gold owners for the purposes of completing the transaction, whether passing through
Defendants' accounts or trading accounts, or wired directly to qualified expenses.

40. Watts also used Plaintiffs' funds to pay the following amounts to the following payees instead of using the funds to purchase gold as he had told Plaintiffs:

**Deny the false premise that** funds should have been used to buy gold. Funds were never purported to purchase gold, but to pay all costs associated with export/import through refining.

Date(s) Payee Amount1

Feb 2012 –

Feb 2013

Bristol 5 Group, LLC, a New Jersey limited liability company

$43,500

$43,500 was the cost of the referenced trading account.

Jan-Feb 2012
Edward Adlam
$15,000

Returned of his own money from 2011 that was never spent or invested.

May 2012
Celene Dutzman
$10,000
One time payment for professional research.

Aug 2012
Darrow Dickey
$2,000
Reimbursement for personal expenses as security on charter to Freetown.

Aug 2012
Mark Hamilton
$1,500
Reimbursement for a compressor used in Africa.

41. Additionally, Watts transferred over four million dollars of Plaintiffs' funds to a
correspondent U.S. dollar account at CommerzBank (herein the "Correspondent Bank Account")
held by the African bank Guaranty Trust Bank (GT Bank) in the name of Sheku Kondeh. See
Sledge Decl, Ex. B, ¶71; Summary of Defendants' transfers to Commerzbank, Exhibit O hereto.2

Payment to for shipping of gold to point of refining – taxes, permits, etc.


42. According to a letter that Watts sent to Bank of America, the funds transferred to the
Correspondent Bank Account were also not used for purchasing Plaintiffs' gold, but rather were
used for Defendants' own purposes. Sledge Decl, Ex. B, ¶72; Watts' letter to Bank of America,
("BOA Letter") Exhibit P. The letter, dated August 15, 2012, was written in response to a bank
inquiry concerning the large transfers by Watts into the Correspondent Bank Account. BOA
Letter, Ex. P. Watts' letter states that the funds transferred were to be used for various business
activities of the Defendants, but conspicuously omits any reference to gold. Id. Watts provided
the following explanation:

**True, except for the false premise** that funds should have been "used for purchasing Plaintiffs'
gold." The purpose of the Account was to transact business, which included high tech exports to
Africa since 1996.

1Miscellaneous Bank of America records, Exhibit J hereto, BANKOFAMERICA000226,
BANKOFAMERICA000230, BANKOFAMERICA000235, BANKOFAMERICA000240,
BANKOFAMERICA000258; Miscellaneous Chase records, Exhibit K hereto, CHASE000426,
CHASE000432, CHASE000449, CHASE000457, CHASE000465.

2 CommerzBank is a German bank with a branch in the Southern District of New York. GT
Bank is a Nigerian bank, which does not have a branch in the (?)

ISR was started in Feb. 1996 as a high tech company, we are partners with; Micro Soft, Intel,
AMD, NVidias, IBM and many other companies…We have been consulting on and off for 30
years in West Africa and in the proses [sic] of opening operations in Sierra Leone for the last 5
years. Our offices our [sic] just about ready to move in. this is what has been causing us to have
frequent wires back and forth. Things like, "Oh, you want electricity in your office all the time,
you need a generator station then". Things do not move forward as fast in third world countries.
Costs are more for some things and I will say much less for others. When to get what from where
is how prudent business pays off in the long run.

Timing is working out about right over there. ISR is the lead company because technology is
fastes on line…November they will turn on our fiber optic, this is as fast as our server farms here
in the U.S. ISR's offices will have been up and running by then with computers sales from the
Dallas, TX office.

They also need infrastructure bad, this is where our construction company and manufacturing
heavy earth moving equipment comes in. The contracts already look to be worth the effort we
have made.

Id.

**True:** This is the direction business was heading when problems forced our concentration on the
gold endeavor. Defendant is currently receiving requests for high tech sales and
telecommunications infrastructure.

43. Watts' August 15, 2012 letter also referred to the Correspondent Bank Account as belonging
to Defendant Indico, even though the account was titled for "security reasons" in the name of
Sheku Kondeh, one of Indico's managers.

Since I have not had the time in Freetown were [sic] our offices are being finished, I was in
surrounding countries the last few trips, our Corporate US Dollar Account for ISR, is titled as
our managers name, Sheku Kondeh for security reasons. He is the signatory. Only he with his
passport can access the account there without me. This will change next trip and accounts will be
titled In ISR's name with appropriate security measures setup there in Freetown. So we can wire
to same name accounts.

**True:** ISR had a support office in Sierra Leone that was open for one year. It was closed to cut
costs when the large gold shipment experienced delays, and it became evident that Plaintiff was
defaulting on their commitment. Gold exports are not ISR's sole endeavor. Gold was originally
brought in as part of a barter system for computers, machinery, and agricultural projects. The
bank account was opened under Sheku Kondeh as the trusted representative for the gold owners.
Defendants intended to open a corporate account in Africa to facilitate management of the gold
owners' money, but the Plaintiffs' default brought progress to a halt.

Id.

44. [Reserved].

45. Defendants never disclosed that they were using Plaintiffs funds for their own personal and
other business purposes, rather than for purchasing gold for Plaintiffs. To the contrary,
throughout the relevant time period Watts sent Plaintiffs periodically amended spreadsheets
purporting to reflect Plaintiffs' growing investment in the subject gold, which made no reference
to any of the actual unauthorized expenditures that the Defendants were in fact making with the
Plaintiffs' funds. Sledge Decl, Ex. B., ¶¶24, 36-37, 62, 68.

**Deny:** Counsel continues with the false premise. Plaintiffs were intimately involved with the
details of the project and movement of funds. Plaintiffs fully understood that at no time were

their Earnest Payments to be used for the purchase of gold. Spreadsheets reflecting current financial status were created and sent to Plaintiffs at their specific request.

### Defendants' Contradictory Statements During Litigation

46. During his deposition Watts was asked whether he had filed an insurance claim or whether he or Indico had an insurance policy with respect to the Plaintiffs' gold. Watts depo, Ex. C, p. 135. Watts responded "No. No. Never", and stated that any insurance on the Plaintiffs' gold would have to be in the name of an African party. Id. Watts also testified that he had paid insurance premiums on behalf of the Plaintiffs. Watts Depo, Ex. C, pp. 280-81.

**Out of context:** all costs are paid by gold owners in Africa from Plaintiffs' Earnest Payment. Indico did not pay directly for insurance, nor did Plaintiff buy insurance. Insurance was purchased by the African gold owners.

47. Later during this deposition, however, Watts was confronted with an insurance policy he sent to Plaintiffs on December 4, 2012, which he had referred to as Plaintiffs' "trump card." Watts depo, Ex. C, pp. 276-78. Contrary to Watts' earlier testimony, on this policy Defendants are, in fact, the named insureds. Watts depo, Ex. C, pp. 278-84. Moreover, as noted in Statement 35 above, this policy was fabricated.

**Deny:** An insurance policy may well have named Defendants as "insureds," because Defendants were the receiving party at the shipment destination. Defendants are not the ones that pay or collect on any policy. That particular policy came from Dr. Karomas' group.

48. Also, at his deposition Watts was asked about the "Chicago investor" group, a group of investors who Watts had told Plaintiffs about prior to the lawsuit. Watts testified that he had no idea who the "Chicago investor" group was. When confronted with a voicemail he had left for Plaintiffs however, wherein Watts can be plainly heard representing that he was waiting for a Chicago investor group to liquidate securities and raise funds to support the investment, Watts changed his story. Watts depo, Ex. C, pp. 347-48, 355-57.

**Deny:** Plaintiff did not play the whole call, just enough Defendant to hear if he could recognize his voice. Obviously this "investor group" did not perform or make enough of an impression for Defendant to remember them, if indeed the lawyers' statement is true.

49. Also during his deposition, Watts talked about a meeting he had had with Chiefs "Alimamy Kamara" and "Ibrahim Kamara" in Africa to discuss the Plaintiffs' gold. Watts depo, Ex. C, pp. 205-206.

**True.**

50. However, several months prior to the deposition, in response to the Plaintiffs' Request for Admissions, Watts had stated that he had never met in person with "Chief Alimamy Kamara" or with "Chief Ibrahim Kamara." Watts depo, Ex. C, pp. 205-206.

**Deny:** Counsel confuses the chiefs. The chief in Q.49 is Chief Alimamy, who Defendant met with in 2007. The Chief Ibrahim that Defendant met in 2010 was the brother of the chief who owned the gold. There is also another gold owner, Chief Ibrahim, that Defendant has not met. There may be a spelling difference in their names that Defendant is missing. In West Africa, the same names are frequently encountered, sometimes with the same spelling, often with one letter changed. The fact that Defendant is Dyslexic makes it difficult to keep track of spelling. Proper nouns are more difficult.

51. When confronted with the inconsistency during the deposition, Watts began to claim, for the first time, that there were multiple chiefs with the same name and that he would "have to make a phone call" to determine which was which. Watts depo, Ex. C, pp. 206-208, 209:18-19.

**Deny:** This would certainly not be the first time that Defendant mentioned to Plaintiff that many parties have the same name.

**DOJ Cease and Desist Letter**

52. On November 18, 2015, the United States Department of Justice ("DOJ") sent Defendant Watts a letter notifying him of a parallel criminal investigation and asserting that the gold investment was a fraudulent scheme. The DOJ letter instructs Watts to cease and desist from any further solicitations of funds or transfers of same to Africa for ostensible gold purchases. Letter from DOJ, Exhibit Q.

Other Facts

53. Defendants did not at any time file any documents or reports whatsoever with the Securities and Exchange Commission relative to the sale of the investments to Plaintiffs. Watts' Responses to Requests for Admission, Exhibit R, No. 56.

**Deny:** An Earnest Payment was accepted from Plaintiff, not an investment that might be subject subject to SEC registration. Gold dust is raw ore, a natural resource not subject to SEC oversight.

54. At all relevant times, Plaintiffs had no way of knowing the truth about Watts' background and were never invited or permitted to communicate with any of Watts' alleged contacts in Africa. Plaintiffs' only source of information about the status of their investments was Watts.

**Deny:** Plaintiff was informed daily of all details of the transaction and of all the people involved. Plaintiff was even put on the phone to speak with the Mandate and signatory representing the gold owners.

Respectfully Submitted,

Cleal Watts III _____ *Clul 1. Watt IV* February 4, 2016



Respectfully Submitted,

/s/ Darrell N. Phillips_____

PIETRANGELO COOK PLC

Anthony C. Pietrangelo BPR # 15596

John J. Cook BPR # 17725

Darrell N. Phillips BPR #30299

6410 Poplar Avenue, Suite 190

Memphis, TN38119

901.685.2662

901.685.6122 (fax)

dphillips@pcplc.com

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of January 2016, a copy of the foregoing electronically submitted document was served on the parties listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

Randall Fishman

Richard Townley

Ballin, Ballin & Fishman

200 Jefferson Ave., Suite 1250

Memphis, TN 38103

/s/ Darrell N. Phillips

Case 2:13-cv-02578-STA-cgc Document 138-2 Filed 01/08/16 Page 14 of 14 PageID

1154

MARIE WATTS

8-4-2016