# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

MARY PHILLIPA SLEDGE, MARY
JANE PIDGEON SLEDGE TRUST, and
PIDGEON SLEDGE FAMILY LIMITED
PARTNERSHIP,

      Plaintiffs,

v.                                           Case No. 2:13-cv-2578-STA-cgc

INDICO SYSTEM RESOURCES, INC. and
CLEAL WATTS, III,

      Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND FOR PERMANENT INJUNCTIVE RELIEF

Plaintiffs Mary Phillipa Sledge, Mary Jane Pidgeon Sledge Trust, and Pidgeon Sledge Family Limited Partnership filed a civil action in this Court against Defendants Indico System Resources, Inc. ("Indico"), and Cleal Watts III in his individual capacity and as an agent for Indico on July 29, 2013. (Cmplt., ECF No. 1.) Plaintiffs allege that Defendants engaged in a fraudulent investment scheme which involved the solicitation from Plaintiffs of approximately $5 million to purchase alleged gold dust mined in Ghana. (*Id.*, ¶ 13.) Plaintiffs have asserted claims for (1) fraud, (2) conversion, trover and misappropriation, (3) negligent misrepresentation, (4) violation of the Tennessee Consumer Protection Act ("TCPA"), (5) violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, 15 U.S.C. § 78j, 17 C.F.R. 240.10b–5; (6) violation of § 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a); (7) violation of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77(a); (8)

breach of contract, (9) breach of fiduciary duty, (10) negligence, (11) fraudulent conveyance, and (12) punitive damages. (*Id.,* ¶¶ 40-109.) Jurisdiction is predicated on 28 U.S.C. § 1332, diversity of citizenship, and 28 U.S.C. § 1331, federal question based on the causes of action that arise under the Securities Act of 1933 and the Securities and Exchange Act of 1934.

On January 8, 2016, Plaintiffs filed a motion for summary judgment. (ECF No. 138.) On February 5, 2016, Defendant Watts filed a pro se response purportedly on behalf of himself and Indico. (ECF No. 152.) Plaintiffs filed a reply on February 18, 2016. (ECF No. 154.) For the reasons set forth below, Plaintiffs' motion for summary judgment is **GRANTED**.[1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant. [3] In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[4] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." [5] These facts must be more than a scintilla of evidence and must meet

---

[1] The Order for Defendants to Show Cause (ECF No. 145) remains pending.

[2] Fed. R. Civ. P. 56(c).

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[6]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[7] The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[8]

As an initial matter, the Court notes that Watts may not proceed on behalf of Indico because a corporation must be represented in Court by an attorney and may not be represented by an officer.[9]  Therefore, the Court will not consider any arguments made by Watts on behalf of Indico.

Additionally, although in the response, Defendant Watts disputes Plaintiffs' statement of facts, he has failed to point to any evidence in the record to support his own recitation of the facts.  Instead, he generally references "emails surrendered to Plaintiff," "records held by the Ghanian attorney," and "bank deposits and wires."[10]  Statements by a party with no citation to particular parts of the record in response to properly supported facts will not be considered.[11]  It

---

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7] *Id.* at 251–52.

[8] *Celotex*, 477 U.S. at 322.

[9] *See Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984).

[10] (Resp., pp. 2-4, ECF No. 152-2.)

[11] *See Turner v. Young Touchstone Co.*, 2010 WL 2598194 *2 (W.D. Tenn. 2010) (citing *Perkins v. Scwappach*, 2010 WL 1558697 *1 n. 1 (E.D. Pa. Apr. 16, 2010) (non-movant's failure to cite to the record in disputing the movant's statement of facts on summary judgment resulted

is not the Court's duty to "scour the record" in search of facts, nor to speculate about potential genuine disputes.[12]

Plaintiffs have presented the following statement of undisputed facts that are supported with citations to the record and have not been refuted by Defendant Watts.[13]

1. At all relevant times, Defendant Watts was an employee, agent, or servant of Defendant Indico and was acting both in his individual capacity as well as in his capacity as sole shareholder, president, an employee and/or agent of Indico.

2. In November 2011, Watts proposed an investment opportunity to Plaintiffs whereby Plaintiffs would purchase unrefined gold dust from Ghana. In November and December 2011, and at various times in 2012, Watts represented to Plaintiffs that Defendants were "ready and able" to supply Plaintiffs with over $5 million worth of unrefined gold dust. These and other representations were made orally and were also contained in documents called "Soft Corporate Offers" emailed by Watts to Plaintiffs.

3. Watts represented that the millions of dollars' worth of gold dust to be supplied was more than 91% pure, and had a built in net profit (ROI) of 30 to 45%. Also at the time, Watts represented to Plaintiffs that he was an experienced gold importer.

4. Watts represented that the gold purchased by the Plaintiffs was ready for pick up and would be delivered into the United States as early as the end of December 2011.

5. Watts did not tell Plaintiffs that, at the time of these solicitations, he had fewer than $300 in Defendant Indico's bank account.

---

in finding that the movant's facts were undisputed). *See also* Fed. R. Civ. P. 56(e)(2) ( "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion.")

[12] *See e.g., Wimbush v. Wyeth*, 619 F.3d 632, 638 n. 4 (6th Cir. 2010) (noting it is not the district court's duty to search the record, but rather, it is the parties' duty to cite to the evidence with "specificity and particularity ... [and t]he non-moving party must present affirmative evidence on critical issues sufficient to allow a jury to return a verdict in its favor."); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial.")

[13] (Facts, ECF No. 138-2.)

6. Plaintiffs were introduced to Watts by a longtime friend who had given Plaintiffs good investment advice in the past. This friend vouched for Watts and told Plaintiffs that Watts came from a prominent, well-respected Texas family. Plaintiffs had several calls with Watts before making their initial investments. In reliance on Watts' representations, Plaintiffs wired millions of dollars to the Defendants' bank accounts expecting that the funds would be used to purchase the gold that Watts had described. To date, after more than 4 years, no gold has been delivered.

7. At the time of Plaintiffs' investments, Plaintiffs' funds were combined with those of other investors.

8. Although Plaintiffs did not know it, as of the time that Watts represented that he was an experienced gold importer, and that Defendants were "ready and able" to supply Plaintiffs with over $5 million of 91% pure gold from Ghana, in point of fact Watts, according to his own testimony, had never successfully delivered gold or returns on gold investments for anyone else.

9. At the time of these representations, Watts knew that Defendants were not "ready and able to supply" $5 million worth of gold to Plaintiffs, or at least acted with a reckless disregard as to the truth of these representations. Watts had been soliciting other investors for 5 years prior to Plaintiffs' investments, but he had never successfully imported gold or produced a return for them.

10. For example, from 2006 through 2011, Watts solicited the following investors to invest money to import raw diamonds and/or gold dust from Africa: Peter Belsky, Ed Pritzkau, Chris Harris, Debra Koper, John Chu, Richard Carey, Sergio Melconian, Tim Williams, Celene Dutzman, and Lisa Bartlett. After many stories from Watts regarding the causes of multiple delays in shipments into the U.S., Watts never produced any diamonds and/or gold dust or return on their investments.[14]

…..

20. Despite all of these failures over the previous 5 years, in November and December 2011 and thereafter, Watts falsely represented to Plaintiffs that Defendants were experienced gold importers and that Defendants were "ready and able to supply" Plaintiffs with more than $5 million worth of gold dust from Africa.

21. Watts has never seen nor inspected Plaintiffs' purported gold, even though he represented that Plaintiffs were purchasing a certain quantity of gold and that the purported gold was 91% pure. Watts had no way of knowing the purity of the alleged gold dust.

22. At the time, Plaintiffs did not know that these representations by Watts were false.

23. Similarly, at the time, Plaintiffs did not know, as Watts later revealed during his deposition in this case, that Watts had no regular source of income, that he had never

---

[14] The Facts at numbers 10 through 19 have been summarized in this paragraph.

earned more than $25,000 a year in his life, and that he has never owned a home or any significant personal property other than a used pick-up truck given to him by his mother.

24. Plaintiffs also did not know that: Watts has primarily lived with his parents and now with his lady friend, Debra Koper; Watts has never received a W-2; Watts has never held a full-time job; Watts' only liquid asset is his pick-up truck; and Watts does not have a personal bank account.

25. In reliance on Watts' material misrepresentations, Plaintiffs advanced $5,293,500 to Defendants during the period of November 2011 through October 2012, purportedly for the purchase of unrefined gold dust. Defendants were working on behalf of Plaintiffs in connection with the gold purchases. Plaintiffs placed trust and confidence in the faithful integrity of Watts as a result of his representations to Plaintiffs that he had considerable experience and expertise in making investments in gold and in representing investors in the gold market, and as a result Watts gained superiority or influence over the Plaintiffs

26. On or about December 10, 2011, after Plaintiffs had made initial investments of $2 million, Watts sent an email to Plaintiffs with a schedule purportedly confirming the Plaintiffs' gold purchases. The email had a schedule attached entitled "Philapa and Entities Au Buy/Sell Transactions." "Au" is the element symbol for Gold. Watts' email also stated that by December 30 or 31, 2011, he and the "Chief" would be bringing in gold shipments totaling 614 kilograms.

27. During Watts' deposition in this case, he testified that one kilogram of gold is worth $33,000. Based on this value, the 614 kilograms that Watts purportedly was bringing in December 2011 would have been worth $23.5 million.

28. A few days later, in reliance on Watts' representations, on or about December 20, 2011, the Plaintiffs wired another $1 million to Defendants' bank accounts to purchase more gold which would purportedly be part of the upcoming shipment.

29. No gold was delivered in December 2011. According to Watts, he had flown to Africa to pick up the gold, but while en route the owner of the chartered plane had learned of a coup in one of the African countries and ordered that the pilot divert the plane to a safer location. As a result, according to Watts, he was unable to pick up the gold shipment.

30. Despite the failure to bring in the gold in December 2011, from January through October 2012, Watts told Plaintiffs that he was still working to bring in the gold shipment and he continued to solicit additional funds from Plaintiffs for the purchase of more gold. When the promised gold was not delivered, Watts gave Plaintiffs various explanations as to why the gold had not been delivered.

31.  For example, in June and July 2012 Watts emailed articles to Plaintiffs purportedly from Ghana newspapers, along with other documents, describing delays in the gold shipment caused by an alleged theft attempt and by related criminal proceedings. In August 2012, Watts sent Plaintiffs additional documents and articles describing further delays due to mechanical problems with the plane transporting the gold.

32.  At the time, Plaintiffs believed that the articles and documents sent by Watts and his statements regarding the delays were true, and continued to invest based upon Watts' representations that additional funds were necessary in order to bring in the gold shipment.

33.  However, shortly after filing this lawsuit, Plaintiffs obtained the affidavit of a reporter for one of the Ghana newspapers who testified that the articles sent by Watts were fraudulent.

34.  Even Watts during his deposition admitted that the articles were likely fabricated, and that he may have known this as early as June 2012, but he nevertheless continued thereafter to forward articles and related documentation to Plaintiffs in an attempt to explain the constant delays in the gold shipments.

35.  In addition to the fraudulent articles and related documents, Watts sent a purported insurance policy to Plaintiffs on December 4, 2012, covering the gold shipment, which Watts referred to as their "trump card." As it turns out, this document too was fraudulent. The purported policy was issued by a London company known as "Ince & Co." After the commencement of this litigation, Plaintiffs confirmed with a representative of Ince & Co. that this document was fraudulent.

36.  From the period of December 2012 up to and through July 2013 when this lawsuit was filed, Watts continued to report to Plaintiffs regarding the status of their purported gold investments and the continuing unsuccessful efforts to get the gold to the U.S. Throughout the time period that Plaintiffs were making their investments, while Watts was making the various representations and describing his alleged efforts to get the gold, Watts frequently told Plaintiffs that "the only way you lose in this is if you quit."

37.  After more than 4 years, and over $5 million invested, no gold has ever been received by Plaintiffs.

38.  In November and December 2011 and January 2012, Watts sent Plaintiffs various schedules purporting to show the initial $3 million of gold allegedly purchased by the Plaintiffs. However, in December 2011, instead of sending Plaintiffs' money to purchase gold from Africa as promised and as reflected on the schedules, Watts actually wired $1 million of Plaintiffs' funds to Defendant Indico's own investment accounts at Rosenthal Collins Group, a futures trading firm in Chicago, and at Stifel, Nicolaus & Company, a brokerage firm based in the United States. Watts did not tell Plaintiffs about the transfers of their funds to the Defendant's investment accounts,

but instead sent Plaintiffs statements showing that their funds had been used to purchase gold.

39. Defendants' bank records also show that Watts used hundreds of thousands of dollars of Plaintiffs' funds to pay his own personal expenses and other expenditures which were not for the purchase of Plaintiffs' gold.

40. Watts also used Plaintiffs' funds to pay the following amounts to the following payees instead of using the funds to purchase gold as he had told Plaintiffs: Bristol 5 Group, LLC, a New Jersey limited liability company ($43,000); Edward Adlam ($15,000); Celene Dutzman ($10,000); Darrow Dickey ($2,000); and Mark Hamilton ($1,500).

41. Additionally, Watts transferred over four million dollars of Plaintiffs' funds to a correspondent U.S. dollar account at CommerzBank ("Correspondent Bank Account") held by the African bank Guaranty Trust Bank ("GT Bank") in the name of Sheku Kondeh.

42. According to a letter that Watts sent to Bank of America ("BOA Letter"), the funds transferred to the Correspondent Bank Account were also not used for purchasing Plaintiffs' gold, but rather were used for Defendants' own purposes. The letter, dated August 15, 2012, was written in response to a bank inquiry concerning the large transfers by Watts into the Correspondent Bank Account. Watts' letter states that the funds transferred were to be used for various business activities of the Defendants, but conspicuously omits any reference to gold. …

43. Watts' August 15, 2012 letter also referred to the Correspondent Bank Account as belonging to Defendant Indico, even though the account was titled for "security reasons" in the name of Sheku Kondeh, one of Indico's managers. …

44. [Reserved]

45. Defendants never disclosed that they were using Plaintiffs funds for their own personal and other business purposes, rather than for purchasing gold for Plaintiffs. To the contrary, throughout the relevant time period Watts sent Plaintiffs periodically amended spreadsheets purporting to reflect Plaintiffs' growing investment in the subject gold, which made no reference to any of the actual unauthorized expenditures that the Defendants were in fact making with the Plaintiffs' funds.

46. During his deposition Watts was asked whether he had filed an insurance claim or whether he or Indico had an insurance policy with respect to the Plaintiffs' gold. Watts responded "No. No. Never", and stated that any insurance on the Plaintiffs' gold would have to be in the name of an African party. Watts also testified that he had paid insurance premiums on behalf of the Plaintiffs.

47. Later during this deposition, however, Watts was confronted with an insurance policy he sent to Plaintiffs on December 4, 2012, which he had referred to as Plaintiffs' "trump card." Contrary to Watts' earlier testimony, on this policy Defendants are, in fact, the named insureds. Moreover, as noted in Statement 35 above, this policy was fabricated.

48. Also, at his deposition Watts was asked about the "Chicago investor" group, a group of investors who Watts had told Plaintiffs about prior to the lawsuit. Watts testified that he had no idea who the "Chicago investor" group was. When confronted with a voicemail he had left for Plaintiffs however, wherein Watts can be plainly heard representing that he was waiting for a Chicago investor group to liquidate securities and raise funds to support the investment, Watts changed his story.

49. Also during his deposition, Watts talked about a meeting he had had with Chiefs "Alimamy Kamara" and "Ibrahim Kamara" in Africa to discuss the Plaintiffs' gold.

50. However, several months prior to the deposition, in response to the Plaintiffs' Request for Admissions, Watts had stated that he had never met in person with "Chief Alimamy Kamara" or with "Chief Ibrahim Kamara."

51. When confronted with the inconsistency during the deposition, Watts began to claim, for the first time, that there were multiple chiefs with the same name and that he would "have to make a phone call" to determine which was which.

52. On November 18, 2015, the United States Department of Justice ("DOJ") sent Defendant Watts a letter notifying him of a parallel criminal investigation and asserting that the gold investment was a fraudulent scheme. The DOJ letter instructs Watts to cease and desist from any further solicitations of funds or transfers of same to Africa for ostensible gold purchases.

53. Defendants did not at any time file any documents or reports whatsoever with the Securities and Exchange Commission relative to the sale of the investments to Plaintiffs.

54. At all relevant times, Plaintiffs had no way of knowing the truth about Watts' background and were never invited or permitted to communicate with any of Watts' alleged contacts in Africa. Plaintiffs' only source of information about the status of their investments was Watts.

<u>Fraud Claims</u>

"Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage."[15] To establish a claim for fraudulent misrepresentation, a plaintiff must show with particularity[16] that: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly;[17] (5) the plaintiff reasonably relied on the misrepresented fact; and (6) the plaintiff suffered damage as a result of the misrepresentation.[18] "[F]raud by its nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence."[19] A party asserting a fraud claim must show its elements by a preponderance of the evidence.[20]

In the present case, Plaintiffs have pointed to unrefuted evidence that Watts knowingly and/or recklessly misrepresented the material facts of Defendants' ability to supply gold to

---

[15] *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005) (citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001)).

[16] *See* Federal Rules of Civil Procedure Rule 9(b) which provides *inter alia* that claims of fraud must be stated with particularity ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")

[17] "Recklessness" means carelessness as to whether the facts are true or false or without belief in their truth. *Menuskin v. Williams*, 145 F.3d 755, 764-65 (6th Cir. 1998).

[18] *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 548 (Tenn. Ct. App. 2012). *See also McPherson v. Shea Ear Clinic,* 2007 WL 1237718 (Tenn. Ct .App. Jan. 18, 2007) (quoting *Metro. Gov't of Nashville and Davidson County v. McKinney,* 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992) *(citing Graham v. First Am. Nat'l Bank,* 594 S.W.2d 723, 725 (Tenn. Ct. App.1979))).

[19] *Edwards v. Travelers Ins. of Hartford*, 563 F.2d 105, 112 (6th Cir. 1977).

[20] *Elchlepp v. Hatfield*, 294 S.W.3d 146, 150 (Tenn. Ct. App. 2008).

Plaintiffs and his experience as a successful gold importer. Specifically, Watts misrepresented the fact that Defendants were "ready and able" to supply Plaintiffs with more than $5 million of gold from Africa, which was 91% pure and had a built-in 30% net profit, as part of an investment opportunity.[21] These statements were made orally and were also contained in documents called "Soft Corporate Offers" emailed by Watts to Plaintiffs.

Also, Watts falsely represented to Plaintiffs that he was an experienced gold importer.[22] Although Plaintiffs did not know it, at the time that Watts represented that he was an experienced gold importer, Watts had never successfully delivered gold to anyone else.[23]

Watts represented that the gold purchased by the Plaintiffs would be delivered into the United States as early as December 31, 2011.[24] In reliance on these representations, Plaintiffs wired millions of dollars to Defendants to be used to purchase the gold that Watts had described.[25]

On December 10, 2011, after Plaintiffs had initially invested $2 million, Watts sent Plaintiffs a schedule purportedly confirming Plaintiffs' gold purchases. Watts stated that by December 31, 2011, he and the "Chief" would be bringing in gold shipments with a total value of more than $23 million, which included Plaintiffs' gold. Days later, in reliance on Watts'

---

[21] (Facts, No. 2, ECF No. 138-2.)

[22] (*Id.*, No. 2-3.)

[23] (*Id.*, Nos. 10-20.) Defendants' history of failing to deliver gold promised to investors is evidence of that the representations made to Plaintiffs were false and were made with knowledge of their falsity and/or recklessly. *See U.S. v. Price*, 623 F.2d 587, 593 (9th Cir. 1980) (finding that defendant's use of fabricated excuses and misleading statements demonstrated that defendant had knowledge and intent to defraud).

[24] (*Id.*, No. 4.)

[25] (*Id.*, Nos. 25, 28, 32, 37.)

representations, Plaintiffs wired another $1 million to purchase more gold which would purportedly be part of the upcoming shipment.[26]  No gold was delivered then or ever.[27]

The deceptive excuses used by Watts to explain the delays in the delivery of Plaintiffs' alleged gold shipment are evidence of the fraudulent scheme. For example, according to Watts, he had flown to Africa to pick up the gold, but while en route, the owner of the chartered plane had learned of a coup in one of the African countries and ordered that the pilot divert the plane to a safer location. As a result, according to Watts, he was unable to pick up the gold shipment.[28]

Despite failing in December 2011, Watts continued to solicit additional funds from Plaintiffs for the purchase of more gold. When the promised gold continued not to be delivered, Watts sent articles to Plaintiffs purportedly from Ghanaian newspapers, with other documents, describing delays in the shipment caused by an alleged theft attempt and related criminal proceedings. In August 2012, Watts sent Plaintiffs additional documents and articles describing further alleged delays due to mechanical problems with the plane transporting the gold.[29]

After filing this lawsuit, Plaintiffs obtained the declaration of a reporter for one of the Ghanaian newspapers who testified that the articles sent by Watts were fraudulent. Watts during his deposition admitted that the articles were likely fabricated and that he may have known this as early as June 2012, but he nevertheless continued to forward articles and related documentation to Plaintiffs to explain the delays in the gold shipments.[30]

---

[26] (*Id.*, Nos. 26- 28.)

[27] (*Id.*, No. 6.)

[28]  (*Id.*, No. 29.)

[29]  (*Id.*, Nos. 30-31.)

[30]  (*Id.*, Nos. 32-34.)

Additionally, on December 4, 2012 Watts sent a purported insurance policy covering the gold which Watts called Plaintiffs' "trump card." The purported policy was issued by a London company known as "Ince & Co." After the filing of this lawsuit, Plaintiffs discovered that this document was fraudulent.[31]

From December 2012 through July 2013, Watts continued to give reports regarding the status of Plaintiffs' purported gold and the unsuccessful efforts to get the gold to the United States. Watts assured Plaintiffs that "the only way you lose in this is if you quit." Beginning in December 2011 and through 2012, Defendants sent statements to Plaintiffs purportedly showing Plaintiffs' gold purchases.[32] However, Defendants' bank records show that Watts was using Plaintiffs' funds to pay his own personal expenses, to invest $1 million in United States based investment accounts owned by Defendants, and to pay certain United States based individuals, not related to Plaintiffs' investment.[33] Further, Defendants sent the majority of the funds to a Nigerian bank's correspondent bank account.[34] Although the correspondent account was not titled in Defendants' names, Defendants control the account and use the funds for multiple business purposes, which do not include purchasing gold for the Plaintiffs.[35]

Plaintiffs have received no gold or return on their investment.[36]

---

[31]  (*Id.*, No. 35.)

[32]   (*Id.*, Nos. 38, 45.)

[33]  (*Id.*, Nos. 38-41.)

[34]  (*Id.*, No. 41.)

[35]  (*Id.*, Nos. 42-43.)

[36]  (*Id.*, Nos. 36-37.)

An action for fraud lies when, as here, a defendant misrepresents his ability to perform a service or to provide a product.[37] "[S]trong circumstantial evidence of fraud in a business context occurs when a defendant continues to offer merchandise or services with the knowledge that the defendant's business is insolvent, has defaulted on prior debts, or has left promises to previous customers unfulfilled."[38] Self-contradictory statements, such as those made by Watts regarding the purported gold investment, provide further evidence that Defendants perpetrated a fraudulent scheme.[39]

Because the undisputed evidence shows that all the elements of a fraud claim are present in this case, Plaintiffs are entitled to summary judgment on their fraud claim. Defendants made material representations concerning the investment scheme that were false,[40] and Watts knew they were false at the time he made them. Watts knew that he could not import such a large

---

[37] *See Gizzi v. Marinov*, 79 F.3d 1148 (6th Cir. 1996) (affirming fraud finding when defendant induced plaintiffs to invest by misrepresenting his ability to produce high quality gem stones - The district court relied, in part, on the fact that defendant had attempted a similar scheme with other investors and that, during the course of the scheme, one of those investors had confronted defendant prior to plaintiffs' investment, which was evidence that the defendant knew that his representations were false when he made them). *See also S.E.C. v. AIC, Inc.*, 2014 WL 3810667, at *1 (E.D. Tenn. 2014) (finding fraudulent investment scheme based on defendant's misrepresentations regarding ability to repay notes).

[38] Haddad, Jr., Frank E. and Wallace, Jerome E., "The Appeal of a Federal Mail Fraud Conviction," 42 *Am. Jur. Trials* § 1 (1991). *See also United States v. Kyle*, 257 F.2d 559, 563 (2nd Cir. 1958) (involving a mail fraud prosecution of subscription toy club that repeatedly solicited subscriptions with the knowledge that it could not supply the promised toys and that it was insolvent at the time).

[39] *C.f. U.S. v. Galasso*, 50 F. App'x 488, 489-90 (2d Cir. 2002) (defendant's "multiple contradicting statements" supported conviction for mail fraud).

[40] A fact is material if a reasonable person would attach importance to it in determining his action. *See Lowe v. Gulf Coast Dev., Inc.*, 1991 WL 220576 *8 (Tenn. Ct. App. 1991). The misrepresentations made by Watts are material because any reasonable investor would have attached importance to representations that Defendants were experienced gold importers and were "ready and able to supply" more than $5 million in pure gold from Ghana.

quantity of gold and/or acted with a reckless disregard as to whether he would be able to supply the gold that he told Plaintiffs he was "ready and able to supply." Defendant made these misrepresentations in order to induce Plaintiffs to invest, and Plaintiffs' decision to invest was based on Watts' purported background and his ability to produce gold

Additionally, Plaintiffs reasonably relied on the misrepresented facts,[41] and Plaintiffs suffered damages as a result. Plaintiffs were introduced to Watts by a longtime friend who had given good investment advice in the past, and the friend vouched for Watts. Plaintiffs had several phone calls with Watts before making their initial investments.[42] Plaintiffs' only source of information about the status of their investments was Watts.[43] Furthermore, other investors made similar investments with Watts.[44] It is undisputed that Plaintiffs suffered the loss of at least $5,293,500 as a direct result of Watts' fraudulent misrepresentation.[45] In addition, Plaintiffs never received the thirty percent benefit on their investment as promised to them by Watts.[46] Therefore, Plaintiffs have proven the elements of a fraudulent misrepresentation claim.

---

[41] Reasonable reliance is defined as "what would be reasonable for a prudent man to do under those circumstances." *Field v. Mans*, 516 U.S. 59, 63, (1995).

[42] (*Id.*, No. 6.)

[43] (*Id.*, No. 54.)

[44] (*Id.*, Nos. 10-19.)

[45] (*Id.*, No. 25.)

[46] (*Id.*, No. 37.)

<u>Conversion, Trover and Misappropriation Claims</u>

"A conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right."[47] "To be liable for conversion, the defendant 'need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so.'"[48] A party seeking to make out a prima facie case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights.[49] "Misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion."[50] When "the defendant is under an obligation to deliver specific money to the plaintiff and fails or refuses to do so, or when wrongful possession of it has been obtained by the defendant, there is a conversion for which trover lies."[51]

In the present case, the undisputed evidence shows that Defendants transferred Plaintiffs' funds to Defendants' own brokerage accounts and used the funds for Watts' personal expenses and for other unauthorized purposes without the knowledge or consent of Plaintiffs and without

---

[47] *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App.1977) (quoting *Barger v. Webb*, 216 Tenn. 275, 391 S.W.2d 664, 665 (1965)).

[48] *Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008) (quoting *Mammoth*, 569 S.W.2d at 836).

[49] *PNC Multifamily Capital,* 387 S.W.3d at 553.

[50] *Id.* at 553–54 (quoting 90 *C.J.S. Trover and Conversion* § 16 (2012)).

[51] *Id.*

giving Plaintiffs any benefit in return.[52] Accordingly, Plaintiffs are entitled to summary judgment on these claims.

Negligent Misrepresentation Claim

Plaintiffs contend that, "[t]o the extent this Court finds that Defendants are not liable for intentional misrepresentation,[53] they are liable for negligent misrepresentation."[54] Because the Court has found in favor of Plaintiffs on their intentional misrepresentation or fraud claim, the Court will deny summary judgment on this claim.

TCPA Claim

The TCPA provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages."[55] Though the TCPA does not define the terms "unfair" or "deceptive," the Tennessee Supreme Court has recognized that a deceptive act or practice is a material representation, practice, or omission likely to mislead a reasonable consumer.[56] This includes "the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment,

---

[52] (*Id.*, Nos. 34-35.)

[53] "Intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n. 1 (Tenn. 1999).

[54] (Pls' Memo., p. 15, ECF No. 138-2.)

[55] Tenn Code Ann. § 47-18-109(a)(1).

[56] See *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115-17 (Tenn. Ct. App. 2005). *See also Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997).

suppression or omission of such material fact."[57] A deceptive act is one that causes a consumer to believe what is false or that misleads a consumer as to a matter of fact. An act is unfair if it causes substantial injury.[58] Thus, to establish a TCPA claim, a plaintiff must prove that: (1) the defendant engaged in an unfair or deceptive act, and (2) the defendant's conduct caused an "ascertainable loss." If the defendant's conduct is willful, treble damages may be awarded.[59]

Here, as described above, Defendants made false representations to Plaintiffs in order to induce Plaintiffs to invest in a bogus gold scheme. Defendants' conduct was both deceptive and unfair within the meaning of the TCPA. Furthermore, Defendants' conduct warrants trebled damages because it was willful and knowing.

<u>Securities Claims</u>

1. Section 10(B) of the Securities and Exchange Act of 1934 and Rule 10b-5

Section 10(b) of the Act and Rule 10b–5 prohibit fraudulent, material misstatements in connection with the sale or purchase of a security.[60] A private right of action for violations exists when a plaintiff can demonstrate the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[61] In order to recover under § 10(b) and

---

[57] *Ganzevoort*, 949 S.W.2d at 299.

[58] *Id.*

[59] Tenn Code. Ann. § 47-18-109(a)(3).

[60] *Zaluski v. United Am. Healthcare Corp.,* 527 F.3d 564, 570 (6th Cir. 2008)

[61] *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148 (2008); *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007).

Rule 10b–5, a plaintiff must show both an omission or misstatement and its materiality.[62] Materiality can be established by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[63] An investment contract is a "security" for purposes of both the Securities Act and the Securities Exchange Act if the contract meets three criteria: (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others.[64]

As discussed previously, tt is undisputed that Watts knowingly and/or recklessly made untrue statements of material fact and omitted to disclose material facts. Plaintiffs relied on those misrepresentations in conjunction with their investment for the sale of a security within the meaning of the Act, and they suffered an economic loss as the result of their investment. Because Defendants' conduct operated as a fraud or deceit upon Plaintiffs in connection with the purchase or sale of a security, Plaintiffs are entitled to summary judgment against Defendants under § 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934.

2.   Section 20(A) of the Securities and Exchange Act of 1934

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

---

[62]   *Zaluski*, 527 F.3d at 571.

[63]   *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).

[64]   *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). Here, undisputed evidence shows that Plaintiffs' investment was a "security" because the contracts at issue involved the investment of money, there was a common enterprise in that the "funds of two or more investors" went into "a common pool from which all may benefit," *Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir. 1993), and Defendants' scheme promised profits as a result of Defendants' own efforts and the efforts of others in Africa.

person to whom such controlled person is liable."[65] In order to establish a violation under §

20(a), a plaintiff must prove a primary violation of federal securities laws and that the targeted

defendants exercised actual power or control over the primary violator.[66] Because it is

undisputed that Watts was in complete control of Indico, Watts is liable for Indico's conduct

which violated § 10(b) of the Act.

3. Section 12(1) of the Securities Act of 1933

Securities must be registered with the S.E.C. pursuant to 15 U.S.C. § 77e before any

person may sell or offer those securities. Section 12(1) [67] prohibits anyone from offering or

selling a security in violation of § 77e.[68] To recover under this section, Plaintiffs need only show

that the securities were unregistered.[69] Because Defendants did not register Plaintiffs'

investments,[70] Plaintiffs are entitled to summary judgment on this claim.

Breach of Contract Claim

To establish breach of contract under Tennessee law, Plaintiffs must prove: "(1) the

existence of a contract, (2) breach of the contract, and (3) damages which flow from the

---

[65] Section 12(1) is also violated if a person "offers or sells a security...by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements..." 15 U.S.C. § 77l(a)(2)d.

[66] *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 356 (W.D. Tenn. 2001).

[67] 15 U.S.C. § 77l(a)(1).

[68] 15 U.S.C.A. § 77e.

[69] *Riedel v. Acutote of Colorado*, 773 F. Supp. 1055, 1063 (S.D. Ohio 1991). *See also S.E.C. v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004), and *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980) (the Securities Act imposes strict liability on offerors and sellers of unregistered securities

[70] (Facts, No. 53, ECF No. 138-2.)

breach."[71]   The undisputed evidence as stated above shows that the agreements at issue were enforceable; Defendants breached the agreements by not delivering the promised gold and profit; and Plaintiffs suffered damages as a result. Plaintiffs are, therefore, entitled to summary judgment on the breach of contract claim.[72]

<u>Breach of Fiduciary Duty Claim</u>

"In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach."[73] "Fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence."[74]   A fiduciary has "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients."[75]

The undisputed facts show that Plaintiffs had confidence in Watts, who was acting on behalf of Plaintiffs. Watts breached his fiduciary duty by concealing his history of failure with

---

[71] *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996).

[72] The Court has not considered Watts' argument that the failure to consummate the gold transactions was the result of Plaintiffs' failure to satisfy contractual obligations because it is not properly before the Court. The doctrine of "first material breach" is an affirmative defense, and it is waived if not timely raised. *See Bash v. Laikin*, 2014 WL 3842884 at *14 (N.D. Ohio 2014) ("Because defendant did not raise this issue until just prior to the commencement of trial, defendant waived any argument in this regard.").

[73] *Ann Taylor Realtors, Inc. v. Sporup*, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2010).

[74] *Thompson v. Am. Gen. Life & Accident Ins. Co.*, 404 F. Supp.2d 1023, 1028 (M.D. Tenn. 2005) (citing *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992)).

[75] *S.E.C. v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985).

investors, by representing that he was "ready and able" to supply gold, and by misappropriating Plaintiffs' funds.[76]  Accordingly, Plaintiffs are entitled to summary judgment on the breach of fiduciary duty claim.

Negligence Claim

To establish a negligence claim, a plaintiff must show: (1) a duty of care owed by defendant, (2) a breach of this duty, (3) an injury or loss, (4) a cause-in-fact connection between the injury or loss and defendant's conduct, and (5) the existence of proximate or legal cause.[77] Here, Watts owed Plaintiffs a duty of care by virtue of his representations to them, his relationship with them, and his status as agent with regard to the ostensible gold transactions. Watts breached these duties by misrepresenting his history and qualifications and omitting material facts and by misusing Plaintiffs' funds. Plaintiffs have suffered damages as a proximate result. Therefore, they have shown that they are entitled to summary judgment on their negligence claim.

Fraudulent Transfer Claim

The elements of a fraudulent transfer claim are that (1) the creditor's claim arose before the transfer; (2) the debtor made a transfer for which it did not receive a reasonably equivalent value in exchange; and (3) the debtor was insolvent or rendered insolvent by the transfer.[78] It is undisputed that Plaintiffs' funds were wired to Indico and that Watts caused Indico to transfer funds to bank accounts from which Watts paid his own personal expenses and made other unauthorized expenditures. These transfers were made without Watts providing to Indico a fair

---

[76]  (Facts, No. 25, ECF No. 138-2.)

[77]  *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn.  2005).

[78]  *Stone v. Smile*, 2009 WL 4893563, *4 (Tenn. Ct. App. 2009); Tenn. Code Ann. § 66-3-306.

consideration and with the effect of rendering Indico insolvent. Plaintiffs are, therefore, entitled to summary judgment for these fraudulent transfers.

Summary and Conclusion

Plaintiffs have pointed to unrefuted evidence in the record showing that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law on all their claims except the claim for negligent misrepresentation. Accordingly, Plaintiffs' motion for summary judgment (ECF No. 138) is **GRANTED**.

The preliminary injunction previously granted to Plaintiffs is hereby **CONVERTED** to a permanent injunction.[79]

Based on the evidence presented, Plaintiffs will be awarded damages in the total amount of $22,232,700.[80] This amount includes the $5,293,500 that Plaintiffs invested with Defendants; $2,117,400 in pre-judgment interest at 10% per annum calculated from December 2011 as provided by the TCPA;[81] and treble damages in the amount of $14,821,800 under the TCPA.[82]

---

[79] *See* Order Grt'ing Mot. for Prelim. Inj., p. 1 (ECF No. 151) ("Plaintiffs' request for permanent injunctive relief shall be taken under advisement pending the final disposition of this matter.")

[80] Because Watts was, at all relevant times, an employee, agent, or servant of Indico and was acting both in his individual capacity as well as in his capacity as president, employee and/or agent of Indico and because he individually made all of the oral and written misrepresentations which form the bases for Plaintiffs' claims, he is personally liable Plaintiff's damages. *See Cooper v. Cordova Sand & Gravel Co.*, 485 S.W.2d 261, 272 (Tenn. Ct. App. 1971) ("If, however, a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby.")

[81] Pre-judgment interest may be awarded in the case of a violation of the TCPA. *Solomon v. Hager*, 2001 WL 1657214 (Tenn. Ct. App. 2001). *See also* Tenn. Code Ann. § 47-14-123 (Pre-judgment interest "may be awarded ... in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.") An award of prejudgment interest is within the sound discretion of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

[82] Although Plaintiffs have asked for both punitive and treble damages, Tennessee law prohibits Plaintiffs from obtaining treble damages under their TCPA claim and punitive damages on their

Plaintiffs are entitled to reasonable attorney's fees on their claim brought pursuant to the TCPA.[83]  Plaintiffs will have thirty (30) days from the entry of this order in which to file a motion for attorney's fees and costs. Defendants will then have thirty (30) in which to respond to Plaintiffs' motion.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  February 29, 2016.

---

common law claims "due to the punitive nature of the treble damages." *Branch Banking & Trust Co. v. Beams*, 2009 WL 113482 *2 (E.D. Tenn. Jan. 14, 2009) (citing *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 907 (Tenn. 1999)).  Plaintiffs have elected to seek treble damages rather than punitive damages.  (Pls' Memo., p. 1 n. 2, ECF No. 138-1.)

[83]  The TCPA provides that, "[u]pon a finding by the court that a provision of [the TCPA] has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs."  Tenn. Code Ann. § 47–18–109(e)(1).